# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CORPORATION FOR PUBLIC BROADCASTING,<br>    401 Ninth St., NW<br>    Washington, DC 20004 | ) ) ) ) ) |
| THE BOARD OF DIRECTORS OF THE CORPORATION FOR PUBLIC BROADCASTING,<br>    401 Ninth St., NW<br>    Washington, DC 20004 | ) ) ) ) ) ) |
| LAURA G. ROSS, in her Official Capacity as Member of the Board of Directors for The Corporation for Public Broadcasting,<br>    401 Ninth St., NW<br>    Washington, DC 20004 | ) ) ) ) ) ) ) |
| THOMAS E. ROTHMAN, in his Official Capacity as Member of the Board of Directors for The Corporation for Public Broadcasting,<br>    401 Ninth St., NW<br>    Washington, DC 20004 | ) ) ) ) ) ) ) |
| DIANE KAPLAN, in her Official Capacity as Member of the Board of Directors for The Corporation for Public Broadcasting,<br>    401 Ninth St. NW<br>    Washington, DC 20004 | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |

Case No.  2025-cv-1305

DONALD J. TRUMP, in his Official )
Capacity as President of the United )
States of America, 1600 Pennsylvania )
Avenue, NW Washington, DC 20500, )
)
TRENT MORSE, in his Official Capacity )
as Deputy Director of Presidential )
Personnel for the Executive Office of )
The President of the United States, )
   1600 Pennsylvania Ave. NW )
   Washington, DC 20500, )
   1650 17th St. NW, )
   Washington, DC 20006 )
)
UNITED STATES OFFICE OF )
MANAGEMENT AND BUDGET, )
   725 17th St., NW )
   Washington, DC 20503 )
)
RUSSELL VOUGHT, in his Official )
Capacity as Director of OMB, )
   1600 Pennsylvania Ave. NW )
   Washington, DC 20500, )
   1650 17th St. NW, )
   Washington, DC 20006 )
)
THE WHITE HOUSE PRESIDENTIAL )
PERSONNEL OFFICE )
   1600 Pennsylvania Ave NW )
   Washington, DC 20500 )
)
SERGIO GOR, in his Official Capacity )
as Director of the White House )
Presidential Personnel Office, )
   1600 Pennsylvania Ave. NW )
   Washington, DC 20500, )
   1650 17th St. NW, )
   Washington, DC 20006 )
)
   Defendants. )

## COMPLAINT

The Corporation for Public Broadcasting ("CPB"), a District of Columbia nonprofit corporation created by Congress in the Public Broadcasting Act of 1967 (the "Act"), 47 U.S.C. § 396, the entirety of the Board of Directors for CPB, and individual Board members Laura G. Ross, Thomas E. Rothman, and Diane Kaplan file this Complaint seeking a judicial declaration that an email dated April 28, 2025, purportedly from Trent Morse, Deputy Director of Presidential Personnel, to three of the Board members of CPB asserting that President Trump had purportedly terminated their positions on the Board is of no legal effect given that the President has no power to remove or terminate CPB's Board members. As set forth in the Act, government guidance, and well-established legal precedent, the CPB was created by Congress to expressly be "a private corporation [to] be created to facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control." *Id*. at § 396 (a)(10). To ensure that CPB was insulated from partisan governmental interference and control and ensure its autonomy, Congress expressly provided various protections, including that:

- **CPB is not a federal agency subject to the President's authority, but rather a private corporation**. *See Id*. at § 396(b) ("[CPB] will not be an agency or establishment of the United States Government. The Corporation shall be subject to the provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act.");

- **CPB's Board members are not officers of the United States, and thus are not within the removal provisions of Article II of the Constitution**. *See Id*. at § 396(d)(2) ("The members of the [CPB] Board shall not, by reason of such membership, be deemed to be officers or employees of the United States.");

- **CPB Board members cannot be affected, controlled, or disturbed by the actions of the government**. *See Id*. at § 398(c) (forbidding "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over [CPB] …");

- **CPB Board members forfeit their membership in only one scenario, not present here**. *See Id*. at § 396(e)(7) ("Members of the Board shall attend not less than 50 percent of all duly convened meetings of the Board in any calendar year. A member who fails to meet the requirement … shall forfeit membership.");

- **The Act omits the typical statutory provision when creating a federal agency that the Board members serve at the pleasure of the President**.

Indeed, the House Report accompanying the act carefully pointed out that the CPB must be "a nonprofit Corporation, directed by a Board of Directors, none of whom will be Government employees, [which] will provide the most effective insulation from Government control…" H.R.Rep.No.572, 90th Cong., 1st Sess. 15 (1967). Even the United States Government Manual, which has been published for over 80 years by the National Archives and Records Administration, itself being an executive agency, and which provides information on the agencies of the legislative, judicial, and executive branches, does not even mention the CPB anywhere among its listing of governmental and quasi-governmental agencies covering over 2,000 pages for the obvious reason that CPB is a private, non-profit corporation that is not subject to control by the Executive Branch.

It is not only Congress and government guidance that expressly excludes CPB from federal agency consideration, but the courts as well. The D.C. Circuit has explicitly recognized CPB's independence and non-government-entity status in affirming a D.C. District Court Opinion which found that 28 U.S.C. 1361 (the Mandamus Act) did not apply to CPB:

> CPB and PBS are not agencies of the United States and the members of the CPB Board of Directors are not Officers of the United States.  [47 USC 396(b)] specifically provides that CPB 'will not be an agency or establishment of the United States Government.'

*Network Project v. Corp. for Pub. Broad.*, 398 F. Supp. 1332, 1339 (D.D.C. 1975), *aff'd in relevant part*, 561 F.2d 963, 976 (D.C. Cir. 1977). *See also Community-Service Broadcasting of Mid-America, Inc. v. Fed. Communications Comm'n¸* 593 F.2d 1102, 1108-11 (D.C. Cir. 1978) (describing the CPB's founding and purpose, and quoting congressional reporting related to its

independence being a key component of CPB); *American Chemistry Council v. National Academy of Sciences*, 2024 WL 1141465 (D.D.C. March 15, 2024). This well-established precedent is not unique to the D.C. Circuit. The Supreme Court even recognized CPB's independent status when it relied on the statutory independence of CPB to invalidate a prior version of 47 U.S.C. § 399:

> The Act also established a second layer of protections which serve to protect stations from governmental coercion and interference.  Thus, in addition to requiring the Corporation to operate so as to 'assure maximum freedom [of local stations] from interference with or control of program content or other activities, the Act expressly forbids 'any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, ***or over the Corporation*** or any of its grantees or contractors . . . .'

*FCC v. League of Women Voters*, 468 U.S. 364, 389 (1984) (emphasis added) (citations omitted). As the Court noted, "the legislative history of the Public Broadcasting Act clearly indicates that Congress was concerned with 'assur[ing] complete freedom from any Federal Government influence.'"  *Id*. at 394.

As a result, Plaintiffs seek (1) a declaration that the email purporting to remove Plaintiffs Laura G. Ross, Thomas E. Rothman, and Diane Kaplan is of no legal effect; and (2) an Order that the Defendants take no actions to give effect to the purported email or otherwise seek to interfere with or control the governance and operations of the CPB.

## **Parties**

1. Plaintiff CPB is a District of Columbia nonprofit corporation created pursuant to the Public Broadcasting Act of 1967 (the "Act"), 47 U.S.C. § 396. CPB is the steward of the federal government's investment in public broadcasting and the largest single source of funding for public radio, television, and related online and mobile services.

2. Plaintiff The Board of Directors of the Corporation for Public Broadcasting is the duly-appointed and authorized Board of Directors of the CPB.

3. Plaintiff Laura G. Ross is a member of the Board of Directors for the CPB. Member Ross is suing in her official capacity as a member of the Board of Directors.

4. Plaintiff Thomas E. Rothman is a member of the Board of Directors for the CPB. Member Rothman is suing in his official capacity as a member of the Board of Directors.

5. Plaintiff Diane Kaplan is a member of the Board of Directors for the CPB. Member Kaplan is suing in her official capacity as a member of the Board of Directors.

6. Defendant Donald J. Trump is the President of the United States of America and is referenced in the e-mail which purports to remove three members of CPB's Board of Directors (the "Correspondence"). President Trump is being sued in his official capacity.

7. Defendant Trent Morse is the Deputy Director of Presidential Personnel for the Executive Office of the President and is responsible for sending the Correspondence. Mr. Morse is being sued in his official capacity.

8. Defendant United States Office of Management and Budget is an executive agency of the United States federal government and is responsible for assisting the President in meeting his policy, budget, management, and regulatory objectives.

9. Defendant Russel Vought is currently the Director of the Office of Management and Budget. Director Vought is being sued in his official capacity.

10. Defendant White House Presidential Personnel Office is responsible for recruiting, vetting, and nominating political appointees throughout the federal government.

11. Defendant Sergio Gor is currently the Director of the White House Presidential Personnel Office. Director Gor is being sued in his official capacity.

## Jurisdiction and Venue

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1651, 2201, and 2022, and because Plaintiff alleges violations of the Public Broadcasting Act of 1967, 47 U.S.C. § 396.

13. Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e), because at least one of Defendants is headquartered in Washington, D.C. and a substantial part of the events or omissions giving rise to CPB's claims occurred here.

## Factual Background

**The Establishment and Purpose of the Corporation for Public Broadcasting, A Private Non-Profit Corporation**

14. In 1967, Congress passed the Act, which was signed into law by President Lyndon B. Johnson. The Act was designed to set up public broadcasting in the United States and establish the CPB as a private nonprofit corporation, to steward congressionally appropriated funds and ensure universal access to non-commercial, high-quality content and services that educate, inform, foster curiosity, and promote civil discourse essential to American society.

15. Congress was prompted to enact the Act as a result of their express findings that:

> (1) it is in the public interest to encourage the growth and development of public radio and television broadcasting, including the use of such media for instructional, educational, and cultural purpose;

> (2) it is in the public interest to encourage the growth and development of nonbroadcast telecommunications technologies for the delivery of public telecommunications services;

> (3) expansion and development of public telecommunications and of diversity of its programming depend on freedom, imagination, and initiative on both local and national levels…

(5) it furthers the general welfare to encourage public telecommunications services which will be responsive to the interests of people both in particular localities and throughout the United States, and which will constitute an expression of diversity and excellence….

(7) **a private corporation should be created to facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control**.

47 U.S.C. § 396(a) (emphasis added).

16. Congress made it clear that CPB was "a private corporation [to] be created to facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control." *Id*. at § 396 (a)(10). To ensure that CPB was insulated from partisan governmental interference and control and ensure its autonomy, Congress expressly provided various protections, including that:

- "[CPB] will not be an agency or establishment of the United States Government. The Corporation shall be subject to the provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act." *Id*. at § 396(b);

- "The members of the [CPB] Board shall not, by reason of such membership, be deemed to be officers or employees of the United States." *Id*. at § 396(d)(2);

- The Act expressly forbids "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over [CPB] or any of its grantees or contractors…" *Id*. at § 398.

17. Moreover, the Act allows and encourages CPB to solicit financial support from the public:

- To carry out the foregoing purposes and engage in the foregoing activities, [CPB] shall have the usual powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act. Id. at § 396(f)(3).

- [CPB] must maintain existing, and stimulate new, sources of non-Federal financial support for stations by providing incentives for increases in such support. Id. at § 396(k).

18. Establishment of the CPB and the statutory scheme of the Act were a product of a Congressional determination that strong safeguards were necessary to ensure that federal funding of programming did not carry with it any political influence on the contents of that programming. Thus, the Senate Report accompanying the Act carefully pointed out:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs. It is also recognized that this assistance should in no way involve the Government in programming or program judgments. An **independent** entity supported by Federal funds is required to provide programs **free of political pressures**. The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.
>
> Your committee has heard considerable discussion about the fear of Government control or interference in programming if S. 1160 is enacted. We wish to state in the strongest terms possible that it is our intention that local stations be absolutely free to determine for themselves what they should or should not broadcast. As President Johnson said in his message of February 28: 'Noncommercial television and radio in America, even though supported by Federal funds, must be absolutely free from any Federal Government interference over programming.'

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967).

19. The same theme was echoed in the House Report on the Act:

> How can the Federal Government provide a source of funds to pay part of the cost of educational broadcasting and not control the final product? That question is answered in the bill by the creation of a nonprofit educational broadcasting corporation.
>
> Every witness who discussed the operation of the Corporation agreed that funds for programs should not be provided directly by the Federal Government. ***It was generally agreed that a nonprofit Corporation, directed by a Board of Directors, none of whom will be Government employees, will provide the most effective insulation from Government control or influence over the expenditure of funds***.

H.R.Rep.No.572, 90th Cong., 1st Sess. 15 (1967) (emphasis added).

20. Put simply, Congress conceived CPB as a vehicle for infusing federal money into public broadcasting without the introduction of government direction or control, with Congress reserving for itself the oversight responsibility for the CPB by, among other things, controlling the appropriations for CPB and public broadcasting. Moreover, Congress protected the CPB from the executive branch by withholding from CPB any form, pure or quasi, of legislative, judicial, or regulatory power.

21. Indeed, in the course of its business, CPB has no ability to regulate any aspect of public media, resolve disputes among stations, dictate content of public media stations, or render any form of judgment over any other entity or organization. CPB does not, and cannot, infringe on or aid the executive branch's ability to carry out or implement the laws. By way of limited example, CPB:

- Does not have any *ex officio* governmental members on its Board;

- Has a board that is required to be divided by party;

- Is not subject to Freedom of Information Act requests;

- Is not designated as or referred to as a federal entity under any other statute;

- Does not and cannot issue any regulations;

- Does not and cannot regulate or adjudicate disputes between public radio and television stations and members of the public;

- Is forward-funded for two years (that is, appropriations made, for example, in 2025 are for its 2027 fiscal year);

- Receives its funds directly from the Treasury and not through any governmental department or agency;

- Is not subject to the jurisdiction of any other governmental department or agency with regard to its directly appropriated funds;

- Is prohibited from making content or dictating content to any station;

- Is not required to attend frequent oversight hearings in front of Congress, aside from CPB's annual request for appropriations; and

- Does not receive instructions for day-to-day operations from any political branch.

22. The United States Government Manual, which has been published for over 80 years by the National Archives and Records Administration, describes itself as the "official handbook" of the Federal Government and provides information on the agencies of the legislative, judicial, and executive branches. It also includes information on quasi-official agencies; international organizations in which the United States participates; and boards, commissions, and committees. *See* https://www.usgovernmentmanual.gov. However, the United States Government Manual does not even mention the CPB anywhere among its listing of governmental and quasi-governmental agencies covering over 2,000 pages. This is consonant with other federal statutes defining "executive departments," "government corporation," and "executive agency," none of which identify the CPB or apply to the CPB. *See* 5 U.S.C. §101 (setting forth those entities qualifying as executive departments, not including CPB); 5 U.S.C. § 103 (defining "government corporation" as a "corporation owned or controlled by the Government of the United States"); 5 U.S.C. § 105 (defining "executive agency" as "an executive department, a Government corporation").

**The Non-partisan Structure of CPB and the Statutory Provisions Regarding the Appointment and Removal of Board Members**

23. In the Act, Congress mandated that CPB's Board of Directors consist of nine members, initially appointed by the President, by and with the advice and consent of the Senate. 47 U.S.C. § 396(c)(1). A full Board term runs for six years, with the President nominating

Board members for vacancies. *Id.* at § 396(c)(5). The Board, in turn, appoints CPB's president and the chief executive officer, who then names the other corporate officers. *Id.* at § 396(e)(1).

24. Congress wrote the Act without providing the President with any authority to remove a Board member, with or without cause. Congress communicated this intent in five ways.

25. First, Congress made clear that CPB is not a federal agency subject to the President's authority, but rather a private corporation:

> [CPB] will not be an agency or establishment of the United States Government. The Corporation shall be subject to the provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act. *Id.* at § 396(b).

26. Second, Congress clarified that the Board Members are not officers of the United States, and thus are not within Article II's removal provisions:

> [T]he members of the Board shall not, by reason of such membership, be deemed to be officers or employees of the United States. *Id.* at § 396(d)(2).

27. Third, the Act mandates that Board members cannot be affected or otherwise controlled or disturbed by the actions of the government, forbidding:

> [A]ny department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over [CPB] or any of its grantees or contractors…. *Id.* at § 398.

28. Fourth, Congress included only one mechanism through which a Board member can be removed:

> Members of the Board shall attend not less than 50 percent of all duly convened meetings of the Board in any calendar year. A member who fails to meet the requirement of the preceding sentence shall forfeit membership and the President shall appoint a new member to fill such vacancy not later than 30 days after such vacancy is determined by the Chairman of the Board. *Id.* at § 396(e)(7).

29. Fifth, Congress omitted the statutory provision, which appears in many statutes establishing a federal agency, that Board members serve at the pleasure of the President. In

fact, aside from the members' statutory instructions to serve as stewards of specific congressional appropriations, Congress never mandated that the Board members serve at the pleasure of anyone, including the President. Instead, the only related provision is that all of CPB's officers shall serve at the pleasure of the Board. *Id*. at § 396(e)(1).

30. When appointing a member of the Board, the President is required to select individuals so as to "provide as nearly as practicable a broad representation of various regions of the Nation, various professions and occupations, and various kinds of talent and experience appropriate to the functions and responsibilities of the Corporation." *Id*. at § 396(c)(2).

31. Moreover, Congress' intent was to establish CPB as an independent, non-partisan corporation. As such, the Act mandates that "no more than 5 members of the Board appointed by the President may be members of the same political party." *Id*. at § 396(c)(1). In addition, Congress required that the CPB "may not contribute to or otherwise support any political party or candidate for elective public office." *Id*. at § 396(f)(3).

32. All of the above provisions were included to ensure CPB's independence, protection from government obstruction that hinders its mission, the application of specific expertise, and its ability to provide freedom of expression to public broadcasters in the United States. For this very reason, over the last forty-five years, Congress has consistently supported two-year advance appropriations to insulate CPB from politically motivated interference with programming.

33. As the House Commerce Committee report accompanying the 1975 bill related to Public Broadcasting Financing Act of 1975 stated, advance funding "would go a long way toward eliminating both the risk of and the appearance of undue interference with and control of public broadcasting and will minimize the possibility of any government scrutiny of or

influence on programming that might occur in the course of the usual annual budgetary, authorization, and appropriation process." *See* House Report 94-245, Part 1 (House Committee on Interstate and Foreign Commerce) to accompany H.R. 6461, The Public Broadcasting Financing Act of 1975 (Public Law 94-192).

**The Email Purporting to Terminate Three Members of the Board of Directors for CPB**

34. On April 28, 2025, three members of the Board of Directors for CPB – Laura G. Ross, Diane Kaplan, and Thomas E. Rothman – received an email from Trent Morse, the Deputy Director of Presidential Personnel for the Executive Office of the President, purporting to notify the board members that their positions on the Board of Directors for CPB were terminated.

35. The Correspondence stated, in full:

> On behalf of President Donald J. Trump, I am writing to inform you that your position on the Corporation for Public Broadcasting is terminated effective immediately.
>
> Thank you for your service.

36. The Correspondence did not identify the authority with which the President was purporting to terminate the Board members.

**The Administration's Recent Pattern of Unlawful Removal of Board Members and Illegal Invasion of Privately Owned Property**

37. The credible and urgent threats facing CPB, as a result of the Correspondence are not speculative or theoretical. To the contrary, such threats are well-grounded in the administration's recent terminations of board members at other congressionally-created organizations.

38. By way of limited example, the United States Institute of Peace ("USIP") serves as an example for the threat currently facing CPB. *See U.S. Institute of Peace, et. al. v. Jackson*,

No. 1:25-cv-00804 (D.D.C. Mar. 18, 2025). On February 19, 2025, the President issued Executive Order 14217, which purported to classify USIP – a statutorily independent, congressionally chartered nonprofit – as part of the federal bureaucracy. Within weeks, the administration attempted to remove Senate-confirmed board members without statutory cause or consultation, in violation of 22 U.S.C. § 4605(f).

39. On March 17, 2025, federal agents and Department of Government Efficiency ("DOGE") staff forcefully entered and seized control of USIP's headquarters. *Jackson*, No. 1:25-cv-00804, Exhibit A to ECF No. 2, Plaintiff's Motion for TRO, at ¶ 2.

40. The government's agents ousted USIP's president and staff, accessed secure computer systems, and initiated actions to dismantle USIP's core operations. *Jackson*, No. 1:25-cv-00804, ECF No. 2, Plaintiff's Motion for TRO, at 2.

41. Judge Howell of the U.S. District Court for the District of D.C. in the USIP case noted that the "records and property destruction, and defendants' threatening and aggressive confrontation, involving the deployment of law enforcement officers from three different agencies, in interactions with employees at the U.S. Institute of Peace [was] deeply troubling." *Jackson*, No. 1:25-cv-00804, Minute Order entered March 19, 2025.

**The Termination of CPB Board Members and/or the Invasion of CPB's Private Property Will Cast Irreparable Harm Upon Plaintiffs**

42. Unless Defendants are enjoined from continuing, and further initiating, these actions against CPB, Plaintiffs will suffer a variety of irreparable harms.

43. These harms include the frustration of CPB's mission and statutory obligations, ultra vires actions taken by unlawfully installed officials, the exposure of attorney-client privileged documents and sensitive operational and personal information, the permanent destruction

of documents and other real property, the loss of goodwill and public trust, chilled speech, and possible destruction of the CPB itself.

**Claims for Relief**

**Count I**
**Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202**

44. CPB restates and realleges all paragraphs above as if fully set forth here.

45. Plaintiff is entitled to declaratory relief on the basis of all claims identified. There is substantial and ongoing controversy between Plaintiff and Defendants, which creates confusion among CPB's staff, external partners, and the public regarding who has the authority to control and direct actions of the Institute. A declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that CPB's Board members, whom the President of the United States has illegally attempted to remove, lawfully remain members of the CPB's Board of Directors.

46. Moreover, a Declaratory Judgment is needed to protect the CPB from the exact type of government interference that Congress deliberately and explicitly sought to preserve. Indeed, the Correspondence violates the CPB's legislative structure by undermining CPB's structure and autonomy in one sweeping act of executive overreach.

47. Accordingly, a Declaratory Judgment is required to resolve the controversy and affirm the rights and responsibilities of the parties under the Constitution, the Administrative Procedure Act, and the Public Broadcasting Act.

**Count II**
**Violation of the Administrative Procedure Act**
**Not in Accordance with Law/In Excess of Statutory Authority**

48. CPB restates and realleges all paragraphs above as if fully set forth here.

49. The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A). In addition, the APA requires that a reviewing court must hold unlawful and set aside agency actions that are found to be "in excess of statutory jurisdiction, authority, or limitations." *Id*. at § 706(2)(C).

50. In purporting to terminate three Board members of CPB, Defendants are acting unlawfully and in excess of their statutory authority in at least four ways.

51. First, when Congress created the CPB, it stated clearly that the CPB is not "an agency or establishment of the United States Government."  47 USC 396(b).

52. Second, while the Act set forth responsibilities of the President in appointing Board Members, the Executive Branch's authority ends there. *Id*. at § 396(a) ("[CPB] should be created to facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control.").  The President has no further statutory authority over the CPB.

53. Third, Congress mandated that "[t]he members of the Board shall not, by reason of such membership, be deemed to be officers or employees of the United States."  *Id*. at 396(d)(2).

54. Fourth, Congress did consider removal mechanisms, and limited removal to only one scenario by which a Board member can be removed – when such a member attends less than 50 percent of all duly convened board meetings of the Board in any calendar year. *Id*. at § 396(e)(7).

55. In purporting to terminate Board members of CPB, Director Morse is exceeding the authority provided to the President and his agencies with respect to the CPB.  Any federal agency control over CPB is expressly forbidden by statute. 47 U.S.C. § 398(a).

56. Accordingly, Defendants' actions are both are not in accordance with law and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

**Count III**
**Violation of Separation of Powers/Ultra Vires Presidential Action**

57. CPB restates and realleges all paragraphs above as if fully set forth here.

58. The Constitution vests exclusive power over federal spending and lawmaking with Congress; the Constitution likewise requires the Executive branch to faithfully execute the law. These distinct roles of the co-equal branches of government are of critical importance, and "the carefully defined limits on the power of each Branch must not be eroded." *I.N.S. v. Chadha*, 462 U.S. 919, 958 (1983).

59. The separation of powers doctrine thus represents perhaps the central tenet of our constitution, see, e.g., *Trump v. U.S.*, 603 U.S. 593, 637-38 (2024), and consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

60. Congress has exercised its Article I legislative power to curate a specific governance and operational structure for CPB, one that does not allow the President to remove Board members at his discretion.

61. Defendants' actions unlawfully usurp congressional legislative authority, including by ignoring and running counter to the mandates outlined in the Act as to the appointment and removal of Board Members.

62. Moreover, Article II of the Constitution limits the President's powers to those enumerated. Article II provides no authority to the President over the internal operations of private corporations.

63. Accordingly, the Correspondence is unconstitutional because it violates the Constitution's Separation of Powers and is an ultra vires exercise of power which the President is not authorized to undertake.

**Count IV**
**Violation of the Presentment, Appropriations, and Take Care Clauses**

64. CPB restates and realleges all paragraphs above as if fully set forth here.

65. The Presentment Clause of the U.S. Constitution provides that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States." U.S. Const. Art. I, Sec. 7, Clause 2; *I N S v. Chadha*, 462 U.S. 919, 946 (1983). "Our Constitution gives Congress control over the public fisc." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024); *see also id.* at 431 ("By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement. It was uncontroversial that the powers to raise and disburse public money would reside in the Legislative Branch."). The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I, Sec. 7. The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. U.S.*, 301 U.S. 308, 321 (1937)). The Take Care Clause provides that the executive must "take Care that the Laws be faithfully executed...." U.S. Const. Art. II, Sec. 3, Clause 3.

66. No provision of the United States Constitution authorizes the executive to enact, amend, or repeal statutes, including appropriations approved by Congress and signed into law by

the President. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* at 438.  "Although the Constitution expressly authorizes the President to play a role in the process of enacting statutes, it is silent on the subject of unilateral Presidential action that either repeals or amends parts of duly enacted statutes."  *Id*. at 439.

67. "There are powerful reasons for construing constitutional silence on this profoundly important issue as equivalent to an express prohibition."  *Id*.  "Our first President understood the text of the Presentment Clause as requiring that he either approve all the parts of a Bill, or reject it in toto."  *Id*. at 440 (quotations and citations omitted).

68. The PBA was presented to President Lyndon B. Johnson in 1967, and signed by him pursuant to the Article I, § 7 of the U.S. Constitution.  Congress knows how to do this— indeed, both section 396 and 398 have been amended as recently as March 23, 2018, which amendment President Trump signed into law.  Public Law 115-41 (March 23, 2018).  The President cannot today unilaterally change those prior decisions of prior Congresses and prior Presidents.

69. The executive also cannot unilaterally amend or cancel appropriations that Congress has duly enacted. *See Train v. City of New York*, 420 U.S. 35, 38, 44 (1975); *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); 2 U.S.C. § 683 (requiring the President to transmit proposed rescissions of budget authority to Congress for approval and requiring "any amount of budget authority proposed to be rescinded" to be made available for obligation unless and until Congress approves the rescission within 45 days).

70. The Correspondence constitutes a partial, unilateral repeal or amendment of the Act by the President, an action which he has no authority to take without Congress effecting the repeal through legislation.

71. Plaintiffs are entitled to a declaration that the Executive Order violates the Presentment, Appropriations, and Take care Clauses of the U.S. Constitution, and an Order enjoining the President and the defendants from taking any action to interfere in the internal operations of the CPB.

**Prayer for Relief**

WHEREFORE, plaintiffs pray that this Court:

a.  Declare that the email purporting to remove Plaintiffs Laura G. Ross, Thomas E. Rothman, and Diane Kaplan is of no legal effect because the President does not have the authority to take such an action;

b.  Issue a Temporary Restraining Order prohibiting the Defendants from taking any action which gives effect to the Correspondence or otherwise seeks to interfere with or control the governance and operations of CPB.

c.  Award CPB its costs, reasonable attorney's fees, and other disbursements as appropriate; and

d.  Grant such other relief as the Court deems necessary, just, and proper.

Date:  April 29, 2025

By:  */s/ Jason W. McElroy*
Jason W. McElroy (D.C. Bar No. 502733)
Peter C. Nanov (D.C. Bar No. 230021)
SAUL EWING LLP
1919 Pennsylvania Avenue NW, Suite 550
Washington, D.C. 20006
Tel: (202) 295-6605
Email:  jason.mcelroy@saul.com
           peter.nanov@saul.com

Jeffrey S. Robbins (*Pro Hac Vice forthcoming*)
Joseph D. Lipchitz (*Pro Hac Vice forthcoming*)
SAUL EWING LLP
131 Dartmouth St., Suite 501
Boston, MA 02116
Tel:  (617) 912-0941
Email: jeffrey.robbins@saul.com
           joseph.lipchitz@saul.com

***Counsel for Plaintiffs***