# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE CORPORATION FOR PUBLIC BROADCASTING, *et al.* | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.    2025-cv-1305 |
| DONALD J. TRUMP, in his Official Capacity as President of the United States of America, *et al.* | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS THE CORPORATION FOR PUBLIC BROADCASTING, THE BOARD OF DIRECTORS FOR CORPORATION FOR PUBLIC BROADCASTING, LAURA G. ROSS, THOMAS E. ROTHMAN, AND DIANE KAPLAN'S MEMORANDUM IN SUPPORT OF ITS MOTION <u>FOR A TEMPORARY RESTRAINING ORDER</u>**

# **TABLE OF CONTENTS**

**FACTUAL BACKGROUND** ................................................................ 3

**STANDARD OF REVIEW** ................................................................ 7

**ARGUMENT** ................................................................................ 8

   I.   CPB Is Likely To Succeed On The Merits Of Its Claim ................................. 8

      A.  The President Has No Authority Over the CPB ............................. 9

      B.  The Purported Terminations Overstep The President's Article II Authority ................................................................................ 13

      C.  Executive Agencies Have No Authority Over Cpb Or Its Board Of Directors ................................................................................ 16

      D.  The Agencies' Actions are Final Agency Actions ......................... 18

   II.  CPB And Its Board Will be Irreparably Harmed Without a TRO ............... 19

   III.  The Public Interest and the Balance of Equities Favor The Entry of A Temporary Restraining Order ..................................................... 22

   IV.  The Court Should Impose No Bond Requirement on CPB .......................... 25

**CONCLUSION** ............................................................................ 26

Early on the morning of April 28, 2025, Defendant Trent Morse, on behalf of President Donald J. Trump, sent three separate emails to Plaintiffs Thomas Rothman, Laura Ross, and Diane Kaplan, purporting to terminate them from their positions as members of Plaintiff the Corporation for Public Broadcasting's (the "CPB") Board of Directors, doing so in direct violation of the Public Broadcasting Act of 1967, 47 U.S.C. § 396 (the "Act"), caselaw, and the Separation of Powers inherent in the U.S. Constitution.  Indeed, under the Act, Congress made it clear that it the CPB is a ***private*** corporation,  over whom the President has no authority save the ability to nominate members of the Board of Directors, with the advice and consent of the Senate.  Congress underscored this point with clear and unambiguous language that:

- "[CPB] will not be an agency or establishment of the United States Government. The Corporation shall be subject to the provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act." 47 U.S.C § 396(b);

- "[T]he members of the Board shall not, by reason of such membership, be deemed to be officers or employees of the United States." *Id*. at § 396(d)(2); and

- It forbids "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over [CPB] or any of its grantees or contractors…" *Id*. at § 398.

The Act and the legislative history makes it clear that CPB was created in this way, **precisely** to prevent governmental control or influence over its operations.  As the House report on the Act reflects:

How can the Federal Government provide a source of funds to pay part of the cost of educational broadcasting and not control the final product?

1

That question is answered in the bill by the creation of a nonprofit educational broadcasting corporation.

Every witness who discussed the operation of the Corporation agreed that funds for programs should not be provided directly by the Federal Government. It was generally agreed that a nonprofit Corporation, directed by a Board of Directors, **none of whom will be Government employees, will provide the most effective insulation from Government control or influence over the expenditure of funds**.

H.R.Rep.No.572, 90th Cong., 1st Sess. 15 (1967).  Moreover, the D.C. Circuit has explicitly recognized CPB's independence and non-government-entity status, ruling:

CPB and PBS are not agencies of the United States and the members of the CPB Board of Directors are not Officers of the United States.  [47 USC 396(b)] specifically provides that CPB 'will not be an agency or establishment of the United States Government.

*Network Project v. Corp. for Pub. Broad.*, 398 F. Supp. 1332, 1339 (D.D.C. 1975), *aff'd in relevant part*, 561 F.2d 963, 976 (D.C. Cir. 1977).

By the *ultra vires* act purporting to terminate three of its Board members, the defendants have attempted to bring the board below a quorum and otherwise interfere with its corporate governance, which Congress expressly sought to prevent. As a result, CPB, its unanimous Board, and the individual board members purportedly "terminated" bring this action and motion to prevent further interference with their internal governance, operations, and duties.  Because the President has no authority, either statutory or constitutional, over the CPB, his attempt to terminate its board members is ultra vires.  Plaintiffs request a temporary restraining order against the Defendants, preventing them from taking any further actions to interfere with the internal governance and operations of the CPB, a private non-profit corporation.

2

## FACTUAL BACKGROUND

CPB is a nonprofit corporation created pursuant to the Public Broadcasting Act of 1967 and is the steward of the federal government's investment in public broadcasting.  *See* 47 U.S.C. § 396; Compl. ¶ 1.  CPB is the steward of the federal government's investment in public broadcasting and the largest single source of funding for public radio, television, and related online and mobile services.  Compl. ¶ 1.  The PBA was designed to set up public broadcasting in the United States and established the CPB as a private nonprofit corporation, to steward congressionally appropriated funds and ensure universal access to non-commercial, high-quality content and services that educate, inform, foster curiosity, and promote civil discourse essential to American society.  Compl. ¶ 9.

When it created the CPB, Congress set forth express findings as to its reasons for doing so, including:

> (1) it is in the public interest to encourage the growth and development of public radio and television broadcasting, including the use of such media for instructional, educational, and cultural purpose;

> (2) it is in the public interest to encourage the growth and development of nonbroadcast telecommunications technologies for the delivery of public telecommunications services;

> (3) expansion and development of public telecommunications and of diversity of its programming depend on freedom, imagination, and initiative on both local and national levels…

> (5) it furthers the general welfare to encourage public telecommunications services which will be responsive to the interests of people both in particular localities and throughout the United States, and which will constitute an expression of diversity and excellence….

3

> (7) **a <u>private</u> corporation should be created to facilitate the development of public telecommunications and <u>to afford maximum protection from extraneous interference and control</u>**.

47 U.S.C. § 396(a) (emphasis added).  Congress emphasized that CPB was to be "a ***<u>private</u>*** corporation [to] be created to facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control."  *Id.* at § 396 (a)(10).

Congress expressly noted that the CPB "will not be an agency or establishment of the United States Government."  *Id.* at § 396(b).  Moreover, "[t]he members of the [CPB] Board shall not, by reason of such membership, be deemed to be officers or employees of the United States."  *Id.* at § 396(d)(2).  To insulate it from partisan gamesmanship, Congress expressly forbade "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over [CPB] or any of its grantees or contractors…" *Id.* at § 398.

Establishment of the CPB and the statutory scheme of the PBA were a product of a Congressional determination that strong safeguards were necessary to ensure that federal funding of programming did not carry with it any political influence.  Thus, the Senate Report accompanying the Act noted:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs.  It is also recognized that this assistance should in no way involve the Government in programming or program judgments.  An **<u>independent entity</u>** supported by Federal funds is required to provide programs **<u>free of political pressures</u>**.  The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.

> Your committee has heard considerable discussion about the fear of Government control or interference in programming if S. 1160 is enacted. We wish to state in the strongest terms possible that it is our intention that local stations be absolutely free to determine for themselves what they should or should not broadcast. As President Johnson said in his message of February 28: 'Noncommercial television and radio in America, even though supported by Federal funds, must be absolutely free from any Federal Government interference over programming.'

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967) (emphasis added). The House report

on the bill expressed similar concerns:

> How can the Federal Government provide a source of funds to pay part of the cost of educational broadcasting and not control the final product? That question is answered in the bill by the creation of a nonprofit educational broadcasting corporation.

> Every witness who discussed the operation of the Corporation agreed that funds for programs should not be provided directly by the Federal Government. It was generally agreed that a nonprofit Corporation, directed by a Board of Directors, **none of whom will be Government employees, will provide the most effective insulation from Government control or influence over the expenditure of funds**.

H.R.Rep.No.572, 90th Cong., 1st Sess. 15 (1967) (emphasis added).

While Congress required that the President nominate members of the CPB's

Board of Directors, he must do so with the advice and consent of the Senate. 47 U.S.C.

396(c). But Congress gave the President no authority to remove anyone from the

CPB—sensibly, because the CPB was created as a private corporation, and not part

of the government. Instead, Congress created only one way to remove directors, other

than through the normal operation of District of Columbia law governing non-profits:

by failing to attend "less than 50 percent of all duly convened meetings of the Board

in any calendar year[,]" a board member "shall forfeit membership and the President

shall appoint a new member to fill such vacancy not later than 30 days after such vacancy is determined by the Chairman of the Board."  47 U.S.C. § 396(e)(7). Congress also omitted any statutory provision stating that Board members serve at the pleasure of the President. Instead, the only related provision is that all of CPB's officers shall serve at the pleasure of the Board. Id. at § 396(e)(1).

The Executive Branch has no oversight or involvement in the operations of CPB.  Indeed, the United States Government Manual, which has been published for over 80 years by the National Archives and Records Administration, itself being an executive agency, in the Federal Register, describes itself as the "official handbook" of the Federal Government and provides information on the agencies of the legislative, judicial, and executive branches. It also includes information on quasi-official agencies; international organizations in which the United States participates; and boards, commissions, and committees. *See* https://www.usgovernmentmanual.gov.  However, the United States Government Manual does not even mention the CPB anywhere among its listing of governmental and quasi-governmental agencies covering over 2,000 pages.  This is consonant with other federal statutes defining "executive departments," "government corporation," and "executive agency," none of which identify the CPB or apply to the CPB.  *See* 5 U.S.C. §101 (setting forth those entities qualifying as executive departments, not including CPB); 5 U.S.C. § 103 (defining "government corporation" as a "corporation owned or controlled by the Government of the United States"); 5 U.S.C. § 105

6

(defining "executive agency" as "an executive department, a Government corporation").

On April 28, 2025, three members of the Board of Directors for CPB – Laura G. Ross, Diane Kaplan, and Thomas E. Rothman – received an email from Trent Morse, the Deputy Director of Presidential Personnel for the Executive Office of the President, purporting to notify the board members that their positions on the Board of Directors for CPB were terminated. The Correspondence stated, in full:

> On behalf of President Donald J. Trump, I am writing to inform you that your position on the Corporation for Public Broadcasting is terminated effective immediately.
>
> Thank you for your service.

The Correspondence did not identify the authority with which the President was purporting to terminate the Board members.

## STANDARD OF REVIEW

The "underlying purpose" of a temporary restraining order is "preserving the status quo and preventing irreparable harm" until the Court has an opportunity to rule on the merits. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).[1]  A motion for a

---

[1] *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011) ("The court may issue a temporary restraining order ('TRO') when a movant is faced with the possibility that irreparable injury will occur even before the hearing for a preliminary injunction required by Federal Rule of Civil Procedure 65(a) can be held."); *Elec. Data Sys. Fed. Corp. v. Gen. Servs. Admin.*, 629 F. Supp. 350, 352 (D.D.C. 1986) ("In the context of the limited purpose of a temporary restraining order, the Court's analysis of these factors seeks principally to ensure preservation of the status quo.").

temporary restraining order should be granted when the movant carries the burden of persuasion. *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021). The court may accept as true well-pleaded allegations in the complaint and uncontroverted affidavits. *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976)).

To obtain a temporary restraining order, "the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) that the moving party would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Aviles-Wynkoop v. Neal*, 978 F. Supp 2d 15, 21 (D.D.C. 2013). "When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

## **ARGUMENT**

### I.    **CPB Is Likely To Succeed On The Merits Of Its Claim**

CPB seeks a TRO pursuant to its claims under the Constitution and the Administrative Procedure Act. Both claims will prevail for the same reason: the President has no constitutional or statutory authority whatsoever with respect to the CPB. As a result, the Correspondence is null, illegal and unenforceable, and any action taken by the defendants to enforce them is contrary to law, and without authority.

The Supreme Court has "long held" that federal courts may grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Center, Inc.*¸ 575 U.S. 320, 326-27 (2015). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* at 327.

The APA entitles "a person suffering legal wrong because of any agency action" to seek "judicial review thereof." 5 U.S.C. § 702. "The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). More specifically, and relevant to the claims in the current matter, the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be: [1] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or 2] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2)(A), (C), (D).

## A.    The President Has No Authority Over the CPB

When Congress created the CPB, it stated clearly that the CPB is not "an agency or establishment of the United States Government." 47 USC 396(b). This alone demonstrates that the CPB is not an executive agency over which the President may exert plenary Article II powers. But Congress didn't stop there—it also explicitly

9

commanded that the CPB is to be completely free from government control: "Nothing in this part shall be deemed . . . **to authorize any department, agency, officer, or employee of the United States to exercise any discretion, supervision, or control . . .** over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation . . . ." 47 USC 398(a) (emphasis added).

Not only does the statute explicitly state that the CPB is not a government agency, and that the government cannot exercise any control over the CPB, but it also prohibits any political litmus test from applying to its employees: "no political test or qualification shall be used in selecting, appointing, promoting, or taking other personnel actions with respect to officers, agents, and employees of the Corporation." 47 USC 396(e)(2). Moreover, Congress made it clear that "[t]he members of the Board **shall not, by reason of such membership, be deemed to be officers or employees of the United States**." 47 USC 396(d)(2) (emphasis added). These board members "shall be selected from among citizens of the United States (**not regular full-time employees of the United States**) . . . ." 47 USC 396(b)(emphasis added). Congress set up the CPB in this manner "to afford [it] maximum protection from extraneous interference and control." *Id*. at § 396 (a)(10).

This is consonant with other federal statutes defining "executive departments," "government corporation," and "executive agency," none of which identify the CPB or apply to the CPB. *See* 5 U.S.C. §101 (setting forth those entities qualifying as executive departments, not including CPB); 5 U.S.C. § 103 (defining "government corporation" as a "corporation owned or controlled by the Government of the United

States"); 5 U.S.C. § 105 (defining "executive agency" as "an executive department, a Government corporation, and an independent establishment."). And the U.S. Government Manual, "the official handbook of the Federal Government" that "provides information on the agencies of the legislative, judicial, and executive branches," does not even mention the CPB once in its 2,000+ pages. *See* United States Government Manual (2025 ed.).[2]

The D.C. Circuit has explicitly recognized CPB's independence and non-government-entity status in affirming a DC District Opinion which found that 28 U.S.C. 1361 (the Mandamus Act) did not apply to CPB:

> CPB and PBS are not agencies of the United States and the members of the CPB Board of Directors are not Officers of the United States. [47 USC 396(b)] specifically provides that CPB 'will not be an agency or establishment of the United States Government.

*Network Project v. Corp. for Pub. Broad.*, 398 F. Supp. 1332, 1339 (D.D.C. 1975), *aff'd in relevant part*, 561 F.2d 963, 976 (D.C. Cir. 1977). *See also Community-Service Broadcasting of Mid-America, Inc. v. Fed. Communications Comm'n¸* 593 F.2d 1102, 1108-11 (D.C. Cir. 1978) (describing the CPB's founding and purpose, and quoting congressional reporting related to its independence being a key component of CPB); *American Chemistry Council v. National Academy of Sciences*, 2024 WL 1141465 (D.D.C. March 15, 2024) (relying on *Network Project*'s ruling, stating "the court concluded that the Corporation for Public Broadcasting was not an "agenc[y] of the

---

[2] The U.S. Government Manual is available at https://www.govinfo.gov/content/pkg/GOVMAN-2025-01-13/pdf/GOVMAN-2025-01-13.pdf.

United States" and the members of the CPB's board were not "officers of the United States" who could be sued under the mandamus statute.").

Indeed, the D.C. Circuit has found that the Federal Communications Commission, an executive agency, has no jurisdiction over the CPB: "any FCC jurisdiction over the CPB would constitute a radical extension of the FCC's basic jurisdictional grant." *Accuracy in Media, Inc. v. F.C.C.*, 521 F.2d 288, 293 (D.C. Cir. 1975). As the DC Circuit noted in *Accuracy in Media*, "Section 398 [47 USC 398] **expresses the clear intent of Congress that there shall be no direct jurisdiction of the FCC over the Corporation**." *Id.* at 292 (emphasis added). "Congress desired to establish a program funding agency which would be free from governmental influence or control in its operations." *Id.* at 293.

And the Supreme Court has even recognized the CPB's independent status. In *FCC v. League of Women Voters,* 468 U.S. 364 (1984), the Supreme Court relied on the statutory independence of the CPB to invalidate a prior version of 47 U.S.C. § 399. In doing so, the Supreme Court noted that Congress "mandated that the new Corporation for Public Broadcasting would have a ***private***, bipartisan structure . . . ." *Id.* at 389 (emphasis added). The Court further recognized:

> The Act also established a second layer of protections which serve to protect stations from governmental coercion and interference. Thus, in addition to requiring the Corporation to operate so as to 'assure maximum freedom [of local stations] from interference with or control of program content or other activities, **the Act expressly forbids 'any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over the Corporation** or any of its grantees or contractors . . . .'

*Id.* (emphasis added) (citations omitted).  As the Court noted, "the legislative history of the Public Broadcasting Act clearly indicates that Congress was concerned with 'assur[ing] complete freedom from any Federal Government influence.'"  *Id.* at 394.

As a result of the CPB's independent, non-governmental nature, the President has no inherent authority over it.  The only authority the President has with respect to the CPB is to nominate board members, with the advice and consent of the Senate. 47 USC 396(c).  Nowhere in the statute is the President empowered with any other authority with respect to the CPB.  As a result, the President has no authority to terminate Board members of CPB.

### B.    The Purported Terminations Overstep The President's Article II Authority

"In our system, the Federal Government's powers are enumerated, and hence limited."  *United States v. Comstock*, 560 U.S. 126, 159 (2010) ("In our system, the Federal Government's powers are enumerated, and hence limited.") (Thomas, J., dissenting).  "The government of the United States has been emphatically termed a government of laws, and not of men.  It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."  *National Treasury Employees Union v. Nixon*, 492 F.2d 587, 609 (D.C. Cir. 1974) (citing The Federalist Papers, No. 69).

The highest legal rights in this Country are enunciated in the Constitution, which is the "supreme Law of the Land."  U.S. Constitution, Article VI.  The Constitution sets up only three branches of the federal government, and ***limits*** those branches to only those powers enumerated within the Constitution.  *See* U.S.

Constitution, Articles I, II, and III. "[A]nd that these limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" *Marbury v. Madison*, 5 U.S. 137, 176 (1803).

"The Constitution's express conferral of some powers makes clear that it does not grant others. And the Federal Government 'can exercise only the powers granted to it.'" *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519, 534-35 (2012) (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 405, 4. L. ed. 579 (1819)). Crucially, Article II of the Constitution enumerates no authority to the President over private corporations—as a result, the President has no authority over the CPB. *See id.*, at 535 ("Today, the restrictions on government power foremost in many Americans' minds are likely to be affirmative prohibitions, such as contained in the Bill of Rights. These affirmative prohibitions come into play, however, only where the Government possesses authority to act in the first place. If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not violate any of the express prohibitions in the Bill of Rights or elsewhere in the Constitution.").

Because the President has no authority over the CPB, he has no authority to terminate its board members as he has purported to do here. "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585

14

(1952) (finding executive order to seize possession of steel mill invalid because President had no authority under Constitution or Statute to issue it). The termination of CPB board members is not an exercise of Article II authority because, similar to the lawless seizure of private property in *Youngstown*, it "does not direct that a congressional policy be executed in a manner prescribed by Congress—*it directs that a presidential policy be executed in a manner prescribed by the President*." *Id.* at 588. Indeed, the Correspondence usurps Congress' clearly-stated prerogative with respect to the CPB, particularly with respect to Congressional aims in its formation, and therefore also violate the Constitution's Separation of Powers. *See, e.g., United States v. Trucking Management, Inc.¸* 662 F.2d 36, 42-45 (D.C. Cir. 1981) (finding Executive Order could not overturn the will of Congress).

Finally, the effect of the Correspondence is to amend or repeal portions of the Public Broadcasting Act of 1967 as to the authority of the President to remove Board members. But the President can neither amend nor repeal validly enacted laws unilaterally—any amendment or repeal of a validly enacted statute must pass through Congress and be presented to the President. U.S. Constitution, Article I, § 7; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *id.* at 439 ("Although the Constitution expressly authorizes the President to play a role in the process of enacting statutes, it is silent on the subject of unilateral Presidential action that either repeals or amends parts of duly enacted statutes."). Because the President cannot amend or repeal validly enacted statutes unilaterally,

the attempt to terminate CPB board members violate the Presentment Clause, and is invalid for this reason as well.

### C.    Executive Agencies Have No Authority Over Cpb Or Its Board Of Directors

The Executive Office of the President, the White House Presidential Personnel Office, and the OMB possess no authority over CPB either.  *See, e.g., Accuracy in Media, Inc. v. F.C.C.*, 521 F.2d 288, 293 (D.C. Cir. 1975) (finding FCC has no jurisdiction over CPB).  Just as Congress provided no authority to the President in the CPB's origin statute, neither did it provide any of the other Defendants any power.  *See* 47 U.S.C. §§ 396-398.  Indeed, since executive agencies and officers wield Article II power, their power cannot be more extensive than that of the President. *See, e.g., Seila Law LLC v. Consumer Financial Protection Bureau,* 591 U.S. 197, 213 (2020) ("The entire 'executive Power' belongs to the President alone.  But because it would be impossible for one man to perform all of the great business of the State, the Constitution assumes that lesser executive officers will assist the supreme Magistrate in discharging the duties of his trust.") (quotations and citations omitted). Thus, any action taken by any of these agencies with respect to the CPB is not in accordance with law, in excess of statutory jurisdiction, authority, limitation, and short of statutory right.  *See* 5 U.S.C. 706 (2)(a) and (c).

Executive agencies and their employees are creatures of statute, and have no authority to do anything other than what Congress has authorized them to do.  *Marin Audubon Society v. Fed. Aviation Admin.¸*121 F.4th 902, 911-12 (D.C. Cir. 2024) (citing *Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022)).  None

of the agencies the President presumably ordered to take action against the CPB have any jurisdiction or authority over it. *See* 15 U.S.C. § 1501, *et seq.* (creating and setting forth powers of Department of Commerce); 47 U.S.C. § 154, *et seq.* (creating and setting forth powers of Federal Communications Commission); 31 U.S.C. § 501 *et seq.* (creating and setting forth powers of Office of Management and Budget). Because none of the federal agencies presumably ordered to take action against the CPB have the authority to do so, any such actions would be a clear violation of law, and in excess of their statutory authority. *See National Federation of Independent Business v. Department of Labor¸* 595 U.S. 661, 665 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority Congress has provided. . . . The question, then, is whether the Act plainly authorizes the Secretary's mandate. It does not."). *See also Accuracy in Media, Inc. v. F.C.C.*, 521 F.2d 288, 292 (D.C. Cir. 1975) (expressly finding that FCC had no jurisdiction over CPB).

Because none of the agencies or employees directed to take action against the CPB have any jurisdiction or authority over it, any action taken by them against the CPB is, by definition, not in accordance with law, in excess of statutory jurisdiction, authority, limitation, and short of statutory right. 5 U.S.C. 706(2)(a) and (c). "Lest [the agencies] forget, [they are] a creature of statute, and ha[ve] only those authorities conferred upon [them] by Congress; if there is no statute conferring authority, a federal agency has none." *See North Carolina v. Environmental Protection Agency*, 531 F.3d 896, 922 (D.C. Cir. 2008) (citations and quotations omitted). "So too here:

17

no statute confers authority" on the agencies to take these actions, and they have no authority to do so. *Id.* "Both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington, Tex. V. Fed. Communications Commission¸* 569 U.S. 290, 297 (2013). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires, and violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

Because the Agencies had no authority to terminate members of the CPB board of directors, their actions violated the Administrative Procedure Act. The CPB is likely to succeed on the merits of its case.

### D.    The Agencies' Actions are Final Agency Actions

For an APA action to succeed, there must be final agency action. *Doctors for America v. Office of Personnel Management*, __ F. Supp. 3d __, 2025 WL 452707, at *4 (D.D.C. Feb. 11, 2025). "Agency action is considered final to the extent that it imposes an obligation, denies a right, or fixes some legal relationship." *Farrell v. Tillerson*, 315 F. Supp. 3d 47, 60 (D.D.C. 2018) (quotations and citations omitted). "Final agency action, in particular, 'must mark the consummation of the agency's decisionmaking process' and determine 'rights or obligations ... from which legal consequences will flow.'" *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), __ F. Supp. 3d __, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78, (1997)).

18

Here, the agencies' decision to issue the Correspondence attempting to terminate three CPB Board members constitutes final agency action. *Doctors for Tomorrow,* 2025 WL 452707, at *5. The agencies' decisionmaking process is over and from that process flows serious legal consequences—namely, the irreversible consequence of termination of Board membership. Similar to the OMB memorandum addressed in *National Council of Nonprofits*, the Correspondence has "issued a mandatory command . . . that produced legal consequences for Plaintiffs and others." *National Council of Nonprofits*, 2025 WL 597959, at *13. Because of this mandatory effect, there is nothing speculative about the actions to be taken, and there is no wiggle room for the agencies—the Executive Order lays out the concrete steps that must be taken by the Agencies. Those concrete steps negatively affect the CPB's rights and obligations. *Farrell v. Tillerson*, 315 F. Supp. 3d 47, 62 (D.D.C. 2018).

The CPB is likely to succeed on the merits of whether these actions are final agency actions under the APA. *See New York v. Trump*, __ F.4th __, 2025 WL 914788, at *13 (1st Cir. March 26, 2025) (finding OMB memorandum regarding funding freeze to be final agency action).

## II.    CPB And Its Board Will be Irreparably Harmed Without a TRO

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*,

19

427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion)). Deprivation of private property by government seizure of that property, particularly as a result of unlawful executive action, constitutes irreparable injury for which "monetary recovery would be inadequate." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576-77 (D.D.C), *aff'd*, 343 U.S. 579, 72 S. Ct. 863 (1952). Damage to reputation and goodwill also constitute irreparable harm. *Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997). Additionally, as a matter of law, "obstacles [that] unquestionably make it more difficult for [a plaintiff] to accomplish [its] primary mission … provide[s] injury for purposes [of] … irreparable harm." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Here, Plaintiffs have been, and will be further irreparably harmed in all of these ways. *See* Decl. of E. Slavitt (attached as Exhibit A). The effect of the Correspondence is to remove from CPB its Constitutional freedoms. As a private corporation separate and distinct from the government, CPB enjoys the same Constitutional freedoms that individual citizens enjoy. *See, e.g., Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342, 130 S. Ct. 876, 899 (2010).

> A corporation is simply a form of organization used by human beings to achieve desired ends. An established body of law specifies the rights and obligations of the people (including shareholders, officers, and employees) who are associated with a corporation in one way or another. When rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the rights of these people.

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706–07, 134 S. Ct. 2751, 2768 (2014). Its Constitutional freedoms were further enshrined in its enacting laws,

which attempted to shield CPB from extraneous political interference and control. *See* 47 U.S.C.A. §§ 396, 398. CPB's board members enjoy the same constitutional protections. By terminating CPB's Board members in violation of the Constitution, CPB's and its board members' Constitutional freedoms have been adversely effected.

Further, CPB has legitimate concerns that the attempts to terminate the CPB board members are only the first step in an effort to seize CPB property. CPB's communications, financial records, and various other corporate documents are all CPB's corporate property. As such, CPB has a right to possess that property and not be deprived thereof by the government. *See Burwell*, 573 U.S. at 707; *Youngstown*, 103 F. Supp. at 576-77. To the extent that the government desires to deprive CPB of its property, it must be afforded due process of law. U.S. Constitution, Amendment V. As a result of the attempt to terminate its board members, the government has effectively seized CPB's property by prohibiting the Board members from accessing CPB's corporate property and directing its corporate affairs. That seizure constitutes irreparable injury for which "monetary recovery would be inadequate." *See Youngstown*, 103 F. Supp. at 576-77.

Additionally, CPB's mission is to "establish[] and develop[] … systems of public telecommunications entities throughout the United States "in ways that will most effectively assure ***the maximum freedom*** of the public telecommunications entities and systems from interference with, or control of, program content or other activities." 47 U.S.C.A. § 396(g)(1)(C), (D) (emphasis added). The attempted terminations confound that mission in multiple ways. First, the nature of the attempted

terminations have vitiated the non-political nature of CPB and its designed insulation from political interference or control, by attempting to make it directly answerable to the President. Second, by issuing the Correspondence, the President's aim is to leave CPB with only two board members, one short of a quorum which is necessary for the Board to take any corporate action. Without a quorum, CPB will be effectively paralyzed, unable to carry out the tasks mandated by Congress. Not only would this jeopardize the mission and primary purpose of CPB, but it would also severely damage CPB's reputation and goodwill among its industry partners.

CPB, therefore, has shown that it will be irreparably harmed by the Administration's continued action and a temporary restraining order is warranted to prevent that harm.

## III. <u>The Public Interest and the Balance of Equities Favor The Entry of A Temporary Restraining Order</u>

"It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citations omitted). "There is generally no public interest in the perpetuation of unlawful [government] action. To the contrary, there is a substantial public interest in having [government] abide by the federal laws that govern [its] existence and operations." *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (internal citations and quotations omitted). Put simply, "the public is served when the law is followed." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013).

The statute creating CPB specifically states that "it is in the public interest to encourage the growth and development of public radio and television broadcasting, including the use of such media for instructional, educational, and cultural purposes." 47 U.S.C.A. § 396(a)(1).  The statute also states that CPB "will not be an agency or establishment of the United States Government" and "should be created" as "a private corporation" "to facilitate the development of public telecommunications and to afford *maximum protection from extraneous interference and control*."  47 U.S.C.A. §§ 396(a)(10), (b) (emphasis added).  Congress, therefore, intended that CPB "would be free from governmental influence or control in its operations.  Yet, the lawmakers feared that such complete autonomy might lead to biases and abuses of its own.  The unique position of [CPB] is the synthesis of these competing influences." *Accuracy in Media, Inc. v. F.C.C.*, 521 F.2d 288, 293 (D.C. Cir. 1975).  "Reference to the legislative history of the 1967 Act shows a deep concern that governmental regulation or control over the Corporation might turn the CPB into a Government spokesman.  Congress thus sought to insulate CPB by removing its 'programming activity from governmental supervision.'" *Id.* (citing H.R.Rep.No.572, 90th Cong., 1st Sess., at 19 (1967), U.S.Cong. & Admin.News 1967, pp. 1772, 1810).

As a result of this deep concern, as noted above, Congress explicitly stated that:

Nothing [in the acts creating CPB] shall be deemed ... *to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation* or any of its grantees or contractors, or over the charter or bylaws of the Corporation.

47 U.S.C.A. § 398 (emphasis added).  Additionally, CPB's board cannot have more than five of its nine members from the same political party.  47 U.S.C.A. § 396(c)(1).

> [CPB] was established as nonprofit and non-political in nature.…
> Numerous statutory safeguards were created to insure against partisan
> abuses.  Ultimately, Congress may show its disapproval of any activity
> of the Corporation through the appropriation process.  This supervision
> of CPB through its funding is buttressed by an annual reporting
> requirement. Through these statutory requirements and control over
> the 'purse-strings,' **Congress reserved for itself the oversight
> responsibility for the Corporation.**

*Accuracy in Media*, 521 F.2d  at 294 (citations omitted).  CPB, therefore, "is accountable to Congress and the public."  *Cmty.-Serv. Broad. of Mid-Am., Inc. v. F.C.C.*, 593 F.2d 1102, 1108–09 (D.C. Cir. 1978).

The public, therefore, has an interest in the growth and development of public broadcasting.  *See* 47 U.S.C.A. § 396(a)(1).  That interest includes the CPB, as the steward of that growth and development, being free from government influence or control in its operations, lest CPB become a government spokesman.  *See* 47 U.S.C.A. §§ 396(a)(10), 398; *Accuracy in Media,* 521 F.2d at 293.  In other words, the public has an interest in CPB being accountable to the public, rather than the government.  *See Cmty.-Serv. Broad. of Mid-Am*, 593 F.2d at 1108–09.

Moreover, as discussed above, Defendants' actions sought to be enjoined are inconsistent with the statutory establishment of CPB as a private corporation accountable to Congress, and are therefore unlawful.  *See* 47 U.S.C.A. §§ 396(a)(10), (b); *Accuracy in Media,* 521 F.2d at 293; *Cmty.-Serv. Broad. of Mid-Am*, 593 F.2d at 1108–09.  Defendants cannot suffer harm from an injunction barring that unlawful action.  *See C.G.B. v. Wolf*, 464 F. Supp. 3d at 218.  The public has the "substantial"

interest in proscribing that unlawful activity, because the public has a "substantial" interest in Defendants acting lawfully, consistent with the statutory establishment of CPB. *See Open Communities Alliance,* 286 F. Supp. 3d at 179. *See Daniels Health*, 710 F.3d at 585.

As a result, both the public interest and the balance of harms favors the issuance of a temporary restraining order, enjoining Defendants from taking any action to enforce the Correspondence's termination of CPB's three democratic Board members.

## IV. <u>The Court Should Impose No Bond Requirement on CPB</u>

Rule 65(c) vests district courts with broad discretion to determine the appropriate amount of an injunction bond, *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all." *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). "The purpose of the security given under Rule 65(c) is to cover the costs and damages suffered by the party wrongfully enjoined." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) (citing 7 7 Moore's Federal Practice ¶ 65.09, at 1656). Accordingly,

when a party against whom the injunction is entered will face no monetary injury as a result of that injunction, no bond is necessary.[3]

Here, no pecuniary harm would inure to Defendants should this Court grant CPB a temporary restraining order. Defendants would simply be precluded from causing pecuniary harm to CPB. As a result, there is no basis or need for this Court to require CPB to post a bond upon issuance of its requested temporary restraining order.

## CONCLUSION

For the foregoing reasons, Plaintiffs CPB, Laura G. Ross, Thomas E. Rothman, and Diane Kaplan request that the Court enter a temporary restraining order prohibiting the President and the other Defendants from terminating any member of the CPB's Board of Directors, or taking any action to interfere with the CPB's internal governance and operations.

Date:  April 29, 2025          By: _/s/ Jason W. McElroy_
                               Jason W. McElroy (D.C. Bar No. 502733)
                               Peter C. Nanov (D.C. Bar No. 230021)
                               SAUL EWING LLP
                               1919 Pennsylvania Avenue NW, Suite 550
                               Washington, D.C. 20006
                               Tel: (202) 295-6605
                               Email:   jason.mcelroy@saul.com
                                        peter.nanov@saul.com

---

[3] S*ee, e.g., Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882–83 (9th Cir. 2003); *Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990); 11A Wright et al., supra, § 2954, pp. 292–93; *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,* No. 25-cv-00239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (setting a bond of zero dollars). *See also  Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,* 2025 WL 573764, *29 (D. Md. Feb. 21, 2025) (same).

Jeffrey S. Robbins (*Pro Hac Vice forthcoming*)
Joseph D. Lipchitz (*Pro Hac Vice forthcoming*)
SAUL EWING LLP
131 Dartmouth St., Suite 501
Boston, MA 02116
Tel:  (617) 912-0941
Email:      jeffrey.robbins@saul.com
                 joseph.lipchitz@saul.com

***Counsel for Plaintiffs***