# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CORPORATION FOR PUBLIC BROADCASTING,<br>    401 Ninth St., NW<br>    Washington, DC 20004<br><br>THE BOARD OF DIRECTORS OF THE CORPORATION FOR PUBLIC BROADCASTING,<br>    401 Ninth St., NW<br>    Washington, DC 20004<br><br>LAURA G. ROSS, in her Official Capacity as Member of the Board of Directors for The Corporation for Public Broadcasting,<br>    401 Ninth St., NW<br>    Washington, DC 20004<br><br>THOMAS E. ROTHMAN, in his Official Capacity as Member of the Board of Directors for The Corporation for Public Broadcasting,<br>    401 Ninth St., NW<br>    Washington, DC 20004<br><br>DIANE KAPLAN, in her Official Capacity as Member of the Board of Directors for The Corporation for Public Broadcasting,<br>    401 Ninth St. NW<br>    Washington, DC 20004<br><br>    Plaintiffs,<br><br>v. | Case No.  2025-cv-1305 |

1

| | |
|---|---|
| DONALD J. TRUMP, in his Official Capacity as President of the United States of America, 1600 Pennsylvania Avenue, NW Washington, DC 20500, | ) ) ) ) ) |
| TRENT MORSE, in his Official Capacity as Deputy Director of Presidential Personnel for the Executive Office of The President of the United States,     1600 Pennsylvania Ave. NW     Washington, DC 20500,     1650 17th St. NW,     Washington, DC 20006 | ) ) ) ) ) ) ) ) ) |
| UNITED STATES OFFICE OF MANAGEMENT AND BUDGET,     725 17th St., NW     Washington, DC 20503 | ) ) ) ) ) |
| RUSSELL VOUGHT, in his Official Capacity as Director of OMB,     1600 Pennsylvania Ave. NW     Washington, DC 20500,     1650 17th St. NW,     Washington, DC 20006 | ) ) ) ) ) ) ) |
| THE WHITE HOUSE PRESIDENTIAL PERSONNEL OFFICE     1600 Pennsylvania Ave NW     Washington, DC 20500 | ) ) ) ) ) |
| SERGIO GOR, in his Official Capacity as Director of the White House Presidential Personnel Office,     1600 Pennsylvania Ave. NW     Washington, DC 20500,     1650 17th St. NW,     Washington, DC 20006 | ) ) ) ) ) ) ) ) ) |
|     <u>Defendants.</u> | ) |

2

## **DECLARATION OF EVAN SLAVITT**

I, Evan Slavitt, do hereby state under oath as follows:

1. I am Senior Vice-President and General Counsel of the Corporation for Public Broadcasting ("CPB"). The CPB is a Congressionally created private nonprofit corporation established pursuant to the Public Broadcasting Act of 1967, 47 U.S.C. § 396 (the "Act"). As General Counsel, I am responsible for all legal affairs concerning CPB.

2. CPB's purpose is to steward Congressionally appropriated funds and ensure universal access to non-commercial, high-quality content and services that educate, inform, foster curiosity, and promote civil discourse essential to American society.

3. CPB operates from private offices leased from a private corporation located in downtown District of Columbia. CPB does not share any space with any government agency. CPB's offices are locked and access is given only to the authorized persons, with the exception that the public is allowed to attend meetings of its board of directors. Within the CPB office space are my offices and those of the legal department as well as the offices of CPB's Inspector General. The legal department offices contain attorney/client privileged information as well as attorney work product. The IG offices contain confidential information about CPB and about a large number of broadcasting stations. CPB's offices also contain irreplaceable archival material as well as personal belongings of its employees and officers.

**CPB Is A Private, Nonprofit Corporation, Not A Government Agency**

4. In creating CPB, Congress made clear that it was "a private corporation [to] be created to facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control." 47 U.S.C. at § 396 (a)(10).

3

5. To ensure that CPB is insulated from partisan governmental interference and control and to ensure its autonomy, Congress expressly provided that "[CPB] will not be an agency or establishment of the United States Government. The Corporation shall be subject to the provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act." *Id*. at § 396(b).

6. In addition, the statute expressly forbids "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over [CPB] or any of its grantees or contractors…" *Id*. at § 398.

7. Establishment of the CPB and the statutory scheme of the Act were a product of a Congressional determination that strong safeguards were necessary to ensure that federal funding of programming did not carry with it any political influence on the contents of that programming. Thus, the Senate Report accompanying the Act carefully pointed out:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs. It is also recognized that this assistance should in no way involve the Government in programming or program judgments. An **independent** entity supported by Federal funds is required to provide programs **free of political pressures**. The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967).

8. In other words, Congress conceived of CPB as an entirely private corporation that also acts as a vehicle to infuse federal funds into public broadcasting without the introduction of government direction or control, particularly from the executive branch, which Congress accomplished by withholding from CPB any form, pure or quasi, of legislative, judicial, or regulatory power.

4

9. Indeed, in the course of its business, CPB has no ability to regulate any aspect of public media, resolve disputes among stations, dictate content of public media stations, or render any form of judgment over any other entity or organization. CPB does not, and cannot, infringe on or aid the executive branch's ability to carry out or implement the laws. By way of limited example, CPB:

- Does not have any *ex officio* governmental members on its Board;

- Has a board that is required to be divided by party;

- Is not subject to Freedom of Information Act requests;

- Is not designated as or referred to as a federal entity under any other statute;

- Does not and cannot issue any regulations;

- Does not and cannot regulate or adjudicate disputes between public radio and television stations and members of the public;

- Is forward-funded for two years (that is, appropriations made, for example, in 2025 are for its 2027 fiscal year;

- Receives its funds directly from the Treasury and not through any governmental department or agency;

- Has its own statutorily created inspector general and is not subject to the jurisdiction of any other governmental department or agency with regard to its directly appropriated funds;

- Is prohibited from making content or dictating content to any station;

- Is not required to attend frequent oversight hearings in front of Congress, aside from CPB's annual request for appropriations; and

- Does not receive instructions for day-to-day operations from any political branch.

10. The United States Government Manual, which has been published for over 80 years by the National Archives and Records Administration, itself being an executive agency, in the Federal Register, describes itself as the "official handbook" of the Federal Government and

5

provides information on the agencies of the legislative, judicial, and executive branches. It also includes information on quasi-official agencies; international organizations in which the United States participates; and boards, commissions, and committees. *See* https://www.usgovernmentmanual.gov. However, the United States Government Manual does not even mention the CPB anywhere among its listing of governmental and quasi-governmental agencies covering over 2,000 pages. This is consonant with other federal statutes defining "executive departments," "government corporation," and "executive agency," none of which identify the CPB or apply to the CPB. *See* 5 U.S.C. §101 (setting forth those entities qualifying as executive departments, not including CPB); 5 U.S.C. § 103 (defining "government corporation" as a "corporation owned or controlled by the Government of the United States"); 5 U.S.C. § 105 (defining "executive agency" as "an executive department, a Government corporation").

**The Executive Branch Does Not Have The Ability To Remove Any Of CPB's Board Members, Officers, Or Employees**

11. Congress enacted the Act without providing the executive branch with any authority to remove a Board member, with or without cause. Congress communicated this intent in five ways.

12. First, Congress made clear that CPB is not a federal agency subject to the President's authority, but rather a private corporation:

> [CPB] will not be an agency or establishment of the United States Government. The Corporation shall be subject to the provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act. 47 U.S.C. at § 396(b).

13. Second, Congress clarified that the Board Members are not officers of the United States, and thus are not within the removal provisions of Article II of The United States Constitution:

6

> [T]he members of the Board shall not, by reason of such membership, be deemed to be officers or employees of the United States.

*Id*. at § 396(d)(2).

14.  Third, the Act mandates that Board members cannot be affected or otherwise controlled or disturbed by the actions of the government, forbidding:

> [A]ny department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over [CPB] or any of its grantees or contractors….

*Id*. at § 398.

15.  Fourth, Congress did consider removal mechanisms, and limited removal to only one scenario by which a Board member can be removed:

> Members of the Board shall attend not less than 50 percent of all duly convened meetings of the Board in any calendar year. A member who fails to meet the requirement of the preceding sentence shall forfeit membership and the President shall appoint a new member to fill such vacancy not later than 30 days after such vacancy is determined by the Chairman of the Board.

*Id*. at § 396(e)(7). This removal power, moreover, is self-executing; it does not require or permit any action by any person, including the President, to have effect.

16.  Fifth, Congress omitted the statutory provision, which appears in many statutes establishing a typical federal agency, that Board members serve at the pleasure of the President. In fact, aside from the members' statutory instructions to serve as stewards of specific congressional appropriations, Congress never mandated that the Board members serve at the pleasure of anyone, including the President. Instead, Board members serve for fixed terms. *Id*. at § 396(b)(5).

7

**Three Board Members of CPB Received Purported Notices of Termination, Unlawfully Attempting to Remove Them From Their Positions**

17. On April 28, 2025, three members of the Board of Directors for CPB – Laura G. Ross, Diane Kaplan, and Thomas E. Rothman – received an email purportedly from Trent Morse, the Deputy Director of Presidential Personnel for the Executive Office of the President, purporting to notify the board members that their positions on the Board of Directors for CPB were terminated.

18. The purported notices stated, in full:

> On behalf of President Donald J. Trump, I am writing to inform you that your position on the Corporation for Public Broadcasting is terminated effective immediately.
>
> Thank you for your service.

19. The purported notices did not identify the authority with which the President was purporting to terminate the Board members, nor did it reconcile with the fact that the President's authority to remove Board members or interfere with CPB's independence is clearly prohibited by Congress.

20. The emails were sent to an email address, concur_board@cpb.org, that is monitored by CPB staff but not by the individual board members.

21. Below are true and accurate screenshots of the purported notices sent to each of the three Board members.

**From:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Sent:** Monday, April 28, 2025 9:26 AM
**To:** Concur_Board <concur_board@cpb.org>
**Subject:** Message from PPO

**Caution:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Tom,

On behalf of President Donald J. Trump, I am writing to inform you that your position on the Corporation for Public Broadcasting is terminated effective immediately.

Thank you for your service.

Trent Morse
Deputy Director
Presidential Personnel

---

**From:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Sent:** Monday, April 28, 2025 9:27 AM
**To:** Concur_Board <concur_board@cpb.org>
**Subject:** Message from PPO

**Caution:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Diane,

On behalf of President Donald J. Trump, I am writing to inform you that your position on the Corporation for Public Broadcasting is terminated effective immediately.

Thank you for your service.

Trent Morse
Deputy Director
Presidential Personnel

---

**From:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Sent:** Monday, April 28, 2025 9:26 AM
**To:** Concur_Board <concur_board@cpb.org>
**Subject:** Message from PPO

**Caution:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Laura,

On behalf of President Donald J. Trump, I am writing to inform you that your position on the Corporation for Public Broadcasting is terminated effective immediately.

Thank you for your service.

Trent Morse
Deputy Director
Presidential Personnel

**CPB Faces A Significant And Credible Threat That Government Officials Will Follow Up On The Purported Termination Of CPB's Board Members by Entering CPB's Privately-Owned Property**

22. CPB's concern that the government will follow through on the Purported Notice by replacing the board members with appointees before they are confirmed by the U.S. Senate, and forcefully gaining access to CPB's private property is not speculation or conjecture. Rather, it is well-grounded in the administration's recent actions in just the past six weeks.

23. By way of limited example, the United States Institute of Peace ("USIP") serves as a direct and alarming precedent for the threat currently facing CPB. *See U.S. Institute of Peace, et. al. v. Jackson*, No. 1:25-cv-00804 (D. D.C. Mar. 18, 2025). On February 19, 2025, the President issued Executive Order 14217, which erroneously classified USIP – a statutorily independent, congressionally chartered nonprofit – as part of the federal bureaucracy. Within weeks, the administration attempted to remove Senate-confirmed board members without statutory cause or proper consultation, in violation of 22 U.S.C. § 4605(f).

24. In a horrific turn of events, on March 17, 2025, law enforcement agents acting under the direction of the Acting United States Attorney and the Department of Government Efficiency ("DOGE") staff physically and forcefully entered and seized control of USIP's headquarters, a private, non-government building owned by USIP. *Jackson*, No. 1:25-cv-00804, Exhibit A to ECF No. 2, Plaintiff's Motion for TRO, at ¶ 2.

25. The government's agents physically ousted USIP's president and staff, accessed secure computer systems containing sensitive information by extorting a USIP employee to grant them access, initiated actions to entirely dismantle USIP's core operations, shredded documents, and prevented the USIP from performing any of its lawful functions – all without judicial authorization. *Jackson*, No. 1:25-cv-00804, ECF No. 2, Plaintiff's Motion for TRO, at 2.

26.     Judge Howell of the U.S. District Court for the District of D.C. in the USIP case noted that the "records and property destruction, and defendants' threatening and aggressive confrontation, involving the deployment of law enforcement officers from three different agencies, in interactions with employees at the U.S. Institute of Peace [was] deeply troubling." *Jackson*, No. 1:25-cv-00804, Minute Order entered March 19, 2025.

**<u>A Temporary Restraining Order Is Necessary To Prevent Irreparable Harm</u>**

27.     Unless Defendants are enjoined from continuing, and further initiating, their attempts to interfere with the internal governance and operations of the CPB, Plaintiffs will suffer irreparable harm. These harms are not compensable with monetary relief and will fundamentally alter CPB's ability to operate, fulfill its mission, and serve the public interest. By way of limited example, these harms include:

- <u>The Frustration of CPB's Mission and Statutory Mandate</u>: Any purported termination of CPB's Board members and/or the invasion of CPB's private property would seriously disrupt CPB from carrying out its statutory obligation to provide universal access to non-commercial, educational broadcasting. This cannot be undone by a later award of damages because CPB's core purpose—public service media—depends on <u>continuity of operations and experienced personnel</u>. In the event that these purported terminations are upheld, CPB will be left without a quorum and will be unable to operate functionally, if at all. Public stations would go dark, educational programming would cease, and civic discourse would be stifled. Once these services are lost, especially in rural or underserved communities, they may never be restored, and the societal cost—particularly for K-12 and emergency communication services—is incalculable.

- *Ultra Vires* Actions: Any actions taken by individuals unlawfully placed into CPB governance positions—whether as purported Board members, officers, or acting leadership—would be *ultra vires* and not attributable to the Corporation. Nevertheless, such individuals could purport to bind CPB to any number of obligations, causing immediate and irreversible harm.

- <u>Imposing Liabilities on CPB</u>: Public media sub-awardees rely on promised funds to enter into contractual obligations such as programming production, infrastructure maintenance, and staffing. If the purported terminations are validated, the sudden inoperative status of CPB due to the lack of a quorum or the invasion of its premises would create significant liabilities for whatever is left of the Corporation, which would

11

be without the means to meet existing contractual and financial commitments—placing it at legal and financial risk.

- <u>Compromise of Confidential and Privileged Information</u>: Any invasion of CPB premises or IT systems by federal agents, as occurred in the case of the United States Institute of Peace, risks disclosure of privileged attorney-client communications, non-public Board materials, personal financial information, and proprietary grant data. Therefore, the seizure or unauthorized access of CPB's systems would violate attorney-client confidentiality, undermine pending litigation, expose sensitive personal data, and irreparably harm station partners' trust and legal protections.

- <u>Interference in Reporting Obligations</u>. CPB is under an obligation under the Continuing Resolution to make certain reports to the Office of Management and Budget. This requires detailed reports to be submitted on or before April 28. Any physical invasion or any validation of the purported termination of Board members will impede this statutory mandate.

- <u>Loss of Licenses</u>. CPB holds music and streaming licenses on behalf of all public television and radio stations. CPB has reporting and payment obligations under such licenses. Any physical invasion or attempted removal of officers or directors will impede these obligations, potentially causing the cancellation of such licenses.

- <u>Physical Invasion and Damage to Property and Infrastructure</u>: CPB's headquarters house vital administrative, technical, and archival infrastructure. Should federal agents attempt to forcibly enter or take control of the premises and/or the computer software, as they did with USIP, it could result in the destruction of property, improper access to secure systems, or loss of mission-critical documentation and databases that cannot be repaired.

- <u>Irreparable Destabilization of Public Media Nationwide</u>: CPB serves as the backbone for thousands of local public broadcasting entities, particularly in rural and underserved communities. Unlawful interference in its leadership structure would jeopardize existing grant relationships, disrupt strategic planning, and impose cascading uncertainty throughout the public media system. The downstream impact on stations' governance, operations, and compliance obligations would be immediate and widespread.

- <u>Loss of Goodwill, Institutional Trust, and Public Confidence</u>: CPB's legitimacy depends on its reputation for editorial independence and lawful governance. A political purge of its Board and occupation of its premises would send shockwaves throughout the public media ecosystem, diminishing trust among the public, affiliate stations, educational partners, and Congress. The reputational harm resulting from the

perception of a political takeover cannot be undone and would chill civic discourse and public engagement.

28. In light of the substantial irreparable harms facing CPB, including the purported termination of its Board members and the federal government's potential decision force itself onto CPB property, the urgent need for a Temporary Restraining Order cannot be understated.

Signed under the pain and penalties of perjury this 28th day of April, 2025.

_____
Evan Slavitt, General Counsel