**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ———————————————— | ) | |
| THE CORPORATION FOR | ) | |
| PUBLIC BROADCASTING, *et al.*, | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | Civil Action No. 25-1305 (RDM) |
|  | ) | |
| DONALD J. TRUMP, in his Official | ) | |
| Capacity as President of the | ) | |
| United States of America, *et al.*, | ) | |
|  | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

I       Statutory Background ..........................................................................................3

II.     Factual and Procedural Background......................................................................7

LEGAL STANDARD .......................................................................................................9

ARGUMENT ....................................................................................................................10

I.      Plaintiffs Are Unlikely to Succeed on the Merits ............................................10

    A.      Absent a Valid Statutory Restriction on Removal, Presidential Appointees Are Removable by the President at Will................................................................11

    B.      The CPB Is Governmental for Constitutional Purposes, Such as the President's Removal Authority............................................................................14

    C.      CPB Board Members Are Removable at Will by the President Under the D.C. Nonprofit Corporation Act...................................................................23

    D.      Plaintiffs' APA Claim Additionally Fails Because They Do Not Challenge Agency Action .............................................................................................24

II.     Plaintiffs Fail to Show Imminent Irreparable Harm.........................................25

III.    The Balance of the Equities and Public Interest Weigh Against Injunctive Relief .........27

IV.     The Remedy Plaintiffs Seek Is Overbroad and Improper.................................28

V.      If the Court Issues a Temporary Restraining Order, It Should Require a Bond.............30

CONCLUSION...................................................................................................30

## TABLE OF AUTHORITIES

**CASES**

*Accuracy Media, Inc. v. FCC,*
    521 F.2d 288 (D.C. Cir. 1975) ........................................................................22

*Alexander v. FBI,*
    691 F. Supp. 2d 182 (D.D.C. 2010) ................................................................25

*Baker v. Carr,*
    369 U.S. 186 (1962) ........................................................................................29

*Bessent v. Dellinger,*
    145 S. Ct. 515 (2025) ......................................................................................29

*Biden v. Nebraska,*
    600 U.S. 477 (2023) ........................................................................................18

\* *Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ........................................................ 10, 25, 27

*Cherry Cotton Mills, Inc. v. United States,*
    327 U.S. 536 (1946) ........................................................................................18

*Cobell v. Norton,*
    391 F.3d 251 (D.C. Cir. 2004) ..........................................................................9

*Defs. of Wildlife v. Perciasepe,*
    714 F.3d 1317 (D.C. Cir. 2013) ......................................................................27

\* *Dep't of Transp. v. Ass'n of Am. R.Rs.,*
    575 U.S. 43 (2015) ................................................................................. *passim*

*DSE, Inc. v. United States,*
    169 F.3d 21 (D.C. Cir. 1999) ..........................................................................30

*FCC v. League of Women Voters,*
    468 U.S. 364 (1984) ........................................................................................21

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) ........................................................................10

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ......................................................................... 21, 24, 28

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ...................................................................................29

*Hanson v. Dist. of Columbia*,
  120 F.4th 223 (D.C. Cir. 2024) .................................................................9

*Harkrader v. Wadley*,
  172 U.S. 148 (1898) ...................................................................................29

*Humphrey's Ex'r v. United States*
  295 U.S. 602 (1935) ...................................................................................29

\* *In re Hennen*,
  38 U.S. 230 (1839) ....................................................................... 11, 14, 24

*In re Sawyer*,
  124 U.S. 200 (1888) ...................................................................................29

*Inland Waterways Corp. v. Young*,
  309 U.S. 517 (1940) ...................................................................................18

*Jones v. Dist. of Columbia*,
  177 F. Supp. 3d 542 (D.D.C. 2016) ..........................................................26

\* *Lebron v. Nat'l R.R. Passenger Corp.*,
  513 U.S. 374 (1995) ...........................................................................*passim*

*Mills v. Dist. of Columbia*,
  571 F.3d 1304 (D.C. Cir. 2009) ................................................................26

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1867) ....................................................................28

\* *Myers v. United States*,
  272 U.S. 52 (1926) ........................................................................ 1, 11, 29

*Network Project v. Corp. for Public Broadcasting*,
  398 F. Supp. 1332 (D.D.C. 1975),
  *aff'd in part, rev'd in part and remanded*, 561 F.2d 963 (D.C. Cir. 1977) .............................19

*Nguyen v. U.S. Dep't of Homeland Sec.*,
  460 F. Supp. 3d 27 (D.D.C. 2020) ..............................................................9

*Nken v. Holder*,
  556 U.S. 418 (2009) ...........................................................................10, 28

*Parsons v. United States*,
167 U.S. 324 (1897) ...................................................................................... 11, 29

*Pennsylvania v. Bd. of Dirs. of City Trs. of Phila.*,
353 U.S. 230 (1957) .............................................................................................. 18

*Reconstruction Fin. Corp. v. J.G. Menihan Corp.*,
312 U.S. 81 (1941) ................................................................................................ 18

*Sampson v. Murray*,
415 U.S. 61 (1974) ............................................................................................ 2, 26

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ......................................................................................... 2, 21

\* *Severino v. Biden*,
71 F.4th 1038 (D.C. Cir. 2023) ..................................................................... *passim*

*Shurtleff v. United States*,
189 U.S. 311 (1903) .............................................................................................. 29

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) ......................................................................... 26

*Soucie v. David*,
448 F.2d 1067 (D.C. Cir. 1971), *aff'd,* 456 F. App'x 1 (D.C. Cir. 2011) .............. 25

*Walton v. House of Representatives*,
265 U.S. 487 (1924) .............................................................................................. 29

*White v. Berry*,
171 U.S. 366 (1898) .............................................................................................. 29

*Wiener v. United States*,
357 U.S. 349 (1958) .............................................................................................. 29

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................................................... 9

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ......................................................................... 26, 27

## STATUTES

5 U.S.C. § 101 ........................................................................................................ 19

5 U.S.C. § 103 ........................................................................................................ 18

5 U.S.C. § 105......................................................................................................19

5 U.S.C. § 415.........................................................................................7, 17, 19

5 U.S.C. § 702......................................................................................................24

15 U.S.C. § 41......................................................................................................13

31 U.S.C. § 902......................................................................................................18

47 U.S.C. § 390, *et seq.*.........................................................................................3

\* 47 U.S.C. § 396..............................................................................................*passim*

\* 47 U.S.C. § 398..............................................................................................*passim*

Pub. L. No. 90-129, 81 Stat. 365, *codified at* 47 U.S.C. § 390, *et seq.* ........................................3

Pub. L. No. 91-518, 84 Stat. 1328 ........................................................................15

Pub. L. No. 118-47, 138 Stat. 460 ..................................................................6, 17

**STATE STATUTES**

D.C. Code § 29-406.03.........................................................................................27

\* D.C. Code § 29-406.08 ..................................................................................*passim*

D.C. Code § 29-406.24.........................................................................................27

**RULES**

Fed. R. Civ. P. 65................................................................................................30

**OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner,
 Reading Law: The Interpretation of Legal Texts (2012).......................................12

By-Laws of the Corporation for Public Broadcasting, As amended September 13, 2021
 https://cpb.org/sites/default/files/CPB%20By-
 Laws%20as%20amended%20September%2013%2C%202021.pdf................... 4, 5, 23, 24, 27

Charles Allen Wright, Arthur R. Miller, & Mary Kay Kane,
 11A Federal Practice and Procedure § 2948.1 (3d ed. 2025) ...........................10, 26

*Const. Separation of Powers Between the President and Cong.*,
    20 Op. O.L.C. 124 (1996) .................................................................................................16

Corporation for Public Broadcasting, Board of Directors, Resolutions,
    https://cpb.org/aboutcpb/leadership/board/resolutions. .............................................................5

Gov't Accountability Office, Government Corporations: Profiles of Existing Government
    Corporations (1996),
    https://www.gao.gov/assets/ggd-96-14.pdf.............................................................................20

*Holdover and Removal of Members of Amtrak's Reform Bd.*,
    27 Op. O.L.C. 163 (2003) ............................................................................................16, 22

House Committee on Energy & Commerce, Oversight and Investigations Subcommittee
    Hearing: "Examining Accusations of Ideological Bias at NPR, a Taxpayer Funded News
    Entity," (May 8, 2024)
    https://energycommerce.house.gov/events/oversight-and-investigations-subcommittee-
    hearing-examining-accusations-of-ideological-bias-at-npr-a-taxpayer-funded-news-entity 7, 17

Office of the Inspector General, Corporation for Public Broadcasting,
    https://cpboig.oversight.gov/what-we-do/overview. .........................................................7, 17

Press Release, Committee on Oversight and Government Reform, Hearing Wrap Up: DOGE
    Subcommittee Holds NPR and PBS Executives Accountable for Leftist Propaganda Funded by
    Taxpayer Dollars, (Mar. 26, 2025)
    https://oversight.house.gov/release/hearing-wrap-up-doge-subcommittee-holds-npr-and-pbs-
    executives-accountable-for-leftist-propaganda-funded-by-taxpayer-dollars/..........................17

*Status of Nat'l Veterans Bus. Dev. Corp.*,
    28 Op. O.L.C. 62 (2004)...............................................................................................18

U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About .....20

## INTRODUCTION

As the President conferred with statutory authority to appoint members of the Board of the Corporation for Public Broadcasting ("CPB"), President Donald J. Trump has the lawful authority to remove them.  Congress empowered the President to appoint each member of the CPB's Board, with Senate confirmation.  47 U.S.C. § 396(c)(1).  That appointment power carries with it the incident power to remove Board members at will.  *See Myers v. United States*, 272 U.S. 52, 126 (1926).  Plaintiffs argue that the CPB's enabling statute does not contain a provision expressly stating that the President may remove Board members, and therefore the President lacks *any* authority to remove Board members.  That is backwards.  "Because of the background presumption that the President may remove anyone he appoints, Congress must make it clear in a statute if it wishes to restrict the President's removal power," not the other way around.  *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023).  Far from restricting the President's removal power, the Act provides that the CPB is generally governed by the D.C. Nonprofit Corporation Act, which itself creates a default rule that those who appoint board members have the authority to remove them.  *See* 47 U.S.C. § 396; D.C. Code § 29-406.08(e).

Plaintiffs get no further in arguing that the President lacks any authority over the CPB because Congress structured it as a corporation and provided that it is not a government agency.  In determining whether a government-created corporation is governmental for constitutional purposes, courts look not to Congressional disclaimers of agency status, but rather to a functional test based on the federal government's authority and influence over the corporation.  *See Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 50-55 (2015); *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392-99 (1995).  The CPB easily qualifies as governmental under this test because "the Government create[d] [the CPB] by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint . . . the directors of [the CPB]."

*Lebron*, 513 U.S. at 399.  That Congress has dictated many aspects of the CPB's operations, that the CPB must regularly report to Congress or the Executive Branch, it depends on federal appropriations for its own operations, and its principle function is to disburse half-a-billion dollars of Congressional appropriations per year to other organizations in a manner prescribed in detail by statute, further show that "its significant ties to the Government" make it "a governmental entity for purposes of the Constitution's separation of powers provisions."  *Ass'n of Am. R.Rs.*, 575 U.S. at 53-54.  The President's role in selecting Board members ties his reputation and faithful execution of statutory duties to their performance and service on the board.  *See Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) (removal authority is necessary for the President to "be held fully accountable for discharging his own responsibilities") (citation omitted).  The President must therefore be able to supervise Board members and remove them if necessary.

In any event, even if Plaintiffs were correct that the CPB should be viewed as a wholly private entity regulated only by District of Columbia corporate law, the result would be the same. That is because the D.C. Nonprofit Corporation Act enacts a default rule that "a director who is appointed by persons other than the members may be removed with or without cause by those persons."  D.C. Code § 29-406.08(e).  Any way you slice it, under executive removal precedents or under D.C. corporate law, the President's power to remove CPB Board members at will is incident to his power to appoint them.

The other equitable factors likewise weigh against preliminary relief.  Plaintiffs have failed to show a likelihood of imminent irreparable harm, as necessary for preliminary relief.  The loss of a position does not qualify as irreparable harm, absent a "genuinely extraordinary situation." *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974).  Plaintiffs' other claims to irreparable harm rest on speculative fear of potential future events.  The balance of equities and public interest weigh

against granting relief that would supersede Congress's choice to confer upon the President the authority to appoint Board members, which carries with it the incident power of removal. Finally, the relief Plaintiffs seek is improper and overbroad in several respects, because it would directly enjoin the President, go beyond traditional equitable remedies by reinstating a removed Presidential appointee, and prevent the President from filling even the four Board vacancies that existed *before* the President's recent removal of three Board members.

## BACKGROUND

### I.    Statutory Background

The CPB is a corporation created by Congress that advances governmental purposes subject to statutory restrictions by deploying appropriated taxpayer dollars. CPB is overseen by a Board consisting solely of Senate-confirmed Presidential appointees.

Congress created the CPB in the Public Broadcasting Act of 1967 (the "Act"). Pub. L. No. 90-129, 81 Stat. 365, *codified at* 47 U.S.C. § 390, *et seq.* Congress determined that the CPB would advance various governmental purposes, including serving the "public interest" by "encourag[ing] the growth and development of public radio and television broadcasting" and "nonbroadcast telecommunications technologies for the delivery of public telecommunications services." 47 U.S.C. § 396(a)(1), (2).[1] The CPB advances these purposes primarily by using appropriated taxpayer funds, drawn from an established Public Broadcasting Fund administered by the Secretary of the Treasury, to issue grants supporting public broadcasting, in a manner prescribed in detail by statute. *See id.* § 396(k). Historically, CPB has issued grants to the Public

---

[1] *See also*, *e.g.*, *id.* § 396(a)(4) ("the encouragement and support of public telecommunications . . . are . . . of appropriate and important concern to the Federal Government"); *id.* § 396(a)(9) ("it is in the public interest for the Federal Government to ensure that all citizens of the United States have access to public telecommunications services through all appropriate available telecommunications distribution technologies").

Broadcasting System ("PBS"), National Public Radio ("NPR"), and local public radio and television broadcasting stations.

The CPB is governed by a "Board of Directors," which, when fully staffed, "consist[s] of 9 members appointed by the President, by and with the advice and consent of the Senate." *Id.* § 396(c)(1). The Act provides that "[t]he term of office of each member of the Board appointed by the President shall be 6 years." *Id.* § 396(c)(5). The Act contains no explicit provision protecting Board members from removal, such as a for-cause removal restriction. The only provision explicitly discussing how Board members could lose their seats during their term states that Board members who fail to attend 50 percent of Board meetings in a calendar year "shall forfeit membership and the President shall appoint a new member to fill such vacancy not later than 30 days after such vacancy is determined by the Chairman of the Board." *Id.* § 396(c)(7). The statute also states that the CPB is subject to D.C. Nonprofit Corporation Act to the extent that statute is consistent with the statute. *See id.* § 396(b). The District of Columbia Nonprofit Corporation Act, in turn, creates a default rule that the power to remove board members at will is incident to the power of appointment: "Except as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons." D.C. Code § 29-406.08(e).

The CPB's bylaws do not alter this default. As of at least 2021, the CPB's bylaws state that it is "managed by the Board of Directors" and that the "method of appointment of Directors and their terms of office shall be as set forth in the Public Broadcasting Act of 1967 and any amendments thereto." By-Laws of the Corporation for Public Broadcasting, As amended September 13, 2021 ("By-Laws"), at §§ 2.01-2.02 https://cpb.org/sites/default/files/CPB%20By-

Laws%20as%20amended%20September%2013%2C%202021.pdf.[2]    Nothing in the By-Laws mentions any removal protections for Board members.  In fact, the By-Laws do not mention removal of Board members at all.   By contrast, the Board appoints several "Officers" to manage the CPB day to day.  *Id.* § 4.01.  For those "appointed Officers," the By-laws specify that "[a]ny officer appointed by the Board may be removed by the Board, and any officer appointed by the President [of CPB] and Chief Executive Officer under expressed delegated authority from the Board may be removed by the [CPB] President, whenever, in the judgment of the Board or the [CPB] President, the best interests of the Corporation will be served thereby."  *Id.* § 4.04.  The Board members at issue in this litigation are not "appointed Officers."

The Public Broadcasting Act provides that "[t]he members of the Board shall not, by reason of such membership, be deemed to be officers or employees of the United States."  *Id.* § 396(d)(2). It also provides that the CPB "will not be an agency or establishment of the United States Government."  *Id.* § 396(b).  Notwithstanding the statutory disclaimer of CPB's government agency status, the Act and other statutes provide many levers of government control and influence over the CPB:

- As noted above, all of the CPB's Board members are appointed by the President and confirmed by the Senate.  *Id.* § 396(c)(1).

- Congress set forth specific qualifications for Board members, including that no more than 5 members will be of the same political party, that Board members must be "eminent in" relevant fields, and that the Board contain members who represent licensees and permittees of public television stations and public radio stations.  *Id.* § 396(c)(1)-(3).

- Congress restricted the compensation of CPB's officers and employees based on a federal employee pay scale.  *Id.* § 396(e)(1).

---

[2] These 2021 By-Laws are the most recent By-Laws available on the CPB's website.  That website collects the Board's resolutions from the year 2020 onward, and there is no more recent resolution amending the By-Laws.  *See* Corporation for Public Broadcasting, Board of Directors, Resolutions, https://cpb.org/aboutcpb/leadership/board/resolutions.

- Congress authorized the CPB to take various actions "[i]n order to achieve the objectives and to carry out the purposes of" the Act. *Id.* § 396(g); *see also id.* § 396(a) (listing those objectives and purposes). The CPB funds "public telecommunications . . . programs," assists "in the development . . . of interconnection systems" and "public telecommunication entities." 47 U.S.C. § 396(g)(1). And the CPB is empowered to make grants, hire staff, make payments, and to "take any other actions" necessary to support its congressional purposes. *Id.* § 396(g)(2). Congress also "prohibited" the CPB from owning or operating broadcast stations or producing its own programming. *Id.* § 396(g)(3).

- The CPB is primarily funded through annual Congressional appropriations. *Id.* § 396(k)(1). For example, in 2024, Congress appropriated $535 million to CPB for fiscal year 2026. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 696, § 407.

- Congress sharply restricted how the CPB can use its funds, requiring it to use appropriated funds "solely for its grants, contracts, and administrative costs." 47 U.S.C. § 396(k)(2). Congress further required the CPB to establish an annual budget, and Congress set forth specific percentage requirements or limits for certain uses of funds. *Id.* § 396(k)(3).

- Only a small percentage of the funds appropriated to CPB go to funding the CPB itself; the vast majority are disbursed in accordance with a highly reticulated statutory scheme to various local and national public-radio and public-broadcasting entities. *Id*. The CPB is, in short, a statutorily-created body that exists to administer the disbursement of appropriations in accordance with a statutory scheme.

- Congress imposed various requirements on recipients of grants from the CPB, including that they hold open meetings, that public broadcast station grant recipients establish a community advisory board, and that employees of PBS and NPR cannot "be compensated in excess of reasonable compensation" while those organizations receive grants. *Id.* § 396(k)(4), (8), (9).

- The CPB must be audited by the Government Accountability Office ("GAO") in accordance with regulations promulgated by the Comptroller General, and the Comptroller General must report on such audits to Congress. *Id.* § 396(l).

- The Act provides that nothing in the Act "shall be deemed . . . *except to the extent authorized in subsection (b)*, to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation, or over the curriculum, program of instruction, or personnel of any educational institution, school system, or public telecommunications entity." *Id.* § 398(a) (emphasis added).[3] That subsection requires the CPB to incorporate into its grant agreements equal employment opportunity (EEO) regulations promulgated by the Secretary of Health and Human Services and empowers the Secretary to review claims of EEO violations and make final determinations on such claims. *Id.* § 398(b)(2),

---

[3] Plaintiffs cite this provision frequently, yet they omit the caveat referring to subsection (b).

(3).  That subsection also requires the CPB to provide an annual report to the Secretary of Health and Human Services.  *Id.* § 398(b)(4).

- The CPB is a "designated Federal entity" under the Inspector General Act, 5 U.S.C. § 415(a)(1)(A), which means it has an Inspector General who conducts investigations and audits of the CPB's operations and issues reports to Congress, the CPB Board and Management, and the public, *see* Office of the Inspector General, Corporation for Public Broadcasting, https://cpboig.oversight.gov/what-we-do/overview (the CPB's Office of the Inspector General "conduct[s] independent audits, evaluations, and investigations" and "report[s] to Congress and the public about our activities").

- Congress holds oversight hearings regarding the CPB.  *See*, *e.g.*, House Committee on Energy & Commerce, Oversight and Investigations Subcommittee Hearing: "Examining Accusations of Ideological Bias at NPR, a Taxpayer Funded News Entity," https://energycommerce.house.gov/events/oversight-and-investigations-subcommittee-hearing-examining-accusations-of-ideological-bias-at-npr-a-taxpayer-funded-news-entity (May 8, 2024); *see also* Slavitt Decl. ¶ 9, ECF No. 2-2 (the CPB submits "annual request for appropriations" to Congress).

## II.    Factual and Procedural Background

On April 28, 2025, President Trump removed three members of the CPB's Board of Directors: Plaintiffs Laura G. Ross, Diane Kaplan, and Thomas E. Rothman (the "former members").  Slavitt Decl. ¶ 17.  The President communicated this removal through emails from Trent Morse, the Deputy Director of Presidential Personnel for the Executive Office of the President, informing the former members "[o]n behalf of President Donald J. Trump" that their "position on the Corporation for Public Broadcasting is terminated effective immediately."  *Id.* ¶¶ 18, 21.  After Plaintiffs' removal, two Board members remained.  *See* Pls.' Mot. for Temporary Restraining Order at 22, ECF No. 2 ("Motion" or "Mot.").  That is, before April 28, 2025, there were five Board members, and four slots on the CPB's Board were vacant.  On April 29, 2025, Plaintiffs filed their Complaint.  *See* Compl., ECF No. 1.  That same day, Plaintiffs also moved for a temporary restraining order.  The Complaint lists as Plaintiffs the CPB, the Board of Directors of the CPB, and the three former members.  *See* Compl. ¶¶ 1-5.  Defendants are President Trump,

the White House Presidential Personnel Office and its Director and Deputy Director, and the United States Office of Management and Budget and its Director. *Id.* ¶¶ 6-11.

The Complaint contains four counts. Count I seeks a declaratory judgment that the former members "lawfully remain members of the CPB's Board of Directors." *Id.* ¶ 45. Count II asserts that by terminating the former Board members, Deputy Director Morse exceeded statutory authority in violation of the Administrative Procedure Act ("APA"). *Id.* ¶¶ 55-56. Count III, labeled Violation of Separation of Powers/Ultra Vires Presidential Action, asserts that the removal of the former members "usurp[ed] congressional legislative authority" and exceeded the President's authority under Article II of the Constitution. *Id.* ¶¶ 61-62. Count IV claims that the former members' removal "constitutes a partial, unilateral repeal or amendment of the Act by the President," and accordingly "violates the Presentment, Appropriations, and Take care Clauses of the U.S. Constitution." *Id.* ¶¶ 70-71.

In the Motion, Plaintiffs seek a temporary restraining order enjoining all Defendants, including the President, from "taking any steps to implement or give effect to any purported removal of any board member of the [CPB]." Proposed Order at 1, ECF No. 2-3. It would also enjoin "Defendants and their officers, employees, and agents . . . from taking any steps to participate or engage in the corporate governance of the [CPB], including but not limited to purporting to appoint individuals to the board . . . ." *Id.* Thus, by its terms, Plaintiffs' proposed injunction would prevent the President from sending to the Senate nominees for even the four undisputed vacancies on the Board that existed before April 28, 2025.

In support of their TRO Motion, Plaintiffs submitted a declaration of the CPB's General Counsel, Evan Slavitt. In large part, this declaration summarizes the Act and Plaintiffs' legal arguments, Slavitt Decl. ¶¶ 1-16, and describes the correspondence communicating the President's

removal of three Board members, *id.* ¶¶ 17-21.  Mr. Slavitt also states that the CPB has "concern" that the President or the administration will take actions in the future that will purportedly harm the CPB, but he does not contend that any of these events have occurred to this point.  *Id.* ¶¶ 22-28.  This section of the declaration consists largely of a summary of court records in a separate case involving a different organization, the United States Institute of Peace ("the Institute"), in which Judge Beryl Howell has repeatedly denied preliminary relief.  *See* Minute Order, *U.S. Inst. of Peace v. Jackson*, 1:25-cv-804 (D.D.C. Mar. 19, 2025) ("Plaintiffs did not make the sufficient showings of likelihood of success on the merits and likelihood of suffering irreparable harm to warrant issuance of the extraordinary relief of a temporary restraining order ('TRO').");  Minute Order, *Jackson*, 1:25-cv-804 (Apr. 1, 2025) (denying plaintiffs' motion for relief under All Writs Act).  Judge Howell also denied preliminary relief in a related case, *Pippenger v. U.S. DOGE Service*, 1:25-cv-1090 (D.D.C.), involving plaintiffs making comparable claims arising from the same set of facts related to Board terminations at the Institute.  *See* ECF No. 25.

## LEGAL STANDARD

"Courts analyze motions for temporary restraining orders using the same standards that apply to preliminary injunctions."  *Nguyen v. U.S. Dep't of Homeland Sec.*, 460 F. Supp. 3d 27, 33 (D.D.C. 2020).  "These 'extraordinary' remedies 'should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.'"  *Id.* (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).  To obtain such extraordinary relief, a plaintiff "must show (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'"  *Hanson v. Dist. of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)), *pet. for cert. filed*, No 24-936 (Feb. 28, 2025).  When "the Government is the opposing party," the assessment of

"harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs must do more than merely show the possibility of prevailing on the merits, but rather, they must show "a substantial likelihood of success on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted). Plaintiffs also must establish irreparable harm, as failure do so is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *accord* 11A Charles Allen Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2025) ("Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief.").

## ARGUMENT

### I.    Plaintiffs Are Unlikely to Succeed on the Merits

Plaintiffs are unlikely to succeed on the merits of their claims because the President has the authority to remove Board members of the CPB at will.[4] As a longstanding rule of constitutional law and statutory interpretation, the President's removal authority is incident to his power to appoint. Therefore, statutes granting the President the power to appoint are construed as granting him the power to remove at will, absent a clear manifestation of Congressional intent to restrict the President's removal authority. That does not exist here. Plaintiffs ignore these principles and suggest that they do not apply because the CPB is wholly nongovernmental, but that is incorrect. Under the functional test articulated by the Supreme Court, for purposes of evaluating the President's removal authority and issues under the separation of powers, the CPB is

---

[4] Each claim in the Complaint depends on the legal contention that the President lacked legal authority to remove the former members. *See* Compl. ¶¶ 45, 55, 60, 70.

governmental because it was created by Congress to advance governmental purposes, it is governed by a Board of governmental appointees, it depends on governmental funding, and its operations are substantially restricted and dictated by federal statute. In any event, even if Plaintiffs were correct that the CPB should be viewed as a wholly private entity governed by the D.C. Nonprofit Corporation Act, the result would be the same. This is because the statute applies the same default rule as executive removal precedents: the power to remove a board member at will is incident to the power to appoint. The CPB's By-Laws do not alter this fundamental rule.

A.    **Absent a Valid Statutory Restriction on Removal, Presidential Appointees Are Removable by the President at Will**

At its base, "the power of removal [is] incident to the power of appointment." *In re Hennen*, 38 U.S. 230, 259 (1839) (holding that district court could remove court clerk because it appointed the clerk). This is doubly true for appointments by the President, as "it was very early adopted, as the practical construction of the Constitution, that [the removal] power was vested in the President alone." *Id.* at 259 (explaining resolution of the removal debate of 1789 in Congress). So courts have long recognized "the background presumption that the President may remove anyone he appoints." *Severino*, 71 F.4th at 1044; *see also Myers*, 272 U.S. at 126 ("In the absence of any specific provision to the contrary, the power of appointment to executive office carries with it, as a necessary incident, the power of removal."); *Parsons v. United States*, 167 U.S. 324, 338-39 (1897) (holding that the President had authority to remove Presidentially-appointed United States Attorneys at will, notwithstanding the fact that the statute provided for a term of years). Thus, "Congress must make it clear in a statute if it wishes to restrict the President's removal power" over a Presidential appointee. *Severino*, 71 F.4th at 1044. Here, no "plain text" of the Act "impose[s] a removal restriction" on the President." *Id.* Rather, like the statute at issue in *Severino*, no provision of the Act restricts the President's removal authority. Absent a valid,

express restriction on removal, the President has discretion to remove those he appoints.  And if anything, the Act's incorporation of the District of Columbia Nonprofit Corporation Act demonstrates the opposite.  47 U.S.C. § 396(b).

The fact that the Act provides a fixed term of years for Board members, *see* 47 U.S.C. § 396(c)(5) ("[t]he term of office of each member of the Board appointed by the President shall be 6 years"), does not imply a restriction on removal.  "When used in federal appointment statutes, the word 'term' has a long-settled meaning of limiting a person's tenure in office, not investing the person with a guaranteed minimum period of service.  A 'term,' in other words, is a ceiling, not a floor, on the length of service."  *Severino*, 71 F.4th at 1045.  Thus, "the longstanding meaning of a fixed-term provision laid out in *Parsons* and *Myers*" is that "[a] defined term of office, standing alone, does not curtail the President's removal power during the office-holder's service."  *Id.* at 1047.

Plaintiffs also point to the fact that a provision of the Act calls for Board members to "forfeit membership" if they miss more than 50 percent of Board meetings, 47 U.S.C § 396(c)(7), suggesting that this implies the lack of at-will removability.  Mot. 5-6.  But nothing in that provision precludes removal of a Board member by other means.  As a general matter, the "[e]*xpressio unius*" or "negative-implication canon," under which the expression of one thing in a statute implies the exclusion of others, "must be applied with great caution, since its application depends so much on context. . . . The doctrine properly applies only when the *unius* . . . can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012).  Automatic removal for failing to perform one's duties in no way limits discretionary removal by the appointer (here, the President).  Indeed, it would be absurd to believe that Congress intended

that a Board member could not be removed for any reason other than failure to attend Board meetings.  If that were the case, a Board member could not be removed for any other type of serious misconduct, even commission of a felony.  That goes far beyond typical for-cause removal restrictions.  *See*, *e.g.*, 15 U.S.C. § 41 (FTC members can be removed for "inefficiency, neglect of duty, or malfeasance in office").  Thus, § 396(c)(7) plainly does not provide the exclusive means of removing a Board member, and the *expressio unius* canon simply does not apply.

Plaintiffs also argue that a series of provisions stating that the CPB is not a government agency confers on Board members protections from removal, particularly the following provision: "[CPB] . . . will not be an agency or establishment of the United States Government.  The Corporation shall be subject to the provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act."  47 U.S.C. § 396(b).  This argument fails for three reasons.  First, none of these provisions mentions removal authority, and therefore they do not "make it clear" that Congress "wishe[d] to restrict the President's removal power," as they must to displace the baseline rule of statutory construction.  *Severino*, 71 F.4th at 1044.  Second, for the reasons explained below, the CPB is governmental for purposes of the separation of powers analysis.  *See infra*, pp. 14-22.  Third, the D.C. Nonprofit Corporation Act likewise makes power to remove a Board member at will incident to the power to appoint.  *See* D.C. Code § 29-406.08(e); *infra*, pp. 22-24.  Thus, if anything, Congress's decision to make the CPB a D.C. nonprofit corporation reinforces the conclusion that the President's removal authority is incident to his appointment authority.

At bottom, Plaintiffs' argument is that the Act must preclude the President's removal authority because it specifically authorizes Presidential appointment but does not mention Presidential removal.  *See* Mot. 13 ("The only authority the President has with respect to the CPB

is to nominate board members, with the advice and consent of the Senate.  47 USC 396(c).

Nowhere in the statute is the President empowered with any other authority with respect to the

CPB.  As a result, the President has no authority to terminate Board members of CPB.").  This

argument gets the matter backwards. "Because of the background presumption that the President

may remove anyone he appoints, Congress must make it clear in a statute if it wishes to restrict

the President's removal power." *Severino*, 71 F.4th at 1044.  The Act's lack of restrictions on

Presidential removal confirms the presence, not the absence, of the President's removal authority.

### B.    The CPB Is Governmental for Constitutional Purposes, Such as the President's Removal Authority

Plaintiffs entirely ignore the executive removal precedents that demonstrate that the

President has the authority to remove Board members of the CPB.  Instead, they argue primarily

that the Court should treat CPB as wholly nongovernmental, arguing that "[a]s a result of the

CPB's independent, non-governmental nature, the President has no inherent authority over it."

Mot. 13.  Since the President appoints the Board members, that is irrelevant.  *See In re Hennen*,

38 U.S. at 259 (court can remove court clerk appointed by the court because removal is incident

to appointment).  Regardless, Plaintiffs are incorrect.

In considering whether a government-created corporation is part of the government for

purposes of separation of powers, courts apply a functional test that does not depend on whether

Congress formally structured the entity as a corporation rather than a government agency.  Under

that test, the CPB is governmental because it is created by the government to serve governmental

purposes, its Board is appointed wholly by the government, it is primarily funded by the

government, and the Act dictates many aspects of the CPB's operations.

The framework for evaluating whether a government-created corporation should be

considered part of the government is set forth in *Lebron v. National Railroad Passenger Corp.*,

513 U.S. 374 (1995), and its progeny.  In *Lebron*, the Supreme Court held that the National Railroad Passenger Corporation (commonly known as Amtrak) was "an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution," even though the federal statute creating Amtrak structured it as a corporation.  *Id.* at 394.  Amtrak, much like the CPB, is a corporation created by a federal statute that "declares that [Amtrak] 'will not be an agency or establishment of the United States Government."  *Id.* at 391 (quoting Rail Passenger Service Act of 1970, Pub. L. No. 91-518, 84 Stat. 1328, 1330).  Just as Plaintiffs rely on a provision of the Act stating that CPB is not a government agency, Mot. 9 (citing 47 U.S.C. § 396(b)), Amtrak argued that "its charter's disclaimer of agency status prevents it from being considered a Government entity in the present case." *Id.* at 392.  But the Supreme Court concluded that "[t]his reliance on the statute is misplaced."  *Id.*  The Court reasoned that it does not consider Congressional determination within the enabling statute as the final word of an entity's status as governmental or nongovernmental, particularly in areas where the agency affects the "constitutional rights of citizens."  *Id.*  Thus, even though Amtrak (like CPB) is a corporation with a statutory disclaimer of government agency status, it could still infringe on First Amendment rights by rejecting an advertisement based on its content.  *Id.* at 377.

The Supreme Court instead applied a functional test to conclude that Amtrak was part of the government for constitutional purposes, holding "that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment."  *Id.* at 399.  That description of Amtrak applies equally to the CPB.  Indeed, the Supreme Court in *Lebron* identified the CPB as

an entity that is structured similarly to Amtrak and suggested that its analysis would likewise apply to the CPB. *See id.* at 391.

*Lebron* dealt specifically with whether the First Amendment applied to Amtrak, but the Department of Justice's Office of Legal Counsel ("OLC") later relied on *Lebron* to conclude that "[t]he President may remove a member of the Amtrak Reform Board without cause." *Holdover and Removal of Members of Amtrak's Reform Bd.*, 27 Op. O.L.C. 163, 163 (2003). OLC reasoned that *Lebron* applied to the removal question because there is "no principled basis for distinguishing between the status of a federal entity vis-a-vis constitutional obligations relating to individual rights and vis-a-vis the structural obligations that the Constitution imposes on federal entities." *Id.* at 166 (quoting *Const. Separation of Powers Between the President and Cong.*, 20 Op. O.L.C. 124, 148 n.70 (1996)).[5] OLC therefore deemed applicable to Amtrak the "fundamental element of Executive Branch structure . . . that presidential appointees are subject to removal by the President." *Id.*

Of course, OLC opinions are not binding on courts. But the Supreme Court favorably cited this OLC opinion in holding that Amtrak is "a governmental entity for purposes of the Constitution's separation of powers provisions." *Ass'n of Am. R.Rs.*, 575 U.S. at 53-54; *see id.* at 51 (citing this OLC opinion). The Supreme Court pointed to many characteristics of Amtrak supporting the conclusion that Amtrak was a public entity for purposes of the separation of powers analysis, almost all of which apply equally if not more so to the CPB.

- Board members are "appointed by the President and confirmed by the Senate," *Ass'n of Am. R.Rs.*, 575 U.S. at 51. The same is true for CPB. *See* 47 U.S.C. § 396(c)(1). In fact, *most* of Amtrak's Board members are Presidentially appointed and Senate confirmed, *Ass'n of Am. R.Rs.*, 575 U.S. at 51, but *all* of CPB Board members are, *see* 47 U.S.C. § 396(c)(1).

---

[5] As this quotation indicates, this interpretation has been consistently adhered to by the OLC under administrations of both major political parties.

- "Under further statutory provisions, Amtrak's Board members must possess certain qualifications." *Ass'n of Am. R.Rs.*, 575 U.S. at 51. Likewise, CPB Board members must be of partisan balance, have eminence in certain fields, and represent interests of licensees of public broadcasters. *See* 47 U.S.C. § 396(c)(1)-(3).

- "Amtrak must submit numerous . . . reports" to the federal government. *Ass'n of Am. R.Rs.*, 575 U.S. at 52. Similarly, CPB must submit annual reports to the Secretary of Health and Human Services regarding EEO issues, 47 U.S.C. § 398(b)(4), the GAO the CPB and the Comptroller General submits reports of those audits to Congress, 47 U.S.C. § 396(l)(2)(B), CPB submits annual appropriation requests to Congress, Slavitt Decl. ¶ 9, "CPB is under an obligation under the Continuing Resolution to make certain reports to the Office of Management and Budget," *id.* ¶ 27, and the Inspector General of CPB "report[s] to Congress" about its audits and investigations of CPB. Office of the Inspector General, Corporation for Public Broadcasting, https://cpboig.oversight.gov/what-we-do/overview.

- "Amtrak must maintain an inspector general, much like governmental agencies such as the Federal Communications Commission and the Securities and Exchange Commission." *Ass'n of Am. R.Rs.*, 575 U.S. at 52. CPB is also a "designated Federal entity" with an inspector general. 5 U.S.C. § 415(a)(1)(A).

- "Congress conducts frequent oversight hearings into" Amtrak. *Ass'n of Am. R.Rs.*, 575 U.S. at 52. Congress has likewise recently conducted oversight hearings into the CPB and how it deploys its funds. *See*, *e.g.*, House Committee on Energy & Commerce, Oversight and Investigations Subcommittee Hearing: "Examining Accusations of Ideological Bias at NPR, a Taxpayer Funded News Entity," https://energycommerce.house.gov/events/oversight-and-investigations-subcommittee-hearing-examining-accusations-of-ideological-bias-at-npr-a-taxpayer-funded-news-entity (May 8, 2024); Press Release, Committee on Oversight and Government Reform, Hearing Wrap Up: DOGE Subcommittee Holds NPR and PBS Executives Accountable for Leftist Propaganda Funded by Taxpayer Dollars, https://oversight.house.gov/release/hearing-wrap-up-doge-subcommittee-holds-npr-and-pbs-executives-accountable-for-leftist-propaganda-funded-by-taxpayer-dollars/ (Mar. 26, 2025).

- "Amtrak is required to pursue numerous . . . goals defined by statute." *Ass'n of Am. R.Rs.*, 575 U.S. at 53. The Public Broadcasting Act of 1967 sets forth clear congressional purposes for CPB and limits its use of appropriated funds. *See* 47 U.S.C. § 396(a) (setting forth Congressional purposes for CPB); *id.* § 396(g) (authorizing the CPB to take actions and prohibiting the CPB from taking other actions to further Congressional purposes); *id.* § 396(k)(2)-(3) (directing and limiting CPB's uses of appropriated funds).

- "Amtrak is also dependent on federal financial support." *Ass'n of Am. R.Rs.*, 575 U.S. at 53. The CPB is primarily supported by Congressional appropriations and the Public Broadcasting Fund administered by the Secretary of the Treasury. *See* 47 U.S.C. § 396(k)(1) (establishing Public Broadcasting Fund to support CPB's operations); Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 696, § 407 (appropriating $535 million to CPB for fiscal year 2026; Compl. ¶ 1 ("CPB is the steward of the federal government's investment in public broadcasting").

17

Furthermore, in carrying out its various "public interest" missions, the CPB "acts as a governmental agency in performing its functions," *Lebron*, 513 U.S. at 394-96, in that it has sweeping grant- and contract-making power. *See* 47 U.S.C. § 396(g)(2)(A), (B).  That is, it is "authorized to . . . obtain grants from and make contracts with individuals and with private, State, and Federal agencies, organizations, and institutions," and can also "contract with or make grants to public telecommunications entities, national regional, and other systems of public telecommunications entities, and independent producers and production entities for the production of acquisition of public telecommunications services to be made available for use by public telecommunications entities." *Id.*  Ample authority exists for treating other government-created entities as governmental where they serve governmental purposes, such as these, and are controlled by governmental appointees.[6]  "That Government-created and -controlled corporations are (for many purposes at last) part of the Government itself has a strong basis, not merely in past practice

---

[6] *See Biden v. Nebraska*, 600 U.S. 477, 490-92 (2023) (finding that a state nonprofit corporation was "part of" the state, for purposes of determining the state's standing to sue, where the corporation was "created by the State to further a public purpose, is governed by state officials and appointees, reports to the State, and may be dissolved by the State"); *Pennsylvania v. Bd. of Dirs. of City Trs. of Phila.*, 353 U.S. 230, 231 (1957) (per curiam) (holding that Girard College, which had been built and maintained pursuant to a privately erected trust, was nevertheless a governmental actor for constitutional purposes because it was operated and controlled by a board of state appointees, which was itself a state agency); *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539 (1946) (concluding Reconstruction Finance Corporation ("RFC") was "an agency selected by Government to accomplish purely governmental purposes"); *Reconstruction Fin. Corp. v. J.G. Menihan Corp.,* 312 U.S. 81, 83 (1941) (finding RFC—despite its organic statute not stating it to be a Governmental instrumentality, to be "a corporate agency of the government" because "it acts as a governmental agency in performing its functions."); *Inland Waterways Corp. v. Young*, 309 U.S. 517 (1940) (finding that Inland Waterways Corporation, though not specifically designated in its charter as an instrumentality of the U.S., was an agency of the U.S.); Status of Nat'l Veterans Bus. Dev. Corp., 28 Op. O.L.C. 62, 78 (2004) (determining that the National Veterans Business Development Corporation was a government corporation under 5 U.S.C. § 103 and an agency under 31 U.S.C. § 902 where the "President appoints the entire Board of Directors," "high-level federal officials serve on the Board," the United States "regulates NVBDC's fiscal operations," and the entity "receives federal appropriations").

and understanding, but in reason itself.  It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Lebron*, 513 U.S. at 397.  There is no basis to treat CPB differently.

None of Plaintiffs' contrary arguments is persuasive.  Plaintiffs point to a provision of the Act stating that the CPB is not "an agency or establishment of the United States Government," 47 U.S.C. § 396(b), Mot. 9, and they argue that similar statutes that do not define the CPB as an executive department, government corporation, or executive agency, Mot. 10-11 (citing 5 U.S.C. §§ 101, 103, 105).  Plaintiffs also cite a case relying on the agency disclaimer to support the conclusion that the Act did not create a private right of action by viewers of public broadcasting to sue the CPB for violating the Act.  *Network Project v. Corp. for Public Broadcasting*, 398 F. Supp. 1332 (D.D.C. 1975), *aff'd in part, rev'd in part and remanded*, 561 F.2d 963 (D.C. Cir. 1977).  But while the agency disclaimer may be relevant to that discrete issue of statutory interpretation, it is "not dispositive of [CPB]'s status as a governmental entity for purposes of separation of powers analysis under the Constitution." *Ass'n of Am. R.Rs.*, 575 U.S. at 51; *see also Lebron*, 513 U.S. at 392 (disclaimer of agency status may be "dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control," but "it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions").  Moreover, statutes do not uniformly exclude the CPB from lists of federal entities.  It is listed as a "designated Federal entity" under the Inspector General Act, 5 U.S.C. § 415(a)(1)(A), which means that it "must maintain an inspector general, much like governmental agencies such as the Federal Communications Commission and the Securities and Exchange Commission," *Ass'n of Am. R.Rs.*,

575 U.S. at 52, a fact specifically relied on by the Supreme Court in classifying Amtrak as governmental for separation-of-powers purposes, *id.*

For the same reasons, the fact that CPB is not listed in the United States Government Manual, Mot. 11, does not affect the analysis. The U.S. Government Manual does not purport to be a legal document or a definitive expression of the Executive's view on the law. Rather, it is a handbook that provides salient information as to the identities of officials, summaries of agency missions, histories of agencies, and contact information for government components. U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About. As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" *Id.* Presumably, its omission simply reflects that the CPB did not submit any information for inclusion in the U.S. Government Manual. Notably, the GAO included the CPB in a report about "government corporations" even though the CPB had "reported" to GAO "that [it] w[as] not" a government corporation, because it is "frequently considered to be [a government corporation] by others and w[as] previously identified in several major [government corporation] studies done over the last 15 years." Gov't Accountability Office, Government Corporations: Profiles of Existing Government Corporations at 2 n.4, 160 (1996), https://www.gao.gov/assets/ggd-96-14.pdf. In any event, the CPB's exclusion from the Manual does not change the fact that it is a corporation created "by special law, for the furtherance of governmental objectives," and the government "retains for itself permanent authority to appoint . . . the directors of that corporation." *Lebron*, 513 U.S. at 399.

Nor does the provision invoked and selectively quoted, out of context, by the Plaintiffs, Mot. 10, stating that the Act generally does not "authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over" the CPB, 47

U.S.C. § 398(a), signify that the CPB is nongovernmental.  The Plaintiffs fail to mention that this section in fact subjects the CPB to significant oversight of its employment practices by the Secretary of Health and Human Services.  *Id.* § 398(b).[7]  Further, the provision disclaiming departmental and officer supervision over the CPB does not expressly mention the President. Courts generally "require an express statement by Congress" to construe statutes as restricting the President's exercise of executive power. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).  In any event, it is undisputed that, as with Amtrak, the President and Congress exercise significant control over the CPB because its "Board members are appointed by the President and confirmed by the Senate," and it is "dependent on federal financial support" provided through appropriations. *Ass'n of Am. R.Rs.*, 575 U.S. at 53.

Plaintiffs cite Supreme Court and D.C. Circuit precedents, but those cases actually support the conclusion that the CPB is governmental for constitutional purposes.  For example, in *FCC v. League of Women Voters*, 468 U.S. 364 (1984), the Supreme Court held that a law restricting public broadcasting stations that received CPB grants from engaging in editorializing violated the First Amendment.  *Id.* at 366, 402.  Plaintiffs point to language in the Court's opinion noting the objective of "assur[ing] the maximum freedom *[of local stations]* from interference with or control of program content," *id.* at 389 (emphasis added) (second alteration in original), and "that Congress was concerned with assur[ing] complete freedom from any Federal Government influence," *id.* at 394.  But the Supreme Court referred to freedom of government influence *over public broadcast stations*, explaining that "[c]onsistently with this concern, Congress refused to create any federally

---

[7] Since cabinet members such as the Secretary of Health and Human Services are classic principal officers subject to at-will removal by the President, *see Seila Law*, 591 U.S. at 215, the significant authority given to the Secretary of Health and Human services necessarily invokes Presidential supervision of the CPB.

owned stations and it expressly forbid the CPB to own or operate any television or radio stations." *Id.* at 394 (citing 47 U.S.C. § 396(g)(3)).  That is, because the CPB itself is subject to significant federal government influence through the Act, forbidding CPB from owning broadcasting stations is a way to insulate those stations from federal influence.  Therefore, the Supreme Court's analysis underscores that the CPB is governmental.

Plaintiffs also cite a D.C. Circuit case relying on § 398(a) to conclude that the FCC does not have general jurisdiction to regulate the CPB's compliance with the Act.  *Accuracy in Media, Inc. v. FCC*, 521 F.2d 288, 292-93 (D.C. Cir. 1975).  If anything, the fact that the CPB is not regulated by the FCC in a way that a private media company would be, so that the CPB can better pursue governmental objectives, suggests that the CPB is governmental, not a purely private entity.  And the D.C. Circuit acknowledged that despite the lack of general FCC jurisdiction, the federal government exercised substantial influence of the CPB, noting that the Act imposes many "statutory requirements" on CPB's operations and that "the appropriations process" provides a way for the government to influence CPB's activities."  *Id.* at 294.  These are among the factors relied on by the Supreme Court to conclude that Amtrak was governmental in the separation of powers analysis.  *Am. Ass'n of R.Rs.*, 575 U.S. at 53 ("Amtrak is required to pursue numerous, additional goals defined by statute" and "is also dependent on federal financial support").

Because the CPB is governmental for purposes of the separation of powers, the "fundamental element of Executive Branch structure . . . that presidential appointees are subject to removal by the President," applies to the CPB.  *Holdover and Removal of Members of Amtrak's Reform Bd.*, 27 Op. O.L.C. at 166.

C.    **CPB Board Members Are Removable at Will by the President Under the D.C. Nonprofit Corporation Act**

Even if Plaintiffs were correct that the CPB should be viewed as a purely private nonprofit corporation, application of the D.C. Nonprofit Corporation Act would produce the same result: Board members are removable by the President.  That act sets the same default rule for Board members as the governing executive removal precedents, that the power to remove is incident to the power to appoint.  Specifically, the D.C. statute provides that "[e]xcept as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons."  D.C. Code § 29-406.08(e).  Under that default rule, because the CPB's Board members are "appointed by" the President, they "may be removed with or without cause by" the President.  *Id.*

Plaintiffs cite no provision of CPB's By-laws or Articles of Incorporation that would displace this default rule, and Defendants are unaware of any.  The most recent bylaws of the CPB available on the CPB's website provide that "[t]he method of appointment of Directors and their terms of office shall be as set forth in the Public Broadcasting Act of 1967 and any amendments thereto," but say nothing specifically about removal of Board members.  By-Laws § 2.02.  Indeed, Plaintiffs concede that Board members may be removed "through the normal operation of District of Columbia law governing non-profits."  Mot. 5.  Because such normal operation would provide that he who has the power to appoint a Board member has the power to remove that Board member at will, that concession is dispositive.

In fact, the By-Laws reinforce this understanding.  One of the Board's roles is to appoint several "Officers" to manage the Corporation.  By-laws § 4.01.  In contrast to the Board, the By-Laws' provision for "appointed Officers" includes a "Removal" subsection that states that "[a]ny officer appointed by the Board may be removed by the Board, and any officer appointed by the

President [of CPB] and Chief Executive Officer under expressed delegated authority from the Board may be removed by the [CPB] President, whenever, in the judgment of the Board or the [CPB] President, the best interests of the Corporation will be served thereby." *Id.* § 4.04.  Thus, the CPB knew how to include specific removal provisions in their By-Laws but chose not to modify the default rule for Board members.  And even in setting the removal rules for Officers, the By-Laws adopt the default that the appointer may remove the appointee.  The fundamental principle that "the power of removal [is] incident to the power of appointment," *In re Hennen*, 38 U.S. at 259, operates on all sources of authority in this case.  And that principle dictates that the President lawfully terminated the former members of the Board.

> ### D. Plaintiffs' APA Claim Additionally Fails Because They Do Not Challenge Agency Action

Plaintiffs' APA claim depends on the legal contention that the President lacks authority to remove Board members of the CPB, Compl. ¶¶ 52, 54, and therefore fails for the reasons explained above, *see supra*, pp. 11-24.  It also fails for an independent reason: Plaintiffs do not allege any "agency action" under the APA.  5 U.S.C. § 702.

The former members were removed by the President, but it is well established that the President is not an agency under the APA.  *Franklin*, 505 U.S. at 800-01.  Plaintiffs try to circumvent this limitation by asserting that the former members were removed by Morse, Deputy Director of the Presidential Personnel Office of the Executive Office of the President.  Compl. ¶ 55; Mot. 16.  Yet as Plaintiffs concede, the former members were removed "by the President." Compl. ¶ 70.  The fact that Morse sent emails notifying Plaintiffs of the President's action to remove them does not convert the President's removal into an action of the Presidential Personnel Office, any more than every agency regulation is an action of the National Archives and Records Administration ("NARA") because NARA prints them in the Federal Register.  In any event, the

Presidential Personnel Office is also not an agency under the APA. "[A] component of the Executive Office [of the President] whose sole function [i]s to 'advise and assist the President' would not be an agency under . . . the Administrative Procedures Act." *Alexander v. FBI*, 691 F. Supp. 2d 182, 189 (D.D.C. 2010) (quoting *Soucie v. David*, 448 F.2d 1067, 1075 (D.C. Cir. 1971)), *aff'd* 456 F. App'x 1 (D.C. Cir. 2011). The Presidential Personnel Office is not an agency because it advises and assists the President in personnel functions but does not exercise "substantial independent authority" from the President. *Soucie*, 448 F.2d at 1073. Plaintiffs also argue that the Office of Management and Budget (OMB) violated the APA. Mot. 16. But for a TRO, Plaintiffs must demonstrate they are likely to succeed on the merits. Yet Plaintiffs provide zero evidence that OMB played a role in the terminations.[8] Even the Complaint contains no allegations of any actions by OMB or its Director Russell Vought. The only mention of them in the Complaint is in the listing of parties. *See* Compl. ¶¶ 8-9. If Plaintiffs could not even survive a motion dismiss, they surely cannot secure an extraordinary remedy like a TRO. Absent evidence of any agency action, Plaintiffs' motion must be denied.

## II.    Plaintiffs Fail to Show Imminent Irreparable Harm

Plaintiffs have failed to establish that a temporary restraining order is necessary to prevent irreparable harm, which alone is grounds to deny their motion. *See Chaplaincy*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."):

> [The D.C. Circuit] has set a high standard for irreparable injury. First, the injury "must be both certain and great; it must be actual and not theoretical." The moving party must show "[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." Second, the injury must be beyond remediation.

---

[8] The only mention of OMB in the declaration supporting the Motion is that the CPB makes certain reports to OMB. *See* Slavitt Decl. ¶ 27.

*Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)) (citations omitted).  "[I]t is well established that 'perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'"  *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 2013)).

Plaintiffs fail to meet this burden.  The primary harm they allege is that the former members have been terminated from their positions.  But loss of employment generally does not qualify as irreparable harm, absent a "genuinely extraordinary situation."  *Sampson*, 415 U.S. at 92 & n.68.

None of the other purportedly irreparable harms claimed by Plaintiffs withstands scrutiny. They argue that "the loss of constitutional freedoms" is necessarily irreparable harm.  Mot. 19 (quoting *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)).  But even if that were true, they do not show that they have been or imminently will be deprived of any constitutional freedoms.  Indeed, the Complaint contains no claim for violation of Plaintiffs' constitutional rights. *See generally* Compl. ¶¶ 44-71.  Plaintiffs argue that "[d]eprivation of private property by government seizure of that property" qualifies as irreparable harm, Mot. 20, but they do not allege or show that the government has seized any of their private property.  Plaintiffs argue that "[d]amage to reputation and goodwill also constitute irreparable harm."  *Id.*  In fact, courts are skeptical of such claims of irreparable harm to reputation, requiring that "the showing of reputational harm must be concrete and corroborated, not merely speculative."  *Jones v. Dist. of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) (citation omitted).  And Plaintiffs do not show how being terminated without a stated reason damaged their reputations in any way.

Plaintiffs claim irreparable harm because they have "concerns" that Defendants will take steps in the future "to seize CPB property." Mot. 21. But a fear of future adverse government action lacks the "imminence" or "certain[ty]" required for irreparable harm. *Chaplaincy*, 454 F.3d at 297, 298 (quoting *Wis. Gas Co.*, 758 F.2d at 674); *see also id.* at 299 (finding no irreparable harm based on concern that the Navy would deny promotions to military chaplains in the future); *cf. Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013) ("Article III standing requires more than the possibility of potentially adverse regulation.").

Plaintiffs also assert that "with only two board members," the CPB is "one short of a quorum which is necessary for the Board to take any corporate action." Mot. 22. But they fail to provide any evidence or legal argument on what immediate activities the CPB can or cannot undertake with two board members.[9] Plaintiffs' failure to meet their burden to show that a temporary restraining order is necessary to protect them from imminent irreparable harm is alone a sufficient reason to deny their Motion.

## III. The Balance of the Equities and Public Interest Weigh Against Injunctive Relief

The balance of the equities and public interest weigh against the Court issuing the extraordinary relief of enjoining the President and reinstating Board members the President has

---

[9] At the April 29, 2025, status conference, Plaintiffs' counsel referred to a statute requiring D.C. nonprofit corporations to have at least three directors, presumably D.C. Code § 29-406.03(a) ("A board of directors shall consist of 3 or more directors."). But another provision titled, "Quorum and voting," states that "[t]he articles of incorporation or bylaws may authorize a quorum of the board of directors to consist of no fewer than the greater of 1/3 of the number of directors in office or 2 directors," and that "[i]f a quorum is present when a vote is taken, the affirmative vote of a majority of directors present shall be the act of the board of directors unless a greater vote is required by the articles of incorporation or bylaws." *Id.* § 29-406.24(b), (c). The CPB's By-laws similarly provide that two directors may call a Board meeting if they represent at least one-third of the directors then serving, and that at a Board meeting, a quorum consists of "a simple majority of the Directors then serving pursuant to law." By-laws §§ 2.09-2.10. Defendants are not aware of any D.C. case law addressing a nonprofit corporation's authority to act when its board has been reduced to two members as a result of vacancies.

lawfully removed.  When Congress created the CPB and gave the President power to appoint all if its Board members, 47 U.S.C. § 396(c)(1), that reflected the public policy choice that the President should have the authority to remove them, under "the background presumption that the President may remove anyone he appoints."  *Severino*, 71 F.4th at 1044.  Even if the Court accepted Plaintiffs' meritless argument that these executive removal precedents are irrelevant and that only the D.C. Nonprofit Corporation Act should govern, the D.C. Council made the same public policy choice that he who has the authority to appoint a board member should have the authority to remove that board member at will.  D.C. Code § 29-406.08(e).  The public interest supports allowing the President to exercise the authority he possesses by virtue of the American people's decision to entrust him with the Presidency.  And, as here, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge.  *Nken*, 556 U.S. at 435.  So all the factors favor the government, requiring the Court to deny Plaintiffs' motion for a TRO.

## IV.     The Remedy Plaintiffs Seek Is Overbroad and Improper

For the reasons explained above, the Court should deny Plaintiffs' Motion and not award any relief.  But for several reasons, the remedy Plaintiffs seek is particularly overbroad and improper.

First, Plaintiffs improperly seek to enjoin the President.  The Supreme Court recognized long ago that a court "has no jurisdiction of a bill to enjoin the President in the performance of his official duties."  *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867); *see Franklin*, 505 U.S. at 826-28 (Scalia, J., concurring in part and concurring in the judgment).  The order sought by Plaintiffs would violate this principle by imposing broad injunctive relief on all "Defendants," including President Trump.  Proposed Order at 1-2.

Second, an order reinstating the former members would exceed the scope of the Court's equitable powers. A federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). But "a court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another." *White v. Berry*, 171 U.S. 366, 377 (1898) (citation omitted); *see also In re Sawyer*, 124 U.S. 200, 212 (1888).[10] Accordingly, "[t]he jurisdiction to determine the title to a public office belongs exclusively to the courts of law" — for instance, through suits for back pay. *Sawyer*, 124 U.S. at 212. This is why when officials have challenged their removal by the President, they have traditionally sought back pay, not reinstatement. *See Wiener*, 357 U.S. at 350 (suit "for recovery of his salary"); *Humphrey's Ex'r*, 295 U.S. at 618 (suit "to recover a sum of money alleged to be due . . . for salary"); *Myers*, 272 U.S. at 106 (suit "for his salary from the date of his removal"); *Shurtleff v. United States*, 189 U.S. 311, 318 (1903) (suit "for salary"); *Parsons*, 167 U.S. at 326 (suit "for salary and fees"). Thus, Plaintiffs' requested equitable remedies are improper.

---

[10] "[T]he power of a court of equity to restrain by injunction the removal of a [public] officer has been denied in many well-considered cases." *Id.*; *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers[.]"); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898) ("[T]o sustain a bill in equity to restrain . . . the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the Government."); *White*, 171 U.S. at 377 ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another."); *see also Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (observing that "courts of equity at the time of the founding were apparently powerless" to stop the removal of executive officers).

Third, the relief sought by Plaintiffs is plainly overbroad in that it would prevent the President from nominating *any* new members to the CPB Board, even to fill the four vacancies that undisputedly existed before April 28, 2025. *See* Proposed Order at 1 (enjoining Defendants, including President Trump from "taking any steps . . . purporting to appoint individuals to the board"). There is no basis for restraining the President from filling vacancies he otherwise has a right to fill under the statute. 47 U.S.C. § 396(c)(1).

## V.    If the Court Issues a Temporary Restraining Order, It Should Require a Bond

If the Court enters a temporary restraining order, it should order Plaintiffs to provide security. Under the Federal Rules of Civil Procedure, the Court may issue a temporary restraining order "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues a temporary restraining order here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any restraint. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Temporary Restraining Order.

Dated:  May 6, 2025

Respectfully Submitted,


YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 532-3114
Fax: (202) 616-8470
Email: jeremy.s.newman@usdoj.gov

*Attorneys for Defendants*