# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CORPORATION FOR PUBLIC BROADCASTING, *et al.* )<br>)<br>) | |
|      Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1 1:25-cv-01305-RDM |
| ) | |
| DONALD J. TRUMP, in his Official<br>Capacity as President of the United<br>States of America, *et al.* )<br>)<br>) | |
| ) | |
|      Defendants. ) | |

## PLAINTIFFS REPLY IN SUPPORT OF THEIR
## MOTION FOR A TEMPORARY RESTRAINING ORDER[1]

---

[1] Given that the underlying facts at issue in this matter will not change in the coming weeks, and both parties have had a chance to fully brief the issues, Plaintiffs believe it would be appropriate for the court to enter not just a temporary restraining order, but a preliminary injunction.

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ....................................................................... ii

**ARGUMENT** .............................................................................................. 2

   I.   CPB Is Likely To Succeed On The Merits Of Its Claim ................................. 2

     A.  Defendants' Assertion of Presidential Power is Incorrect ............................ 2

     B.  CPB is Not a Governmental Entity ................................................. 6

     C.  *Lebron* Does Not Assist Defendants ............................................. 10

     D.  Even if *Lebron* Applied, the Statute Authorizing CPB is Very Different from the Statute Creating Amtrak ................................................. 13

     E.  If a Government Entity, CPB is not an Executive Entity ............................. 14

     F.  The President Lacks Removal Power Under the D.C. Law ......................... 15

   II.  CPB and Its Board Will be Irreparably Harmed Without a TRO ................. 16

     A.  CPB Cannot Function Without the Statutory Minimum Number of Directors ..................................................................... 16

     B.  The Loss of Membership on CPB's Board of Directors Constitutes Irreparable Harm to those Board Members and to CPB ........................... 21

     C.  The Irreparable Harm Cited by CPB is Not Speculative ........................... 23

   III.  The Public Interest and the Balance of Equities Favor The Entry of A Temporary Restraining Order ..................................................... 24

   IV.  The Relief Sought by CPB is Appropriate, Not Overbroad ......................... 25

**CONCLUSION** ........................................................................................ **25**

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Accuracy in Media, Inc. v. F.C.C.*,
  521 F.2d 288 (D.C. Cir. 1975) ................................................................. 9, 15

*Aviel v. Gor*, No. CV 25-778,
  2025 WL 1009035 (D.D.C. Apr. 4, 2025) ............................................... 24

*Berry v. Reagan*,
  No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983),
  *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) (per curiam) .............................. 23

*Cmty.-Serv. Broad. of Mid-Am., Inc. v. F.C.C.*,
  593 F.2d 1102 (D.C. Cir. 1978) ............................................................. 15

*Children's Day Treatment Center and School, Inc. v. Dorn*,
  83 A.D.3d 425, 922 N.Y.S.2d 7 (N.Y. App. Div. 2011)............................................. 18

*Freidus v. Kaufman*,
  35 N.J. Super. 601, 114 A.2d 751 (Ch. Div.),
  *aff'd*, 36 N.J. Super. 321, 115 A.2d 592 (App. Div. 1955) ..................................... 18

*Gorman v. Salamone*,
  No. CV 10183-VCN, 2015 WL 4719681 (Del. Ch. July 31, 2015) ........................ 18

*Harris v. Bessent*,
  No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ............................ 4, 23, 25

*Harris v. Bessent*,
  No. 25-cv-412-RC, 2025 WL 521027 (D.D.C. Feb. 18, 2025)..................... 21, 22, 23

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) ................................................................. 3, 4, 22

*In re Hennen*,
  38 U.S. 230 (1839) ................................................................. 3

*Klayman v. Obama*,
  125 F. Supp. 3d 67 (D.D.C. 2015) ............................................................. 6

*Lamar v. United States*,
  241 U.S. 103, 36 S.Ct. 535 (1916) ............................................................. 6

*Laurel Baye Healthcare of Lake Lanier, Inc. v. N.L.R.B.*,
  564 F.3d 469 (D.C. Cir. 2009) ................................................................ 17

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................... 21

*Lebron v. Nat'l R.R. Passenger Corp.*,
  513 U.S. 374, 115 S. Ct. 961 (1995) ................................................. 10, 11, 12, 13

*Manhattan Cmty. Access Corp. v. Halleck*,
  587 U.S. 802, 139 S. Ct. 1921, 204 L. Ed. 2d 405 (2019) ....................................... 9

*Massachusetts v. Nat'l Institutes of Health*,
  No. 25-CV-10338, --- F.Supp.3d ----, 2025 WL 702163 (D. Mass. Mar. 5, 2025) .. 21

*Morrison v. Olson*,
  487 U.S. 654 (1988) ........................................................................ 4, 10

*Myers v. United States*,
  272 U.S. 52 (1926) ......................................................................... 3, 4, 15

*Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*,
  38 F.4th 1126 (D.C. Cir. 2022) ............................................................. 16

*Seila Law LLC v. Consumer Fin. Protection Bur.*,
  591 U.S. 197 (2020) ....................................................................... 2, 10

*Severino v. Biden*,
  71 F.4th 1038 (D.C. Cir. 2023) ......................................................... 5, 6, 9, 15

*U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*,
  813 F.3d 1259 (9th Cir. 2016) ............................................................. 11

*U.S. ex rel. Totten v. Bombardier Corp.*,
  380 F.3d 488 (D.C. Cir. 2004) ............................................................. 11

*United Tel. Credit Union, Inc. v. Roberts*,
  115 Ohio St. 3d 464 (2007) ................................................................ 18

*Wiener v. United States*,
  357 U.S. 349 (1958) ..................................................................... 4, 9, 22, 25

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................. 22

## FEDERAL STATUTES

5 U.S.C. § 101 ........................................................................................... 8

5 U.S.C. § 13101(11) ................................................................................ 14

12 U.S.C. §1717 ......................................................................................... 8

31 U.S.C. § 9101 ........................................................................................ 8

42 U.S.C. § 2296b(a) .................................................................................. 8

42 U.S.C. § 8102 ........................................................................................ 8

47 U.S.C. § 396 ................................................................................... *passim*

47 U.S.C. § 398 ................................................................................... *passim*

49 U.S.C. § 24301I .................................................................................... 14

49 U.S.C. § 24302(a) ................................................................................. 14

Pub.L. 90–129, 81 Stat. 365 ..................................................................... 13

Pub. L. 91-518, Title III, 302, Oct. 30, 1970, 84 Stat. 1330 ..................... 14

## STATE STATUTES

D.C. Code § 29-401.01 ............................................................................. 17

D.C. Code § 29-406.01(b) ........................................................................ 17

D.C. Code § 29-406.08 ........................................................................ 15, 16

D.C. Code § 29-406.24 ........................................................................ 16, 17

## OTHER AUTHORITIES

H.R.Rep.No.572, 90th Cong., 1st Sess. (1967) ........................................... 9

Defendants' argument can be summarized as follows: if the President can appoint, he can remove. This position, of course, would entitle the President to remove this very Court from its position. But Defendants' argument also defies the plain text of the statute authorizing the creation of CPB as a nonprofit corporation, Congress's plain purpose in authorizing the creation of CPB to be free from governmental control, and, the President's express language in signing the legislation authorizing CPB.

And that's just for starters. The Defendants' position is also undermined by controlling case law, which the Defendants take pains to overlook or otherwise attempt to evade, all supporting the plain text of the governing statute and its natural interpretation: CPB is *not* an agency of the Executive Branch, and CPB shall *not* be deemed to "authorize any department, agency, officer, or employee, of the United States to exercise direction, supervision, or control … over CPB." 47 U.S.C. § 398(a). Of course, permitting the President, who is well established to be an "officer" of the United States, to remove the CPB Board when Congress pointedly did not authorize him to do so, and to replace them with his own appointees in their place, would enable him to direct, supervise, and control CPB in exactly the manner Congress forbade.

Defendants fare no better in attempting to argue that legal and functional dismantling of a corporate board on which CPB, like other corporations, fundamentally relies for corporate governance, approval, oversight, direction, and operation on key matters somehow *doesn't* constitute irreparable harm to CPB and its Board. No corporation can properly function when its heart—its board of directors

—is not beating. Decisions cannot be made, policy cannot be determined, and all actions are potentially called into question. It is easy for agency employees to dismiss these core issues, but for those in the day-to-day life of a corporation, they are critical and immediate. Even more so when a company such as CPB faces existential questions of funding and assertions of authority that require balancing of clear congressional directives with new assertions of executive authority.

Ever since 1968, CPB has, under Republican and Democratic administrations, stood as the firewall between the government and the free press rights of the public media Congress, through CPB, funds. If Congress chooses to change that mission, then it may do so. The President may not.

## **ARGUMENT**

### I.   **CPB Is Likely To Succeed On The Merits Of Its Claim**

#### A. **Defendants' Assertion of Presidential Power is Incorrect**

Defendants argue that removal power is inherently and without limitation incidental to the President' power to appoint. *See* Opp'n at 1. Indeed, Defendants' argument would hand the President discretion to remove Your Honor from this very Court. Instead, the President's removal powers are limited to *executive branch* employees and officers—those employees and officers who wield the President's power. *Seila Law LLC v. Consumer Fin. Protection Bur.*, 591 U.S. 197, 213-214 (2020) ("These lesser officers must remain accountable to the President, whose authority they wield.'") (citations omitted). In fact, the Supreme Court effectively addressed Defendants' argument in *Humphrey's Executor v. United States,* when discussing the

power to terminate the purely judicial members of the Court of Claims: "We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named." 295 U.S. 602, 629 (1935). Because CPB is not an executive agency, nor is it wielding any of the President's executive power, the President has no authority over it.

In support of their incidental power argument, Defendants bypass the plain text of the statute authorizing CPB's creation, the legislative history undergirding it, and the President's remarks while signing the statute into law, instead invoking cases which do not support their broad construction. One such case is *In re Hennen*, 38 U.S. 230, 259 (1839), in which the Court found that an Article III judge was allowed to terminate a clerk in his court. Of course, a case dealing with a district judge's power to terminate a clerk provides no authority for the proposition that the President has unfettered authority to terminate anyone he appoints, even those outside of the executive department.

The Supreme Court has reaffirmed on multiple occasions that the President's removal authority is not inherently coextensive with the power to appoint and extends only to *executive offices*. In *Myers v. United States*, 272 U.S. 52 (1926), the Court limited its ruling to executive officers, stating: "the power of appointment to ***executive office*** carries with it, as a necessary incident, the power of removal." *Myers*, 272 U.S. at 126. The Supreme Court later specifically noted the limitation of its ruling in *Myers*, stating:

> The actual decision in the *Myers* Case finds support in the theory that [an executive officer] is merely one of the units in the executive department and,

3

> hence, inherently subject to the exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is…. [T]he necessary reach of the decision goes far enough to include all purely executive officers. It goes no farther; ***much less does it include an officer who occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President.***

*Humphrey's Ex'r*, 295 U.S. at 627–28 (emphasis added). This was not the only occasion on which the Supreme Court recognized the limitation on the Presidential removal power to *executive offices*.

> The assumption was short-lived that the *Myers* case recognized the President's inherent constitutional power to remove officials, no matter what the relation of the executive to the discharge of their duties and no matter what restrictions Congress may have imposed regarding the nature of their tenure.

*Wiener v. United States,* 357 U.S. 349, 352 (1958) (citations omitted).

Even that power to remove executive officers is not without limit. *Humphrey's Executor* validated limitations on the President's ability to terminate members of the Federal Trade Commission. 295 U.S. at 630-32. As the D.C. Circuit has recently expressed, "the Supreme Court has repeatedly stated that it was not overturning the precedent established in *Humphrey's Executor* and *Wiener* for multimember adjudicatory bodies. Instead, the Supreme Court has, in its own words, left that precedent 'in place[.]'" *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *1 (D.C. Cir. Apr. 7, 2025). The Supreme Court's holding in *Morrison v. Olson* also restricts the President's ability to remove executive officers: "[c]ontrary to the implication of some dicta in *Myers,* the President's power to remove Government officials simply was not all-inclusive in respect of civil officers with the exception of the judiciary provided for by the Constitution." 487 U.S. 654, 687 (1988) (citations and quotations

omitted).

Defendants wish away *Humphrey's Executor* and *Morrison* and urge this Court to ignore them. But those cases unambiguously support the proposition that appointment and removal are not co-extensive powers, and it depends on whether the person at issue is part of the executive branch.

Defendants' invocation of *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023) is curious, at best. In *Severino*, the D.C. Circuit did not rule "that the President may remove anyone he appoints," *see* Opp'n at 11-12. Rather, it ruled that "the President generally must be able to control those who execute the laws on **his** behalf" and "discharg[e] **his own** responsibilities" because "Presidential control … requires the ability to remove **executive officials**." *Severino*, 71 F.4th at 1044 (citations and quotations omitted) (emphasis added). Notably, *Severino* involved an entity specifically *within* the executive branch whose purpose was "**purely executive**" and which consisted of representatives from each executive department.[2] *Id.* at 1040 (emphasis added).

Contrary to Defendants' assertion, the D.C. Circuit did not rule that Congress "must make it clear" in the "plain text" of a statute that it intended to impose a restriction on removal. *See* Opposition at 11. Instead, it stated that "the Supreme Court has recognized … **two ways** Congress can send such a clear signal. First, Congress may impose a removal restriction in the plain text of a statute. Second,

---

[2] The person whose employment was terminated was the Director of the Office of Civil Rights in the Department of Health and Human Services, an executive office.

Congress may clearly indicate its intent to restrict removals ***through the statutory structure and function of an office***." *Severino*, 71 F.4th at 1044 (internal citations and quotations omitted) (emphasis added). But here, in authorizing CPB, Congress did so in *both ways*—explicit and structural.  In the plain text of the statute, Congress stated that: "Nothing … shall be deemed … to authorize any department, agency, ***officer***, or ***employee*** of the United States to exercise any direction, supervision, or control over … the Corporation." 47 U.S.C. § 398(a). The President is both an officer[3] and an employee of the United States.[4] Congress also structurally precluded the President's reach by stating that the CPB is not an "agency or establishment of the United States," 47 U.S.C. § 396(b), and that members of the CPB's board of directors are not officers or employees of the United States, 47 U.S.C. § 396(d)(2).

Put simply, the President's "incidental" power to remove can only exist with respect to *executive officers*.  As *Severino* holds, even in such circumstances, where Congress has by the plain text of the authorizing statute *or* by the statutory scheme indicated that the President may not be afforded such an implied right, he would not have that implied power. Defendants' own cited authority dooms their argument.

### B. CPB is Not a Governmental Entity

CPB is a non-profit corporation organized under the laws of the District of Columbia, it is not part of the government, and the President of the United States has no authority to remove its board members, just like the President has no

---

[3] *See Lamar v. United States*, 241 U.S. 103, 36 S.Ct. 535 (1916) (constitutionally recognized persons are officers of the United States).
[4] *See Klayman v. Obama*, 125 F. Supp. 3d 67, 82–85 (D.D.C. 2015).

authority to remove the board members of any other private corporation. This Court has already correctly observed that CPB is a "private entity." Dkt. No. 10 at 12:11. Defendants contend otherwise, however, even though the plain text of the legislation authorizing CPB, the legislative history, and binding D.C. Circuit authority, all demonstrate that CPB is a private entity.

CPB was "*authorized*" by Congress; it was not created by Congress: "There is authorized to be established a nonprofit corporation, to be known as the 'Corporation for Public Broadcasting', which will not be an agency or establishment of the United States Government." 47 USC § 396(b). The initial members of the Board of Directors "shall serve as incorporators and shall … establish the Corporation . . . ." *Id.* None of those initial incorporators were government officials or employees. Supp. Slavitt Decl. at ¶ 4 Exhibit A. Those members of the Board of Directors "***shall not, by reason of such membership, be deemed to be officers or employees of the United States***." 47 USC § 396(d)(2) (emphasis added). "Nothing in [the authorizing statute] shall be deemed . . . ***to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control*** . . . over the Corporation . . . ." 47 USC § 398(a) (emphasis added). At no time in CPB's 58-year existence has a member of the executive branch ever sat on its Board. Supp. Slavitt Decl. at ¶ 4. No federal governmental entity has any ownership interest in CPB. *Id.* at ¶ 6. CPB was intended to be a private corporation "to afford ***maximum protection from extraneous interference and control***." 47 U.S.C. §§ 396(a)(10) (emphasis added). That is, to afford "maximum protection" from the very type of interference

the President presses here.

The distinction between "authorization" and "creation" is important—whereas the *original* Board of Directors created the CPB, with Congressional authorization, Congress expressly **created** other organizations to which the Defendants compare the CPB.[5] Consistent with this, the Government Corporation Control Act identifies government corporations, including both mixed-ownership and wholly-owned, but does not include CPB. 31 U.S. Code § 9101. Statutes that define the entities that qualify as executive departments do not include CPB. 5 U.S.C. § 101. Time and again, Congress has clearly spoken that CPB is not a governmental entity.

When President Johnson signed the Public Broadcasting Act ("PBA"), which authorized the creation of CPB, he stated:

> Finally--and most important--it builds a new institution: the Corporation for Public Broadcasting.
>
> *       *       *
>
> It will get part of its support from our Government. **But it will be carefully guarded from Government or from party control.**

https://www.presidency.ucsb.edu/documents/remarks-upon-signing-the-public-broadcasting-act-1967 (emphasis added). President Johnson's language mirrors the legislative history of the PBA, which reflected Congress's intention that CPB "would be free from governmental influence or control in its operations" because of its

---

[5] *See* Opposition at 14-21 (citing GAO report discussing "government corporations"); *see also* 42 U.S.C. § 2296b(a) ("**There is established** in the District of Columbia a private nonmembership nonprofit corporation, which shall be known as the Legal Services Corporation . . . .") (emphasis added); 42 U.S.C. § 8102 ("**There is established** a Neighborhood Reinvestment Corporation . . . .") (emphasis added); 12 U.S.C. 1717 ("**There is created** a body corporate to be known as the 'Federal National Mortgage Association'") (emphasis added).

"concern that governmental regulation or control over the Corporation might turn the CPB into a Government spokesman." *Accuracy in Media, Inc. v. F.C.C.*, 521 F.2d 288, 293 (D.C. Cir. 1975) (citing H.R.Rep.No.572, 90th Cong., 1st Sess., at 19 (1967), U.S.Cong. & Admin.News 1967, pp. 1772, 1810).

CPB, therefore, is not a governmental entity. Its Board members are not executive officials who were executing any laws on the President's behalf or discharging any of the President's responsibilities. *See Severino*, 71 F.4th at 1044. Not only are its functions and duties not executive in nature, but they are also not even *governmental* in nature. *See Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 810, 139 S. Ct. 1921, 1929, 204 L. Ed. 2d 405 (2019) ("The relevant function in this case is operation of public access channels on a cable system. That function has not traditionally and exclusively been performed by government."). The President, therefore, has no incidental authority to remove members of CPB's Board.

Moreover, as noted above, Congress imposed a removal restriction in the plain text of the statute, as well as the "statutory structure," designed to insulate CPB from political influence and control, precluding the President's removal authority. *See Severino*, 71 F.4th at 1044. Defendants' apparent notion that Congress needed to expressly list the word "removal" in stating that CPB was not to be subject to executive "direction, supervision, or control," can hardly be serious. As the Supreme Court noted in *Morrison* about its ruling in *Wiener,* there was no removal provision in the statute setting up the War Claims Commission either, and the Supreme Court nonetheless limited the President's power to remove those commissioners. *Morrison,*

9

487 U.S. at 688 ("Commissioners were appointed by the President, with the advice and consent of the Senate, but the statute made no provision for the removal of officers . . . .").

Given CPB's Board of Directors are specifically *not* executive, or government, officials, of any kind, any specific removal restriction was unnecessary. *See* 47 USC § 396(d)(2). Even so, Congress spoke clearly and unequivocally as to the President's lack of authority over the CPB by explicitly stating in the statute: the CPB is not a government agency, its board members are not officers or employees of the United States, and no federal officer or employee shall have any control over it. 47 U.S.C. § 396(b); 47 U.S.C. § 396(d)(2); 47 U.S.C. § 398.

Defendants' argument that the President must have removal power because the "President's role in selecting Board members ties his reputation and faithful execution of statutory duties to their performance and service on the Board" is also meritless. Defendants cite *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020), but their citation belies their argument, noting that "removal authority is necessary for the President to 'be held fully accountable for discharging **his own responsibilities**.'" Opposition at 2 (emphasis added). Defendants have not identified **what** presidential "statutory duties" the Board members execute; in fact, they execute none of the President's duties. Because the Board members are not executing the President's responsibilities, there is no "necessity" for removal power.

### C. *Lebron* Does Not Assist Defendants

Defendants have also argued that, even though CPB is a private corporation,

for constitutional purposes, it should be treated as an executive entity subject to the President's removal power. Opposition at 14-22. To do so, the Defendants claim that the Supreme Court's opinion in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 115 S. Ct. 961, 974 (1995) applies here. *Id.* But *Lebron* determined whether a private entity should be considered a governmental entity with respect to the infringement of individual constitutional rights. *See Lebron*, 513 U.S. at 394 ("we conclude that it is an agency or instrumentality of the United States ***for the purpose of individual rights guaranteed against the Government by the Constitution*** . . . .") (emphasis added). There are no individuals' constitutional rights allegedly being infringed here by CPB—instead, it is the constitutional rights of CPB being infringed by the President's *ultra vires* actions.

"[J]ust because an entity is considered a federal instrumentality for one purpose does not mean that the same entity is a federal instrumentality for another purpose." *U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259 (9th Cir. 2016) (citations omitted). The D.C. Circuit has recognized this with respect to Amtrak, the "federal entity" at issue in *Lebron*: in *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 492 (D.C. Cir. 2004), it found that Amtrak was not a governmental entity for purposes of the False Claims Act, despite *Lebron*'s issuance nearly ten years beforehand. In doing so, then D.C. Circuit Judge Roberts relied on Congress's statement that Amtrak was not the government, noting that Congress's determinations of the matter were "assuredly dispositive of Amtrak's status as a governmental entity for purposes of matters that are within Congress's control." *Id.*

at 492 (quoting *Lebron*, 513 U.S. at 392). Individual rights guaranteed by the Constitution are not at issue here, rather whether the President can act in a way that Congress plainly stated he could not act, to terminate the members of the board of a private corporation, by overriding the plain text of the governing statute providing otherwise.

But, even if the Court were inclined to apply the *Lebron* standards, the invocation of *Lebron* fails at the threshold: the CPB is not a Congressionally-created corporation. Instead, it was authorized by Congress, and created by the original board of directors. 47 U.S.C. § 396. The statute is clear: Congress stated that it authorized the CPB to *be created*, not that Congress *created* it. Congress has found itself more than capable in other instances of ***creating*** corporations.[6]

Moreover, even the *Lebron* Court itself recognized a difference between the application of Amtrak's powers against individuals and the removal rights of the President:

> It is true that the directors of Amtrak, unlike commissioners of independent regulatory agencies, are not, by the explicit terms of the statute, removable by the President for cause, and are not impeachable by Congress. But any reduction in the immediacy of accountability for Amtrak directors vis-á-vis regulatory commissioners seems to us of minor consequence for present purposes—especially since, by the very terms of the chartering Act, Congress's right to repeal, alter, or amend this chapter at any time is expressly reserved.

*Lebron*, 513 U.S. at 398. The Supreme Court did not, however, find that the President has a necessary and incident right to remove those Amtrak directors. Instead, it

---

[6] *See,supra*, n.4.

stated that they "have no doubt, for example, that the statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit, and of the ordinarily presumed power of Government agencies authorized to incur obligations to pledge the credit of the United States." *Id.* at 392 (citations and quotations omitted). Similarly here, Congress has acted well within its constitutional powers in insulating the CPB from political influence.

## D. Even if *Lebron* Applied, the Statute Authorizing CPB is Very Different from the Statute Creating Amtrak

The PBA, authorizing the CPB, was enacted in 1967. Pub.L. 90–129, 81 Stat. 365. This statute emphasizes Congressional intent to insulate the CPB from political control and influence: it states that it shall not be "an agency or establishment of the United States Government" (47 U.S.C. § 396(b); that it should be "afford[ed] maximum protection from extraneous interference and control" (47 U.S.C. § 396(a)(10)); that the members of its board of directors "shall not . . . be deemed to be officers or employees of the United States" (47 U.S.C. § 396(d)(2)); and that "***nothing . . . shall be deemed . . . to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over***" it. 47 U.S.C. § 398(a) (emphasis added).[7]

---

[7] Defendants claim that CPB selectively quoted section 398(a) by leaving out "except to the extent authorized in subsection (b) . . . ." Opposition at 20. But subsection b simply requires the CPB to incorporate equal employment opportunity laws into its grant contracts. 47 U.S.C. § 398(b). Of course, as a private corporation, CPB is subject to all otherwise applicable federal laws, and a banal statement that the companies it does business with must also comply with those laws adds nothing to the determination of whether the CPB is a governmental entity.

In stark contrast, the statute creating Amtrak required Presidential approval of its incorporation. *See* Pub. L. 91-518, title III, 302, Oct. 30, 1970, 84 Stat. 1330 ("The incorporators shall take whatever actions are necessary to establish the Corporation, including the filing of articles of incorporation, ***as approved by the President***.") (emphasis added). The Secretary of Transportation sits on Amtrak's board. 49 U.S.C. § 24302(a). The Freedom of Information Act applies to Amtrak, but does not apply to CPB. *See* 49 U.S.C. § 24301I. And, most crucially, Amtrak's statute contains no provisions that its board members shall not be considered officers or employees of the United States due to their membership, and Amtrak's statute contains no provision affording it "maximum protection from extraneous interference and control." Congress expressed its clear intent to insulate CPB from political influence in a way that it did not with Amtrak, and the two cannot be equated.

## E. If a Government Entity, CPB is not an Executive Entity

To the extent that CPB could even be considered a governmental entity, it is not wielding executive power, but legislative power. The legislative branch encompasses various entities and offices beyond Congress. The Office of the Architect of the Capitol, the United States Botanic Garden, the Government Accountability Office, the Government Printing Office, the Library of Congress, the Office of Technology Assessment, the Congressional Budget Office, the United States Capitol Police, and "any other agency, entity, office, or commission established in the legislative branch" are part of the legislative branch. 5 U.S.C. § 13101(11).

> [CPB] was established as nonprofit and non-political in nature…. Numerous statutory safeguards were created to insure against partisan

abuses. Ultimately, Congress may show its disapproval of any activity of the Corporation through the appropriation process. This supervision of CPB through its funding is buttressed by an annual reporting requirement. Through these statutory requirements and control over the 'purse-strings,' **Congress reserved for itself the oversight responsibility for the Corporation.**

*Accuracy in Media*, 521 F.2d at 294 (citations omitted) (emphasis added). CPB, therefore, "is accountable to Congress and the public." *Cmty.-Serv. Broad. of Mid-Am., Inc. v. F.C.C.*, 593 F.2d 1102, 1108–09 (D.C. Cir. 1978).

Since CPB would *at most* be a part of the legislative branch, the President would have no "incidental" removal power to remove CPB's directors. *See Myers*, 272 U.S. at 126; *Severino*, 71 F.4th at 1044. Further, it would violate the separation of powers for the President to be able to remove a legislative officer, *i.e.* a CPB Board member, when "Congress reserved for itself the oversight responsibility for the Corporation." *See Accuracy in Media*, 521 F.2d at 294. Thus, even if a governmental entity, the President has no removal power over CPB's Board members.

## F. The President Lacks Removal Power Under the D.C. Law

Defendants have argued, in the alternative, that if the President does not have the incidental authority to remove CPB's Board members, he has that authority under the D.C. Nonprofit Corporation Act. Opp'n at 23-24. Defendants have argued that D.C. Code Section 29-406.08 allows the President to remove a CPB Board member because the section states that, "[e]xcept as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons." *See* D.C. Code § 29-406.08(e); Opp'n at 23. Initially, even if this were correct, it would require the

President to do so with the advice and consent of the Senate, as those are the persons who appointed the board members.  *See* 47 U.S.C. 396(c)(1).

Defendants are also incorrect because that section, read in that way, is inconsistent with the PBA.  Pursuant to the PBA, the CPB "shall be subject to the provisions of this section, and, ***to the extent consistent with this section***, to the District of Columbia Nonprofit Corporation Act."  47 U.S.C. § 398(b) (emphasis added).  The only basis for removal under the PBA is, as noted above, failure to attend at least half of all Board meetings.  *Id.* at § 396(c)(7).  D.C. Code Section 29-406.08 also provides that a board member may be removed if that member "missed the number of board meetings specified in the articles of incorporation or bylaws, if the articles or bylaws at the beginning of the director's current term provided that a director may be removed for missing the specified number of board meetings."  D.C. Code § 29-406.08(c)(4).  Congress, therefore, chose to include ***only*** this basis of removal from DC law, but also modified it, so that it did not apply only if in place when the Board member joined.  The canon of "*expressio unius est exclusio alterius*"— mention of one thing implies exclusion of the other—forecloses Defendants' interpretation here.  *See Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) (using the canon to reject SEC's interpretation of statute).

## II.    CPB and Its Board Will be Irreparably Harmed Without a TRO

### A.  CPB Cannot Function Without the Statutory Minimum Number of Directors

Defendants have also argued that CPB can function with only two members because D.C. Code § 29-406.24 and CPB's By-laws create a mechanism to get around

that issue. Opp'n at 27. Defendants' argument is incorrect because it wrongly equates (a) the statutory minimum number of directors, and (b) the necessary quorum of that statutory minimum that must be present to conduct business. Defendants have it backwards.

D.C. Code § 29-401.01 requires CPB to have a board of directors: "[A]ll corporate powers shall be exercised by or under the authority of the board of directors. D.C. Code § 29-406.01(b). Section 29-406.03 requires CPB's Board of Directors to have at least three members. Section 29-406.24's quorum definitions do not *override* Section 29-406.03's requirement of three board members. Instead, Section 29-406.24 simply sets forth, in subsection (a), the default quorum rule and, in subsection (b) – relied upon by Defendants – the minimum quorum rule. The requirement of three board members remains. CPB, therefore, cannot fulfill its quorum requirement without fulfilling its minimum number of directors.

In *Laurel Baye Healthcare of Lake Lanier, Inc. v. N.L.R.B.*, 564 F.3d 469 (D.C. Cir. 2009), the N.L.R.B. purported to act with only two board members, despite a statutory quorum requirement of three members. *N.L.R.B.* 564 F.3d at 470-72. In rejecting the N.L.R.B.'s "strained interpretation" of its "statutory Board quorum requirement" the D.C. Circuit concluded that: "The Board's ability to legally transact business exists only when three or more members are on the Board." *N.L.R.B.* 564 F.3d at 475. "Congress provided that a quorum of the Board is three members. The Board does not have three members. It cannot act." *Id*. That conclusion is consistent with case law from around the country concluding that a corporation's actions when

it lacks the minimum number of board members are not valid.[8]  CPB, therefore, cannot take action without the minimum number of members of the Board of Directors.

Defendants' Correspondence, therefore, "poses **an existential and immediate threat** to CPB's corporate existence and ability to undertake pressing and essential action necessary to maintain the infrastructure of the public media system. Supp. Slavitt Decl. at ¶ 11.

> CPB can only act through its board and in accordance with the requirements of the [PBA] and the D.C. nonprofit corporation statute. This means that if the terminations are allowed even on an interim basis, CPB has no longer has statutory power for its Board to provide general oversight responsibility for the management of the corporation's affairs and fulfill the mission of the [PBA].

*Id.* at ¶ 19.[9] CPB's General Counsel is required to frequently advise CPB's Board and seek its direction; in the past two months, there have been at least **eight** board meetings. *Id.* at ¶ 20. Without the minimum number of Board members, CPB cannot:

- "execut[e] any contracts and grant awards over $1 million;

- creat[e] any Board Committees, such as the Audit and Finance Committee,

---

[8] *See, e.g.*, *United Tel. Credit Union, Inc. v. Roberts*, 115 Ohio St. 3d 464, 469 (2007) (holding that statute requiring credit unions to have at least five directors on the board, three of which must be present for a quorum, prohibited a single director from taking any action); *Freidus v. Kaufman*, 35 N.J. Super. 601, 606, 114 A.2d 751, 753 (Ch. Div.), *aff'd*, 36 N.J. Super. 321, 115 A.2d 592 (App. Div. 1955) ("[W]hen there is less than the minimum number of directors as required by statute, the balance cannot act as a board except in regard to the ordinary internal affairs of the corporation which must be carried on from necessity"); *Children's Day Treatment Center and School, Inc. v. Dorn*, 83 A.D.3d 425, 922 N.Y.S.2d 7 (N.Y. App. Div. 2011) (where corporation's by-laws required a minimum number of directors, the board lacked authority to act).

[9] "Uncertainty regarding the identity of the lawful board would impair the corporate administration." *Gorman v. Salamone*, No. CV 10183-VCN, 2015 WL 4719681, at *8 (Del. Ch. July 31, 2015).

which provides oversight of the corporation's finances;

- assist[] with developing proposed appropriations requests to Congress;

- assist[] with any requests for appropriations, including emergency requests; [or]

- perform[] various human resources functions, such as hiring, firing, promoting and setting compensation for employees."

*Id.* "CPB has had two corporate officers leave and only has an interim corporate secretary;" "[p]roper and legally-binding Board approval is necessary to hire and replace existing corporate officers." *Id.* at ¶21. "CPB faces ongoing critical issues that require decisions in the near future regarding ongoing litigation, potential rescission of funding by Congress, Fiscal Year 2026 appropriated funding, among many other issues. These are mission critical – indeed even existential – issues that need to be considered by a properly constituted Board." *Id.* at ¶22.

Defendants' actions also pose irreparable harm to specific CPB responsibilities. "[T]he ability to have a statutory-compliant and functioning Board is critical to CPB's ability to maintain the public media infrastructure as mandated by Congress, including through numerous Congressionally appropriated grants that ***must be issued in the coming weeks and months***." *Id.* at ¶23. "CPB's mission is to ensure universal access to non-commercial, high-quality content and telecommunications services." *Id.* at ¶24. "CPB does not own or operate any of the equipment or infrastructure essential for the non-commercial, telecommunications services that Congress mandates that CPB provide and maintain. [That] system of transmitters, relay stations, satellite networks (the "Interconnection") is owned and operated by other non-profit corporations … and other public media stations, but funded through

CPB based on Congressional appropriations for [that] specific purpose." *Id.* at ¶¶25-27. "CPB is statutorily required to support Interconnection services for public media." *Id.* at ¶26 (citing 47 U.S.C. § 396(g)(1)(B)). "Interconnection is also essential to the National Emergency Alert System, which is a national public warning system used by federal, state, local, and tribal authorities to deliver important and timely emergency information," and the modernization thereof in the Next Generation Warning System ("NGWS"). *Id.* at ¶¶28-34. "A critical part of the Interconnection is maintaining access to the Public Radio Satellite System (PRSS), which is the national satellite distribution network." *Id.* at ¶35. The current PRSS Interconnection grant expires on September 30, 2025. *Id.* at ¶36. CPB was negotiating the extension of that grant for an additional $35,962,000 using funds that Congress has already appropriated for that specific purpose. *Id.* That extension must be approved by CPB's (legally constituted) Board. *Id.* If the PRSS Interconnection Grant is not extended, the PRSS system will cease operations and the resulting effects will be catastrophic because Interconnection is how stations across the country can share information, programing and communications. *Id.* To do so, fees are paid to various satellite system providers to reserve a certain amount of high-demand and limited telecommunications bandwidth to transmit data, which, once lost, cannot simply be re-purchased at a later time, as it has been acquired by other purchasers. *Id.*

Prior to the President's Correspondence, the Board had scheduled a meeting for May 13, 2025 at which CPB was scheduled to receive guidance and directional authority from the Board, including: (1) its legislative communications plan with

Congress; (2) pending and potential litigation; and (3) the NGWS Grant program, including approving  two Fiscal Year 2022 NGWS grant awards. *Id.* at ¶38. Without a legally constituted Board, it cannot approve or give direction on any of these matters. *Id.* The Board has a similar meeting set for June 4, 2025. *Id.*

As a matter of law, "obstacles [that] unquestionably make it more difficult for [a plaintiff] to accomplish [its] primary mission … provide[s] injury for purposes [of] … irreparable harm." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).[10] Here, "[p]ut bluntly, the Defendants' conduct has frustrated and prevented CPB from accomplishing the objectives and purposes of the mission provided to it by Congress under the Act." Supp. Slavitt Decl. at ¶39. CPB, therefore, has demonstrated irreparable harm.

## B. The Loss of Membership on CPB's Board of Directors Constitutes Irreparable Harm to those Board Members and to CPB

Additionally, Defendants have argued that the Board members' loss of their position on the Board does not qualify as irreparable harm. Opp'n at 26. Defendants ignore case law that recognizes irreparable harm in just such instances.

For example, in *Harris v. Bessent*, No. 25-cv-412-RC, 2025 WL 521027 (D.D.C. Feb. 18, 2025), the plaintiff, whom had been appointed, and confirmed by the Senate

---

[10] *See also Massachusetts v. Nat'l Institutes of Health*, No. 25-CV-10338, --- F.Supp.3d ----, 2025 WL 702163 at *30 (D. Mass. Mar. 5, 2025) (granting a preliminary injunction because "[f]or essentially all of the Plaintiff institutions, there are myriad other immediate consequences that will make it harder to fulfill their purpose…. These consequences include the degradation of vital infrastructure, the loss of imperative staff necessary for research to be conducted, … and finally, the uncertainty around the ability to sustain future grant applications, resulting in the loss of direct research").

to the Merit Systems Protection Board ("MSPB") and was purportedly terminated from that position, claimed that she would "suffer irreparable harm because, absent interim relief, she will be deprived of her "statutory right to function" as a senior government official" and because "her claim to MSPB membership may be frustrated by the appointment of a successor." *Harris*, 2025 WL 521027 at *6. The government argued that there was no harm because MSPB continued to function with a quorum[11] and because the President had not yet nominated a successor. *Id.* The court rejected the government's arguments and granted the plaintiff a temporary restraining order.

The court ruled that, with respect to the MSPB:

> Even if this Court were to direct Harris's reinstatement after resolving the merits of her claims … the MSPB's congressionally mandated independence would be permanently marred by the threat of renewed removal and delayed reinstatement while litigation proceeds. *See Humphrey's Executor*, 295 U.S. at 629–30, 55 S.Ct. 869 (explaining that the "coercive influence" of the removal power "threatens the independence of a commission"). Harris would reenter the position as a Chairman of the MSPB who had just been removed from her role for a significant length of time, and "the Damocles' sword of removal by the President," *Wiener*, 357 U.S. at 356, 78 S.Ct. 1275, would hang over her and her colleagues. This harm would accrue in the absence of a temporary restraining order, and the passage of time would both cause this damage and preclude a remedy. *See* [*Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)] (stating that injunctive relief is appropriate when post-hoc "legal remedies" are "inadqeua[te]").

*Harris*, 2025 WL 521027 at *8. With respect to the individual plaintiff, the court ruled that her termination deprived her of her statutory right to function as a member of the MSPB, "foreclosed her ability to carry out the [MSPB's] mission, and rejected the

---

[11] Of course, the necessary corollary to the government's argument, that the ability to function with a quorum demonstrated a lack of harm, is that the lack of a quorum, that inhibits the ability to function, **does** constitute irreparable harm.

notion that loss of employment did not constitute irreparable harm because the plaintiff was not seeking compensatory damages, such as back pay, that could be awarded later. *Id.* at *8-9. Ultimately, the court concluded that "[*i*]*f there ever were an "extraordinary case[ ]" meriting injunctive relief* for a Government employee, *then this would be it. Id.* at *8 (internal citations omitted). *See also Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *1 (D.D.C. Nov. 14, 1983) (""irreparable nature of [the] injury is evident by the obviously disruptive effect the denial of preliminary relief will likely have on the Commission's final activities"), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) (per curiam)).

Here, the same analysis applies with greater force. CPB Board members are *not* government employees. Yet, their deprivation from fulfilling their statutory right and obligation are the same. The effect on CPB itself would be the same. As in *Harris*, compensatory back pay is not at issue here. The general rule that loss of employment does not constitute irreparable harm does not apply here. CPB, and its Board members, therefore, have demonstrated irreparable harm.

### C. The Irreparable Harm Cited by CPB is Not Speculative

Defendants claim that CPB's claims of irreparable harm are speculative. Opposition at 26-27. The harm to CPB's ability to function as a corporation during the pendency of this litigation if the injunction is not granted, as detailed above, is not a mere possibility, but a virtual certainty. *See supra* Section II(1).

The threat of further adverse executive action, predicated on the unlawful removal of a majority of CPB's Board is most assuredly *not* speculative, particularly

23

given the context of Defendants' actions. Defendants' Correspondence is just the first step in a broader process. On April 29, 2025, just one day after sending the Correspondence purporting to terminate three of CPB's Board members, Department of Government Efficiency (DOGE) officials sent an email to the two remaining CPB Board members, in which they requested a meeting to "discuss getting a DOGE team assigned to the organization." *Id.* at ¶25. This email was sent immediately prior to this court's initial scheduling hearing on CPB's Motion, and counsel were not aware of it at the hearing. Two days later, President Trump issued an Executive Order, entitled "ENDING TAXPAYER SUBSIDIZATION OF BIASED MEDIA," in which he purported to "instruct the CPB Board of Directors and all executive departments and agencies to cease Federal funding for NPR and PBS." Supp. Slavitt Decl. at ¶¶ 11-12. In other words, further executive action is coming. This chain of events places the CPB in an analogous position to what Judge AliKhan recently faced in *Aviel v. Gor*, No. CV 25-778, 2025 WL 1009035, at *10–11 (D.D.C. Apr. 4, 2025), in which she found irreparable harm where later reinstatement would matter "little if the officer of a government organization returns to a pile of rubble."

CPB's claims of irreparable harm are well beyond mere possibility and into the realm of substantial likelihood.

### III.  <u>The Public Interest and the Balance of Equities Favor The Entry of A Temporary Restraining Order</u>

Defendants have not even tried to identify any harm that they would suffer. Nor could they. No harm would occur to the executive branch because CPB does not engage in executive functions or execute the President's responsibilities, and any

24

funding that CPB has received would not revert to the executive branch.

Instead, Defendants have argued that the "public interest supports allowing the President to exercise the authority he possesses . . . ." Opp'n at 28. This argument fails because any "claimed intrusion on presidential power only exists if *Humphrey's Executor* and *Wiener* are overturned." *Harris*, 2025 WL 1021435, at *2 (D.C. Cir.). Instead, it lies with CPB functioning per its statutory mission and structure.

## IV.    **The Relief Sought by CPB is Appropriate, Not Overbroad**

Defendants have argued that the relief sought by CPB is overbroad because it would enjoin the President in the performance of his official duties and would restrain the President from removal of "subordinate appointee[s]." Opp'n at 28-29. It would do no such thing because CPB does not engage in executive functions or execute the President's responsibilities and its Board members are not subordinate appointees within the executive branch.  Moreover, in stark contrast to Defendants' assertion that CPB would prohibit the "President from nominating any new members to the CPB Board," Opp'n at 30, that relief was never sought.  CPB's requested relief is simple: (1) the President should be enjoined from firing or removing its directors; and (2) the President cannot use the Vacancies Act to fill vacancies on the board. Indeed, there are currently four legitimate vacancies on the Board—CPB seeks no relief with respect to any nomination the President may make to those vacancies.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request that this Court grant their Motion for Temporary Restraining Order.

Date:  May 9, 2025                By: _/s/ Jason W. McElroy_
                                  Jason W. McElroy (D.C. Bar No. 502733)
                                  Peter C. Nanov (D.C. Bar No. 230021)
                                  SAUL EWING LLP
                                  1919 Pennsylvania Avenue NW, Suite 550
                                  Washington, D.C. 20006
                                  Tel: (202) 295-6605
                                  Email:      jason.mcelroy@saul.com
                                              peter.nanov@saul.com


                                  Jeffrey S. Robbins (*Admitted Pro Hac Vice*)
                                  Joseph D. Lipchitz (*Admitted Pro Hac Vice*)
                                  SAUL EWING LLP
                                  131 Dartmouth St., Suite 501
                                  Boston, MA 02116
                                  Tel: (617) 912-0941
                                  Email:      jeffrey.robbins@saul.com
                                              joseph.lipchitz@saul.com


                                  *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2025 I caused one copy of the foregoing **PLAINTIFFS REPLY IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER** on all parties and counsel of record via the Court's CM/ECF system as follows:

Jeremy Samuel Bloch Newman
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Email: jeremy.s.newman@usdoj.gov


*/s/ Jason W. McElroy*
Jason W. McElroy

*Counsel for Plaintiffs*

27