# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CORPORATION FOR PUBLIC
BROADCASTING, *et al.*,
*Plaintiffs*,
v.
DONALD J. TRUMP,
*in his official capacity as President of the*
*United States of America*, *et al.*,
*Defendants*.

Civil Action No. 25-1305 (RDM)

## SUPPLEMENTAL DECLARATION OF EVAN SLAVITT

I, Evan Slavitt, do hereby state under oath as follows:

1.      I am Executive Vice-President and General Counsel of the Corporation for Public Broadcasting ("CPB").  As the Public Broadcasting Act of 1967, 47 U.S.C. § 396, (the "Act") provides and authorizes, CPB is a private nonprofit corporation.  As General Counsel, I am responsible for all legal affairs concerning CPB.

## CPB Is A Private, Nonprofit Corporation, Not A Government Agency, Much Less A Part of The Executive Branch

2.      In my initial declaration dated April 28, 2025, I colloquially referred to the CPB as a Congressionally <u>created</u> private nonprofit corporation established pursuant to the Public Broadcasting Act of 1967, 47 U.S.C. § 396 (the "Act").  It is more accurate to state that CPB is a Congressionally <u>authorized</u> nonprofit corporation that was actually established by 15 private citizens who served as its incorporators.  Specifically, Section 396 of the Act provides:

b) ***Establishment of Corporation; application of District of Columbia Nonprofit Corporation Act***.  There is <u>authorized to be established a nonprofit corporation</u>, to be known as the "Corporation for Public Broadcasting", <u>which will not be an agency or establishment of the United States Government</u>. The Corporation shall be subject to the

provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act….

(4) The members of the initial Board of Directors shall serve as incorporators <u>and shall take whatever actions are necessary to establish the Corporation</u> under the District of Columbia Nonprofit Corporation Act.

47 U.S.C. § 396 (b) (emphasis added).

3.     As set forth in CPB's Articles of Incorporation, which are attached hereto as Exhibit A, CPB was incorporated on March 27, 1968 by 15 individuals, none of whom were government officials or employees.  <u>See</u> Exhibit A at Article IX.

4.     The Act does not dictate that any member of the executive branch sit on its Board of Directors and, indeed, notably for present purposes, at no time in its 58-year existence has a member of the executive branch ever sat on its Board.  Moreover, the Act provides that each board member shall serve for a six-year term, which is beyond the four-year tenure of any presidential term.  <u>See</u>, 47 U.S.C. § 396 (c)(5).

5.     In creating CPB, Congress made clear that it was "a private corporation [to] be created to facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control."  47 U.S.C. at § 396 (a)(10).

6.     To ensure that CPB is insulated from partisan governmental interference and control and to ensure its autonomy, Congress expressly provided that "[CPB] will not be an agency or establishment of the United States Government. The Corporation shall be subject to the provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act."  <u>Id</u>. at § 396(b).  Moreover, the U.S. Government, including all departments and agencies, has no ownership interest in CPB.

7.     In addition, the statute expressly forbids "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational

television or radio broadcasting, or over [CPB] or any of its grantees or contractors…." *Id*. at § 398(c).

8. Indeed, President Johnson in his public remarks in signing the Act on November 7, 1967 expressly emphasized that CPB was to remain free from governmental control and would be independent from any such control:

> This Corporation will assist stations and producers who aim for the best in broadcasting good music, in broadcasting exciting plays, and in broadcasting reports on the whole fascinating range of human activity. It will try to prove that what educates can also be exciting.
>
> It will get part of its support from our Government. But it will be carefully guarded from Government or from party control. It will be free, and it will be independent-and it will belong to all of our people.

Exhibit B -- Remarks Upon Signing the Public Broadcasting Act of 1967. Consistent with the purpose and express terms of the Act, CPB does not report to, take direction from, or allow itself to be controlled by anyone from the Executive Branch.

9. The CPB has its own independent non-governmental auditors, Grant Thornton, as dictated by the Act. See 47 U.S.C. at § 396 (l)(1)(A).

**The President's Unlawful Removal Of Three Members of CPB's Five-Person Board**

10. As set forth in my original declaration, on April 28, 2025, three members of the Board of Directors for CPB – Laura G. Ross, Diane Kaplan, and Thomas E. Rothman – received an email purportedly from Trent Morse, the Deputy Director of Presidential Personnel for the Executive Office of the President, purporting to notify those Board members that their positions on the Board of Directors for CPB were terminated.

11. CPB's Board of Directors is a five-person board. Under the D.C. nonprofit corporation statute, a board must have and maintain at least three directors. See D.C. ST § 29-406.03. The President's act of purporting to remove three members of CPB's board takes the board

below the three-person requirement for a nonprofit corporation under the D.C. nonprofit statute. Moreover, the purported termination also would deprive the CPB of a quorum for any board meeting or resolution. As discussed herein, this action poses an existential and immediate threat to CPB's corporate existence and ability to undertake pressing and essential action necessary to maintain the infrastructure of the public media system as a matter of corporate governance, corporate procedure and CPB's duties and obligations.

12.     On April 29, 2025, just one day after the President's purported termination of three members of CPB's board, DOGE officials sent an email to the two remaining CPB Board members. Specifically, the two Board members received an email at 3:02 p.m. purportedly from Nate Cavanaugh, a "member of the DOGE team working at the General Services Administration." Mr. Cavanaugh stated:

> My name is Nate Cavanaugh – I'm a member of the DOGE team working at the General Services Administration.
>
> Are you available for a meeting tomorrow or on Thursday? I would like to learn more about the Corporation for Public Broadcasting and discuss getting a DOGE team assigned to the organization.
>
> Best,
> Nate

Below is a true and accurate screenshot of the email sent to the two Board members who did not receive a purported notice of termination.

**From:** Nate Cavanaugh - Q2 <nate.cavanaugh@gsa.gov>
**Sent:** Tuesday, April 29, 2025 3:02 PM
**To:** Concur_Board <concur_board@cpb.org>; lsembler@cpb.org
**Cc:** Justin Fox - A <justin.fox@gsa.gov>; Aimonetti, Justin W. EOP/DOGE <Justin.W.Aimonetti@doge.eop.gov>; Jonathan Mendelson - A <jonathan.mendelson@gsa.gov>
**Subject:** Meeting Request | DOGE

> **Caution:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Ruby, Liz,

My name is Nate Cavanaugh – I'm a member of the DOGE team working at the General Services Administration.

Are you available for a meeting tomorrow or on Thursday? I would like to learn more about the Corporation for Public Broadcasting and discuss getting a DOGE team assigned to the organization.

Best,
Nate

--
Nate Cavanaugh
202-941-1935

Because CPB's counsel was before this Court on April 29, 2025, they were unaware of this email and could not bring it to the Court's attention at that time.

13.    In terms of DOGE's reference to its team "working at the General Services Administration," at no time has the General Services Administration been involved in the operation, oversight, or control of CPB.

14.    On April 29, 2025, I responded to Mr. Cavanaugh, stating in part:

> CPB is a private entity incorporated under the laws of the District of Columbia. While its funding largely comes from Congress, it is not an agency or department of the federal government. It certainly is not part of the executive branch. The following is an explicit determination of its statutory creation:

> "There is authorized to be established a nonprofit corporation, to be known as the "Corporation for Public Broadcasting", which will not be an agency or establishment of the United States Government." 47 U.S.C. § 396(b)."

> Accordingly, neither DOGE, the GSA, nor any other component of the executive branch has any role supervising or having any activity relating to CPB. Thus, DOGE's resources might best be focused elsewhere on some aspect of the government within its jurisdiction.

Exhibit C.

15.    Then, forty-eight hours later, on May 1, 2025, President Trump issued an Executive Order entitled *Ending Taxpayer Subsidization Of Biased Media* in which he purported to "instruct the CPB Board of Directors and all executive departments and agencies to cease Federal funding for NPR and PBS" (the "Public Media EO"), a copy of which is attached as Exhibit D.

16.    In the Public Media EO, President Trump purported to instruct the CPB Board of Directors and all executive departments and agencies to cease all direct and indirect Federal funding for NPR and PBS" because he objects to the content of their speech:

> Sec. 2.  Instructions to the Corporation for Public Broadcasting.  (a)  The CPB Board shall cease direct funding to NPR and PBS, consistent with my Administration's policy to ensure that Federal funding does not support biased and partisan news coverage.  The CPB Board shall cancel existing direct funding to the maximum extent allowed by law and shall decline to provide future funding.
>
> (b)  The CPB Board shall cease indirect funding to NPR and PBS, including by ensuring that licensees and permittees of public radio and television stations, as well as any other recipients of CPB funds, do not use Federal funds for NPR and PBS.  To effectuate this directive, the CPB Board shall, before June 30, 2025, revise the 2025 Television Community Service Grants General Provisions and Eligibility Criteria and the 2025 Radio Community Service Grants General Provisions and Eligibility Criteria to prohibit direct or indirect funding of NPR and PBS.  To the extent permitted by the 2024 Television Community Service Grants General Provisions and Eligibility Criteria, the 2024 Radio Community Service Grants General Provisions and Eligibility Criteria, and applicable law, the CPB Board shall also prohibit parties subject to these provisions from funding NPR or PBS after the date of this order.  In addition, the CPB Board shall take all other necessary steps to minimize or eliminate its indirect funding of NPR and PBS.

Exhibit D.

17.    Of course, this is precisely the type of governmental interference designed to impact media programming or program judgments that Congress by its plain terms sought to prevent in creating CPB as it did.  As the Senate Report accompanying the Act carefully pointed out:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality

programs. It is also recognized that this assistance **should in no way involve the Government in programming or program judgments**. An **independent** entity supported by Federal funds is required to provide programs **free of political pressures**. The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967) (emphasis added).

**Injunctive Relief Is Necessary To Prevent Both Ongoing Irreparable Harm And Forthcoming Irreparable Harm**

18.     The President's conduct has already caused CPB to suffer irreparable harm and, if not enjoined, will cause the evisceration of the public media interconnection network and infrastructure that Congress has mandated CPB to maintain. As discussed below, this will result in the end of the public media system, including the national emergency broadcast system.

**1.      Ongoing Irreparable Harm To CPB's Day-to-Day Operations**

19.     As a threshold matter, the President's removal of three of its directors – if effective – places CPB below the statutory minimum of directors set by the D.C. Nonprofit corporation statute which requires every nonprofit corporation to have and maintain no fewer than three directors. See D.C. ST. § 29-406.03. CPB can only act through its board and in accordance with the requirements of the Act and the D.C. nonprofit corporation statute. This means that if the terminations are allowed even on an interim basis, CPB has no longer has statutory power for its Board to provide general oversight responsibility for the management of the corporation's affairs and fulfill the mission of the Act. As General Counsel, I am acutely aware of these consequences.

20.     As General Counsel, I can only receive direction from CPB through a properly constituted and functioning board of directors. In the performance of my duties, there are continuous and ongoing matters on which I need to frequently advise the Board and seek its

direction.  Indeed, in the past two months, there have been at least eight board meetings.  By way of limited example, CPB is now prevented from:

- executing any contracts and grant awards over $1 million;

- creating any Board Committees, such as the Audit and Finance Committee, which provides oversight of the corporation's finances;

- assisting with developing proposed appropriations requests to Congress;

- assisting with any requests for appropriations, including emergency requests; and

- performing various human resources functions, such as hiring, firing, promoting and setting compensation for employees.

21.     For example, CPB has had two corporate officers leave and only has an interim corporate secretary.  Proper and legally-binding Board approval is necessary to hire and replace existing corporate officers.

22.     Further, CPB faces ongoing critical issues that require decisions in the near future regarding ongoing litigation, potential rescission of funding by Congress, Fiscal Year 2026 appropriated funding, among many other issues.  These are mission critical – indeed even existential – issues that need to be considered by a properly constituted Board.  Another concrete example of this is the Public Media EO in which the President of the United States has issued an Executive Order articulating the policy of the United States. While this is not binding on CPB, CPB must properly inform itself and discuss the policy.  However, without a legally constituted Board, there is no authority to change existing policy.

**2.      Irreparable Harm To CPB's Ability To Maintain Public Media Infrastructure And Next Generation Warning System As Part of National Emergency Alert System, As Mandated By Congress**

23.      Furthermore, the ability to have a statutorily-compliant and functioning Board is critical to CPB's ability to maintain the public media infrastructure as mandated by Congress, including through numerous Congressionally appropriated grants that must be issued in the coming weeks and months.

**CPB's Role In The National Interconnection System And National Emergency Alert System**

24.      By way of background, public broadcasting stations across the country reach 99% of the American population and are the only local media in many areas of the country, particularly rural communities.  The Act requires that more than 70% of CPB's annual federal appropriation goes directly to more than 1,500 public media stations across the country, and not more than 5% is allocated to CPB's administrative costs.  CPB's mission is to ensure universal access to non-commercial, high-quality content and telecommunications services.

25.      CPB does not own or operate any of the equipment or infrastructure essential for the non-commercial, telecommunications services that Congress mandates that CPB provide and maintain.  Rather, the system of transmitters, relay stations, and satellite networks (the "Interconnection") is owned and operated by other non-profit corporations, such as PBS, NPR, and other public media stations, but funded through CPB based on Congressional appropriations for the specific purpose of maintaining the Interconnection.

26.      CPB is statutorily required to support Interconnection services for public media. Specifically, the Act authorizes CPB to assist in the establishment and development of one or more interconnection systems to be used for the distribution of public telecommunications services so that all public telecommunications entities may disseminate such services at times chosen by the entities.  See 47 U.S.C. § 396(g)(1)(B).

27.     Furthermore, interconnection funds, which are separately appropriated by Congress, are also addressed in the Act.  Specifically, the Act provides: "[t]he Secretary of the Treasury shall make available and disburse to the Corporation, at the beginning of fiscal year 1991 and of each succeeding fiscal year thereafter, such funds as have been appropriated to the Satellite Interconnection Fund for the fiscal year in which such disbursement is to be made."  47 U.S.C. § 396(k)(10)(C).

28.     Interconnection is also essential to the National Emergency Alert System, which is a national public warning system used by federal, state, local, and tribal authorities to deliver important and timely emergency information, such as alerts about flash floods, blizzards, tornados, hurricanes, and other national and regional emergencies that affect the lives and property of citizens across the country.  As the Department of Homeland Security ("DHS") recognized in its National Emergency Communications Plan issued in September 2019 (www.cisa.gov/sites/default/files/publications/19_0924_CISA_ECD-NECP-2019_1.pdf):

> Emergency communications are critical to the Nation's ability to respond to devastating natural disasters, terrorist threats, and other emergency events, incidents, and routine activities affecting our communities every day. When faced with these situations, the public safety community has a collective responsibility to share information. Achieving this goal requires communications capabilities that are resilient and secure today, yet agile enough to integrate advanced and emerging technologies tomorrow.

Id. at p.1 (emphasis added).

29.     Public television and radio stations play an integral and essential role in our nation's emergency alert system.  Public media's infrastructure through the Interconnection provides the broadest nationwide communications platform in the country, and its national-local organization allows public media entities to distribute federal, state, and regional emergency alerts and provide encrypted, geo-targeted alerts to local communities in times of public emergencies.

30.     By way of limited example, during the January 2025 wildfires, Southern California public media stations provided timely news and information, on air and online, to more than 18 million people.  From January 7-13, 2025, local alerting authorities issued 111 geotargeted alerts, including fire weather warnings and fire outbreak alerts, evacuation warnings and orders, and curfew notices.  The stations also offered real-time guides and resources for those threatened by the fires, partnering to send out daily newsletters with the latest updates from all their organizations.

31.     Some public stations serve as their state's primary Emergency Alert Service hub. Between January 1, 2023, and January 1, 2024, approximately 8,500 Wireless Emergency Alerts were issued by over 1,600 federal, state, local, tribal and territorial authorities and transmitted over public media Interconnection throughout the country.

32.     The U.S. government operates and maintains the Integrated Public Alert and Warning Systems ("IPAWS"), which serves as a gateway between official entities that need to communicate an emergency alert and the national communications networks, including the Interconnection, capable of delivering those alerts to relevant public audiences.  IPAWS was created by Executive order 13407, signed by President George W. Bush on June 26, 2006.  It is managed by FEMA.  On its website, FEMA describes IPAWS as "FEMA's national system for local alerting that provides authenticated emergency and life-saving information to the public through mobile phones using Wireless Emergency Alerts, to radio and television via the Emergency Alert System, and on the National Oceanic and Atmospheric Administration's Weather Radio."  (Integrated Public Alert & Warning System, FEMA.gov (2024), https://www.fema.gov/emergency-managers/practitioners/integrated-public-alert-warning-

system#:~:text=IPAWS%20is%20FEMA's%20national%20system,EAS%20and%20NOAA%20
Weather%20Radio).

33.    As a result, Congress - - separate from and in addition to appropriating funds to
maintain the Interconnection - - also appropriates grants to CPB through FEMA for the Next
Generation Warning System ("NGWS") that modernizes the national EAS.  Specifically, Congress
has appropriated NGWS funds to CPB for fiscal years 2022-2025.

34. DHS declared the critical importance of this program:

> Having in place an effective system for warning and informing the
> American public of impending natural and man-made disasters is an
> essential part of America's emergency preparedness….The pace of
> innovation in communications technology is faster than ever before making
> it imperative that the providers of the nation's alert and warning information
> - - public broadcasting entities - - have the capacity to acquire and
> implement emerging technologies that advance the Nation's public alert and
> warning system.  The Next Generation Warning System Grant Program
> (NGWSGP) makes Federal funds available to enable the adoption of
> emerging digital broadcast technology and standards and furthers the 2022-
> 2024 DHS Strategic Plan Goal 5 (Strengthen Preparedness and Resilience).

Ex. E at §10(a) (emphasis added).

## The $35 Million Interconnection Grant

35.    A critical part of the Interconnection is maintaining access to the Public Radio
Satellite System (PRSS), which is the national satellite distribution network.  Through
Congressionally appropriated funds, CPB has issued grants to NPR to manage and operate the
PRSS on behalf of the entire U.S. public radio system for decades.  The PRSS provides essential
and secure delivery of content, including news, music, and other programming to public radio
stations across the United States.  It also plays a crucial role in delivering emergency alerts to local
radio stations.

36.     The current PRSS Interconnection grant with NPR expires on September 30, 2025. As a result, at the time of the President's purported termination of CPB's board members and the EO, CPB was negotiating the extension of that grant to NPR for an additional $35,962,000 using the funds that Congress already appropriated for that specific purpose. That extension must be approved by a Board of CPB that meets the statutory requirements of at least three members.  If the PRSS Interconnection Grant is not extended, the PRSS system will cease operations and the resulting effects will be catastrophic.  This is because PRSS Interconnection is the very system that creates a national connected public media system whereby stations across the country can share information, programing and communications.  To do so, fees are paid to various satellite system providers to reserve a certain amount of high-demand and limited telecommunications bandwidth to transmit data.  Once that reserved amount of satellite reserved bandwidth is lost, it cannot simply be re-purchased at a later time as it has been acquired by other purchasers.

**NGWS Grant Programs for the National Emergency Alert System**

37.     In addition to taking corporate action to maintain the critically important PRSS Interconnection, CPB also has numerous Next Generation Warning System ("NGWS") grants that it must issue in the coming weeks and months.  Specifically, Congress, through FEMA, has awarded CPB $136 million to establish and implement the Next Generation Warning System (NGWS) grant program.  CPB is administering a competitive grant program for public television and public radio stations that fund equipment upgrades and training that will result in enhanced alerting and warning capabilities.  Failure to fully execute these five grants will greatly impact this critical program and will affect the safety and wellbeing of the communities the program is meant to serve.  The following is a summary of those NGWS grants that must be approved by the CPB Board.

| NGWS FY 2022 Subawards | 3 projects ($5.0 MM) | Three remaining projects over $1M require Board approval, two of which were scheduled to be submitted to the CPB Board on May 13, 2025 for approval. |
|---|---|---|
| NGWS FY 2023 Subawards | 16 projects ($31.9MM) | There are 16 applications for FY23 that meet high priority criteria and are seeking more than $1M, which would require CPB Board approval.  CPB's business plan has these projects needing to be approved no later than December 31, 2025. |
| NGWS Technical Assistance Contracts | 2 contracts ($6MM+) | Two separate contracts, covering the FY23 and FY24 NGWS awards, each expected to exceed $3MM, which will need CPB Board approval in the coming months. |

### 3. Irreparable Harm To CPB's Ability To Conduct Binding Business At The May 13, 2025 Board Meeting

38.    Prior to the President's purported removal of the CPB's directors, the Board had scheduled a meeting for May 13, 2025.  Issues that CPB was scheduled to receive guidance and directional authority from the Board included (1) its legislative communications plan with Congress; (2) pending and potential litigation; (3) the NGWS Grant program, including approving two Fiscal Year 2022 NGWS grant awards; and (4) personnel matters.  If CPB does not have a legally constituted Board, then it cannot approve or give direction on any of these matters.  Similar issues will arise and will need to be discussed and determined at the June 4, 2025 meeting.

39.    Put bluntly, the Defendants' conduct has frustrated and prevented CPB from accomplishing the objectives and purposes of the mission provided to it by Congress under the Act.

Signed under the pain and penalties of perjury this 9th day of May, 2025.

*Evan Slavitt*
Evan Slavitt, General Counsel

# Exhibit A

APR--1-68   1 0 9 1 1 9  F5227     o   —Crp— S ⊢   12.00

OFFICE OF RECORDER OF DEEDS
Washington, D. C.

Recorder *Peter S. Ridley*

# CERTIFICATE

**THIS IS TO CERTIFY** that all provisions of the District of Columbia

Non-profit Corporation Act have been complied with and ACCORD-

INGLY this Certificate of _____ **Incorporation** _____

_____

is hereby issued to the __**CORPORATION FOR PUBLIC BROADCASTING**__

_____

as of the date hereinafter mentioned.

Date – **March 27, 1968**

PETER S. RIDLEY,
*Recorder of Deeds, D. C.*

*Alfred Goldstein*

**Alfred Goldstein**
_____
*Superintendent of Corporations*

Government of the District of Columbia
Form RD-C 55
Oct. 1962

2642

ARTICLES OF INCORPORATION

OF

CORPORATION FOR PUBLIC BROADCASTING

We, the undersigned natural persons of the age of twenty-one (21) years or more, and citizens of the United States, acting as incorporators appointed by the President of the United States under Title II of the Public Broadcasting Act of 1967, Public Law 90-129, approved November 7, 1967, 81 Stat. 365, and desiring to organize a corporation under said Act and under the District of Columbia Non-Profit Corporation Act (29 D. C. Code Chapter 10), adopt, by direction of all the Incorporators so appointed, the following Articles of Incorporation for such Corporation.

ARTICLE I.

Section 1.01.  The name of the Corporation is: Corporation for Public Broadcasting.

ARTICLE II.

Section 2.01.  The period of duration of the Corporation is perpetual.

FILED
MAR 27 1968

BY: _____

- 2 -

## ARTICLE III.

Section 3.01. The purposes for which the Corporation is organized are -

(a) to further and carry out the purposes and achieve the objectives of the Public Broadcasting Act of 1967 and any amendments thereto; and

(b) to do everything necessary, desirable, advisable, or convenient for the furtherance and accomplishment of such purposes and the achievement of such objectives, and to do all other things incidental thereto or connected therewith which are not forbidden by applicable law or these Articles.

Section 3.02. In order to further and carry out the purposes and achieve the objectives of the Public Broadcasting Act of 1967, the Corporation -

(a) shall have the powers set forth in the Public Broadcasting Act of 1967, and any amendments thereto, as the powers of the Corporation authorized to be created by said Act, and

(b) shall have the further power, subject to the provisions of the Public Broadcasting Act of 1967, and any amendments thereto, to -

- 3 -

1. have perpetual succession by its corporate name;

2. sue and be sued, complain and defend, in **its corporate name;**

3. have a corporate seal which may be altered at pleasure and to use the **same by causing it,** or a facsimile thereof, to be impressed or affixed or in any other manner reproduced;

4. purchase, take, receive, lease, take by **gift, devise** or bequest, or otherwise acquire, own, hold, improve, use, and otherwise deal in and with, real or personal property, or any interest therein, wherever situated;

5. **sell,** convey, mortgage, pledge, lease, exchange, transfer, and otherwise dispose of all or any part of its property and assets;

6. purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, loan, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests **in,** or obligations of, other domestic or foreign corporations,

- 4 -

whether for profit or not for profit, associations, partner-
ships, or individuals, or direct or indirect obligations of
the United States, or of any other government, State, terri-
tory, governmental district, or municipality or of any in-
strumentality thereof;

       7.  make contracts and incur liabilities,
borrow money at such rates of interest as the Corporation
may determine, issue its notes, bonds, and other obligations,
and secure any of its obligations by mortgage or pledge of
all or any of its property, franchises and income;

       8.  lend money for its corporate purposes, in-
vest and reinvest its funds, and take and hold real and per-
sonal property as security for the payment of funds so loan-
ed or invested;

       9.  conduct its affairs, carry on its opera-
tions, hold property, and have offices and exercise its
powers in any part of the world;

       10.  elect or appoint officers and agents of
the Corporation, and define their duties and fix their com-
pensation;

- 5 -

11.   make and alter By-Laws, not inconsistent
with its Articles of Incorporation, or with applicable law,
for the administration and regulation of the affairs of the
Corporation;

12.   make donations for the public welfare or
for charitable, scientific, literary, or educational purposes,
or for other purposes for which the Corporation is organized;

13.   indemnify any director or officer or
former director or officer of the Corporation, or any person
who may have served at its request as a director or officer
of another corporation, whether for profit or not for profit,
against expenses actually and necessarily incurred by him
in connection with the defense of any action, suit, or pro-
ceeding in which he is made a party by reason of being or
having been such director or officer, except in relation to
matters as to which he shall be adjudged in such action,
suit, or proceeding to be liable for negligence or miscon-
duct in the performance of a duty.  Such indemnification
shall not be deemed exclusive of any other rights to which
such director or officer may be entitled, under any by-law,

- 6 -

agreement, vote of board of directors or members, or other-
wise;

      14.   cease its corporate activities and
surrender its corporate franchise; and

      15.   have and exercise all powers necessary
or convenient to effect any or all of the purposes for which
the Corporation is organized.

## ARTICLE IV.

    Section 4.01.   The Corporation will have no members.

## ARTICLE V.

    Section 5.01.   The directors of the Corporation
shall be appointed or elected in the manner provided for by
the Public Broadcasting Act of 1967 and any amendments thereto.

## ARTICLE VI.

    Section 6.01.   The affairs of the Corporation
shall be conducted as provided for in the By-Laws of the
Corporation to be adopted by the Board of Directors.

    Section 6.02.   The Corporation is organized ex-
clusively for charitable, scientific, literary and educa-
tional purposes, including, for such purposes, the making

- 7 -

of distributions to organizations that qualify as exempt
organizations under section 501(c)(3) of the Internal Revenue
Code of 1954 (or the corresponding provisions of any future
United States Internal Revenue Law).

Section 6.03.  Notwithstanding any other provi-
sion of these Articles, the Corporation shall not carry on
any other activities not permitted to be carried on (a) by
a corporation exempt from Federal income tax under section
501(c)(3) of the Internal Revenue Code of 1954 (or the
corresponding provision of any future United States Internal
Revenue Law) or (b) by a corporation, contributions to which
are deductible under section 170(c)(2) of the Internal Revenue
Code of 1954 (or the corresponding provision of any future
United States Internal Revenue Law).

Section 6.04.  In the event of dissolution or
final liquidation of the Corporation, the Board of Direc-
tors shall, after paying or making provision for the pay-
ment of all of the liabilities of the Corporation, dispose
of all of the assets of the Corporation in such manner, or
to such organization or organizations organized and operated

- 8 -

exclusively for charitable, educational, literary, or scientific purposes as shall at the time qualify as an exempt organization or organizations under section 501(c)(3) of the Internal Revenue Code of 1954 (or the corresponding provision of any future United States Internal Revenue Law), as the Board of Directors shall determine.

## ARTICLE VII.

Section 7.01.  The address of the Corporation's initial registered office is:

> 1250 Connecticut Avenue
> Washington, D. C. 20036

Section 7.02.  The name of the Corporation's initial registered agent at such address is:

> William E. Miller

## ARTICLE VIII.

Section 8.01.  The number of directors constituting the Initial Board of Directors is fifteen (15) and the names and address, including street and number, of the

- 9 -

persons who are to serve as the Initial Directors until their
successors are elected and qualified are:

| Name | Address |
| --- | --- |
| Joseph A. Beirne | 1925 K Street, N. W.<br>Washington, D. C. 20006 |
| Robert S. Benjamin | 729 Seventh Avenue<br>New York, New York 10019 |
| Roscoe C. Carroll | 1999 W. Adams Blvd.<br>Los Angeles, California 90018 |
| Milton S. Eisenhower | 12 E. Bishops Road<br>Baltimore, Maryland 21218 |
| Michael A. Gammino | 33 Weybosset Street<br>Providence, Rhode Island 02903 |
| Saul Haas | 1530 Queen Anne Avenue N.<br>Seattle, Washington 98109 |
| Oveta Culp Hobby | 2410 Polk Avenue<br>Houston, Texas 77003 |
| Joseph D. Hughes | 525 William Penn Place<br>Pittsburgh, Pennsylvania 15219 |
| James R. Killian, Jr. | 77 Massachusetts Avenue<br>Cambridge, Massachusetts 02139 |
| Erich Leinsdorf | 251 Huntington Avenue<br>Boston, Massachusetts 02115 |

- 10 -

| Name | Address |
|------|---------|
| Frank Pace, Jr. | 545 Madison Avenue<br>New York, New York 10022 |
| John D. Rockefeller 3rd | 30 Rockefeller Plaza<br>New York, New York 10020 |
| Carl E. Sanders | 34 Broad Street<br>Atlanta, Georgia 30303 |
| Frank E. Schooley | 504 West Springfield Avenue<br>Champaign, Illinois 61820 |
| Jack Valenti | 918 Sixteenth Street, N. W.<br>Washington, D. C. 20006 |

## ARTICLE IX.

Section 9.01. The name and address, including street and number, of each Incorporator is:

| Name | Address |
|------|---------|
| Joseph A. Beirne | 1925 K Street, N. W.<br>Washington, D. C. 20006 |
| Robert S. Benjamin | 729 Seventh Avenue<br>New York, New York 10019 |
| Roscoe C. Carroll | 1999 W. Adams Blvd.<br>Los Angeles, California 90018 |
| Milton S. Eisenhower | 12 E. Bishops Road<br>Baltimore, Maryland 21218 |
| Michael A. Gammino | 33 Weybosset Street<br>Providence, Rhode Island 02903 |
| Saul Haas | 1530 Queen Anne Avenue N.<br>Seattle, Washington 98109 |

- 11 -

| Name | Address |
|------|---------|
| Oveta Culp Hobby | 2410 Polk Avenue<br>Houston, Texas 77003 |
| Joseph D. Hughes | 525 William Penn Place<br>Pittsburgh, Pennsylvania 15219 |
| James R. Killian, Jr. | 77 Massachusetts Avenue<br>Cambridge, Massachusetts 02139 |
| Erich Leinsdorf | 251 Huntington Avenue<br>Boston, Massachusetts 02115 |
| Frank Pace, Jr. | 545 Madison Avenue<br>New York, New York 10022 |
| John D. Rockefeller 3rd | 30 Rockefeller Plaza<br>New York, New York 10020 |
| Carl E. Sanders | 34 Broad Street<br>Atlanta, Georgia 30303 |
| Frank E. Schooley | 504 West Springfield Avenue<br>Champaign, Illinois 61820 |
| Jack Valenti | 918 Sixteenth Street, N. W.<br>Washington, D. C. 20006 |

Whereas, we, the undersigned Incorporators, hereunto affix, on separate pages, with acknowledgments, our signatures:

- 12 -

_Joseph A. Beirne_

WASHINGTON, D. C.

DISTRICT OF COLUMBIA

On this the 18th day of March , 1968,
before me Ebba H. Muller , the undersigned officer,
personally appeared Joseph A. Beirne, who signed the foregoing
document as an incorporator and who acknowledged that the state-
ments therein contained are true.

_Ebba H. Muller_
Notary Public

My Commission Expires May 14, 1970

- ` 13 -

Robert S. Benjamin

CITY OF ___NEW YORK___

STATE OF ___NEW YORK___


On this the ___25th___ day of ___March___, 1968,

before me ___Florence Abramson___, the undersigned officer,

personally appeared Robert S. Benjamin, who signed the fore-

going document as an incorporator and who acknowledged that the

statements therein contained are true.

Florence Abramson

FLORENCE ABRAMSON
Notary Public, State of New York
No. 31 5000100
Qualified in New York County
Commission Expires March 30, 1968

- 14 -

_Roscoe C. Carroll_
Roscoe C. Carroll

CITY OF  Los Angeles

STATE OF  California

COUNTY OF  Los Angeles

On this the 18th day of  March  , 1968,

before me  NOLAN PAYTON  , the undersigned officer,

personally appeared Roscoe C. Carroll, who signed the foregoing

document as an incorporator and who acknowledged that the state-

ments therein contained are true.



OFFICIAL SEAL
**NOLAN PAYTON**
NOTARY PUBLIC - CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

– 15 –

_Milton S. Eisenhower_

**Milton S. Eisenhower**

**CITY OF**      Baltimore

**STATE OF**      Maryland


On this the ___25___ day of ___March___, 1968,
before me ___a Notary Public___, the undersigned officer,
personally appeared Milton S. Eisenhower, who signed the fore-
going document as an incorporator and who acknowledged that the
statements therein contained are true.

_Gertrude K. Holland_

- 16 -

Michael A. Gammino

CITY OF Providence

STATE OF Rhode Island and Providence Plantations


        On this the 18th day of March        , 1968,
                a notary public
before me   Michael A. Gammino   , the undersigned officer,

personally appeared Michael A. Gammino, who signed the foregoing

document as an incorporator and who acknowledged that the state-

ments therein contained are true.

My Commission Expires
June 30, 1971

- 17 -

_____

**SAUL HAAS**

WASHINGTON, D. C.

DISTRICT OF COLUMBIA

On this the 13 day of March , 1968,
before me Hugh W. Smith , the undersigned officer,
personally appeared Saul Haas, who signed the foregoing docu-
ment as an incorporator and who acknowledged that the state-
ments therein contained are true.

_____

My Commission Expires April 14, 1972

- 18 -

_Oveta Culp Hobby_

CITY OF Houston

STATE OF Texas


    On this the __18th__ day of _____March_____, 1968,
before me __Peggy C. Buchanan__, the undersigned officer,
personally appeared Oveta Culp Hobby, who signed the foregoing
document as an incorporator and who acknowledged that the state-
ments therein contained are true.

_Peggy C. Buchanan_
    Peggy C. Buchanan, Notary Public in and
    for Harris County, T e x a s

- 19 -

_Joseph D. Hughes_ (signature)

Joseph D. Hughes

CITY OF PITTSBURGH

COMMONWEALTH OF PENNSYLVANIA

On this the __19th__ day of _____March_____, 1968,
before me _Dorothy J. Deist_____, the undersigned officer,
personally appeared Joseph D. Hughes, who signed the foregoing
document as an incorporator and who acknowledged that the
statements therein contained are true.

_Dorothy J. Deist_ (signature)

Notary Public

DOROTHY J. DEIST, Notary Public
Pittsburgh, Allegheny Co., Pa.
My Commission Expires
January 15, 1971

- 20 -

James R. Killian, Jr.

CITY OF _Cambridge_

STATE OF _Mass._

On this the _19th_ day of _March_, 1968,
before me _Mary Louise Thomas_, the undersigned officer,
personally appeared James R. Killian, Jr., who signed the fore-
going document as an incorporator and who acknowledged that the
statements therein **contained are** true.

- 21 -

Erich Leinsdorf

CITY OF  Boston

STATE OF  Massachusetts


On this the  18th  day of  March  , 1968,
before me  James J. Brosnahan  , the undersigned officer, per-
sonally appeared Erich Leinsdorf, who signed the foregoing docu-
ment as an incorporator and who acknowledged that the statements
therein contained are true.

- 22 -

Frank Pace Jr.
_____
Frank Pace, Jr.

CITY OF    New York
STATE OF    New York

On this the 18th day of    March    , 1968,
before me    Diana Houghtelling    , the undersigned officer, per-
sonally appeared Frank Pace, Jr., who signed the foregoing docu-
ment as an incorporator and who acknowledged that the statements
therein contained are true.

Diana Houghtelling
_____

DIANA HOUGHTELLING
Notary Public, State of New York
No. 31-1867800
Qualified in New York County
Commission Expires....3/22/69

- 23 -

*John D. Rockefeller 3rd*
John D. Rockefeller 3rd

CITY OF _NEW YORK_

STATE OF _NEW YORK_


    On this the _22nd_ day of _MARCH_, 1968,

before me _JOHN D. ROCKEFELLER 3rd_, the undersigned officer,

personally appeared John D. Rockefeller 3rd, who signed the

foregoing document as an incorporator and who acknowledged that

the statements therein contained are true.

*Ruth Avidon*

RUTH AVIDON
Notary Public, State of New York
No. 31-6118550 - New York County
Commission Expires March 30, 19 69

- 24 -

Carl E. Sanders

**CITY OF** _____Atlanta_____

**STATE OF**_____Georgia_____


On this the 18th day of ____March____, **1968**, before me__Kathryn W. Frierson__, **the undersigned officer, personally appeared Carl E. Sanders, who signed the foregoing document as an incorporator and who acknowledged that the statements therein contained are true.**

Notary Public, Fulton County, Georgia
My Commission expires: March 14, 1971

– 25 –

_Frank E. Schooley_
Frank E. Schooley

CITY OF _CHAMPAIGN_

STATE OF _ILLINOIS_


On this the _18_ day of _MARCH_, 1968,
before me _John UPP_, the undersigned officer,
personally appeared Frank E. Schooley, who signed the foregoing
document as an incorporator and who acknowledged that the state-
ments therein contained are true.

_John Upp_
Notary Public

- 26 -

_Jack Valenti_ (signature)
Jack Valenti

WASHINGTON, D. C.

DISTRICT OF COLUMBIA


On this the 18th day of _March_, 1968, before
me _Mary J. Tyler_, the undersigned officer, personally
appeared Jack Valenti, who signed the foregoing document as an
incorporator and who acknowledged that the statements therein
contained are true.

_Mary J. Tyler_ (signature)

My Commission Expires Sept. 30, 1972

4

# BY-LAWS

## OF THE

## CORPORATION FOR PUBLIC BROADCASTING

*As amended September 13, 2021*

-2-

# ARTICLE I

## Offices

Section 1.01.  **Registered Office**.  The Corporation shall maintain a registered office in the City of Washington, District of Columbia.

Section 1.02.  **Other Offices**.  The Corporation may also have offices at such other places, either within or without the District of Columbia, as the business of the Corporation may require.

# ARTICLE  II

## Board of Directors

Section 2.01.  **General Powers**.  The property, affairs and business of the Corporation shall be managed by the Board of Directors.

Section 2.02.  **Number, Terms of Office and Qualifications**.  The Board of Directors (the "Board") shall consist of the number of Directors required by the Public Broadcasting Act of 1967 and any amendments thereto.  The method of appointment of Directors and their terms of office shall be as set forth in the Public Broadcasting Act of 1967 and any amendments thereto.

Section 2.03.  **The Chair of the Board**.  At each annual meeting of the Board, or at such other time as there may be a vacancy in this office, and, if, as a result of the vacancy, the Board by majority vote calls for an election, the Board shall elect, by majority vote, from among its members who are not employees of the Corporation who have completed a minimum of one full year of service as of the date of such election, a Chair of the Board.  The Chair shall not serve in such a capacity for more than three consecutive full one-year terms during a single term of office.  The Chair shall serve at the pleasure of the Board, or until his or her successor has been duly elected and qualified, or until the Chair shall resign or otherwise vacate his or her office or Board membership.  The Chair shall preside at all meetings of the Board, shall carry out all functions required by these By-Laws, and shall perform such other duties as from time to time may be assigned by the Board.

-3-

Section 2.04.  **The Vice Chair of the Board**.  At each Annual Meeting of the Board, or at such other time as there may be a vacancy in this office, the Board shall elect, by majority vote, from among its members who are not employees of the Corporation, a Vice Chair of the Board.  The Vice Chair shall not serve in such capacity for more than three consecutive full one-year terms during a single term of office.  The Vice Chair shall serve at the pleasure of the Board, or until his or her successor has been duly elected and qualified, or until the Vice Chair shall resign or otherwise vacate his or her office or Board membership.  In the absence of the Chair of the Board, the Vice Chair of the Board shall act in all respects in the stead of the Chair during such absence.  In the case of a vacancy in the office of the Chair of the Board, the Vice Chair of the Board shall act in all respects in the stead of the Chair, for the remainder of the unexpired term of the Chair, or until the Board, by majority vote, elects a successor to the Chair.  In addition, the Vice Chair shall carry out all functions required by these By-Laws and shall perform such other duties as from time to time may be assigned by the Board.

Section 2.05.  **Organization of Directors' Meetings**.  At all meetings of the Board of Directors, the Chair of the Board, or, in his or her absence, the Vice Chair of the Board, or in the absence of the Chair of the Board and the Vice Chair of the Board, a temporary Chair chosen by a majority of the Directors present, shall act as Chair of such meeting and preside threat.  The Secretary shall act as Secretary at all meetings of the Board of Directors.  In the absence from any such meeting of the Secretary, the Chair may appoint any person to act as Secretary of the meeting.  A copy of the minutes of all meetings shall be supplied to each member of the Board.

Section 2.06.  **Place and Manner of Meetings**.  Meetings of the Board of Directors, including the Annual Meeting, will be held at Washington, D.C., or at such other place or places as may be determined by the Board. Meetings of the Board and its committees may be actual or telephonic.  The Annual Meeting and at least two Regular Meetings each year shall be actual meetings of the Board unless the Board otherwise determines. Directors who are unable to attend actual meetings in person may participate by telephonic means. Telephonic meetings and telephonic participation in actual meetings may use any form of electronic communications which permits all persons attending or participating in the meeting to speak to and be heard by all others attending or participating.

-4-

Section 2.07. **Annual Meeting of the Board**. The Annual Meeting of the Board of Directors for the purpose of organization, the election of Chair and Vice Chair for the ensuing year, and the transaction of other business shall be held during September of each year on such date and at such hour and at such place as shall be fixed by the Chair of the Board. However, the Board may vote, by a two-thirds majority, to hold the Annual Meeting during a month other than September, so long as the Annual Meeting occurs before the end of the calendar year. Unless the Board has voted to schedule it otherwise, if no Annual Meeting has been scheduled and called by the Chair of the Board by a date one year from the date of the previous Annual Meeting, then the Vice Chair of the Board shall call such a meeting. If the Annual Meeting is not called by either the Chair of the Board or the Vice Chair of the Board, the Annual Meeting shall be called by the Secretary. Notice of such Annual Meeting shall be given or waived as in the case of special meetings of the Board.

Section 2.08. **Regular Meetings**. Regular meetings of the Board of Directors shall be held at such intervals as may be fixed by resolution adopted by the Board. Notice of such meetings shall be given or waived as in the case of special meetings of the Board.

Section 2.09. **Special Meetings**. Special meetings of the Board of Directors shall be held whenever called by the Chair of the Board ( or in the case of the Chair's absence or a vacancy in the office of the Chair, by the Vice Chair of the Board), or by a number of Directors representing not less than one-third of the current Directors serving on the Board, but in no event fewer than two (2) Directors. Notice of each such meeting shall be mailed or sent by electronic mail to each Director at the mailing or electronic mail address appearing on the books of the Corporation for the purpose of notice to Directors, at least five (5) days before the day on which the meeting is to be held, or shall be sent to such mailing address by overnight express service, charges prepaid, or delivered personally not later than the third (3rd) day before the day on which the meeting is to be held. Every such notice shall specify the time of the meeting, place, day, and hour of the meeting and the general nature of the business to be transacted. A waiver of notice of any meeting in writing signed by the Director entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Participation of a Director in any meeting shall constitute a waiver of notice of such meeting, except where a Director participates for the express purpose of objecting to the

-5-

transaction of any business because the meeting was not lawfully called or convened. Whenever a meeting of the Board shall be adjourned, it shall not be necessary to give any notice of the adjourned meeting or of the business to be transacted thereat, otherwise than by announcement at the meeting at which such adjournment is taken.

Section 2.10. **Quorum, Manner of Acting and Adjournment**. At each regular meeting or special meeting of the Board, the presence or participation of a simple majority of the Directors then serving pursuant to law shall be necessary to constitute a quorum for the transaction of business. Except as otherwise specifically provided by statute, the Articles of Incorporation, or these By-Laws, the acts of a majority of the Directors present at or participating in a regular meeting or special meeting, at which a quorum is present, shall be the acts of the Board. A Director who is present at or participating in a regular or special meeting of the Board, but who abstains from participation in the vote upon any matter whether he or she remains in the meeting or withdraws therefrom during the vote, may be counted for purposes of determining whether or not a quorum is present or participating, and if a quorum is present or participating, the acts with respect to any such matter of a majority of the Directors present or participating who do not abstain shall be the acts of the Board. A majority of the Directors present at or participating in any regular or special meeting, whether or not they shall comprise a quorum, may adjourn the meeting from time to time. Each Director shall be entitled to one vote, and voting rights of Directors may not be exercised by proxy. Notwithstanding the foregoing, during an emergency period following a national, regional or local catastrophe, a majority of the surviving members of the Board of Directors who have not been rendered incapable of attending or participating shall constitute a quorum. Any action which can be taken at a meeting of the Directors may be taken without a meeting if a consent in writing, in the form of a resolution setting forth the action so taken, shall be signed by all of the Directors. Each such resolution shall be reported at the next meeting of the Board and set forth in the minutes of that meeting. The Board may assign and delegate to the Chair, Vice Chair, President and other officers of the Corporation additional duties and authority not conferred pursuant to these By-Laws only by resolution of the Board, which resolution shall be set forth in the minutes of the meeting at which it was adopted.

-6-

## ARTICLE  III

### Standing Committees

Section 3.01.  **Audit Committee.**  After each Annual Meeting of the Board, the Chair shall appoint, subject to the approval of the Board, no more than five (5) Directors to serve on the Audit Committee, including one to serve as chair.  The Audit Committee shall be responsible for meeting with and receiving the reports of the outside auditors of the Corporation, shall review internal audits of the Corporation and shall assume such additional duties as may be assigned to it by the Board. The Committee shall report annually to the Board and at such other times as it deems appropriate or when requested to do so by the Board.

Section 3.02.  **Other Committees.**  The Board of Directors may establish such other standing or temporary committees as it may deem appropriate to perform such functions as it may designate.  The Chair of the Board shall appoint, with the approval of the Board, an appropriate number of Directors to serve on such committees, including one to serve as chair.

Section 3.03.  **Committee Procedure**.  Each member of any regular or standing committee shall continue to serve as a member of that committee at the pleasure of the Board . The Chair of the Board shall serve as an *ex officio*, non-voting member of all Committees of the Board to which he or she is not specifically appointed, with the same rights and obligations as all duly appointed members except that the Chair shall not be counted to establish a quorum. Except as otherwise provided in these By-Laws, a majority of a committee shall constitute a quorum thereof, and the act of a majority of those present at or participating in a meeting at which a quorum is present shall be the act of the committee.  Meetings of each committee shall be called by the chair of the committee or any two members of the committee.  Each committee shall render such reports at such time as the Board shall require.

## ARTICLE IV

### Appointed Officers

Section 4.01.  **Officers**.  In addition to the elected officers of the Board (the Chair and Vice Chair) the Corporation shall have appointed officers employed by the Corporation.  The

appointed officers shall be the President and Chief Executive Officer, the Executive Vice Presidents, the Secretary, the General Counsel, and the Treasurer. Officers in the areas of government relations, corporate communications, education, programming and system and station development, and such other officers as the Board or President and Chief Executive Officer deem necessary may be appointed pursuant to Section 4.03 of these By-Laws. A complete list of current officers of the Corporation shall be kept on file in the Office of the Corporate Secretary and posted on the CPB website.

Section 4.02. **Appointment, Term of Office, and Qualifications.** At such time as there may be a vacancy in the office of the President and Chief Executive Officer, the Board shall appoint an individual to serve in that position under such terms of employment as the Board shall determine. The President and Chief Executive Officer shall serve at the pleasure of the Board, and the Board shall conduct an annual review of the President's performance and his or her compensation at or before the last meeting of the Board in each calendar year. In addition, at such meeting in any year in which the employment agreement of the President and Chief Executive Officer is subject to renewal, the Chairman shall so inform the Board, and the Board shall decide whether to conduct an additional review of the performance and compensation of the President and Chief Executive Officer in connection with such renewal. All other corporate officers shall serve at the pleasure of the Board, but the Board may expressly delegate to the President and Chief Executive Officer the authority to review, hire, and dismiss officers and establish the level of their compensation. No individual other than a citizen of the United States may serve as an officer of the Corporation. Any two or more offices may be held by the same person, except the offices of Treasurer and President.

Section 4.03. **Additional Officers.** The Board may appoint such officers as it may deem necessary or may expressly delegate to the President and Chief Executive Officer the authority to appoint such other officers as the President shall deem necessary. Each such officer shall have such authority and shall perform such duties as may be determined, from time to time, by the Board, or by the President, acting under the expressed delegated authority of the Board.

Section 4.04. **Removal**. Any officer appointed by the Board may be removed by the Board, and any officer appointed by the President and Chief Executive Officer under

expressed delegated authority from the Board may be removed by the President, whenever, in the judgment of the Board or the President, the best interests of the Corporation will be served thereby.  Such removal shall be without prejudice to the contract rights, if any, of the person so removed.

Section 4.05.  **Resignation**.  Any officer of the Corporation may resign at any time by giving written notice of his resignation to the Board, or to the Chair of the Board, or to the President, or to the Secretary.  Any such resignation shall take effect at the time specified therein, and, unless otherwise specified therein, the acceptance thereof shall not be necessary to make it effective.

Section 4.06.  **Vacancies.**  Any vacancy in any office because of death, resignation, removal, disqualification, or any other cause may be filled by the Board at any regular or special meeting thereof, or may be filled by the President and Chief Executive Officer, under expressed authority delegated by the Board.

Section 4.07.  **The President**.  The President of the Corporation shall be its Chief Executive Officer and shall have the responsibility and authority for the day-to-day administration of the affairs of the Corporation under the general supervision of the Board and shall have such other powers and perform such other duties as the Board may from time to time prescribe.  If the President is not a member of the Board he or she may attend and participate in meetings of the Board *ex officio* but may not vote.

Section 4.08.  **The Vice Presidents.**  Each Vice President shall have such powers and perform such duties as the Board or the President and Chief Executive Officer, under expressed authority delegated by the Board, may from time to time prescribe.

Section 4.09.  **The Secretary**.  The Secretary shall (a) see that all notices are duly given in accordance with law and these By-Laws; (b) be custodian of the seal of the Corporation and affix such seal to all documents the execution of which, on behalf of the Corporation under its seal, is authorized by the Board or by any officer or agent of the Corporation to whom power to authorize the affixing of such seal shall have been delegated; (c) keep, or cause to be kept, in books provided for the purpose, minutes of the meetings of the Board, and of each committee of the Board; (d) see that the books, reports, statements and all other documents and records

required by law are properly kept and filed; (e) sign such instruments as require the signature of the Secretary; and (f) in general, perform all the duties incident to the office of the Secretary and such other duties as from time to time may be assigned.

Section 4.10.  **The Treasurer**.  The Treasurer shall (a) have charge and custody of, and be responsible for, all funds and securities of the Corporation and deposit all such funds in such banks, trust companies or other depositories as shall  be selected in accordance with the provisions of these By-Laws; (b) receive, and give receipts for, monies due and payable to the Corporation from any source whatsoever; (c) sign such documents as shall require the signature of the Treasurer; (d) be responsible for the accounting functions of the Corporation including full and accurate accounts of all assets, liabilities, commitments, receipts, disbursements and other financial transactions; (e) see that all expenditures are made in accordance with procedures established from time to time by the Corporation; and (f) in general, perform all duties incident to the office of Treasurer and such other duties as from time to time may be assigned.  The Treasurer shall give a bond for the faithful discharge of his or her duties in such sum and with such sureties as the Board shall determine.

Section 4.11.  **General Counsel**.  The General Counsel is the chief legal officer of the Corporation and provides advice and counsel to the Board of Directors and the Management of the Corporation on legal, public policy, legislative, and regulatory matters affecting public broadcasting and the operation of the Corporation.  The General Counsel is responsible for, and generally oversees, the conduct of the Corporation's legal affairs, including the retention of outside counsel where appropriate and necessary, and provides representation and legal support services required for day-to-day corporate operations.  The General Counsel is authorized to appoint and make changes in the Corporation's registered agent in accordance with the laws of the District of Columbia.

Section 4.12.  **Compensation.**  The compensation of the officers, the duration for which it will be applicable, and such other terms of employment, shall be fixed from time to time by the Board, or by the President and Chief Executive Officer, under expressed authority delegated by the Board.  No officer of the Corporation may receive any salary or other compensation (except for compensation for services on boards of directors of other organizations that do not receive funds from the Corporation, on committees of such boards, and in similar activities for

such organizations) from any sources other than the Corporation for services rendered during the period of his or her employment by the Corporation. Service by any officer on such boards of directors of other organizations, on committees of such boards, and in similar activities for such organizations, shall be subject to annual advance approval by the Board, or by the President under expressed authority delegated by the Board, and shall be subject to the provisions of the Corporation's Statement of Ethical Conduct.

Section 4.13. **Outside Interests of Officers and Employees**. The Board from time to time may adopt rules and regulations governing the conduct of officers or key employees with respect to matters in which they have any interest adverse to the interests of the Corporation. Such rules and regulations may forbid officers or key employees from participating personally and substantially in corporate action with respect to any contract, grant, transaction or other matter in which, to the knowledge of any such officers or employee, he or she or any member of his or her immediate family has any interest, financial or otherwise, unless (a) such officer or employee makes full disclosure of the circumstances to the Board or its delegate and the Board or its delegate determines that the interest is not so substantial as to affect the integrity of the services of such officer or employee, or (b) on the basis of standards to be established in such rules or regulations, the interest is too remote or too inconsequential to affect the integrity of such services. Such rules and regulations may also prohibit, or establish appropriate limits upon, the ownership by such officer or employee, or member of his or her immediate family, of securities of any firm or corporation doing business with the Corporation.

## ARTICLE V

### Designated Body

Section 5.01. **Application.** This Article shall apply only in the instance that the Corporation's Board fails to meet the statutory minimum number of directors required under the D.C. Nonprofit Corporation Act. All references to rights and responsibilities of the Board, in these By-Laws, the Articles of Incorporation, or applicable statutes, shall apply to a Designated Body which shall be authorized to perform the functions of the Board in that

instance, with the exception of the authority to remove Directors under the D.C. Nonprofit Corporation Act.

Section 5.02.  **Responsibilities and Membership.**  If less than the statutory minimum number of presidentially appointed Directors of the Corporation remain in office, a Designated Body, consisting of three (3) members, shall exercise the rights and responsibilities of the Board until such time as there are three (3) presidentially appointed Directors. Members of the Designated Body shall include the remaining presidentially appointed Directors plus the number of former Directors, appointed as provided in Section 5.03, as are required for a total of three (3) members. The Designated Body shall be authorized to perform the functions of the Board for the period of time only until at least the statutory minimum number of Directors are in office.

Section 5.03.  **Appointed Members.**  The President and Chief Executive Officer of the Corporation shall select and appoint to the Designated Body the required number of individuals who most recently served as Directors of the Corporation who were nominated by the President and confirmed by the Senate, whose service on the Board ended by operation of law and not by earlier vacating office, and who agree to serve. Such former Directors shall be selected in the order in which they most recently served as Directors, and shall be removed in the order in which they were most recently appointed to serve on the Designated Body. The President and Chief executive Officer shall ensure the continued presence of three (3) members by appointing former Directors to fill any vacancies that occur, and by removing them from service when new presidentially appointed Directors take office. The Designated Body shall cease to function as soon as three (3) presidentially appointed Directors are in office.

## ARTICLE VI

## Contracts, Checks, Drafts, Bank Accounts, Etc.

Section 6.01.  **Contracts and Appointments of Agents in Connection Therewith**.  To the extent the Board may specifically authorize, the President or any other officer may, in the name of the Corporation and on its behalf, execute and deliver, or appoint agents with power to execute and deliver, in full compliance with the Corporation's procurement and contracting policies, bids and proposals for contracts with any person or entity, corporate or otherwise,

-12-

contracts between the Corporation and any such person or entity, bonds and undertakings required for the faithful performance of such contracts, and vouchers and receipts in connection therewith.

Section 6.02.  **Loans**.  To the extent the Board may specifically authorize, any two of the following, to wit, the President or any other officer, acting together, may effect loans and advances at any time for the Corporation from any bank, trust company or other institution or from any firm or individual and for such loans and advances may make, execute and deliver promissory notes or other evidences of indebtedness of the Corporation, but no officer or officers shall, for purposes of giving security for any such loan or advance, mortgage, pledge, hypothecate or transfer any property whatsoever owned or held by the Corporation, except when specifically authorized by resolution of the Board.

.

Section 6.03.  **Checks, Drafts, Etc**.  All checks, drafts, orders for the payment of money, bills of lading, warehouse receipts, obligations, bills of exchange and insurance certificates shall be signed or endorsed by such officer or officers, agent or agents of the Corporation and in such manner as shall from time to time be determined by resolution of the Board.

## ARTICLE  VII

### Seal

Section 7.01.  The Corporation shall have a corporate seal, which shall be in the form adopted by the Board.

## ARTICLE VIII

### Fiscal Year

Section 8.01.  The fiscal year of the Corporation shall be fixed by resolution of the Board.

-13-

# ARTICLE IX

## Indemnification

Section 9.01.  The Corporation shall indemnify an employee, officer, Director or other volunteer, to the fullest extent mandated or permitted by District of Columbia law, against any and all expenses and liabilities incurred by or imposed on him or her in connection with any claim, action, suit or proceeding (whether actual or threatened, brought by or in the right of the Corporation or otherwise, civil, criminal, administrative, or investigative, including appeals) to which he or she may be or is made a party by reason of being or having been an employee, officer, Director, or other volunteer of the Corporation.

Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, counsel fees and other fees, cost and disbursements, and judgments, fines and penalties against and amounts paid in settlement by such employee, officer, Director, or other volunteer.  The Corporation may advance expenses to, or where appropriate may itself, at its expense, undertake the defense of, any employee, officer,  Director, or other volunteer; provided, however, that such employee, officer, Director or other volunteer shall undertake to repay or to reimburse such expense, if it should be ultimately determined that he or she is not entitled to indemnification.

The provisions of this Article shall be applicable to claims, actions, suits or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption thereof.  Indemnification as provided for in this Section shall inure to the benefit of the heirs, executors, administrators, or other legal representatives of an employee, officer, director, or other volunteer.

If any part of this Section shall be found, in any action, suit or proceeding, to be invalid or ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

# ARTICLE X

## Amendments

-14-

Section 10.01.  Any of these By-Laws may be altered, amended, or repealed, and new By-Laws may be adopted, by an affirmative two-thirds majority vote of the Board; provided that (a) such action may be taken only at a meeting of the Board where such action has been identified, in advance, as one of the purposes of the meeting; (b) the notice of such an action at a meeting shall state the substance of the By-Law to be made or repealed, or of the alteration or amendment; and (c) the notice of such an action at a meeting shall be mailed, sent by electronic mail, sent by overnight express service, or delivered personally to each Director at least five (5) days before the date on which the meeting is to be held.

*Amended September 13, 2021*

5

### Roles and Responsibilities of the
### Board of Directors, Chair of the Board, and President
### in Directing the Affairs of the
### Corporation for Public Broadcasting

The Board of Directors (the "Board"), the Chair of the Board (the "Chair") and the President and Chief Executive Officer (the "President") each have distinct responsibilities in overseeing the affairs of the Corporation for Public Broadcasting ("Corporation"). This memorandum sets forth the Board's understanding of those distinct responsibilities. It does so by first describing, as a matter of general principles, the respective responsibilities of the Board, the Chair and the President. It then describes how those general principles would be applied in certain specific situations that regularly recur at the Corporation.

General Principles

***Board of Directors***

The By-Laws of the Corporation provide that the "property, affairs and business of the Corporation shall be managed by the Board of Directors." This is consistent with the District of Columbia Nonprofit Corporation Act, which provides that the "affairs of a corporation shall be managed by a board of directors." As such, the Board has general oversight responsibility for the management of all of the Corporation's affairs. Board Committees have specific roles in the fulfillment of general oversight responsibilities: the Audit and Finance committee provides oversight of the Corporation's finances; the Governance committee supervises development of and compliance with governance practices and guidelines; the Compensation committee has responsibilities relating to compensation and evaluation of the Corporation's officers and other employees.

The Board satisfies this responsibility by providing active leadership regarding important issues facing the Corporation. In particular, the Board is expected to provide leadership in:
(i)     defining the Corporation's mission and strategy designed to achieve that mission;
(ii)    appointing and planning for succession of the President; and
(iii)   ensuring the Corporation's compliance with the law.

In addition, the Board is responsible for approving all "Matters Requiring Board Approval" as set forth in the Guidelines Regarding Board Approvals and Notification attached hereto as Exhibit A (the "Approvals/Notifications Guidelines").

The Board's responsibility is to provide clear direction on the course it wishes management to pursue regarding these and other critical matters. It is the responsibility of management to determine the manner in which such directives are achieved and implemented.

The Board, and its individual directors, each owe certain fiduciary duties to the Corporation. These duties (i.e., the duties of care, loyalty and candor), are described in the memorandum that is attached hereto as Exhibit B.

### *Chair of the Board*

The Chair is responsible for leading the Board in its activities and for serving as the principal liaison between management and the Board.

With respect to leading the Board in its activities, the Chair is primarily responsible, with the input of committee chairs and other directors, for setting the agenda for regularly-scheduled Board meetings and for determining whether and when special meetings should be held. The Chair presides at all meetings of the Board. The Chair will coordinate Board representation at events and functions. The Chair is expected to keep the Board apprised of his or her activities.

In the absence of the Chair of the Board, the Vice Chair of the Board shall act in all respects in the stead of the Chair during such absence.

With respect to serving as the principal liaison between management and the Board, the Chair is expected to stay in regular contact with the President in the periods between meetings. The Chair is also expected to keep the Board apprised on important issues he or she discusses with management.

The Chair operates in a capacity as a member of the Board and not as a member of the Corporation's management and is expected to respect and reinforce the appropriate roles of the Board and management.

### *President*

The President leads management's efforts in implementing and achieving the priorities that are adopted by the Board. He or she has discretion in determining the most appropriate means to achieve those priorities.

The President is also responsible for keeping the Board appropriately informed regarding the Corporation's significant activities and undertakings. The President is responsible for providing the Board with information regarding the Corporation that is relevant both to specific decisions that the Board is required to make and to the Board's effective fulfillment of its general responsibility for oversight of the Corporation's affairs. In particular, the President is responsible for ensuring that the Board is notified of the items identified under the caption "Matters About Which the Board Must be Notified" in the Approvals/Notifications Guidelines.

**Specific Situations**

The language above defines the general roles and responsibilities of the Board, the Chair, and the President and will guide the parties in their respective roles. What follows is a description of how these roles and responsibilities are to be applied in regularly occurring matters affecting the Corporation.

### Budget-Setting

Each year the President, working with his or her senior staff and in consultation with the Chair, will develop a proposed annual budget. The proposed budget represents the Corporation's plans for fulfilling the Board's annual priorities and will be presented to the Board (or if the Board so chooses, a committee of the Board) for consideration and approval. Additionally, as part of the President's long-term budget planning, each year the President, in consultation with the Board, the public broadcasting system, and CPB senior staff, will develop a proposed appropriations request. The proposed request will be presented to the Board for approval prior to submitting the request to the Federal government. Any request for appropriations outside of the annual cycle (i.e., emergency requests) will be conducted in a similar fashion.

### Personnel Decisions Regarding the President and CEO; Executive Vice President and COO; Treasurer/CFO; and General Counsel

In accordance with Corporation's governance documents and human resources policies, the Board of Directors as a body will evaluate and make decisions regarding the hiring and termination of the Corporation's President.

The Board will also be responsible for approving the hiring and termination of the Corporation's Executive Vice President and Chief Operating Officer, Treasurer/Chief Financial Officer and General Counsel. It will make these decisions, however, only after the President has presented his or her recommendations regarding the same.

The Board delegates to the President the authority to hire, fire, promote, and set compensation and bonuses for all staff other than the Corporation's Executive Vice President and Chief Operating Officer, Treasurer/Chief Financial Officer and General Counsel, in accordance with CPB policies, procedures, and board committee charters.

### Programming Grants

The Board will set programming priorities through the annual budget process. CPB management will make programming and content decisions, including delivery, strategies, program strands, and individual programs, in accordance with CPB policies and procedures.

### *Station Grants*

As required by CPB's authorizing legislation, CPB management will conduct consultations with the public broadcasting system regarding operational grants to public broadcasting stations. Management will then summarize the results of these consultations, and having considered them, present them along with its recommendations to the Board for consideration and approval.

### *Communications/Press*

The President acts as the chief spokesman for the Corporation to the public, press, legislative bodies and other related organizations.

### *Annual Schedule of Standing Agenda Items*

Each year the Board and its committees will be presented with a list of standing agenda items that reflect the matters referenced above and other recurring matters that require the consideration and approval of the Board.

*Adopted by the Board of Directors
on May 1, 2006*

# Exhibit B

*Lyndon B. Johnson, 1967*    Nov. 7    [474]

473    Statement by the President on the Development of a Multinational Program for Science and Technology in Latin America.
*November 7, 1967*

I URGED adoption of this program at Punta del Este, and am gratified that it is developing soundly. We continue to support the program and remain ready to join the Latin American countries in launching and funding these multinational efforts.

NOTE: The President's statement was made public as part of a White House release following a meeting

between the President and Dr. James R. Killian, chairman of the corporation of the Massachusetts Institute of Technology. Dr. Killian reported on his recent visit to Latin America to study the development of a multinational program for science and technology. He was serving at the request of the President as a member of the group of experts convened by the Presidents of the American States following their meeting at Punta del Este, Uruguay in April 1967 (see Items 176, 177).

474    Remarks Upon Signing the Public Broadcasting Act of 1967.
*November 7, 1967*

*Secretary Gardner, Senator Pastore, Chairman Staggers, Members of the Congress, Cabinet, ladies and gentlemen:*

It was in 1844 that Congress authorized $30,000 for the first telegraph line between Washington and Baltimore. Soon afterward, Samuel Morse sent a stream of dots and dashes over that line to a friend who was waiting. His message was brief and prophetic and it read: "What hath God wrought?"

Every one of us should feel the same awe and wonderment here today.

For today, miracles in communication are our daily routine. Every minute, billions of telegraph messages chatter around the world. Some are intercepted on ships. They interrupt law enforcement conferences and discussions of morality. Billions of signals rush over the ocean floor and fly above the clouds. Radio and television fill the air with sound. Satellites hurl messages thousands of miles in a matter of seconds.

Today our problem is not making mira-

cles—but managing miracles. We might well ponder a different question: What hath man wrought—and how will man use his inventions?

The law that I will sign shortly offers one answer to that question.

It announces to the world that our Nation wants more than just material wealth; our Nation wants more than a "chicken in every pot." We in America have an appetite for excellence, too.

While we work every day to produce new goods and to create new wealth, we want most of all to enrich man's spirit.

That is the purpose of this act.

It will give a wider and, I think, stronger voice to educational radio and television by providing new funds for broadcast facilities.

It will launch a major study of television's use in the Nation's classrooms and their potential use throughout the world.

Finally—and most important—it builds a new institution: the Corporation for Public Broadcasting.

995

This Corporation will assist stations and producers who aim for the best in broadcasting good music, in broadcasting exciting plays, and in broadcasting reports on the whole fascinating range of human activity. It will try to prove that what educates can also be exciting.

It will get part of its support from our Government. But it will be carefully guarded from Government or from party control. It will be free, and it will be independent—and it will belong to all of our people.

Television is still a young invention. But we have learned already that it has immense—even revolutionary—power to change, to change our lives.

I hope that those who lead the Corporation will direct that power toward the great and not the trivial purposes.

At its best, public television would help make our Nation a replica of the old Greek marketplace, where public affairs took place in view of all the citizens.

But in weak or even in irresponsible hands, it could generate controversy without understanding; it could mislead as well as teach; it could appeal to passions rather than to reason.

If public television is to fulfill our hopes, then the Corporation must be representative, it must be responsible—and it must be long on enlightened leadership.

I intend to search this Nation to find men that I can nominate, men and women of outstanding ability, to this board of directors.

As a beginning, this morning I have called on Dr. Milton Eisenhower from the Johns Hopkins University and Dr. James Killian of MIT to serve as members of this board.

Dr. Eisenhower, as you will remember, was chairman of the first citizens committee which sought allocation of airwaves for educational purposes.

Dr. Killian served as chairman of the Carnegie Commission which proposed the act that we are signing today.

What hath man wrought? And how will man use his miracles?

The answer just begins with public broadcasting.

In 1862, the Morrill Act set aside lands in every State—lands which belonged to the people—and it set them aside in order to build the land-grant colleges of the Nation.

So today we rededicate a part of the airwaves—which belong to all the people—and we dedicate them for the enlightenment of all the people.

I believe the time has come to stake another claim in the name of all the people, stake a claim based upon the combined resources of communications. I believe the time has come to enlist the computer and the satellite, as well as television and radio, and to enlist them in the cause of education.

If we are up to the obligations of the next century and if we are to be proud of the next century as we are of the past two centuries, we have got to quit talking so much about what has happened in the past two centuries and start talking about what is going to happen in the next century beginning in 1976.

So I think we must consider new ways to build a great network for knowledge—not just a broadcast system, but one that employs every means of sending and of storing information that the individual can use.

Think of the lives that this would change:
—the student in a small college could tap the resources of a great university.

Dr. Killian has just given me an exciting report of his contacts in Latin America as a result of some of the declarations of the Presidents at Punta del Este that he has followed through on and how these Presidents are now envisioning the day when they

can dedicate 20 or 25 or a larger percent of their total resources for one thing alone—education and knowledge.

Yes, the student in a small college tapping the resources of the greatest university in the hemisphere.

—the country doctor getting help from a distant laboratory or a teaching hospital;
—a scholar in Atlanta might draw instantly on a library in New York;
—a famous teacher could reach with ideas and inspirations into some far-off classroom, so that no child need be neglected.

Eventually, I think this electronic knowledge bank could be as valuable as the Federal Reserve Bank.

And such a system could involve other nations, too—it could involve them in a partnership to share knowledge and to thus enrich all mankind.

A wild and visionary idea? Not at all. Yesterday's strangest dreams are today's headlines and change is getting swifter every moment.

I have already asked my advisers to begin to explore the possibility of a network for knowledge—and then to draw up a suggested blueprint for it.

In 1844, when Henry Thoreau heard about Mr. Morse's telegraph, he made his sour comment about the race for faster communication. "Perchance," he warned, "the first news which will leak through into the broad, flapping American ear will be that the Princess Adelaide has the whooping cough."

We do have skeptic comments on occasions. But I don't want you to be that skeptic. I do believe that we have important things to say to one another—and we have the wisdom to match our technical genius.

In that spirit this morning, I have asked you to come here and be participants with me in this great movement for the next

century, the Public Broadcasting Act of 1967.

This act has a host of fathers. Many years ago when I was a Member of the Senate I had a bill prepared—Mr. Siegel drafted it for me—on public television. I had difficulty getting it introduced.

I asked Senator Magnuson to introduce it. He did. I am sorry he can't be here today. But he called me before I came over here and explained to me how happy he was that this event was taking place.

I don't want to single out any one person, because there are so many who have worked so long to bring this bill into where it is this morning to be signed.

I do want to recognize, though, in addition to Senator Magnuson, Senator Pastore, the Chairman of the subcommittee who has spent many days, weeks, and years in this effort, Senator Cotton, the ranking member of that committee, Chairman Staggers, Congressman Macdonald, Congressman Springer, all of whom have been part of the team that has brought this measure to the White House to make it the law of our land.

I should like to send a very special word of greeting to Mr. William Harley and the National Association of Educational Broadcasters who are gathered out in Denver today and who are participating in this ceremony by remote control.

As I mentioned before, we are honored to have Dr. James Killian here this morning. We are grateful to him and other members of the Carnegie Commission who provided the ideas and inspiration some of which are incorporated in this legislation.

I think I should add that John Gardner came to me in the early days when he was head of the Carnegie Commission, before we brought him in here, and suggested this Commission and asked me to help participate in forming it and making suggestions.

We are indebted to Dr. Gardner for this as we are to many things that he has done to provide leadership in the field of what is really important in the world—the education of our people.

At this time I am going to call on Dr. Alan Pifer who is president of the Carnegie Corporation who has a statement that I hope will be of interest to all of you.

Dr. Pifer.

[At this point Dr. Pifer spoke briefly. The text of his remarks is printed in the Weekly Compilation of Presidential Documents (vol. 3, p. 1532). The President then resumed speaking.]

If there are any other distinguished and generous people, I will be glad to recognize

them. If not, I want to express my personal appreciation to Mr. Douglass Cater of the White House staff for the many months that he has followed this legislation and worked on it.

NOTE: The President spoke at 11:33 a.m. in the East Room at the White House. In his opening words he referred to Secretary of Health, Education, and Welfare John W. Gardner, Senator John O. Pastore of Rhode Island, and Representative Harley O. Staggers of West Virginia, Chairman of the House Committee on Interstate and Foreign Commerce. During his remarks he referred to, among others, Seymour N. Siegel, director of radio communications in New York City and a member of the broadcasters advisory council to the President.

As enacted, the bill (S. 1160) is Public Law 90-129 (81 Stat. 365).

## 475   Remarks Upon Signing Bill Providing Equal Opportunity in Promotions for Women in the Armed Forces. *November 8, 1967*

*Mr. Vice President, distinguished Members of the Secretariat and the Armed Forces, Members of the Congress, Mrs. Hobby, Judge Hughes, ladies and gentlemen:*

We have come here this morning to strike another blow for women's rights. At long last we are going to give the dedicated women of our Armed Forces the equal treatment and the equal opportunity that they should have had from the very beginning.

We took the precaution this morning of asking the ladies to supply the honor guard. That is in case there are still some diehard traditionalists who do not approve of our action.

As our good friends Senator Margaret Smith and Congresswoman Bolton, Mrs. Hobby, and many others can testify, women in uniform have had to fight on more than the battlefield of war. I well recall when one of my male colleagues in the House of Representatives, back in 1942 when we were

debating the bill to create the WAAC, had this to say:

"I think it is a reflection upon the courageous manhood of this country to pass a law inviting women to join the Armed Forces in order for us to win a battle.

"Take the women into the Armed Forces, who then will do the cooking, the washing, the mending, the humble homey tasks to which every woman has devoted herself?

"Think of the humiliation! What has become of the manhood of America?"

But the ladies won their battle—and the manhood of America has survived. Colonel Hobby got her Women's Army Auxiliary Corps and the school opened in Fort Des Moines, Iowa. All of you who may have been there will remember what she said on that day:

"You have a debt to democracy, a date with destiny." I think history has recorded how magnificently our American women

# Exhibit C

**From:** Slavitt, Evan
**Sent:** Wednesday, April 30, 2025 10:35 AM
**To:** nate.cavanaugh@gsa.gov
**Cc:** justin.fox@gsa.gov; Justin.W.Aimonetti@doge.eop.gov; jonathan.mendelson@gsa.gov
**Subject:** Meeting Request | DOGE

Dear Mr. Cavanaugh:

I have been asked to respond to your recent email addressed to our Board Chair, Rubydee Calvert, and our board member, Liz Sembler. Before turning to the substance of your request, I would make two points. First, the email addresses you are using are not effective email addresses for either Ms. Calvert or Ms. Sembler. They are artifact addresses used only by our expense reimbursement system. Neither Board Chair Calvert nor Ms. Sembler use them to send or receive actual email. It is only because one of our staff happened to monitor activity in those addresses that we saw your email. In the future, to the extent you wish to communicate with any or all of our Board members, please send the email to me and I will ensure that they receive it promptly. Second, as you may be aware, Laura Ross is the Vice-Chair of the CPB Board. It is CPB's position that Ms. Ross continues to serve in that role; accordingly, any future invitations should include her rather than Ms. Sembler.

Turning to the invitation itself, CPB is a private entity incorporated under the laws of the District of Columbia. While its funding largely comes from Congress, it is not an agency or department of the federal government. It certainly is not part of the executive branch. The following is an explicit determination of its statutory creation:

> "There is authorized to be established a nonprofit corporation, to be known as the "Corporation for Public Broadcasting", which will not be an agency or establishment of the United States Government." 47 U.S.C. § 396(b)."

Accordingly, neither DOGE, the GSA, nor any other component of the executive branch has any role supervising or having any activity relating to

CPB.

Nevertheless, CPB always welcomes inquiries from the general public. If you have some specific questions, I would be happy to review those questions and provide appropriate responses.

Please direct all further inquiries to me. I trust this finds you well.

Best regards,

Evan Slavitt
Senior Vice President and General Counsel
eslavitt@cpb.org
(work) 202/879-9715
(cell) 781/710-0714



# Exhibit D

# Presidential Documents

Executive Order 14290 of May 1, 2025

## Ending Taxpayer Subsidization of Biased Media

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose*. National Public Radio (NPR) and the Public Broadcasting Service (PBS) receive taxpayer funds through the Corporation for Public Broadcasting (CPB). Unlike in 1967, when the CPB was established, today the media landscape is filled with abundant, diverse, and innovative news options. Government funding of news media in this environment is not only outdated and unnecessary but corrosive to the appearance of journalistic independence.

At the very least, Americans have the right to expect that if their tax dollars fund public broadcasting at all, they fund only fair, accurate, unbiased, and nonpartisan news coverage. No media outlet has a constitutional right to taxpayer subsidies, and the Government is entitled to determine which categories of activities to subsidize. The CPB's governing statute reflects principles of impartiality: the CPB may not ''contribute to or otherwise support any political party.'' 47 U.S.C. 396(f)(3); *see also id*. 396(e)(2).

The CPB fails to abide by these principles to the extent it subsidizes NPR and PBS. Which viewpoints NPR and PBS promote does not matter. What does matter is that neither entity presents a fair, accurate, or unbiased portrayal of current events to taxpaying citizens.

I therefore instruct the CPB Board of Directors (CPB Board) and all executive departments and agencies (agencies) to cease Federal funding for NPR and PBS.

**Sec. 2**. *Instructions to the Corporation for Public Broadcasting*. (a) The CPB Board shall cease direct funding to NPR and PBS, consistent with my Administration's policy to ensure that Federal funding does not support biased and partisan news coverage. The CPB Board shall cancel existing direct funding to the maximum extent allowed by law and shall decline to provide future funding.

(b) The CPB Board shall cease indirect funding to NPR and PBS, including by ensuring that licensees and permittees of public radio and television stations, as well as any other recipients of CPB funds, do not use Federal funds for NPR and PBS. To effectuate this directive, the CPB Board shall, before June 30, 2025, revise the 2025 Television Community Service Grants General Provisions and Eligibility Criteria and the 2025 Radio Community Service Grants General Provisions and Eligibility Criteria to prohibit direct or indirect funding of NPR and PBS. To the extent permitted by the 2024 Television Community Service Grants General Provisions and Eligibility Criteria, the 2024 Radio Community Service Grants General Provisions and Eligibility Criteria, and applicable law, the CPB Board shall also prohibit parties subject to these provisions from funding NPR or PBS after the date of this order. In addition, the CPB Board shall take all other necessary steps to minimize or eliminate its indirect funding of NPR and PBS.

**Sec. 3**. *Instructions to Other Agencies*. (a) The heads of all agencies shall identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of NPR and PBS.

(b) After taking the actions specified in subsection (a) of this section, the heads of all agencies shall identify any remaining grants, contracts,

or other funding instruments entered into with NPR or PBS and shall determine whether NPR and PBS are in compliance with the terms of those instruments. In the event of a finding of noncompliance, the head of the relevant agency shall take appropriate steps under the terms of the instrument.

(c) The Secretary of Health and Human Services shall determine whether "the Public Broadcasting Service and National Public Radio (or any successor organization)" are complying with the statutory mandate that "no person shall be subjected to discrimination in employment . . . on the grounds of race, color, religion, national origin, or sex." 47 U.S.C. 397(15), 398(b). In the event of a finding of noncompliance, the Secretary of Health and Human Services shall take appropriate corrective action.

**Sec. 4.** *Severability.* If any provision of this order, or the application of any provision to any agency, person, or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other agencies, persons, or circumstances shall not be affected thereby.

**Sec. 5.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*May 1, 2025.*

[FR Doc. 2025–08133
Filed 5–6–25; 11:15 am]
Billing code 3395–F4–P

# Exhibit E

**The Department of Homeland Security**
**Notice of Funding Opportunity**
**Next Generation Warning System Grant**

Effective April 4, 2022, the federal government transitioned from using the Data Universal Numbering System or DUNS number, to a new, non-proprietary identifier known as a Unique Entity Identifier or UEI. For entities that have an active registration in the System for Award Management (SAM)before April 4, the UEI has automatically been assigned and no action is necessary. For all entities filing a new registration in SAM.gov on or after April 4, 2022, the UEI will be assigned to that entity as part of the SAM.gov registration process.

UEI registration information is available on GSA.gov at Unique Entity Identifier Update | GSA.

Grants.gov registration information can be found at https://www.grants.gov/web/grants/register.html. Detailed information regarding UEI and SAM is also provided in Section D of this funding notice.

# Table of Contents

A.  Program Description........................................................................................................3
   1.  Issued By........................................................................................................3
   2.  Assistance Listings Number ...........................................................................3
   3.  Assistance Listings Title ................................................................................3
   4.  Funding Opportunity Title ..............................................................................3
   5.  Funding Opportunity Number.........................................................................3
   6.  Authorizing Authority for Program ................................................................3
   7.  Appropriation Authority for Program.............................................................3
   8.  Announcement Type .......................................................................................3
   9.  Program Category ...........................................................................................3
   10. Program Overview, Objectives, and Priorities ..............................................3
   11. Performance Measures....................................................................................5
B.  Federal Award Information .............................................................................................6
   1.  Available Funding for the NOFO:  $40 million..............................................6
   2.  Projected Number of Awards:   One................................................................6
   3.  Maximum Award Amount:                $40 million .......................................6
   4.  Period of Performance:                36 months ..........................................6
   5.  Projected Period of Performance Start Date(s):  October 1, 2022 .................6
   6.  Projected Period of Performance End Date(s):  September 30, 2025..............6
   7.  Funding Instrument Type:    Grant .................................................................6
C.  Eligibility Information.....................................................................................................6
   1.  Eligible Applicants.........................................................................................6
   2.  Sub-applicant Eligibility Criteria...................................................................6
   3.  Cost Share or Match.......................................................................................6
D.  Application and Submission Information.........................................................................6
   1.  Key Dates and Times......................................................................................6
   2.  Agreeing to Terms and Conditions of the Award...........................................8

3.     Address to Request Application Package ................................................................. 8
4.     Steps Required to Obtain a Unique Entity Identifier, Register in the System for Award Management (SAM), and Submit an Application ............................................. 8
5.     Electronic Delivery ................................................................................................. 9
6.     How to Register to Apply through Grants.gov ..................................................... 10
7.     How to Submit an Initial Application to FEMA via Grants.gov ........................... 13
8.     Submitting the Final Application in ND Grants ................................................... 14
9.     Timely Receipt Requirements and Proof of Timely Submission .......................... 15
10.   Content and Form of Application Submission...................................................... 15
11.   Intergovernmental Review ................................................................................... 16
12.   Funding Restrictions and Allowable Costs.......................................................... 16
E.   Application Review Information ................................................................................ 20
1.     Application Evaluation Criteria ............................................................................ 20
2.     Review and Selection Process .............................................................................. 21
F.   Federal Award Administration Information ............................................................... 21
1.     Notice of Award ................................................................................................... 21
2.     Administrative and National Policy Requirements............................................... 22
3.     Reporting............................................................................................................... 23
4.     Monitoring and Oversight .................................................................................... 27
G.   DHS Awarding Agency Contact Information ............................................................ 28
1.     Contact and Resource Information ....................................................................... 28
2.     Systems Information ............................................................................................. 29
H.   Additional Information .............................................................................................. 30
1.     Termination Provisions ........................................................................................ 30
2. Program Evaluation .................................................................................................. 30
3.     Period of Performance Extensions........................................................................ 31
4.     Disability Integration ........................................................................................... 31
5.     Conflicts of Interest in the Administration of Federal Awards or Subawards............... 32
6.     Procurement Integrity .......................................................................................... 33
7.     Record Retention ................................................................................................. 37
8.     Actions to Address Noncompliance...................................................................... 39
9.     Audits.................................................................................................................... 40
10.   Payment Information ........................................................................................... 41
11.   Whole Community Preparedness.......................................................................... 41

Next Generation Warning System                                              [Back to the Top](#)

A. **Program Description**
1. **Issued By**
   U.S. Department of Homeland Security (DHS)/Federal Emergency Management Agency (FEMA)/ National Continuity Programs

2. **Assistance Listings Number**
   97.138

3. **Assistance Listings Title**
   Next System Generation Warning System

4. **Funding Opportunity Title**
   Next System Generation Warning System

5. **Funding Opportunity Number**
   DHS-22-IPAWS-138-00-01

6. **Authorizing Authority for Program**
   Department of Homeland Security Appropriations Act, 2022, Title III, Federal Emergency Management Agency, Federal Assistance § 11, Pub. L. No. 117-103

7. **Appropriation Authority for Program**
   Department of Homeland Security Appropriations Act, *2022* (Pub. L. No 117-103)

8. **Announcement Type**
   Initial

9. **Program Category**
   Preparedness & Emergency Management

10. **Program Overview, Objectives, and Priorities**
a. *Overview*
   Having in place an effective system for warning and informing the American public of impending natural and man-made disasters is an essential part of America's emergency preparedness. FEMA's Integrated Public Alert & Warning System (IPAWS) is the national system for local alerting that provides authenticated emergency and life-saving information to the public. Local radio and TV stations, along with cable, direct broadcast satellite and wireless service providers, disseminate the public safety messages they receive from IPAWS.

   The pace of innovation in communications technology is faster than ever before making it imperative that the providers of the nation's alert and warning information - public broadcasting entities - have the capacity to acquire and implement emerging technologies that advance the Nation's public alert and warning system. The Next Generation Warning System Grant Program (NGWSGP) makes Federal funds available to enable the adoption of emerging digital broadcast technology and standards and furthers the 2020-2024 DHS Strategic Plan Goal 5 (Strengthen Preparedness and Resilience). It also supports the 2022-

2026 FEMA Strategic Plan Goal 1 (Instill Equity as a Foundation of Emergency Management) and Goal 3 (Promote and Sustain a Ready FEMA and a Prepared Nation).

The NGWSGP will support projects that result in the adoption of the Common Alerting Protocol standard (CAP) which permits a single CAP compatible message to activate multiple compliant warning systems. Television broadcasters may leverage NGWSGP funding to upgrade to the Advanced Television Systems Committee broadcast standard (ATSC 3.0) allowing broadcast to reach a greater number of differing types of communication devices along with incorporating multimedia in alert and warning messaging. This program will support investments that improve the resilience and security of public broadcasting networks and systems. Projects that enable the capability to alert, warn and provide equivalent information to individuals with disabilities, individuals with access and functional needs, and individuals with limited-English proficiency, are within the priorities of the NGWSGP. The NGWSGP will further support projects that enable alerts and warnings on the basis of geographic location as well as those projects that improve the ability of remote rural areas to receive alerts and warnings.

Upgrading to this advanced technology requires investments in technology, training, and support equipment that may create burdens for broadcasters, especially small stations in rural and underdeveloped areas. In these areas, public broadcast stations often serve a much larger role in providing critical emergency information than in other areas with greater concentrations of private broadcasters. The NGWSGP is intended to ease this burden for qualified public broadcast recipients of grant funding.

FEMA intends to award this grant to a single awardee. That awardee will then manage a competitive process to solicit sub-grant applications from eligible sub-grantees to use these funds in accordance with the requirements and priorities set forth in this notice. The awardee will describe their intended approach for managing this process in their grant application, which FEMA will approve as part of the overall grant award. Ongoing program reporting to FEMA will assess performance of the sub-grant process and of sub-grantee's effective use of funds.

**b. *Objectives***

To have in place a public alert and warning system that provides timely and effective warnings using the latest broadcast technology standards, especially including areas that are traditionally underserved by broadcast providers. Specifically, this NGWSGP grant seeks to:
- Enhance capacity of local broadcast stations to receive, broadcast, and redistribute emergency alert messages from the Integrated Public Alert & Warning System using IPAWS Specification for Common Alerting Protocol (CAP);
- Implement upgrades to the NEXTGEN TV ATSC3 broadcast standard;
- Enhance technology infrastructure to ensure local public broadcast stations can launch new, enhanced broadcast services, that improve and expand the distribution of public alerts and warnings; and
- Expand the delivery and distribution of emergency alert messages from IPAWS to fill gaps in alert and warning delivery to people in underserved areas.

4

c. *Priorities*

FEMA IPAWS has established priority areas for grant awards to authorized sub-recipients. These priorities are intended to convey the importance of the twin objectives of implementing advanced ATSC 3.0 broadcast technology (and comparable technology for radio stations) and to focus on the needs of communities, primarily in rural and Tribal areas, who have more limited broadcast options than more urban areas. The NGWS Grant Program is guided by Executive Order 13985 on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government.

FEMA and the awardee will review these priorities quarterly and refine them as needed based on evolving understanding of overall needs and opportunities. It is not FEMA's intent for the awardee to undertake risky or low-value grant investments simply to favor a sub-grant application in a higher-priority investment area.

Across the overall objectives, the program has established priorities to provide:

1. Advanced Technology for Public Broadcast Entities
   o For television stations: ATSC 3.0 or other NGWSGP technology, equipment and maintenance for stations primarily serving underserved communities
   o For radio stations: digital broadcast technology, equipment, and maintenance for capabilities that deliver emergency alert messages from IPAWS to people in underserved communities
2. Resilience-related Equipment for Public Broadcast Entities
   o Emergency generators and related resilience equipment for stations primarily serving underserved communities
3. Training for Technology and Resilience
   o Training in using NGWSGP and related technology to improve the distribution of emergency messages from IPAWS and in techniques to increase station resilience during emergencies

## 11. Performance Measures

Performance metrics for the Next Generation Warning System Grant Program are as follows:

- As a result of NGWSGP funding, the percentage increase in public television stations that are capable of broadcasting IPAWS alerts;
- As a result of NGWSGP funding, the percentage increase in public radio stations that are capable of broadcasting IPAWS alerts;
- The number of broadcast entities that used NGWSGP funds to replace emergency generators that were at or near their lifecycle; and,
- The number of public broadcasting staff members trained in ATSC 3.0 technology (or related digital broadcast technologies) and station resilience using NGWSGP funds.

FEMA will calculate and analyze the above metrics through a review of the recipient's required financial and programmatic reports. FEMA will review and update performance measures as necessary to adequately track the success of this program.

**B.** Federal Award Information

**1.** Available Funding for the NOFO:              $40 million

**2.** Projected Number of Awards:                 **One**

**3.** Maximum Award Amount:                       $40 million

**4.** Period of Performance:                       36 months

Extensions to the period of performance are allowed. For additional information on period of performance extensions, please refer to Section H. Additional Information

FEMA awards under most programs, including this program, only include one budget period, so it will be same as the period of performance. *See* 2 C.F.R. § 200.1 for definitions of "budget period" and "period of performance."

**5.** Projected Period of Performance Start Date(s):       October 1, 2022

**6.** Projected Period of Performance End Date(s):        September 30, 2025

**7.** Funding Instrument Type:                     Grant

**C.** **Eligibility Information**
**1.** **Eligible Applicants**
Congress intended that FEMA work with the Corporation for Public Broadcasting (CPB) to implement the NGWSP for public broadcast entities. Therefore, CPB is the only entity eligible to submit an application to DHS/FEMA for funding under the Next Generation Warning System Grant Program in FY2022.

**2.** **Sub-applicant Eligibility Criteria**
Eligible sub-applicants include those entities that meet the definition of "public broadcast entities" as defined in the Communications Act of 1934, as amended (47 U.S.C. §397(11)). To receive sub-grant awards, these sub-applicants shall follow a competitive application process designed by the primary awardee and approved by FEMA.

**3.** **Cost Share or Match**
There is no cost share/match requirement.

**D.** **Application and Submission Information**
**1.** **Key Dates and Times**

**a.** *Application Start Date:*                     September 1, 2022

Next Generation Warning System                                    Back to the Top

**b. *Application Submission Deadline:*** September 14, 2022, at 2:00 p.m. ET

All applications **must** be received by the established deadline.

The Non-Disaster (ND) Grants System has a date stamp that indicates when an application is submitted. Applicants will receive an electronic message confirming receipt of their submission. For additional information on how an applicant will be notified of application receipt, see the subsection titled "Timely Receipt Requirements and Proof of Timely Submission" in Section D of this NOFO.

**FEMA will not review applications that are received after the deadline or consider these late applications for funding**. FEMA may, however, extend the application deadline on request for any applicant who can demonstrate that good cause exists to justify extending the deadline. Good cause for an extension may include technical problems outside of the applicant's control that prevent submission of the application by the deadline, other exigent or emergency circumstances, or statutory requirements for FEMA to make an award.

**Applicants experiencing technical problems outside of their control must notify FEMA as soon as possible and before the application deadline**. Failure to timely notify FEMA of the issue that prevented the timely filing of the application may preclude consideration of the award. "Timely notification" of FEMA means: prior to the application deadline and within 48 hours after the applicant became aware of the issue.

A list of FEMA contacts can be found in Section G of this NOFO, "DHS Awarding Agency Contact Information." For additional assistance using the ND Grants System, please contact the ND Grants Service Desk at (800) 865-4076 or NDGrants@fema.dhs.gov. The ND Grants Service Desk is available Monday through Friday, 9:00 a.m. – 6:00 p.m. Eastern Time (ET). For programmatic or grants management questions, please contact your Program Analyst or Grants Specialist. If applicants do not know who to contact or if there are programmatic questions or concerns, please contact the Centralized Scheduling and Information Desk (CSID) by phone at (800) 368-6498 or by e-mail at askcsid@fema.dhs.gov, Monday through Friday, 9:00 p.m. – 5:00 p.m ET.

For additional information on how an applicant will be notified of application receipt, see the subsection titled "Timely Receipt Requirements and Proof of Timely Submission" in Section D of this NOFO.

**c. *Anticipated Funding Selection Date:*** No later than September 15, 2022

**d. *Anticipated Award Date:*** No later than September 29, 2022

**e. *Other Key Dates***

| Event | Suggested Deadline for Completion |
|---|---|
| Obtaining Unique Entity Identifier (UEI) | Four weeks before actual submission deadline |

7

| Obtaining a valid Employer Identification Number (EIN) | Four weeks before actual submission deadline |
|---|---|
| Creating an account with login.gov | Four weeks before actual submission deadline |
| Registering in SAM or Updating SAM registration | Four weeks before actual submission deadline |
| Registering in Grants.gov | Four weeks before actual submission deadline |
| Registering in ND Grants | Four weeks before actual submission deadline |
| Starting application in Grants.gov | One week before actual submission deadline |
| Submitting the final application in ND Grants | By the submission deadline |

2. **Agreeing to Terms and Conditions of the Award**
By submitting an application, applicants agree to comply with the requirements of this NOFO and the terms and conditions of the award, should they receive an award.

3. **Address to Request Application Package**
Initial applications are processed through the Grants.gov portal. Final applications are completed and submitted through FEMA's Non-Disaster Grants (ND Grants) System. Application forms and instructions are available at Grants.gov. To access these materials, go to http://www.grants.gov.

Hard copies of the notice can be downloaded at Grants.gov or obtained via email from the Awarding Office points of contact listed in Section G of this notice, "DHS Awarding Agency Contact Information" or by TTY (800) 462-7585. It can be downloaded at Grants.gov or obtained via email from the Awarding Office points of contact listed in Section G of this notice, "DHS Awarding Agency Contact Information" or by TTY (800) 462-7585.

4. **Steps Required to Obtain a Unique Entity Identifier, Register in the System for Award Management (SAM), and Submit an Application**
Applying for an award under this program is a multi-step process and requires time to complete. Applicants are encouraged to register early as the registration process can take four weeks or more to complete. Therefore, registration should be done in sufficient time to ensure it does not impact your ability to meet required submission deadlines.

Please review the table above for estimated deadlines to complete each of the steps listed. Failure of an applicant to comply with any of the required steps before the deadline for submitting an application may disqualify that application from funding.

To apply for an award under this program, all applicants must:

a. Apply for, update, or verify their Unique Entity Identifier (UEI) from SAM.gov, if applicable, and Employer Identification Number (EIN) from the Internal Revenue Service;
b. In the application, provide a valid UEI;
c. Have an account with login.gov;
d. Register for, update, or verify their SAM account and ensure the account is active before submitting the application;
e. Create a Grants.gov account;
f. Add a profile to a Grants.gov account;
g. Establish an Authorized Organizational Representative (AOR) in Grants.gov;
h. Register in ND Grants
i. Submit an initial application in Grants.gov;
j. Submit the final application in ND Grants, including electronically signing applicable forms; and
k. Continue to maintain an active SAM registration with current information at all times during which it has an active federal award or an application or plan under consideration by a federal awarding agency. As part of this, applicants must also provide information on an applicant's immediate and highest-level owner and subsidiaries, as well as on all predecessors that have been awarded federal contracts or federal financial assistance within the last three years, if applicable.

Specific instructions on how to apply for, update, or verify a UEI or SAM registration or establish an AOR are included below in the steps for applying through Grants.gov.

Applicants are advised that FEMA may not make a federal award until the applicant has complied with all applicable SAM requirements. Therefore, an applicant's SAM registration must be active not only at the time of application, but also during the application review period and when FEMA is ready to make a federal award. Further, as noted above, an applicant's or recipient's SAM registration must remain active for the duration of an active federal award. If an applicant's SAM registration is expired at the time of application, expires during application review, or expires any other time before award, FEMA may determine that the applicant is not qualified to receive a federal award and use that determination as a basis for making a federal award to another applicant.

Per 2 C.F.R. § 25.110(c)(2)(iii), if an applicant is experiencing exigent circumstances that prevents it from receiving a UEI if applicable, and completing SAM registration prior to receiving a federal award, the applicant must notify FEMA as soon as possible by contacting askcsid@fema.dhs.gov and providing the details of the circumstances that prevent completion of these requirements. If FEMA determines that there are exigent circumstances and FEMA has decided to make an award, the applicant will be required to obtain a UEI if applicable, and complete SAM registration within 30 days of the federal award date.

**5. Electronic Delivery**
DHS is participating in the Grants.gov initiative to provide the grant community with a single site to find and apply for grant funding opportunities. DHS encourages or requires applicants

to submit their applications online through Grants.gov, depending on the funding opportunity.

For this funding opportunity, FEMA requires applicants to submit initial applications through Grants.gov and a final application through ND Grants.

**6. How to Register to Apply through Grants.gov**

a. *General Instructions:*
Registering and applying for an award under this program is a multi-step process and requires time to complete. Read the instructions below about registering to apply for FEMA funds. Applicants should read the registration instructions carefully and prepare the information requested before beginning the registration process. Reviewing and assembling the required information before beginning the registration process will alleviate last-minute searches for required information.

**The registration process can take up to four weeks to complete.** To ensure an application meets the deadline, applicants are advised to start the required steps well in advance of their submission.

Organizations must have a UEI , an EIN, an active System for Award Management (SAM) registration and Grants.gov account to apply for grants.

Organizations must also have a Grants.gov account to apply for an award under this program. Creating a Grants.gov account can be completed online in minutes, but UEI and SAM registrations may take several weeks. Therefore, an organization's registration should be done in sufficient time to ensure it does not impact the entity's ability to meet required application submission deadlines. Complete organization instructions can be found on Grants.gov here: https://www.grants.gov/web/grants/applicants/organization-registration.html.

If individual applicants are eligible to apply for this grant funding opportunity, refer to https://www.grants.gov/web/grants/applicants/registration.html.

b. *Obtain a UEI Number:*
All entities applying for funding, including renewal funding, prior to April 4, 2022, must have a UEI number. Applicants must enter the UEI number, if applicable, or UEI in the applicable data entry field on the SF-424 form.

For more detailed instructions for obtaining a UEI , refer to Sam.gov.

c. *Obtain Employer Identification Number*
All entities applying for funding must provide an Employer Identification Number (EIN). The EIN can be obtained from the IRS by visiting https://www.irs.gov/businesses/small-businesses-self-employed/apply-for-an-employer-identification-number-ein-online.

10

**d.** *Create a login.gov account:*
Applicants must have a login.gov account in order to register with SAM or update their SAM registration. Applicants can create a login.gov account here: https://secure.login.gov/sign_up/enter_email?request_id=34f19fa8-14a2-438c-8323-a62b99571fd3.

Applicants only have to create a login.gov account once. For applicants that are existing SAM users, use the same email address for the login.gov account as with SAM.gov so that the two accounts can be linked.

For more information on the login.gov requirements for SAM registration, refer to https://www.sam.gov/SAM/pages/public/loginFAQ.jsf.

**e.** *Register with SAM:*
All organizations applying online through Grants.gov must register with SAM. Failure to register with SAM will prevent your organization from applying through Grants.gov. SAM registration must be renewed annually.

For more detailed instructions for registering with SAM, refer to https://www.grants.gov/web/grants/applicants/organization-registration/step-2-register-with-sam.html.

Note: As a new requirement per 2 C.F.R. § 25.200, applicants must also provide the applicant's immediate and highest-level owner, subsidiaries, and predecessors that have been awarded federal contracts or federal financial assistance within the last three years, if applicable.

I.  ADDITIONAL SAM REMINDERS
Existing SAM.gov account holders should check their account to make sure it is "ACTIVE." SAM registration should be completed at the very beginning of the application period and should be renewed annually to avoid being "INACTIVE." **Please allow plenty of time before the grant application submission deadline to obtain a UEI if applicable, and then to register in SAM. It may be four weeks or more after an applicant submits the SAM registration before the registration is active in SAM, and then it may be an additional 24 hours before FEMA's system recognizes the information.**

It is imperative that the information applicants provide is correct and current. Please ensure that your organization's name, address, and EIN are up to date in SAM and that the UEI used in SAM is the same one used to apply for all other FEMA awards. Payment under any FEMA award is contingent on the recipient's having a current SAM registration.

II.  HELP WITH SAM

Next Generation Warning System                                      Back to the Top

The SAM quick start guide for new recipient registration and SAM video tutorial for new applicants are tools created by the General Services Administration (GSA) to assist those registering with SAM. If applicants have questions or concerns about a SAM registration, please contact the Federal Support Desk at https://www.fsd.gov/fsd-gov/home.do or call toll free (866) 606-8220.

**f.** *Create a Grants.gov Account:*
The next step in the registration process is to create an account with Grants.gov. If applicable, applicants must know their organization's UEI to complete this process.

For more information, follow the on-screen instructions or refer to https://www.grants.gov/web/grants/applicants/registration.html.

See also Section D.8 in this NOFO, "Submitting the Final Application in ND Grants," for instructions on how to register early in ND Grants.

**g.** *Add a Profile to a Grants.gov Account:*
A profile in Grants.gov corresponds to a single applicant organization the user represents (i.e., an applicant) or an individual applicant. If you work for or consult with multiple organizations and have a profile for each, you may log in to one Grants.gov account to access all of your grant applications. To add an organizational profile to your Grants.gov account, if applicable, enter the UEI  for the organization in the UEI field while adding a profile.

For more detailed instructions about creating a profile on Grants.gov, refer to https://www.grants.gov/web/grants/applicants/registration/add-profile.html.

**h.** *EBiz POC Authorized Profile Roles:*
After you register with Grants.gov and create an Organization Applicant Profile, the organization applicant's request for Grants.gov roles and access is sent to the EBiz POC. The EBiz POC will then log in to Grants.gov and authorize the appropriate roles, which may include the Authorized Organization Representative (AOR) role, thereby giving you permission to complete and submit applications on behalf of the organization. You will be able to submit your application online any time after you have been assigned the AOR role.

For more detailed instructions about creating a profile on Grants.gov, refer to https://www.grants.gov/web/grants/applicants/registration/authorize-roles.html.

**i.** *Track Role Status:*
To track your role request, refer to https://www.grants.gov/web/grants/applicants/registration/track-role-status.html.

**j.** *Electronic Signature:*
When applications are submitted through Grants.gov, the name of the organization applicant with the AOR role that submitted the application is inserted into the signature line of the application, serving as the electronic signature. The EBiz POC **must** authorize individuals

who are able to make legally binding commitments on behalf of the organization as an AOR; **this step is often missed, and it is crucial for valid and timely submissions.**

7. **How to Submit an Initial Application to FEMA via Grants.gov**
   Standard Form 424 (SF-424) is the initial application for this NOFO.

   Grants.gov applicants can apply online using a workspace. A workspace is a shared, online environment where members of a grant team may simultaneously access and edit different web forms within an application. For each Notice of Funding Opportunity, you can create individual instances of a workspace. Applicants are encouraged to submit their initial applications in Grants.gov at least seven days before the application deadline.

   In Grants.gov, applicants need to submit the following forms:
   - SF-424, Application for Federal Assistance; and
   - Grants.gov Lobbying Form, Certification Regarding Lobbying.

   Below is an overview of applying on Grants.gov. For access to complete instructions on how to apply for opportunities using Workspace, refer to https://www.grants.gov/web/grants/applicants/workspace-overview.html.

   a. ***Create a Workspace:***
      Creating a workspace allows you to complete it online and route it through your organization for review before submitting.

   b. ***Complete a Workspace:***
      Add participants to the workspace to work on the application together, complete all the required forms online or by downloading PDF versions, and check for errors before submission.

   c. ***Adobe Reader:***
      If you decide not to apply by filling out webforms you can download individual PDF forms in Workspace so that they will appear similar to other Standard or DHS forms. The individual PDF forms can be downloaded and saved to your local device storage, network drive(s), or external drives, then accessed through Adobe Reader.

      NOTE: Visit the Adobe Software Compatibility page on Grants.gov to download the appropriate version of the software at https://www.grants.gov/web/grants/applicants/adobe-software-compatibility.html.

   d. ***Mandatory Fields in Forms:***
      In the forms, you will note fields marked with an asterisk and a different background color. These fields are mandatory fields that must be completed to successfully submit your application.

   e. ***Complete SF-424 Fields First:***

The forms are designed to fill in common required fields across other forms, such as the applicant name, address, and UEI if applicable. To trigger this feature, an applicant must complete the SF-424 information first. Once it is completed, the information will transfer to the other forms.

**f.** ***Submit a Workspace:***
An application may be submitted through workspace by clicking the "Sign and Submit" button on the Manage Workspace page, under the Forms tab. Grants.gov recommends submitting your application package <u>at least 24-48 hours prior to the close date</u> to provide you with time to correct any potential technical issues that may disrupt the application submission.

**g.** ***Track a Workspace:***
After successfully submitting a workspace package, a Grants.gov Tracking Number (GRANTXXXXXXXX) is automatically assigned to the application. The number will be listed on the confirmation page that is generated after submission. Using the tracking number, access the Track My Application page under the Applicants tab or the Details tab in the submitted workspace.

**h.** ***Additional Training and Applicant Support:***

For additional training resources, including video tutorials, refer to
https://www.grants.gov/web/grants/applicants/applicant-training.html.

Grants.gov provides applicants 24/7 (except federal holidays) support via the toll-free number (800) 518-4726, email at support@grants.gov and the website at
https://www.grants.gov/support.html. For questions related to the specific grant opportunity, contact the number listed in the application package of the grant you are applying for.

If you are experiencing difficulties with your submission, it is best to call the Grants.gov Support Center and get a ticket number. The Support Center ticket number will assist FEMA with tracking your issue and understanding background information on the issue.

**8.  Submitting the Final Application in ND Grants**

After submitting the initial application in Grants.gov, eligible applicants will be notified by FEMA and asked to proceed with submitting their complete application package in ND Grants. Applicants can register early with ND Grants and are encouraged to begin their ND Grants registration at the time of this announcement or, at the latest, seven days before the application deadline. Early registration will allow applicants to have adequate time to start and complete their applications.

Applicants needing assistance registering for the ND Grants system should contact ndgrants@fema.dhs.gov or (800) 865-4076. For step-by-step directions on using the ND Grants system and other guides, please see https://www.fema.gov/grants/guidance-tools/non-disaster-grants-management-system.

Next Generation Warning System                                    Back to the Top

In ND Grants, applicants will be prompted to submit the standard application information and any program-specific information required as described in Section D.10 of this NOFO, "Content and Form of Application Submission." The Standard Forms (SF) are auto generated in ND Grants, but applicants may access these forms in advance through the Forms tab under the SF-424 family on Grants.gov. Applicants should review these forms before applying to ensure they have all the information required.

For additional application submission requirements, including program-specific requirements, please refer to the subsection titled "Content and Form of Application Submission" under Section D of this notice.

**9. Timely Receipt Requirements and Proof of Timely Submission**

As application submission is a two-step process, the applicant with the AOR role who submitted the application in Grants.gov will receive an acknowledgement of receipt and a tracking number (GRANTXXXXXXXX) from Grants.gov with the successful transmission of its initial application. **This notification does not serve as proof of timely submission, as the application is not complete until it is submitted in ND Grants.** Applicants can also view the ND Grants Agency Tracking Number by accessing the Details tab in the submitted workspace section in Grants.gov, under the Agency Tracking Number column. Should the Agency Tracking Number not appear, the application has not yet migrated from Grants.gov into the ND Grants System. Please allow 24 hours for your ND Grants application tracking number to migrate.

All applications must be received in ND Grants by **5:00 p.m. ET** on the application deadline. Proof of timely submission is automatically recorded by ND Grants. An electronic date/time stamp is generated within the system when the application is successfully received by ND Grants. Additionally, the applicant(s) listed as contacts on the application will receive a system-generated email to confirm receipt.

**10. Content and Form of Application Submission**
**a. *Standard Required Application Forms and Information***
The following forms or information are required to be submitted in either Grants.gov or ND Grants. The Standard Forms (SF) are submitted either through Grants.gov, through forms generated in ND Grants, or as an attachment in ND Grants. Applicants may also access the SFs at https://www.grants.gov/web/grants/forms/sf-424-family.html.

**I. GRANTS.GOV**
- **SF-424, Application for Federal Assistance**, initial application submitted through Grants.gov
- **Grants.gov Lobbying Form, Certification Regarding Lobbying**, submitted through Grants.gov

**II. ND GRANTS**
- **SF-424A, Budget Information (Non-Construction)**, submitted via the forms generated by ND Grants

15

- o **For construction under an award, submit SF-424C, Budget Information (Construction)**, submitted via the forms generated by ND Grants, in addition to or instead of SF-424A
- **SF-424B, Standard Assurances (Non-Construction)**, submitted via the forms generated by ND Grants
  - o **For construction under an award, submit SF-424D, Standard Assurances (Construction)**, submitted via the forms generated by ND Grants, in addition to or instead of SF-424B
- **SF-LLL, Disclosure of Lobbying Activities**, submitted via the forms generated by ND Grants

Generally, applicants have to submit either the non-construction forms (i.e., SF-424A and SF-424B) or construction forms (i.e., SF-424C and SF-424D), meaning that applicants that only have construction work and do not have any non-construction work need only submit the construction forms (i.e., SF-424C and SF-424D) and not the non-construction forms (i.e., SF-424A and SF-424B), and vice versa. However, applicants who have <u>both</u> construction <u>and</u> non-construction work under this program need to submit both the construction and non-construction forms.

**b.** *Program-Specific Required Forms and Information –*
The following program-specific forms or information are required to be submitted in ND Grants:

- Work Plan Narrative. A summary (narrative) of an applicant's Work Plan for the grant funding that identifies the proposed Allowable Activities, tasks, schedule, and deliverables, and the project management strategy.
- Budget: The applicant must provide a budget for the funds requested
- Master Schedule/Deliverable Table. This document will combine a schedule of planned activities with milestones and expected dates for completion, along with their associated deliverables (e.g., people trained, publications distributed, conferences/workshops/drills held, policies made, website improvements, etc.)
- Competitive Sub-grant Process Description. A description, including a planned schedule and evaluation criteria, of how the awardee plans to solicit, review, and award sub-grants using these funds to focus sub-award funding at the areas of greatest need and greatest likely benefit to communities

## 11. Intergovernmental Review

An intergovernmental review may be required. Applicants must contact their state's Single Point of Contact (SPOC) to comply with the state's process under Executive Order 12372 (See https://www.archives.gov/federal-register/codification/executive-order/12372.html; https://www.whitehouse.gov/wp-content/uploads/2020/01/spoc_1_16_2020.pdf).

## 12. Funding Restrictions and Allowable Costs

All costs charged to awards covered by this NOFO must comply with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements at 2 C.F.R. Part 200, unless otherwise indicated in the NOFO, or the terms and conditions of the award. This

includes, among other requirements, that costs must be incurred, and products and services must be delivered, within the period of performance of the award. See 2 C.F.R. § 200.403(h) (referring to budget periods, which for FEMA awards under this program is the same as the period of performance).

In general, the Cost Principles establish standards for the allowability of costs, provide detailed guidance on the cost accounting treatment of costs as direct or administrative costs, and set forth allowability principles for selected items of cost. More specifically, except as otherwise stated in this NOFO, the terms and condition of an award, or other program materials, costs charged to awards covered by this NOFO must be consistent with the Cost Principles for Federal Awards located at 2 C.F.R. Part 200, Subpart E. To be allowable, all costs charged to a FEMA award or applied to the cost share must be reasonable in nature and amount and allocable to the particular FEMA award.

Additionally, all costs charged to awards must comply with the grant program's applicable statutes, policies, requirements in this notice as well as with the terms and conditions of the award. If FEMA staff identify costs that are inconsistent with any of these requirements, these costs may be disallowed, and FEMA may recover funds as appropriate, consistent with applicable laws, regulations, and policies.

As part of those requirements, grant recipients and subrecipients may only use federal funds or funds applied to a cost share for the purposes set forth in this notice and the terms and conditions of the award, and those costs must be consistent with the statutory authority for the award.

As noted in Section A.10 (Program Overview, Objectives, and Priorities), this funding is intended to provide:
- Advanced Technology to enable IPAWS alerting capability. For television stations, this includes ATSC 3.0 and related technologies, equipment and maintenance. For radio stations, this includes digital broadcast technology, equipment and maintenance;
- Resilience-related Equipment to enable operation during disasters, including emergency generators and related resilience equipment; and,
- Training in using NGWS and related technology to improve the distribution of emergency messages from IPAWS and in techniques to increase station resilience during emergencies

Grant funds are not to be used for:
- Vehicles;
- Funding staff positions; or
- General cosmetic and structural station upgrades and maintenance unrelated to technologies and equipment described in section A.10 and above

The awardee and sub-awardees shall follow requirements set forth in 2 C.F.R. § 200.313, 2 C.F.R. § 200.439 and related guidance related to allowable costs and management requirements for equipment purchased through this program. These include requirements to maintain records and conduct inventories until equipment is disposed of.

17

Grant funds may not be used for matching funds for other federal grants/cooperative agreements, lobbying, or intervention in federal regulatory or adjudicatory proceedings. In addition, federal funds may not be used to sue the federal government or any other government entity.

**a.** ***Prohibitions on Expending FEMA Award Funds for Covered Telecommunications Equipment or Services***

Recipients and subrecipients of FEMA federal financial assistance are subject to the prohibitions described in section 889 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (FY 2019 NDAA), Pub. L. No. 115-232 (2018) and 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200. Beginning August 13, 2020, the statute – as it applies to FEMA recipients, subrecipients, and their contractors and subcontractors – prohibits obligating or expending federal award funds on certain telecommunications and video surveillance products and contracting with certain entities for national security reasons.

Guidance is available at FEMA Policy 405-143-1: Prohibitions on Expending FEMA Award Funds for Covered Telecommunications Equipment or Services
Additional guidance is available at Contract Provisions Guide: Navigating Appendix II to Part 200 - Contract Provisions for Non-Federal Entity Contracts Under Federal Awards .

**Effective August 13, 2020**, FEMA recipients and subrecipients **may not** use any FEMA funds under open or new awards to:

(1) Procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology of any system;

(2) Enter into, extend, or renew a contract to procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology of any system; or

(3) Enter into, extend, or renew contracts with entities that use covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.

**I. REPLACEMENT EQUIPMENT AND SERVICES**

FEMA grant funding may be permitted to procure replacement equipment and services impacted by this prohibition, provided the costs are otherwise consistent with the requirements of the NOFO.

**II. DEFINITIONS**

Per section 889(f)(2)-(3) of the FY 2019 NDAA and 2 C.F.R. § 200.216, covered telecommunications equipment or services means:

   i.  Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation, (or any subsidiary or affiliate of such entities);

    ii. For the purpose of public safety, security of Government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities);

    iii. Telecommunications or video surveillance services provided by such entities or using such equipment; or

    iv. Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the People's Republic of China.

Examples of the types of products covered by this prohibition include phones, internet, video surveillance, and cloud servers when produced, provided, or used by the entities listed in the definition of "covered telecommunications equipment or services." *See* 2 C.F.R. § 200.471.

**b. *Pre-Award Costs***

Pre-award costs are not allowable.

**c. *Management and Administration (M&A) Costs***

Management and Administration costs are allowed under this program. Management and Administration costs are activities directly related to implementing the award. FEMA will allow recipients to use up to 5% of the amount of the award for their M&A and sub recipients may use up to 5% of the amount they receive for M&A. Funding levels for these costs must be negotiated on a per-project basis with the appropriate awarding office and should include an itemized listing of specific costs associated with M&A.

M&A costs include direct charges to the grant related to the administration aspects of implementing the award, such as salaries and benefits of human resources, administrative or finance personnel who support the execution of the grant but are not completing specific project activities.

Costs such as travel, meeting-related expenses, and salaries in direct support of the administration of the award are also examples of typically allowable M&A costs. Other M&A costs might include general operating costs when direct billed. However, M&A costs are not allowable as direct charges to the award when these costs are included in a recipient's negotiated indirect cost rate agreement.

Certain administrative costs are not considered to be M&A costs and are not subject to the M&A cap of 5% when those costs are directly related to a specific award activity.

**d. *Indirect Facilities & Administrative (F&A) Costs***

Indirect costs are allowable under this program as described in 2 C.F.R. Part 200, including 2 C.F.R. § 200.414. Applicants with a current negotiated indirect cost rate agreement that desire to charge indirect costs to an award must provide a copy of their negotiated indirect

cost rate agreement at the time of application. Not all applicants are required to have a current negotiated indirect cost rate agreement. Applicants that are not required by 2 C.F.R. Part 200 to have a negotiated indirect cost rate agreement but are required by 2 C.F.R. Part 200 to develop an indirect cost rate proposal must provide a copy of their proposal at the time of application. Applicants who do not have a current negotiated indirect cost rate agreement (including a provisional rate) and wish to charge the de minimis rate must reach out to their FEMA POC for further instructions. Applicants who wish to use a cost allocation plan in lieu of an indirect cost rate must also reach out to their FEMA POC for further instructions. Post-award requests to charge indirect costs will be considered on a case-by-case basis and based upon the submission of an agreement or proposal as discussed above or based upon on the de minimis rate or cost allocation plan, as applicable.

## E. **Application Review Information**
## 1. **Application Evaluation Criteria**
### a. *Programmatic Criteria*

The application will be reviewed to ensure conformance with the Eligibility Criteria in this notice and the Application Submissions requirements. An applicant that does not meet eligibility or application submission requirements will be removed from consideration. In particular, FEMA will consider the applicant's commitment to, and approach to ensure, the distribution of sub-grant funds by the awardee to eligible parties based on the priorities identified in section 10, above. These priorities focus funding on acquisition of new technology, such as ATSC 3.0 for television stations and comparable enhancements for radio stations, with a priority focus on stations that primarily serve underserved communities.

### b. *Financial Integrity Criteria*

Prior to making a federal award, FEMA is required by 31 U.S.C. § 3354, as enacted by the Payment Integrity Information Act of 2019, Pub. L. No. 116-117 (2020); 41 U.S.C. § 2313; and 2 C.F.R. § 200.206 to review information available through any Office of Management and Budget (OMB)-designated repositories of governmentwide eligibility qualification or financial integrity information, including whether the applicant is suspended or debarred. FEMA may also pose additional questions to the applicant to aid in conducting the pre-award risk review. Therefore, application evaluation criteria may include the following risk-based considerations of the applicant:
   i.   Financial stability;
   ii.  Quality of management systems and ability to meet management standards;
   iii. History of performance in managing federal award;
   iv.  Reports and findings from audits; and
   v.   Ability to effectively implement statutory, regulatory, or other requirements.

### c. *Supplemental Financial Integrity Criteria and Review*

Prior to making a federal award where the anticipated total federal share will be greater than the simplified acquisition threshold, currently $250,000:

   i.   FEMA is required to review and consider any information about the applicant, including information on the applicant's immediate and highest-level owner, subsidiaries, and predecessors, if applicable, that is in the designated integrity

and performance system accessible through the System for Award Management (SAM), which is currently the [Federal Awardee Performance and Integrity Information System](#) (FAPIIS).

ii. An applicant, at its option, may review information in FAPIIS and comment on any information about itself that a federal awarding agency previously entered.

iii. FEMA will consider any comments by the applicant, in addition to the other information in FAPIIS, in making a judgment about the applicant's integrity, business ethics, and record of performance under federal awards when completing the review of risk posed by applicants as described in 2 C.F.R. § 200.206.

## 2. Review and Selection Process

FEMA National Continuity Program (NCP) Integrated Public Alert and Warning System (IPAWS) program staff will review applications to ensure compliance with program eligibility criteria and the program priorities detailed in Section A: Program Description in this notice.

Applications are also reviewed by qualified FEMA grants management staff to ensure compliance with grants management principles, such as administrative requirements and cost principles. Applicants/applications that do not meet eligibility or submission requirements are removed from consideration.

## F. Federal Award Administration Information
## 1. Notice of Award

Before accepting the award, the AOR and recipient should carefully read the award package. The award package includes instructions on administering the grant award and the terms and conditions associated with responsibilities under federal awards. **Recipients must accept all conditions in this NOFO as well as any specific terms and conditions in the Notice of Award to receive an award under this program.**

Notification of award approval is made through the ND Grants system through an automatic electronic mail to the recipient's authorized official listed in the initial application. The recipient should follow the directions in the notification to confirm acceptance of the award.

Recipients must accept their awards no later than 30 days from the award date. The recipient shall notify FEMA of its intent to accept and proceed with work under the award or provide a notice of intent to decline through the ND Grants system. For instructions on how to accept or decline an award in the ND Grants system, please see the ND Grants Grant Recipient User Guide, which is available at [https://www.fema.gov/grants/guidance-tools/non-disaster-grants-management-system](https://www.fema.gov/grants/guidance-tools/non-disaster-grants-management-system) along with other ND Grants materials.

Funds will remain on hold until the recipient accepts the award through the ND Grants system and all other conditions of the award have been satisfied or until the award is

otherwise rescinded. Failure to accept a grant award within the 30-day timeframe may result in a loss of funds.

**2. Administrative and National Policy Requirements**
In addition to the requirements of in this section and in this NOFO, FEMA may place specific terms and conditions on individual awards in accordance with 2 C.F.R. Part 200.

**a. *DHS Standard Terms and Conditions***
All successful applicants for DHS grant and cooperative agreements are required to comply with DHS Standard Terms and Conditions, which are available online at: DHS Standard Terms and Conditions.

The applicable DHS Standard Terms and Conditions will be those in effect at the time the award was made. What terms and conditions will apply for the award will be clearly stated in the award package at the time of award.

**b. *Ensuring the Protection of Civil Rights***
As the Nation works towards achieving the National Preparedness Goal, it is important to continue to protect the civil rights of individuals. Recipients and subrecipients must carry out their programs and activities, including those related to the building, sustainment and delivery of core capabilities, in a manner that respects and ensures the protection of civil rights for protected populations.

Federal civil rights statutes, such as Section 504 of the Rehabilitation Act of 1973 and Title VI of the Civil Rights Act of 1964, along with DHS and FEMA regulations, prohibit discrimination on the basis of race, color, national origin, sex, religion, age, disability, limited English proficiency or economic status in connection with programs and activities receiving federal financial assistance from FEMA.

The DHS Standard Terms and Conditions include a fuller list of the civil rights provisions that apply to recipients. These terms and conditions can be found in the DHS Standard Terms and Conditions. Additional information on civil rights provisions is available at https://www.fema.gov/about/offices/equal-rights/civil-rights.

Monitoring and oversight requirements in connection with recipient compliance with federal civil rights laws are also authorized pursuant to 44 C.F.R. Part 7.

In accordance with civil rights laws and regulations, recipients and subrecipients must ensure the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment.

**c. *Environmental Planning and Historic Preservation (EHP) Compliance***
As a federal agency, FEMA is required to consider the effects of its actions on the environment and historic properties to ensure that all activities and programs funded by FEMA, including grant-funded projects, comply with federal EHP laws, Executive Orders, regulations, and policies, as applicable.

All non-critical new construction or substantial improvement of structures in a Special Flood Hazard Area must, at a minimum, apply the flood elevations of the Federal Flood Risk Management Standard's Freeboard Value Approach unless doing so would cause the project to be unable to meet applicable program cost-effectiveness requirements. All other types of projects may choose to apply the flood elevations of the Federal Flood Risk Management Standard's Freeboard Value Approach. See Executive Order (EO) 14030, Climate-Related Financial Risk and FEMA Policy #-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, Partial Implementation of the Federal Flood Risk Management Standard for Hazard Mitigation Assistance Programs (Interim) .

**Recipients and subrecipients proposing projects that have the potential to impact the environment, including, but not limited to, the construction of communication towers, modification or renovation of existing buildings, structures, and facilities or new construction including replacement of facilities, must participate in the FEMA EHP review process.** The EHP review process involves the submission of a detailed project description along with any supporting documentation requested by FEMA in order to determine whether the proposed project has the potential to impact environmental resources or historic properties.

In some cases, FEMA is also required to consult with other regulatory agencies and the public in order to complete the review process. Federal law requires EHP review to be completed before federal funds are released to carry out proposed projects. FEMA may not be able to fund projects that are not incompliance with applicable EHP laws, Executive Orders, regulations and policies.

DHS and FEMA EHP policy is found in directives and instructions available on the FEMA.gov EHP page, the FEMA website page that includes documents regarding EHP responsibilities and program requirements, including implementation of the National Environmental Policy Act and other EHP regulations and Executive Orders. Individual FEMA programs have separate procedures to conduct and document EHP review. Guidance for individual grant programs is available from applicable program offices.

## 3. Reporting

Recipients are required to submit various financial and programmatic reports as a condition of award acceptance. Future awards and funds drawdown may be withheld if these reports are delinquent demonstrate lack of progress, or are insufficient in detail.

### a. *Financial Reporting Requirements*

### I. FEDERAL FINANCIAL REPORT (FFR)

Recipients must report obligations and expenditures through the FFR form (SF-425) to FEMA.

Recipients may review the Federal Financial Reporting Form (FFR) (SF-425) at https://www.grants.gov/web/grants/forms/post-award-reporting-forms.html#sortby=1

Recipients must file the FFR electronically using the Payment and Reporting Systems (PARS).

## II. FFR Reporting Periods and Due Dates

An FFR must be submitted quarterly throughout the POP, including partial quarters and periods where no grant award activity occurs. The final FFR is due within 120 calendar days after the end of the POP. Future awards and fund drawdowns may be withheld if these reports are delinquent, demonstrate lack of progress, or are insufficient in detail.

Except for the final FFR due at 120 days after the end of the POP for purposes of closeout, the following reporting periods and due dates apply for the FFR:

| Reporting Period | Report Due Date |
|---|---|
| October 1 – December 31 | January 31 |
| January 1 – March 31 | April 30 |
| April 1 – June 30 | July 31 |
| July 1 – September 30 | October 31 |

## b. *Programmatic Performance Reporting Requirements*

### I. Performance Progress Report (PPR)

- Recipients must provide a quarterly performance progress report and a final PPR at grant closeout.

- The recipient is responsible for completing and submitting a Programmatic Performance Report (PPR) using ND Grants. The PPR is due quarterly after the start of the grant's period of performance, and every quarter thereafter until the period of performance ends. The PPR should include the following:
    - A narrative description of overall project(s) status in support of the priorities listed in this NOFO.
    - A summary of overall program expenditures, including totals by priority area
    - Brief descriptions of new sub-grant awards, including awardee, amount, and focus
    - A high-level dashboard of in-progress projects that depicts status and risk of sub-awards
    - A description of any issues, risks, or other concerns
    - A summary of performance measures for this period and total for the program:
        - ✓ As a result of NGWSGP funding, the percentage increase in public television stations that are capable of broadcasting IPAWS alerts;
        - ✓ As a result of NGWSGP funding, the percentage increase in public radio stations that are capable of broadcasting IPAWS alerts;

24

Back to the Top

    ✓ The number of broadcast entities that used NGWSGP funds to replace emergency generators that were at or near their lifecycle.; and,
    ✓ The number of public broadcasting staff members trained in ATSC 3.0 technology (or related digital broadcast technologies) and station resilience using NGWSGP funds.

The awardee shall also facilitate a quarterly review meeting focusing on the content of the quarterly report. In these meetings, the awardee and FEMA will discuss progress, results, and insights gained, and they will jointly work to refine criteria for future sub-award to more effectively focus funding on NGWSGP objectives and priorities relative to improved understanding of community, station, and alerting needs. FEMA does not intend to conduct a detailed review of every sub-grant in these meetings, since the awardee is primarily responsible for managing and overseeing progress for specific projects. Detail should be sufficient to convey the success in allocating grant funding to areas of greatest value and in accordance with priorities, overall progress of projects, insights into specific areas of concern and risk, lessons learned and recommendations to improve the program

### c. *Closeout Reporting Requirements*
### I. CLOSEOUT REPORTING

Within 120 calendar days after the end of the period of performance for the prime award or after an amendment has been issued to close out an award before the original POP ends, recipients must liquidate all financial obligations and must submit the following:

    I.    The final request for payment, if applicable;
    II.   The final FFR (SF-425);
    III.  The final progress report detailing all accomplishments, including a narrative summary of the impact of those accomplishments throughout the period of performance; and
    IV.  Other documents required by this NOFO, terms and conditions of the award, or other FEMA guidance.

In addition, pass-through entities are responsible for closing out their subawards as described in 2 C.F.R. § 200.344; subrecipients are still required to submit closeout materials within 90 calendar days of the period of performance end date. When a subrecipient completes all closeout requirements, pass-through entities must promptly complete all closeout actions for subawards in time for the recipient to submit all necessary documentation and information to FEMA during the closeout of the prime award.

After the prime award closeout reports have been reviewed and approved by FEMA, a closeout notice will be completed to close out the grant. The notice will indicate the period of performance as closed, list any remaining funds that will be deobligated, and address the requirement of maintaining the grant records for at least three years from the date of the final FFR. The record retention period may be longer, such as due to an audit or litigation, for equipment or real property used beyond the period of performance, or due to other circumstances outlined in 2 C.F.R. § 200.334.

The recipient is responsible for refunding to FEMA any balances of unobligated cash that FEMA paid that are not authorized to be retained per 2 C.F.R. § 200.344(d).

## II. ADMINISTRATIVE CLOSEOUT

Administrative closeout is a mechanism for FEMA to unilaterally move forward with closeout of an award using available award information in lieu of final reports from the recipient per 2 C.F.R. § 200.344(h)-(i). It is a last resort available to FEMA, and if FEMA needs to administratively close an award, this may negatively impact a recipient's ability to obtain future funding. This mechanism can also require FEMA to make cash or cost adjustments and ineligible cost determinations based on the information it has, which may result in identifying a debt owed to FEMA by the recipient.

When a recipient is not responsive to FEMA's reasonable efforts to collect required reports needed to complete the standard closeout process, FEMA is required under 2 C.F.R. § 200.344(h) to start the administrative closeout process within the regulatory timeframe. FEMA will make at least three written attempts to collect required reports before initiating administrative closeout. If the recipient does not submit all required reports in accordance with 2 C.F.R. § 200.344, this NOFO, and the terms and conditions of the award, FEMA must proceed to administratively close the award with the information available within one year of the period of performance end date. Additionally, if the recipient does not submit all required reports within one year of the period of performance end date, per 2 C.F.R. § 200.344(i), FEMA must report in FAPIIS the recipient's material failure to comply with the terms and conditions of the award.

If FEMA administratively closes an award where no final FFR has been submitted, FEMA uses that administrative closeout date in lieu of the final FFR submission date as the start of the record retention period under 2 C.F.R. § 200.334.

In addition, if an award is administratively closed, FEMA may decide to impose remedies for noncompliance per 2 C.F.R. § 200.339, consider this information in reviewing future award applications, or apply special conditions to existing or future awards.

## d. *Additional Reporting Requirements*

## I. DISCLOSING INFORMATION PER 2 C.F.R. § 180.335

This reporting requirement pertains to disclosing information related to government-wide suspension and debarment requirements. Before a recipient enters into a grant award with FEMA, the recipient must notify FEMA if it knows if it or any of the recipient's principals under the award fall under one or more of the four criteria listed at 2 C.F.R. § 180.335:

  i. Are presently excluded or disqualified;
 ii. Have been convicted within the preceding three years of any of the offenses listed in 2 C.F.R. § 180.800(a) or had a civil judgment rendered against it or any of the recipient's principals for one of those offenses within that time period;
iii. Are presently indicted for or otherwise criminally or civilly charged by a governmental entity (federal, state or local) with commission of any of the offenses listed in 2 C.F.R. § 180.800(a); or

iv.  Have had one or more public transactions (federal, state, or local) terminated within the preceding three years for cause or default.

At any time after accepting the award, if the recipient learns that it or any of its principals falls under one or more of the criteria listed at 2 C.F.R. § 180.335, the recipient must provide immediate written notice to FEMA in accordance with 2 C.F.R. § 180.350.

## II. REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE

Per 2 C.F.R. Part 200, Appendix I § F.3, the additional post-award reporting requirements in 2 C.F.R. Part 200, Appendix XII may apply to applicants who, if upon becoming recipients, have a total value of currently active grants, cooperative agreements and procurement contracts from all federal awarding agencies that exceeds $10,000,000 for any period of time during the period of performance of an award under this funding opportunity.

Recipients that meet these criteria must maintain current information reported in FAPIIS about civil, criminal, or administrative proceedings described in paragraph 2 of Appendix XII at the reporting frequency described in paragraph 4 of Appendix XII.

## III. SINGLE AUDIT REPORT

For audits of fiscal years beginning on or after December 26, 2014, recipients that expend $750,000 or more from all federal funding sources during their fiscal year are required to submit an organization-wide financial and compliance audit report, also known as the single audit report.

The audit must be performed in accordance with the requirements of U.S. Government Accountability Office's (GAO) Government Auditing Standards, located at https://www.gao.gov/yellowbook/overview, and the requirements of Subpart F of 2 C.F.R. Part 200, located at http://www.ecfr.gov/cgi-bin/text-idx?node=sp2.1.200.f.

## 4.  Monitoring and Oversight

Per 2 C.F.R. § 200.337, FEMA, through its authorized representatives, has the right, at all reasonable times, to make site visits or conduct desk reviews to review project accomplishments and management control systems to review award progress and to provide any required technical assistance. During site visits or desk reviews, FEMA will review recipients' files related to the award. As part of any monitoring and program evaluation activities, recipients must permit FEMA, upon reasonable notice, to review grant-related records and to interview the organization's staff and contractors regarding the program. Recipients must respond in a timely and accurate manner to FEMA requests for information relating to the award.

Effective monitoring and oversight help FEMA ensure that recipients use grant funds for their intended purpose(s); verify that projects undertaken are consistent with approved plans; and ensure that recipients make adequate progress toward stated goals and objectives. Additionally, monitoring serves as the primary mechanism to ensure that recipients comply with applicable laws, rules, regulations, program guidance, and requirements. FEMA regularly monitors all grant programs both financially and programmatically in accordance with federal laws, regulations (including 2 C.F.R. Part 200), program guidance, and the terms

and conditions of the award. All monitoring efforts ultimately serve to evaluate progress towards grant goals and proactively target and address issues that may threaten grant success during the period of performance.

FEMA staff will periodically monitor recipients to ensure that administrative processes, policies and procedures, budgets, and other related award criteria are meeting Federal Government-wide and FEMA regulations. Aside from reviewing quarterly financial and programmatic reports, FEMA may also conduct enhanced monitoring through either desk-based reviews, onsite monitoring visits, or both. Enhanced monitoring will involve the review and analysis of the financial compliance and administrative processes, policies, activities and other attributes of each federal assistance award, and it will identify areas where the recipient may need technical assistance, corrective actions, or other support.

Financial and programmatic monitoring are complementary processes within FEMA's overarching monitoring strategy that function together to ensure effective grants management, accountability, and transparency; validate progress against grant and program goals; and safeguard federal funds against fraud, waste and abuse. Financial monitoring primarily focuses on statutory and regulatory compliance with administrative grant requirements, while programmatic monitoring seeks to validate and assist in grant progress, targeting issues that may be hindering achievement of project goals and ensuring compliance with the purpose of the grant and grant program. Both monitoring processes are similar in that they feature initial reviews of all open awards, and additional, in-depth monitoring of grants requiring additional attention.

Recipients and subrecipients who are pass-through entities are responsible for monitoring their subrecipients in a manner consistent with the terms of the federal award at 2 C.F.R. Part 200, including 2 C.F.R. § 200.332. This includes the pass-through entity's responsibility to monitor the activities of the subrecipient as necessary to ensure that the subaward is used for authorized purposes, in compliance with federal statutes, regulations, and the terms and conditions of the subaward; and that subaward performance goals are achieved.

In terms of overall award management, recipient and subrecipient responsibilities include, but are not limited to: accounting of receipts and expenditures, cash management, maintaining adequate financial records, reporting and refunding expenditures disallowed by audits, monitoring if acting as a pass-through entity or other assessments and reviews, and ensuring overall compliance with the terms and conditions of the award or subaward, as applicable, including the terms of 2 C.F.R. Part 200.

**G.  DHS Awarding Agency Contact Information**
**1.  Contact and Resource Information**
**a.  *Program Office Contact***
   Title: Federal Emergency Management Agency
   Name: National Continuity Programs

   Email Address:  IPAWS@FEMA.DHS.GOV
   Business Phone: 202-646-2500

Next Generation Warning System                                    Back to the Top

b. ***Centralized Scheduling and Information Desk (CSID)***
CSID is a non-emergency comprehensive management and information resource developed by FEMA for grants stakeholders. CSID provides general information on all FEMA grant programs and maintains a comprehensive database containing key personnel contact information at the federal, state, and local levels. When necessary, recipients will be directed to a federal point of contact who can answer specific programmatic questions or concerns. CSID can be reached by phone at (800) 368-6498 or by e-mail at askcsid@fema.dhs.gov, Monday through Friday, 9:00 AM – 5:00 PM ET.

c. ***Grant Programs Directorate (GPD) Award Administration Division***
GPD's Award Administration Division (AAD) provides support regarding financial matters and budgetary technical assistance. Additional guidance and information can be obtained by contacting the AAD's Help Desk via e-mail at ASK-GMD@fema.dhs.gov.

d. ***Equal Rights***
The FEMA Office of Equal Rights (OER) is responsible for compliance with and enforcement of federal civil rights obligations in connection with programs and services conducted by FEMA and recipients of FEMA financial assistance. All inquiries and communications about federal civil rights compliance for FEMA grants under this notice should be sent to FEMA-CivilRightsOffice@fema.dhs.gov.

e. ***Environmental Planning and Historic Preservation***
The FEMA Office of Environmental Planning and Historic Preservation (OEHP) provides guidance and information about the EHP review process to FEMA programs and FEMA's recipients andsubrecipients. All inquiries and communications about EHP compliance for FEMA grant projects under this notice or the EHP review process should be sent to FEMA-OEHP- NOFOQuestions@fema.dhs.gov.

2. **Systems Information**
a. ***Grants.gov***
For technical assistance with Grants.gov, call the customer support hotline 24 hours per day, 7 days per week (except federal holidays) at (800) 518-4726 or e-mail at support@grants.gov.

b. ***Non-Disaster (ND) Grants***
For technical assistance with the ND Grants system, please contact the ND Grants Helpdesk at ndgrants@fema.dhsgov or (800) 865-4076, Monday through Friday, 9:00 AM – 6:00 PM ET. User resources are available at https://www.fema.gov/grants/guidance-tools/non-disaster-grants-management-system.

c. ***Payment and Reporting System (PARS)***
FEMA uses the Payment and Reporting System (PARS) for financial reporting, invoicing, and tracking payments. FEMA uses the Direct Deposit/Electronic Funds Transfer (DD/EFT) method of payment to recipients. To enroll in the DD/EFT, recipients must complete a Standard Form 1199A, Direct Deposit Form. If you have questions about the online system,

please call the Customer Service Center at (866) 927-5646 or email ask-GMD@fema.dhs.gov.

## H. **Additional Information**
## 1. **Termination Provisions**

FEMA may terminate a federal award in whole or in part for one of the following reasons. FEMA and the recipient must still comply with closeout requirements at 2 C.F.R. §§ 200.344-200.345 even if an award is terminated in whole or in part. To the extent that subawards are permitted under this notice, pass-through entities should refer to 2 C.F.R. § 200.340 for additional information on termination regarding subawards.

### a. *Noncompliance*

If a recipient fails to comply with the terms and conditions of a federal award, FEMA may terminate the award in whole or in part. If the noncompliance can be corrected, FEMA may first attempt to direct the recipient to correct the noncompliance. This may take the form of a Compliance Notification. If the noncompliance cannot be corrected or the recipient is non-responsive, FEMA may proceed with a Remedy Notification, which could impose a remedy for noncompliance per 2 C.F.R. § 200.339, including termination. Any action to terminate based on noncompliance will follow the requirements of 2 C.F.R. §§ 200.341-200.342 as well as the requirement of 2 C.F.R. § 200.340(c) to report in FAPIIS the recipient's material failure to comply with the award terms and conditions. See also the section on Actions to Address Noncompliance in this notice.

### b. *With the Consent of the Recipient*

FEMA may also terminate an award in whole or in part with the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated.

### c. *Notification by the Recipient*

The recipient may terminate the award, in whole or in part, by sending written notification to FEMA setting forth the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. In the case of partial termination, FEMA may determine that a partially terminated award will not accomplish the purpose of the federal award, so FEMA may terminate the award in its entirety. If that occurs, FEMA will follow the requirements of 2 C.F.R. §§ 200.341-200.342 in deciding to fully terminate the award.

## 2. **Program Evaluation**

Recipients and subrecipients are encouraged to incorporate program evaluation activities from the outset of their program design and implementation to meaningfully document and measure their progress towards meeting an agency priority goal(s). Title I of the Foundations for Evidence-Based Policymaking Act of 2018 (Evidence Act), Pub. L. No. 115-435 (2019) urges federal awarding agencies and federal assistance recipients and subrecipients to use program evaluation as a critical tool to learn, to improve equitable delivery and to elevate program service and delivery across the program lifecycle. Evaluation means "an assessment using systematic data collection and analysis of one or more programs, policies, and

organizations intended to assess their effectiveness and efficiency." Evidence Act § 101 (codified at 5 U.S.C. § 311). Evaluation costs are allowable costs (either as direct or indirect), unless prohibited by statute or regulation.

3. **Period of Performance Extensions**

Extensions to the period of performance (POP) for this program are allowed. Extensions to the POP identified in the award will only be considered through formal, written requests to the recipient's FEMA Program Analyst and must contain specific and compelling justifications as to why an extension is required. Recipients are advised to coordinate with the FEMA Program Analyst as needed when preparing an extension request.

All extension requests must address the following:
    a. The grant program, fiscal year, and award number;
    b. Reason for the delay –including details of the legal, policy, or operational challenges that prevent the final outlay of awarded funds by the deadline;
    c. Current status of the activity(ies);
    d. Approved POP termination date and new project completion date;
    e. Amount of funds drawn down to date;
    f. Remaining available funds, both federal and, if applicable, non-federal;
    g. Budget outlining how remaining federal and, if applicable, non-federal funds will be expended;
    h. Plan for completion, including milestones and timeframes for achieving each milestone and the position or person responsible for implementing the plan for completion; and
    i. Certification that the activity(ies) will be completed within the extended POP without any modification to the original statement of work, as described in the and as approved by FEMA.

Extension requests will be granted only due to compelling legal, policy, or operational challenges. Extension requests will only be considered for the following reasons:
    • Contractual commitments by the recipient or subrecipient with vendors prevent completion of the project, including delivery of equipment or services, within the existing POP;
    • The project must undergo a complex environmental review that cannot be completed within the existing POP;
    • Projects are long-term by design, and therefore acceleration would compromise core programmatic goals; or
    • Where other special or extenuating circumstances exist.

Recipients should submit all proposed extension requests to FEMA for review and approval at least 90 days before the end of the POP to allow sufficient processing time.

4. **Disability Integration**

Pursuant to Section 504 of the Rehabilitation Act of 1973, recipients of FEMA financial assistance must ensure that their programs and activities do not discriminate against other qualified individuals with disabilities.

Next Generation Warning System                              Back to the Top

Grant recipients should engage with the whole community to advance individual and community preparedness and to work as a nation to build and sustain resilience. In doing so, recipients are encouraged to consider the needs of individuals with disabilities into the activities and projects funded by the grant.

FEMA expects that the integration of the needs of people with disabilities will occur at all levels, including planning; alerting, notification, and public outreach; training; purchasing of equipment and supplies; protective action implementation; and exercises/drills.

The following are examples that demonstrate the integration of the needs of people with disabilities in carrying out FEMA awards:

- Include representatives of organizations that work with/for people with disabilities on planning committees, work groups and other bodies engaged in development and implementation of the grant programs and activities.
- Hold all activities related to the grant in locations that are accessible to persons with physical disabilities to the extent practicable.
- Acquire language translation services, including American Sign Language, that provide public information across the community and in shelters.
- Ensure shelter-specific grant funds are in alignment with FEMA's Guidance on Planning for Integration of Functional Needs Support Services in General Population Shelters.
- If making alterations to an existing building to a primary function area utilizing federal funds, complying with the most recent codes and standards and making path of travel to the primary function area accessible to the greatest extent possible.
- Implement specific procedures used by public transportation agencies that include evacuation and passenger communication plans and measures for individuals with disabilities.
- Identify, create, and deliver training to address any training gaps specifically aimed toward whole-community preparedness. Include and interact with individuals with disabilities, aligning with the designated program capability.
- Establish best practices in inclusive planning and preparedness that consider physical access, language access, and information access. Examples of effective communication access include providing auxiliary aids and services such as sign language interpreters, Computer Aided Real-time Translation (CART), and materials in Braille or alternate formats.

FEMA grant recipients can fund projects towards the resiliency of the whole community, including people with disabilities, such as training, outreach and safety campaigns, provided that the project aligns with this NOFO and the terms and conditions of the award.

5. **Conflicts of Interest in the Administration of Federal Awards or Subawards**
   For conflicts of interest under grant-funded procurements and contracts, refer to the section on Procurement Integrity in this NOFO and 2 C.F.R. §§ 200.317 – 200.327.

32

To eliminate and reduce the impact of conflicts of interest in the subaward process, recipients and pass-through entities must follow their own policies and procedures regarding the elimination or reduction of conflicts of interest when making subawards. Recipients and pass-through entities are also required to follow any applicable federal and state, local, tribal, or territorial (SLTT) statutes or regulations governing conflicts of interest in the making of subawards.

The recipient or pass-through entity must disclose to the respective Program Analyst or Program Manager, in writing, any real or potential conflict of interest that may arise during the administration of the federal award, as defined by the federal or SLTT statutes or regulations or their own existing policies, within five days of learning of the conflict of interest. Similarly, subrecipients, whether acting as subrecipients or as pass-through entities, must disclose any real or potential conflict of interest to the recipient or next-level pass-through entity as required by the recipient or pass-through entity's conflict of interest policies, or any applicable federal or SLTT statutes or regulations.

Conflicts of interest may arise during the process of FEMA making a federal award in situations where an employee, officer, or agent, any members of his or her immediate family, his or her partner has a close personal relationship, a business relationship, or a professional relationship, with an applicant, sub applicant, recipient, subrecipient, or FEMA employees.

6. **Procurement Integrity**

Through audits conducted by the DHS Office of Inspector General (OIG) and FEMA grant monitoring, findings have shown that some FEMA recipients have not fully adhered to the proper procurement requirements at 2 C.F.R. §§ 200.317 – 200.327 when spending grant funds. Anything less than full compliance with federal procurement requirements jeopardizes the integrity of the grant as well as the grant program. To assist with determining whether an action is a procurement or instead a subaward, please consult 2 C.F.R. § 200.331. For detailed guidance on the federal procurement standards, recipients and subrecipients should refer to various materials issued by FEMA's Procurement Disaster Assistance Team (PDAT), such as the PDAT Field Manual and Contract Provisions Guide. Additional resources, including an upcoming trainings schedule can be found on the PDAT Website: https://www.fema.gov/grants/procurement.

The below highlights the federal procurement requirements for FEMA recipients when procuring goods and services with federal grant funds. FEMA will include a review of recipients' procurement practices as part of the normal monitoring activities. **All procurement activity must be conducted in accordance with federal procurement standards at 2 C.F.R. §§ 200.317 – 200.327.** Select requirements under these standards are listed below. The recipient and any of its subrecipients must comply with all requirements, even if they are not listed below.

Under 2 C.F.R. § 200.317, when procuring property and services under a federal award, states (including territories) must follow the same policies and procedures they use for procurements from their non-federal funds; additionally, states must now follow 2 C.F.R. § 200.321 regarding socioeconomic steps, 200.322 regarding domestic preferences for

procurements, 200.323 regarding procurement of recovered materials, and 2 C.F.R. § 200.327 regarding required contract provisions.

**All other non-federal entities, such as tribes (collectively, non-state entities),** must have and use their own documented procurement procedures that reflect applicable SLTT laws and regulations, provided that the procurements conform to applicable federal law and the standards identified in 2 C.F.R. Part 200. These standards include, but are not limited to, providing for full and open competition consistent with the standards of 2 C.F.R. § 200.319 and the required procurement methods at § 200.320.

a. ***Important Changes to Procurement Standards in 2 C.F.R. Part 200***
OMB recently updated various parts of Title 2 of the Code of Federal Regulations, among them, the procurement standards. States are now required to follow the socioeconomic steps in soliciting small and minority businesses, women's business enterprises, and labor surplus area firms per 2 C.F.R. § 200.321. All non-federal entities should also, to the greatest extent practicable under a federal award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States per 2 C.F.R. § 200.322. More information on OMB's revisions to the federal procurement standards can be found in Purchasing Under a FEMA Award: OMB Revisions Fact Sheet.

The recognized procurement methods in 2 C.F.R. § 200.320 have been reorganized into informal procurement methods, which include micro-purchases and small purchases; formal procurement methods, which include sealed bidding and competitive proposals; and noncompetitive procurements. The federal micro-purchase threshold is currently $10,000, and non-state entities may use a lower threshold when using micro-purchase procedures under a FEMA award. If a non-state entity wants to use a micro-purchase threshold higher than the federal threshold, it must follow the requirements of 2 C.F.R. § 200.320(a)(1)(iii)-(v). The federal simplified acquisition threshold is currently $250,000, and a non-state entity may use a lower threshold but may not exceed the federal threshold when using small purchase procedures under a FEMA award. *See* 2 C.F.R. § 200.1 (citing the definition of simplified acquisition threshold from 48 C.F.R. Part 2, Subpart 2.1).

See 2 C.F.R. §§ 200.216, 200.471, and Appendix II as well as section D.13.a of the NOFO regarding prohibitions on covered telecommunications equipment or services.

b. ***Competition and Conflicts of Interest***
Among the requirements of 2 C.F.R. § 200.319(b) applicable to all non-federal entities other than states, in order to ensure objective contractor performance and eliminate unfair competitive advantage, contractors that develop or draft specifications, requirements, statements of work or invitations for bids or requests for proposals must be excluded from competing for such procurements. FEMA considers these actions to be an organizational conflict of interest and interprets this restriction as applying to contractors that help a non-federal entity develop its grant application, project plans, or project budget. This prohibition also applies to the use of former employees to manage the grant or carry out a contract when those former employees worked on such activities while they were employees of the non-federal entity.

Under this prohibition, unless the non-federal entity solicits for and awards a contract covering both development and execution of specifications (or similar elements as described above), and this contract was procured in compliance with 2 C.F.R. §§ 200.317 – 200.327, federal funds cannot be used to pay a contractor to carry out the work if that contractor also worked on the development of those specifications. This rule applies to all contracts funded with federal grant funds, including pre-award costs, such as grant writer fees, as well as post-award costs, such as grant management fees.

Additionally, some of the situations considered to be restrictive of competition include, but are not limited to:
- Placing unreasonable requirements on firms for them to qualify to do business;
- Requiring unnecessary experience and excessive bonding;
- Noncompetitive pricing practices between firms or between affiliated companies;
- Noncompetitive contracts to consultants that are on retainer contracts;
- Organizational conflicts of interest;
- Specifying only a "brand name" product instead of allowing "an equal" product to be offered and describing the performance or other relevant requirements of the procurement; and
- Any arbitrary action in the procurement process.

Per 2 C.F.R. § 200.319(c), non-federal entities other than states must conduct procurements in a manner that prohibits the use of statutorily or administratively imposed SLTT geographical preferences in the evaluation of bids or proposals, except in those cases where applicable federal statutes expressly mandate or encourage geographic preference. Nothing in this section preempts state licensing laws. When contracting for architectural and engineering services, geographic location may be a selection criterion provided its application leaves an appropriate number of qualified firms, given the nature and size of the project, to compete for the contract.

Under 2 C.F.R. § 200.318(c)(1), non-federal entities other than states are required to maintain written standards of conduct covering conflicts of interest and governing the actions of their employees engaged in the selection, award, and administration of contracts. **No employee, officer, or agent may participate in the selection, award, or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest.** Such conflicts of interest would arise when the employee, officer or agent, any member of his or her immediate family, his or her partner, or an organization that employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract. The officers, employees, and agents of the non-federal entity may neither solicit nor accept gratuities, favors or anything of monetary value from contractors or parties to subcontracts. However, non-federal entities may set standards for situations in which the financial interest is not substantial, or the gift is an unsolicited item of nominal value. The standards of conduct must provide for disciplinary actions to be applied for violations of such standards by officers, employees, or agents of the non-federal entity.

Next Generation Warning System                                         Back to the Top

Under 2 C.F.R. 200.318(c)(2), if the recipient or subrecipient (other than states) has a parent, affiliate or subsidiary organization that is not a state, local, tribal, or territorial government, the non-federal entity must also maintain written standards of conduct covering organizational conflicts of interest. In this context, organizational conflict of interest means that because of a relationship with a parent company, affiliate, or subsidiary organization, the non-federal entity is unable or appears to be unable to be impartial in conducting a procurement action involving a related organization. The non-federal entity must disclose in writing any potential conflicts of interest to FEMA or the pass-through entity in accordance with applicable FEMA policy.

c.   *Supply Schedules and Purchasing Programs*
Generally, a non-federal entity may seek to procure goods or services from a federal supply schedule, state supply schedule, or group purchasing agreement.

I.   GENERAL SERVICES ADMINISTRATION SCHEDULES
States, tribes, and local governments and any instrumentality thereof (such as local education agencies or institutions of higher education) may procure goods and services from a General Services Administration (GSA) schedule. GSA offers multiple efficient and effective procurement programs for state, tribal, and local governments and instrumentalities thereof, to purchase products and services directly from pre-vetted contractors. The GSA Schedules (also referred to as the Multiple Award Schedules and the Federal Supply Schedules) are long-term government-wide contracts with commercial firms that provide access to millions of commercial products and services at volume discount pricing.

Information about GSA programs for states, tribes, and local governments, and instrumentalities thereof, can be found at https://www.gsa.gov/resources-for/programs-for-State-and-local-governments and https://www.gsa.gov/buying-selling/purchasing-programs/gsa-schedules/schedule-buyers/state-and-local-governments.

For tribes, local governments and their instrumentalities that purchase off of a GSA schedule, this will satisfy the federal requirements for full and open competition provided that the recipient follows the GSA ordering procedures; however, tribes, local governments, and their instrumentalities will still need to follow the other rules under 2 C.F.R. §§ 200.317 – 200.327, such as solicitation of minority businesses, women's business enterprises, small businesses, or labor surplus area firms (§ 200.321), domestic preferences (§ 200.322), contract cost and price (§ 200.324), and required contract provisions (§ 200.327 and Appendix II).

II.   OTHER SUPPLY SCHEDULES AND PROGRAMS
For non-federal entities other than states, such as tribes, local governments, and nonprofits, that want to procure goods or services from a state supply schedule, cooperative purchasing program, or other similar program, in order for such procurements to be permissible under federal requirements, the following must be true:
- The procurement of the original contract or purchasing schedule and its use by the non-federal entity complies with state and local law, regulations, and written procurement procedures.

36

- The state or other entity that originally procured the original contract or purchasing schedule entered into the contract or schedule with the express purpose of making it available to the non-federal entity and other similar types of entities.
- The contract or purchasing schedule specifically allows for such use, and the work to be performed for the non-federal entity falls within the scope of work under the contract as to type, amount, and geography.
- The procurement of the original contract or purchasing schedule complied with all the procurement standards applicable to a non-federal entity other than states under at 2 C.F.R. §§ 200.317 – 200.327; and
- With respect to the use of a purchasing schedule, the non-federal entity must follow ordering procedures that adhere to applicable state, tribal, and local laws and regulations and the minimum requirements of full and open competition under 2 C.F.R. Part 200.

If a non-federal entity other than a state seeks to use a state supply schedule, cooperative purchasing program, or other similar type of arrangement, FEMA recommends the recipient discuss the procurement plans with its FEMA point of contact.

**d.  *Procurement Documentation***
Per 2 C.F.R. § 200.318(i), non-federal entities other than states and territories are required to maintain and retain records sufficient to detail the history of procurement covering at least the rationale for the procurement method, selection of contract type, contractor selection or rejection and the basis for the contract price. States and territories are encouraged to maintain and retain this information as well and are reminded that in order for any cost to be allowable, it must be adequately documented per 2 C.F.R. § 200.403(g).

Examples of the types of documents that would cover this information include but are not limited to:
- Solicitation documentation, such as requests for quotes, invitations for bids, or requests for proposals;
- Responses to solicitations, such as quotes, bids, or proposals;
- Pre-solicitation independent cost estimates and post-solicitation cost/price analyses on file for review by federal personnel, if applicable;
- Contract documents and amendments, including required contract provisions; and
- Other documents required by federal regulations applicable at the time a grant is awarded to a recipient; and
- Additional information on required procurement records can be found on pages 24-26 of the PDAT Field Manual.

**7.  Record Retention**
**a.  *Record Retention Period***
Financial records, supporting documents, statistical records, and all other non-Federal entity records pertinent to a federal award generally must be maintained for <u>at least</u> three years from the date the final FFR is submitted. *See* 2 C.F.R. § 200.334. Further, if the recipient does not submit a final FFR and the award is administratively closed, FEMA uses the date of administrative closeout as the start of the general record retention period.

The record retention period **may be longer than three years or have a different start date** in certain cases. These include:

- Records for real property and equipment acquired with Federal funds must be retained for **three years after final disposition of the property**. *See* 2 C.F.R. § 200.334(c).
- If any litigation, claim, or audit is started before the expiration of the three-year period, the records **must be retained until** all litigation, claims, or audit findings involving the records **have been resolved and final action taken**. *See* 2 C.F.R. § 200.334(a).
- The **record retention period will be extended if the non-federal entity is notified in writing** of the extension by FEMA, the cognizant or oversight agency for audit, or the cognizant agency for indirect costs, or pass-through entity. *See* 2 C.F.R. § 200.334(b).
- Where FEMA requires recipients to report program income after the period of performance ends, the **program income record retention period begins at the end of the recipient's fiscal year in which program income is earned**. *See* 2 C.F.R. § 200.334(e).
- For indirect cost rate computations and proposals, cost allocation plans, or any similar accounting computations of the rate at which a particular group of costs is chargeable (such as computer usage chargeback rates or composite fringe benefit rates), the start of the record retention period depends on whether the indirect cost rate documents were submitted for negotiation. If the **indirect cost rate documents were submitted for negotiation, the record retention period begins from the date those documents were submitted** for negotiation. If indirect cost rate documents were **not submitted for negotiation, the record retention period begins at the end of the recipient's fiscal year or other accounting period covered by that indirect cost rate**. *See* 2 C.F.R. § 200.334(f).

**b.** *Types of Records to Retain*

FEMA requires that non-federal entities maintain the following documentation for federally funded purchases:

- Specifications;
- Solicitations;
- Competitive quotes or proposals;
- Basis for selection decisions;
- Purchase orders;
- Contracts;
- Invoices; and
- Canceled checks.

Non-federal entities should keep detailed records of all transactions involving the grant. FEMA may at any time request copies of any relevant documentation and records, including purchasing documentation along with copies of cancelled checks for verification. *See, e.g.*, 2 C.F.R. §§ 200.318(i), 200.334, 200.337.

38

In order for any cost to be allowable, it must be adequately documented per 2 C.F.R. § 200.403(g). Non-federal entities who fail to fully document all purchases may find their expenditures questioned and subsequently disallowed.

## 8. Actions to Address Noncompliance

Non-federal entities receiving financial assistance funding from FEMA are required to comply with requirements in the terms and conditions of their awards or subawards, including the terms set forth in applicable federal statutes, regulations, NOFOs and policies. Throughout the award lifecycle or even after an award has been closed, FEMA or the pass-through entity may discover potential or actual noncompliance on the part of a recipient or subrecipient. This potential or actual noncompliance may be discovered through routine monitoring, audits, closeout, or reporting from various sources.

In the case of any potential or actual noncompliance, FEMA may place special conditions on an award per 2 C.F.R. §§ 200.208 and 200.339, FEMA may place a hold on funds until the matter is corrected, or additional information is provided per 2 C.F.R. § 200.339, or it may do both. Similar remedies for noncompliance with certain federal civil rights laws are authorized pursuant to 44 C.F.R. Parts 7 and 19.

In the event the noncompliance is not able to be corrected by imposing additional conditions or the recipient or subrecipient refuses to correct the matter, FEMA might take other remedies allowed under 2 C.F.R. § 200.339. These remedies include actions to disallow costs, recover funds, wholly or partly suspend or terminate the award, initiate suspension and debarment proceedings, withhold further federal awards, or take other remedies that may be legally available. For further information on termination due to noncompliance, see the section on Termination Provisions in the NOFO.

FEMA may discover and take action on noncompliance even after an award has been closed. The closeout of an award does not affect FEMA's right to disallow costs and recover funds as long the action to disallow costs takes place during the record retention period. *See* 2 C.F.R. §§ 200.334, 200.345(a). Closeout also does not affect the obligation of the non-federal entity to return any funds due as a result of later refunds, corrections, or other transactions. 2 C.F.R. § 200.345(a)(2).

The types of funds FEMA might attempt to recover include, but are not limited to, improper payments, cost share reimbursements, program income, interest earned on advance payments, or equipment disposition amounts.

FEMA may seek to recover disallowed costs through a Notice of Potential Debt Letter, a Remedy Notification, or other letter. The document will describe the potential amount owed, the reason why FEMA is recovering the funds, the recipient's appeal rights, how the amount can be paid, and the consequences for not appealing or paying the amount by the deadline.

If the recipient neither appeals nor pays the amount by the deadline, the amount owed will become final. Potential consequences if the debt is not paid in full or otherwise resolved by the deadline include the assessment of interest, administrative fees, and penalty charges;

Next Generation Warning System                                                    Back to the Top

administratively offsetting the debt against other payable federal funds; and transferring the debt to the U.S. Department of the Treasury for collection.

FEMA notes the following common areas of noncompliance for FEMA's grant programs:
- Insufficient documentation and lack of record retention;
- Failure to follow the procurement under grants requirements;
- Failure to submit closeout documents in a timely manner;
- Failure to follow EHP requirements; and
- Failure to comply with the POP deadline.

## 9. Audits

FEMA grant recipients are subject to audit oversight from multiple entities including the DHS OIG, the GAO, the pass-through entity or independent auditing firms for single audits, and may cover activities and costs incurred under the award. Auditing agencies such as the DHS OIG, the GAO, and the pass-through entity (if applicable), and FEMA in its oversight capacity, must have access to records pertaining to the FEMA award. Recipients and subrecipients must retain award documents for at least three years from the date the final FFR is submitted, and even longer in many cases subject to the requirements of 2 C.F.R. § 200.334. In the case of administrative closeout, documents must be retained for at least three years from the date of closeout, or longer subject to the requirements of 2 C.F.R. § 200.334. If documents are retained longer than the required retention period, the DHS OIG, the GAO, and the pass-through entity, as well as FEMA in its oversight capacity, have the right to access these records as well. *See* 2 C.F.R. §§ 200.334, 200.337.

Additionally, non-federal entities must comply with the single audit requirements at 2 C.F.R. Part 200, Subpart F. Specifically, non-federal entities, other than for-profit subrecipients, that expend $750,000 or more in federal awards during their fiscal year must have a single or program-specific audit conducted for that year in accordance with Subpart F. 2 C.F.R. § 200.501. A single audit covers all federal funds expended during a fiscal year, not just FEMA funds. The cost of audit services may be allowable per 2 C.F.R. § 200.425, but non-federal entities must select auditors in accordance with 2 C.F.R. § 200.509, including following the proper procurement procedures. For additional information on single audit reporting requirements, see section F of this NOFO under the header "Single Audit Report" within the subsection "Additional Reporting Requirements."

The objectives of single audits are to:
- Determine whether financial statements conform to generally accepted accounting principles (GAAP);
- Determine whether the schedule of expenditures of federal awards is presented fairly.
- Understand, assess, and test the adequacy of internal controls for compliance with major programs; and
- Determine whether the entity complied with applicable laws, regulations, and contracts or grants.

For single audits, the auditee is required to prepare financial statements reflecting its financial position, a schedule of federal award expenditures, and a summary of the status of

Next Generation Warning System                                    Back to the Top

prior audit findings and questioned costs. The auditee also is required to follow up and take appropriate corrective actions on new and previously issued but not yet addressed audit findings. The auditee must prepare a corrective action plan to address the new audit findings. 2 C.F.R. §§ 200.508, 200.510, 200.511.

Non-federal entities must have an audit conducted, either single or program-specific, of their financial statements and federal expenditures annually or biennially pursuant to 2 C.F.R. § 200.504. Non-federal entities must also follow the information submission requirements of 2 C.F.R. § 200.512, including submitting the audit information to the Federal Audit Clearinghouse within the earlier of 30 calendar days after receipt of the auditor's report(s) or nine months after the end of the audit period. The audit information to be submitted include the data collection form described at 2 C.F.R. § 200.512(c) and Appendix X to 2 C.F.R. Part 200 as well as the reporting package described at 2 C.F.R. § 200.512(b).

The non-federal entity must retain one copy of the data collection form and one copy of the reporting package for three years from the date of submission to the Federal Audit Clearinghouse. 2 C.F.R. § 200.512; *see also* 2 C.F.R. § 200.517 (setting requirements for retention of documents by the auditor and access to audit records in the auditor's possession).

FEMA, the DHS OIG, the GAO, and the pass-through entity (if applicable), as part of monitoring or as part of an audit, may review a non-federal entity's compliance with the single audit requirements. In cases of continued inability or unwillingness to have an audit conducted in compliance with 2 C.F.R. Part 200, Subpart F, FEMA and the pass-through entity, if applicable, are required to take appropriate remedial action under 2 C.F.R. § 200.339 for noncompliance, pursuant to 2 C.F.R. § 200.505.

## 10. Payment Information

FEMA uses the Direct Deposit/Electronic Funds Transfer (DD/EFT) method of payment to recipients. To enroll in the DD/EFT, the recipient must complete SF-1199A, Direct Deposit Form.

FEMA utilizes the Payment and Reporting System (PARS) for financial reporting, invoicing and tracking payments. For additional information, refer to https://isource.fema.gov/sf269/execute/LogIn?sawContentMessage=true.

## 11. Whole Community Preparedness

Preparedness is a shared responsibility that calls for the involvement of everyone—not just the government—in preparedness efforts. By working together, everyone can help keep the nation safe from harm and help keep it resilient when struck by hazards, such as natural disasters, acts of terrorism, and pandemics.

Whole Community includes:
- Individuals and families, including those with access and functional needs;
- Businesses;
- Faith-based and community organizations;
- Nonprofit groups;

- Schools and academia;
- Media outlets; and
- All levels of government, including state, local, tribal, territorial, and federal partners

The phrase "Whole Community" often appears in preparedness materials, as it is one of the guiding principles. It means:
1. Involving people in the development of national preparedness documents; and
2. Ensuring their roles and responsibilities are reflected in the content of the materials.

Next Generation Warning System                                          Back to the Top