**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

CORPORATION FOR PUBLIC
BROADCASTING, *et al.*,

       *Plaintiffs*,

    v.

DONALD J. TRUMP, *in his official capacity*
*as President of the United States*, *et al.*,

       *Defendants*.

Civil Action No. 25-1305 (RDM)

---

## MEMORANDUM OPINION AND ORDER

In the Public Broadcasting Act of 1967 ("PBA" or "Act"), Congress authorized the

establishment of "a nonprofit corporation to be known as the 'Corporation for Public

Broadcasting." Pub. L. No. 90-129, 81 Stat. 365, 369 (1967), codified at 47 U.S.C. § 390 *et seq.*

When President Johnson signed the PBA into law, he ascribed a lofty purpose to the Act—"to

enrich man's spirit" by giving "wider and . . . stronger voice to educational radio and television."

Lyndon B. Johnson, *Remarks Upon Signing the Public Broadcasting Act of 1967*, The American

Presidency Project, https://perma.cc/6ZGJ-L42W. As he described it, the PBA would do so by

"providing new funds for broadcast facilities;" by launching "a major study of television's use in

the Nation's classrooms and [its] potential use throughout the world;" and, "most important[ly],"

by "build[ing] a new institution: the Corporation for Public Broadcasting." *Id.* Consistent with

the PBA, in March 1968, the initial Board of Directors (the "Board") organized the Corporation

as a nonmember, nonprofit corporation pursuant to the D.C. Nonprofit Corporation Act. Dkt.

12-1 at 3. The initial Board included such luminaries as Milton Eisenhower (who headed three

major universities), James Killian, Jr. (who headed MIT), Frank Pace, Jr. (who served as

Secretary of the Army), and Carl Sanders (who served as Governor of Geogia).

Three features of the Corporation stand out.  First, the President appoints the Board

members with the advice and consent of the Senate.  47 U.S.C. § 396(c)(1).  Second, the PBA

provides that the Corporation is not "an agency or establishment of the United States

Government," *id.* § 396(b), and that the members of the Board are not "officers or employees of

the United States," *id.* § 396(d)(2).  Third, except as provided in certain antidiscrimination laws,

the PBA forbids "any department, agency, officer, or employee of the United States" from

exercising "any direction, supervision, or control over . . . the Corporation," *id.* § 398(a), and

from exercising "any direction, supervision, or control over the content or distribution of public

telecommunications programs and services, or over the curriculum or program instruction of any

educational institution or school system," *id.* § 398(c).  The Corporation has operated pursuant to

these legislative conditions for almost six decades.

When the Corporation was originally established, the PBA provided that the Board would

"consist[] of fifteen members."  Pub. L. No. 90-129, 81 Stat. 365, 369 (1967).  Congress

subsequently reduced that number to nine, 47 U.S.C. § 396(c)(1), and, for the past few years, the

Board has operated with only five active directors.  On April 28, 2025, however, events took a

dramatic turn when the Deputy Director of Presidential Personnel sent three of the five sitting

directors an email purporting to dismiss them from the Board, which, if effective, would leave

the Board with only two active directors.  Dkt. 2-2 at 9 (Slavitt Decl. ¶ 17).  Shortly after he did

so, the Corporation for Public Broadcasting, the Board, and Lauren G. Ross, Thomas E.

Rothman, and Diane Kaplan (the purportedly terminated Board members) (collectively,

"Plaintiffs") filed this action against President Trump, the White House Presidential Personnel

Office, the Director and Deputy Director of Presidential Personnel, the Office of Management and Budget ("OMB"), and the Director of OMB (collectively, "Defendants"). Plaintiffs allege that the Corporation is a "private corporation," which Congress carefully insulated from governmental interference, and that the President lacks authority to exercise any "direction, supervision, or control over the Corporation," including by firing members of the Board. Dkt. 1 at 3 (Compl.) (quoting 47 U.S.C. § 398(c)). They seek "a declaration that the email purporting to remove" the three Board members "is of no legal effect" and an order barring Defendants from taking any action "to give effect to the . . . email or otherwise to interfere with or control the governance of the" Corporation. *Id.* at 5 (Compl.).

The ultimate merits of Plaintiffs' claims, however, are not currently before the Court. Instead, all that is before the Court is Plaintiffs' Motion for a Temporary Restraining Order, Dkt. 2; Dkt. 2-1, which the parties subsequently agreed to treat as a Motion for a Preliminary Injunction, Dkt. 15 at 2. That motion seeks emergency relief, barring Defendants from taking any action to give effect to the purported termination of the three Board members or otherwise to interfere with or to attempt to control the Corporation, pending final resolution of the case. Dkt. 2 at 1. Although the case presents important questions regarding the status of the Corporation and its relationship with the federal government, the Court must leave those questions for another day. For present purposes and on the present record, it is enough to conclude that Plaintiffs have failed to carry their burden of demonstrating that they are likely to prevail on the merits of their claim for injunctive relief or that Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief.

The Court will, accordingly, **DENY** Plaintiffs' motion for a preliminary injunction, but will do so without prejudice to Plaintiffs renewing their motion should Defendants (or those acting in concert with them) take steps to interfere in the independence of the Corporation.

## I.  BACKGROUND

### A.    Statutory Background

When Congress enacted the PBA in 1967, it authorized the establishment of "a nonprofit corporation, to be known at the 'Corporation for Public Broadcasting,'" and it specified that the Corporation would "not be an agency or establishment of the United States Government" and that "[t]he members of the Board shall not, by reason of such membership, be deemed to be employees of the United States."  Pub. L. No. 90-129, 81 Stat. 369–70 (1967).  That structure was central to how Congress envisioned the Corporation.  In particular, Congress found that it was "in the public interest to encourage the growth and development of noncommercial educational radio and television broadcasting," that it was "necessary and appropriate for the Federal Government to complement, assist, and support" efforts to "make noncommercial educational radio and television service available to all the citizens of the United States," but that it was necessary to employ "a *private corporation* . . . to facilitate the development of educational radio and television broadcasting . . . to afford maximum protection to such broadcasting from extraneous interference and control."  *Id.* at 368–69 (emphasis added). Throughout the legislative process, and in the legislation itself, Congress made clear that it intended that the Board of Directors perform its duties outside the government and without government or political influence.  H.R. Rep. No. 572, 90th Cong., 1st Sess. 15 (1967); S. Rep. No. 222, 90th Cong., 1st Sess. 4, 11 (1967); 47 U.S.C. § 396(g)(1)(B)–(D).  As explained in the House Report: "It was generally agreed that a nonprofit Corporation, directed by a Board of

Directors, none of whom will be Government employees, will provide the most effective insulation from Government control or influence over the expenditure of funds."  H.R. Rep. No. 572, 90th Cong., 1st Sess. 15 (1967).

Beyond providing for the establishment of a "private" nonprofit corporation, outside the government, to promote noncommercial television and radio, Congress took further steps to ensure the Corporation's independence.  Most notably, it amended the Communications Act of 1934 to preclude "any department, agency, officer, or employee of the United States" from exercising "any direction, supervision, or control over public communications, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation."  47 U.S.C. § 398(a); *see also* 81 Stat. 368.  That prohibition, moreover, further reinforces yet another provision of the PBA:  Under what is codified at 47 U.S.C. § 398(c), no "department, agency, officer, or employee of the United States" may "exercise any direction, supervision, or control over the content or distribution of public telecommunications programs and services."  The term "'public telecommunications services' means noncommercial educational and cultural radio and television programs."  47 U.S.C. § 397(14).

Beyond enforcement of the antidiscrimination laws, the appropriation and disbursement of funds, and the Comptroller General's audit authority, *id.* § 396(k)(11)(A), (*l*)(2), the Act provides only a single, express role for the federal government: the "9 members" of the Board are "appointed by the President, by and with the advice and consent of the Senate." [1]  *Id.* § 396(c)(1).  The Act says almost nothing about removal authority.  The closest it comes is in a

---

[1] The CPB is also a "designated Federal entity" pursuant to the Inspector General Act, 5 U.S.C. § 415(a)(1)(A).  Accordingly, the CPB has an Inspector General who conducts "independent audits, evaluations, and investigations" and reports findings "to Congress and the public."  *See* Office of the Inspector General, Overview, Corporation for Public Broadcasting, https://cpboig.oversight.gov/what-we-do/overview.

provision that requires Board members to attend at least "50 percent of all duly convened meetings of the Board in any calendar year" and specifies that, if "[a] member [] fails to meet [this] requirement," he or she "shall forfeit membership and the President shall appoint a new member to fill such vacancy not later than 30 days after such vacancy is determined by the Chairman of the Board." *Id.* § 396(c)(7). Thus, at least in the case of a "forfeit[ure]" of membership due to nonattendance, removal authority is vested in the Chairman of the Board. Regardless of how it occurs, the Act specifies that "[*a*]*ny* vacancy in the Board . . . shall be filled in the manner consistent with" the PBA. *Id.* § 396(c)(6) (emphasis added).

The Act also sets forth the Corporation's authorized purposes and activities. *See id.* § 396(g). Those purposes include "facilitat[ing] the full development of public telecommunications" and "assist[ing] in the establishment and development of one or more interconnection systems to be used for the distribution of public telecommunications services." *Id.* § 396(g)(1). In order to carry out these purposes, the Corporation is authorized, among other things, to obtain and to make grants, including making "grants to public telecommunications entities, national, regional, and other systems of public telecommunications entities, and independent producers and production entities;" to "make payments to existing and new public telecommunicates entities to aid in financing the production or acquisition of public telecommunications services;" to "arrange, by grant to or contract with appropriate public or private" entities "for interconnection facilities suitable for distribution and transmission of public telecommunications services to public telecommunications entities;" and to "make grants or contracts for the use of nonbroadcast telecommunications technologies for the dissemination to the public of public telecommunications services." *Id.* § 396(g)(2).

In short, Congress envisioned a "a private corporation" that would "facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control." *Id.* § 396(a)(10).  As explained in the Senate Report:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs.  It is also recognized that this assistance should in no way involve the Government in programming or program judgments.  An independent entity supported by Federal funds is required to provide programs free of political pressures.  The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.
>
> . . . .
>
> Your committee has heard considerable discussion about the fear of Government control or interference in programming if S. 1160 is enacted.  We wish to state in the strongest terms possible that it is our intention that local stations be absolutely free to determine for themselves what they should or should not broadcast.  As President Johnson said in his message of February 28: Noncommercial television and radio in America, even though supported by Federal funds, must be absolutely free from any Federal Government interference over programming.

S. Rep. No. 222, 90th Cong., 1st Sess., at 4, 11 (1967); *see also F.C.C. v. League of Women Voters*, 468 U.S. 364, 390 (1984) (noting that the "unifying theme of the[] [PBA's] statutory provisions is that they substantially reduce the risk of governmental interference with the editorial judgments of local stations without restricting those stations' ability to speak on matters of public concern").

The PBA further provides that, in order "[t]o carry out [these] purposes and [to] engage in [these] activities, the Corporation shall have the usual powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act," except that it is barred from "owning or operating any television or radio broadcast station" or related system and from "producing programs, scheduling programs for dissemination, or disseminating programs to the public."  47 U.S.C. § 396(g)(3).  And, more generally, the Act provides that "[t]he Corporation

shall be subject to the provisions of [the PBA], and, to the extent consistent with [the PBA], to the District of Columbia Nonprofit Corporation Act." *Id.* § 396(b).  Consistent with the D.C. law, the Corporation is further governed by its articles of incorporation and bylaws.  *See* Dkt. 12-1 at 17–43, 45–58.

Finally, the Corporation is funded in part through annual congressional appropriations, *id.* § 396(k)(1), and, in part, from private sources, Dkt. 15 at 58.  In 2024, for example, Congress appropriated $535 million to the Corporation for fiscal year 2026.  *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 696 (2024).  That funding is then disbursed to various local and national public-radio and public-broadcasting entities, such as National Public Radio.  47 U.S.C. § 396(k)(3); *see also* Corporation for Public Broadcasting, FY 2025 Operating Budget, https://perma.cc/2J5J-EDZH (fiscal year 2024 budget granting, for example, $262,828,125 in "Direct TV Grants").  The appropriated funds are held in the "Public Broadcasting Fund," which is "administered by the Secretary of the Treasury."  47 U.S.C. § 396(k)(1)(A).

## B.    Factual and Procedural Background

Prior to April 28, 2025, the Corporation had five Board members: (1) Ruby Calvert, the Chair; (2) Laura G. Ross, the Vice Chair; (3) Diane Kaplan; (4) Tom Rothman; and (5) Liz Sembler.  *Board of Directors (Biographies)*, Corporation for Public Broadcasting, https://perma.cc/7WPE-V9Z2.  But on April 28, Trent Morse, the Deputy Director of Presidential Personnel for the Executive Office of the President, sent three members of the Board—Ross, Kaplan, and Rothman—an email purporting to terminate their service on the Board.  Dkt. 2-2 at 9 (Slavitt Decl. ¶ 17).  The email read as follows:

> On behalf of President Donald J. Trump, I am writing to inform you that your
> position on the Corporation for Public Broadcasting is terminated effective
> immediately.

*Id.*; *see also id.* at 10 (Slavitt Decl.).  If effective, that action left the Board with only two

members, Calvert and Sembler.  The following day, a member of the Department of

Government Efficiency ("DOGE"), Nate Cavanaugh, emailed Calvert and Sembler.  Dkt. 12-1

at 5–6 (Supp. Slavitt Decl. ¶ 12).  The emailed stated

> Hi Ruby, Liz,
>
> My name is Nate Cavanaugh – I'm a member of the DOGE team working at the
> General Services Administration.  Are you available for a meeting tomorrow or
> on Thursday?  I would like to learn more about the Corporation for Public
> Broadcasting and discuss getting a DOGE team assigned to the organization.
>
> Best,
> Nate

*Id.*    On April 29, 2025, Plaintiffs filed this action, seeking, among things, a declaratory

judgment specifying that the email purporting to remove Ross, Rothman, and Kaplan was "of

no legal effect because the President did not have the authority to take such an action."  Dkt. 1

at 22.  Plaintiffs also moved for a temporary restraining order ("TRO"), Dkt. 2.  That motion

does not seek the ultimate declaratory relief sought in Plaintiffs' complaint but, rather, seeks an

order "prohibiting the President and the other Defendants from terminating any member of the

CPB's Board of Directors" or from "taking any action to interfere with the [Corporation's]

internal governance and operations."  Dkt. 2-1 at 28.  For present purposes, Plaintiffs did not

request that the Court restore Ross, Kaplan, and Rothman to the Board—if they were, in fact,

effectively removed—or that the Court declare that they were not effectively removed.

Plaintiffs support their motion with a declaration from the Corporation's General Counsel,

Evan Slavitt.  *See* Dkt. 2-2 at 4.

The same day that Plaintiffs filed their TRO, this Court held an emergency scheduling conference, Dkt. 10, and set a briefing schedule for addressing that motion. On May 14, 2025, the Court held a hearing on the then-pending motion. Dkt. 15. At the hearing, however, Plaintiffs requested for the first time that the Court convert their motion for a TRO into a motion for a preliminary injunction, and Defendants consented to doing so. Dkt. 15 at 2. The Court granted that request, *id.*, and the Court provided the parties with the opportunity to offer further briefing on questions raised at the hearing, *id.* at 52–53. The parties did so on several occasions. Dkt. 18, 19, 20, 21, 22, 23, 24.

Plaintiffs' motion for a preliminary injunction is now ripe for decision.

## II.  ANALYSIS

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To obtain a preliminary injunction, a movant "must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the issuance of a preliminary injunction is in the public interest." *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (internal quotations and alterations omitted).

"[T]he movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted). Two factors, however, are of particular importance in assessing a party's request for preliminary relief. First, where a movant fails to show any "likelihood of success on the merits,"

10

courts are without authority to grant a preliminary injunction, and, accordingly, the court "need not proceed to review the other three preliminary injunction factors." *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). Second, "a showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018). Thus, without a showing that irreparable injury is likely, the movant cannot prevail on a motion for a preliminary injunction. *See Winter*, 555 U.S. at 22 (2008); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)); *Ashland Oil, Inc. v. F.T.C.*, 409 F. Supp. 297, 309 (D.D.C. 1976), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976) ("If irreparable injury cannot be established, . . . injunctive relief is not warranted.").

Because the Court concludes that Plaintiffs have failed to show that they are likely to prevail on the merits of their claim for injunctive (as opposed to declaratory) relief or that they are likely to suffer irreparable injury in the absence of a preliminary injunction, the Court will deny the pending motion.

### A.    Likelihood of success

As an initial matter, the Court notes that there is a disconnect between the ultimate relief that Plaintiffs seek and the interim or emergency relief that they seek, and that disconnect bears on their likelihood of success on the merits. The principal relief that they ultimately seek is a declaratory judgment, clarifying that the President's purported removal of the three directors was ineffectual and that the President lacks authority to remove directors from what is, in their view, a private, nonprofit corporation that Congress emphatically insulated from governmental

11

interference.  But there is no such thing as a motion for a preliminary declaratory judgment.  So, instead, their motion for emergency relief seeks a preliminary injunction "prohibiting the President and the other Defendants from terminating any member of the [Corporation's] Board of Directors[] or taking any action to interfere with the [Corporation's] internal governance and operations."  Dkt. 2-1 at 28; *see also* Dkt. 1 at 22 (Compl.) (describing temporary relief sought).

That form of relief raises a host of questions, which Plaintiffs do little, if anything, to answer at this early stage of the litigation.  It is well settled, for example, that the President is not an "agency" subject to the dictates of the Administrative Procedure Act, *see Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), and it is far from clear that the Court has the power to issue an injunction running against the President under these circumstances, *see McCray v. Biden*, 574 F. Supp. 3d 1, 8–11 (D.D.C. 2021), as opposed to his subordinates, it they take further steps to "attempt to enforce the President's" decision, *see Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin*, 505 U.S. at 815).  If Plaintiffs have answers to these difficulties, they have yet to share them.

But even putting aside this serious threshold issues, the Court is unpersuaded that Plaintiffs have carried their burden of showing that they are likely to succeed on the merits.  Much of the parties' briefing focuses on the question of whether the Corporation is a governmental or a private entity, and that question may have some bearing on later rounds of the litigation.  At this point, however, the Court is not yet persuaded that Plaintiffs are entitled to prevail on the merits, even if the Corporation is, in relevant respects, a private, nonprofit corporation that Congress intended to insulate from governmental interference.

The Court starts with the statutory text, which provides that the "[t]he Corporation shall be subject to [the PBA], and, to the extent consistent with [the PBA], to the District of Columbia

Nonprofit Corporation Act."  47 U.S.C. § 396(b); *see also id.* § 396(g)(3).  The Act lacks any

express removal provision; it does not make clear—at least in express terms—whether the

President retains removal authority incident to his appointment authority and, if so, whether any

such authority is constrained by a good-cause provision or other limitation.  To be sure, the

power to appoint ordinarily carries with it the power to remove, *Myers v. United States*, 272 U.S.

52, 126 (1926), but that implied power is not absolute and depends on the other terms of the law.

Understood in this light, the Court must first consider whether the D.C. Nonprofit Corporation

Act addresses the appointing official's removal authority and, if so, whether the D.C. rule is

"consistent with" the PBA.  The Court will then turn to a handful of additional statutory

arguments that Plaintiffs raise.

**1.**

Removal authority is addressed in D.C. Code § 29-406.08.  That provision of the D.C.

Nonprofit Corporation Act divides the universe of nonprofit corporations into two realms,

"membership corporations" and "nonmembership corporations."  All agree that the Corporation

for Public Broadcasting is a "nonmembership corporation," so the Court focuses on that portion

of the D.C. law.  Section 29-406.08(b) vests the power to "remove a director of a

nonmembership corporation" in "[t]he board of directors," and that removal authority is "[w]ith

or without cause, unless the articles of incorporation or bylaws provide that directors may be

removed only for cause."  D.C. Code § 29-406.08(b).  Because neither the Corporation's articles

of incorporation nor its bylaws addressed removal at the time that the three directors were

purportedly removed, this provision seems to favor Plaintiffs' position.  But the D.C. Nonprofit

Corporation Act's discussion of removal authority does not end there.

13

Of particular relevance here, a separate subsection of the D.C. Nonprofit Corporation Act provides as follows:

> Except as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons.

D.C. Code. § 29-406.08(e).  Three things are noteworthy in light of this provision.  First, at the time that the three directors were purportedly removed, neither the Corporation's articles of incorporation nor its bylaws "otherwise provided."  Indeed, neither spoke to the issue of removal at all.  Second, it follows that, as the appointing authority, the President was (at that time) authorized to remove the directors, at least pursuant to D.C. law.  Third, the Corporation has, since the three directors were removed, amended its bylaws to provide that "[n]o Director may be removed from the Board by any person or authority, including the President of the United States, without a two-thirds vote of the other Directors confirming such removal."[2]  *See* By-Laws of the Corporation for Public Broadcasting,  as Amended May 15, 2025 § 2.11, https://perma.cc/HYR5-97XJ.

---

[2]  On May 15, 2025, after the Court's motion hearing, the Board of Directors amended the bylaws as follows:

> Section 2.11 Removal of Directors. No Director may be removed from the Board by any person or authority, including the President of the United States, without a two-thirds vote of the other Directors confirming such removal. In the event the Corporation's President appoints one or more members of the Designated Body, such members may not be removed from the Designated Body by any person or authority, including the President of the United States, without a two-thirds vote of the other Directors and serving members of the Designated Body confirming such removal.

*See* By-Laws of the Corporation for Public Broadcasting, as Amended May 15, 2025, https://perma.cc/HYR5-97XJ.

Thus, assuming that D.C. corporate law is controlling, the President (as the appointing person) was authorized to remove the three directors at the time he acted, but the Corporation was authorized to provide otherwise in its articles of incorporation or bylaws, which it has now done (but had not done before the three director-plaintiffs were purportedly removed). This, then, leads back to the question whether D.C. law is, in this respect, consistent with the PBA.

**2.**

Plaintiffs maintain that, to the extent D.C. law permitted the President unilaterally to remove the three directors, it was inconsistent with the PBA. They proffer one broad and one narrow argument in support of this contention. Although both arguments are plausible, at least at this preliminary stage of the proceeding, the Court is unpersuaded.

**a.**

Plaintiffs' broad argument focuses on the evident congressional intent to insulate the Corporation from governmental or political influence. The Court does not doubt the force of the major premise of their argument; Congress was clearly concerned about preventing "any department, agency, officer, or employee of the United States" from directing, supervising, or controlling the Corporation. 47 U.S.C. § 398(a). But, at the same time, Congress did provide the President with appointment authority, which necessarily admits of some influence through the selection of directors, and it did not include any express removal provision—whether for-cause or otherwise. The question, then, is whether applying D.C. corporate law is irreconcilable with the congressional commitment to independence. For three reasons, the Court concludes that it is not.

First and foremost, even accepting D.C. corporate law, Congress indirectly provided the Corporation with the authority to protect its own independence. Long before the President

15

purported to remove the three directors, the Corporation was free to modify its bylaws—as it has now done—to protect it directors from at-will removal by the appointing authority.  The fact that the Board only did so recently does not mean that the PBA and the D.C. Nonprofit Corporation Act are inconsistent; it simply means that, until recently, the Corporation has not vigorously protected its own independence.

Second, the President is not free to remove directors and then unilaterally to appoint their replacements, thereby using his power to remove as an effective tool for altering Board policy. Rather, the President's appointment authority is tempered by the requirement that he proceed only with the advice and consent of the Senate.  47 U.S.C. § 396(c)(1).  It is unlikely, moreover, that the President can shortcut this process by filling vacancies on an interim basis.  To start, if the Corporation is private entity, as Plaintiffs posit, the directors are not "officers" of the United States, and it is thus doubtful that the President could fill a vacancy in any manner other than that prescribed in the statute, in the D.C. Nonprofit Corporation Act, or in the Corporation's articles of incorporation or bylaws.  The PBA is consistent with that premise and provides that "[a]ny vacancy in the Board . . . shall be filled in the manner consistent with" the Act.  47 U.S.C. § 396(c)(6).

But even if that were not the case, and even if the Corporation's directors were considered "officers" of the United States (who exercise "significant governmental" authority, *Buckley v. Valeo*, 424 U.S. 1, 141 (1976)), "in the absence of any Senate recess, the President could not unilaterally appoint [a new director] to fill a vacancy pursuant to the Recess Appointments Clause, U.S. Const. Art. II, § 2, cl. 3."  *Aviel v. Gor*, No. 25-5105, at *2 (D.C. Cir. June 5, 2025) (Katsas, J., concurring in the denial of stay pending appeal).  Nor is it likely that the Federal Vacancy Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, provides the President with

authority to fill a vacancy temporarily (without the advice and consent of the Senate), since the FVRA provides the President with authority only to designate "acting official[s] to perform the functions and duties of . . . office[s] [within] Executive agenc[ies]," *id.* at § 3347(a), and the PBA makes clear that the Corporation is "not [] an agency or establishment of the United States Government," 47 U.S.C. § 396(b).  Although the parties dispute whether the Corporation bears the *constitutional* hallmarks of a private or governmental entity under *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374 (1995), and *Department of Transportation v. Association of American Railroads*, 575 U.S. 43 (2015), Congress was, of course, free to define the President's *statutory* appointment (and removal) authority in the PBA and FVRA.

Third, as discussed further below, the District of Columbia Nonprofit Corporation Act and the Corporation's bylaws provide the Corporation with another tool to protect its independence and ability to continue to operate, even if the President removes multiple directors. Under D.C. law, a nonprofit corporation may vest some, but not all, of the duties and authorities of the board of directors in a "designated body."  D.C. Code § 28-406.12; *see also id*. § 29-401.02(8).  Here, the Corporation has adopted this provision, and its bylaws provide that, in the absence of "the statutory minimum number of presidentially-appointed Directors . . . , a Designated Body, consisting of three (3) members, shall exercise the rights and responsibilities of the Board until such time as there are three (3) presidentially-appointed Directors."  Dkt. 12-1 at 55.  The designated body consists of the remaining, presidentially-appointed directors and former directors appointed by the Corporation's president "in the order in which they most recently served as Directors."  *Id.*  This provision, accordingly, protects the Corporation from the potentially crippling effect of the loss of most, but not all, directors, and prevents governmental interference in its operations.

17

The Court, accordingly, concludes that Plaintiffs have failed to carry their burden of demonstrating that they are likely to prevail in showing that the provision of the D.C. Nonprofit Corporation Act that allows the appointing party to remove a director, unless the corporation's articles of incorporation or bylaws provide otherwise, is inconsistent with the PBA's focus on non-interference.

**b.**

Plaintiffs' narrow argument relies on 47 U.S.C. § 396(c)(7). That subsection requires that directors "attend not less than 50 percent of all duly convened meetings of the Board in any calendar year," and it provides that any director "who fails to meet th[at] requirement . . . shall forfeit membership." 47 U.S.C. § 396(c)(7). On Plaintiffs' telling, § 396(c)(7) provides the only basis for removing a Board member, and, to the extent the D.C. Nonprofit Corporation Act provides otherwise, it is inconsistent with the PBA. Dkt. 12 at 20-21.

Framed in that manner, Plaintiffs' argument barely gets off the ground. To start, § 396(c)(7) does not expressly discuss removal, it discusses forfeiture of membership. But beyond that, it is difficult to fathom that Congress intended to provide the members of the Corporation's Board with essentially irrevocable tenure; in cases that are sufficiently egregious, even the President, members of Congress, and Article III judges can be removed from office under the appropriate procedures. Yet, if Plaintiffs' reading of § 396(c)(7) were correct, that provision of the PBA would implicitly create an immunity from removal, even when, for example, a director "[h]as been convicted of a felony," § 29-406.08(c)(2). *See generally* D.C. Code § 29-406.08(b), (c). The Court is unprepared to endorse that extraordinary reading of a provision designed to ensure attendance at Board meetings.

A slight variation on Plaintiffs' argument is more palatable, although still unconvincing. In particular, the final sentence of § 396(c)(7) vests "the Chairman of the Board" with authority to make the determination that the "vacancy" exists, and it is only after she does so that the President is authorized "to fill such vacancy." 47 U.S.C. § 396(c)(7). Considered in this light, § 396(c)(7) might be read to suggest that it is the Chairman of the Board, and not the President, who has removal authority—or it might be read at least to call into question the assumption that the President has removal authority. But, once again, that reading places too much weight on a provision that says nothing about "removal"—and, instead, talks about "forfeiture"—and is simply designed to ensure that the directors attend Board meetings.

### 3.

At the hearing on the preliminary injunction and in a supplemental notice filed with the Court, Dkt. 18, Plaintiffs raised two additional arguments, neither of which bears fruit.

*First*, they press the novel argument that D.C. Code § 29-406.08(e) should be read to require that the President obtain the advice and consent of the Senate before removing any Board member. Dkt. 12 at 20–21; Dkt. 15 at 16–17. They argue that the PBA vests appointment authority in the President, but only with the advice and consent of the Senate, 47 U.S.C. § 396(c)(1), and that § 29-406.08(e) merely permits the "persons" making the appointment to remove the director that they appointed, D.C. Code § 29-406.08(e). On this view, the appointment is made by the President and the Senate, and the removal requires both the President and the Senate. But that misunderstands the difference in meaning between "appoint" and "advise and consent." Multiple provisions of the PBA, for example, refer to appointments made by the President without mentioning the Senate, *see* 47 U.S.C. § 396(c)(2)–(3), (5), (7)— understandably so, because it is, in fact, the President who makes the appointment. Moreover, as

a matter of common parlance, we say that "the President appointed the Secretary of State or

Chief Justice," not that the President and the Senate did so.  Plaintiffs attempt to find support in

the case law for treating the appointment of directors under the PBA as joint appointments made

by the President and the Senate, but none of the cases that they cite are even remotely

analogous.[3]

     *Second*, reprising their argument regarding the independence of the Corporation,

Plaintiffs argue that, even if Section 29-406.08(e) might otherwise apply, the President cannot

remove a Board member because he is an "officer" of the United States, and the PBA prohibits

"any department, agency, *officer*, or employee of the United States to exercise any direction,

supervision, or control over . . . [CPB]."  47 U.S.C. § 398 (emphasis added).  Although the

parties cite to competing authority on whether the President is considered an "officer of the

United States," *see* Dkt. 18 at 3–9; Dkt. 20 at 2–3, the Court need not resolve that question here.

For present purposes, the Court can assume (as seems likely) that Congress intended to preclude

the President (or any subordinate officials acting at his direction) from directing, supervising, or

controlling the Corporation.  47 U.S.C. § 398(a).  But Congress did provide the President with

---

[3] *See, e.g.*, *Kreppein v. Downs*, 272 A.D. 452, 454 (N.Y. App. Div. 1947) (statute involving appointment of probation officers that vested the power to appoint in judges of county court, or a majority of said judges, required a joint removal by the same judges where only two judges appointed); *Com. ex rel. Kelley v. Sheridan*, 200 A. 102, 103–104 (Pa. 1938) (statute involving appointment of members of the state's Board of Revision of Taxes "by the County Treasurer and the County Controller acting jointly" required removal by those same officials); *Schlafly v. Eagle Forum*, 970 F.3d 924, 935 (8th Cir. 2020) (statute providing that a director who is "elected by a class of voting members . . . may be removed only by the same class of members"); *Wingert v. Scenic Heights Subdivision Prop. Owners Ass'n, Inc.*, No. 03-07-00297, 2008 WL 2778017, at *5 & n.7 (Tex. App. July 16, 2008) (statute providing that "[i]f the director was elected to office, removal requires an affirmative vote equal to the vote necessary to elect the director"); *Boatmen's First Nat. Bank of W. Plains v. S. Missouri Dist. Council of the Assemblies of God*, 806 S.W.2d 706, 714 (Mo. Ct. App. 1991) (state law providing that "[t]he body which appoints a director may also remove a director").

appointment power, and that authority carries with it at least *some* ability to influence the affairs of the Corporation.  The question presented here, then, is whether that appointment power carries with it the usual trappings of appointment authority, including those embodied in D.C. law and in the governing articles of incorporation and bylaws, or whether the noninterference provision trumps that authority.  For the reasons given above, the Court is not persuaded (at least at this stage of the proceeding) that the provisions at issue are in irreconcilable conflict or that the noninterference provision precludes giving the D.C. law and Board bylaws their ordinary application.

The Court, accordingly, concludes that Plaintiffs have failed to demonstrate a likelihood of success on the merits.

**B.     Irreparable harm**

Plaintiffs have also failed to carry their burden of establishing a likelihood of irreparable harm.  As an initial matter, the Court notes that the injunctive relief that Plaintiffs seek— prohibiting the President from removing any Board member and prohibiting Defendants from taking any action to interfere with the Corporation's internal governance and operations—is unrelated to the harms that the putatively removed directors assert.  Plaintiffs do not request, for example, that the Court order the President to reappoint or to reinstate those directors.  Plaintiffs do request that the Court enjoin Defendants from "taking any steps to implement or give effect to any purported removal of any board member of the Corporation for Public Broadcasting," Dkt. 2-3 at 1, but they do not explain what they intend this to cover.  Presumably, the Corporation decides for itself who can attend (and possibly even vote at) Board meetings, and it decides whether to pay the $150 per day for traveling to and from and attending Board meetings (although it is hard to imagine that the loss of this small amount would, in any event, amount to

irreparable injury). And, to the extent that the putatively removed Board members are concerned

that the President might quickly move to fill their positions, doing so would require nominations,

Senate advice and consent, and, finally, appointment, all of which would take time—and would

provide ample opportunity for Plaintiffs to return to this Court, if necessary. It is telling that

Plaintiffs did not even raise the prospect of irreparable injury to the putatively removed Board

members until they filed their reply brief. *See* Dkt. 12 at 26–28.

      Instead, the core of Plaintiffs' claim of irreparable injury focuses on the workings of the

Corporation. Dkt. 2-2 at 12 (Slavitt Decl. ¶ 27). First, Plaintiffs maintain that, if the removals

are allowed to stand, the Corporation "will be left without a quorum and will be unable to

operate . . . at all." *Id.* Second, they argue that, absent interim relief, the government is likely to

take steps that will be difficult, if not impossible, to unravel. *Id.* These steps include the

unlawful appointment of replacement Board members, which will inject grave uncertainty into

the work of the Corporation; the possible "invasion of [the Corporation's] premises," which

could "create significant liabilities," could violate the attorney-client privilege, and could risk

exposure of other confidential information; the interference with "[r]eporting obligations;" the

loss of licenses; and the "[d]establization" of public media nationwide. *Id.* at 12–13 (Slavitt

Decl. ¶ 27).

      Although Plaintiffs' concern that the other shoe may be about to drop is understandable,

it does not support their claim of irreparable harm. To date, there is no indication that the

Corporation's premises are at risk of "invasion" or that, notwithstanding the clear statutory

prohibition, any department or agency is threatening to take over or otherwise control the

Corporation. To the contrary, beyond pointing to the experience of a *different* entity, Plaintiffs

merely proffer an email from a DOGE staffer requesting the opportunity to meet to discuss the

Corporation and "getting a DOGE team assigned to" it.  Dkt. 12-1 at 5 (Supp. Slavitt Decl. ¶ 12).

Although DOGE likely lacks any authority over the Corporation, that email, which was sent

about five weeks ago, is insufficient to establish a risk of irreparable harm.

Nor is there reason to believe that the President intends to remove (or to attempt to

remove) either of the two remaining directors of the Corporation.  It bears note, moreover, that to

the extent the President might have had the authority unilaterally to remove directors before this

suit was brought, the Board has now taken a step that, in all likelihood, would prevent any such

action: it has amended its bylaws to require Board concurrence, as permitted under the D.C.

Nonprofit Corporation Act.  And beyond that, even if the President were to do so, and even if his

action were effective, the Corporation would not be without a meaningful remedy, which would

permit it to continue to operate.  As explained above, the D.C. Nonprofit Corporation Act

contemplates the possibility that a Board may not be able to function under certain

circumstances, and it authorizes a "designated body" to perform some, although not all, of the

functions of the Board.  D.C. Code § 29-406.12(a).  Consistent with that provision, the

Corporation's bylaws permit the Corporation's President to appoint former Board directors to

serve on a designated body, if fewer than "the statutory minimum number of presidentially-

appointed Directors of the Corporation remain in office."  Dkt. 12-1 at 55.  Thus, if one or both

of the remaining directors were removed, the Corporation could still function.  *See* Dkt. 15 at 46.

The designated body provision also answers Plaintiffs' concern about D.C. Code § 29-

406.03(a), which provides that "[a] board of directors shall consist of 3 or more directors."  The

parties take different positions regarding the meaning of this provision.  According to Plaintiffs,

the provision requires the Board to have at least three members in order to function.  *See* Dkt. 12

at 22; Dkt. 12-1 at 4-5 (Supp. Slavitt Decl. ¶ 11).  According to Defendants, only the quorum

provision limits the authority of the Board to act. Dkt. 11 at 34 n.9. Neither party cites any caselaw in support of its reading of the statute. For present purposes, however, the Court need not resolve this question because the designated body provision, D.C. Code § 29-406.12, and the Corporation's bylaws, Dkt. 12-1 at 45-58, in any event, anticipate the possibility that the Board might "fail[] to meet the statutory minimum number of directors required under the D.C. Nonprofit Corporation Act," *id.* at 54, and they permit the Corporation's President to call upon former directors to fill the cap, *id.* at 55. Although Plaintiffs agree that this authority is available, they respond that, "at the end of the day, those are temporary designees and not full-time members of the board," and "we need full-time members of the board of directors." Dkt. 15 at 8-10. They also assert that any actions that a designated body might take could "have a cloud over them," which could affect the Corporation's dealings with "counter-parties." *Id.* at 11-12. A preliminary injunction, however, deals only with the immediate consequences of the challenged action, which can be addressed by "temporary designees." And there is no reason to believe that the use of a designated body, operating pursuant to D.C. law and the Corporation's bylaws, would cast a darker cloud over the Corporation's activities over the next several months than would a preliminary injunction, which, by definition, leaves the ultimate merits of the dispute for another day.

Finally, Plaintiffs' concern that the allegedly unlawful removal of three of the Board's members has deprived the Board of a quorum and, thus, of the ability to act is also unfounded. The quorum requirement is addressed in D.C. Code § 29-406.24. A quorum consists of a majority of the directors "in office." *Id.* § 29-406.24(a). That does not mean a majority of *slots available*—only those directors presently "in office." The D.C. Nonprofit Corporation Act further provides that a corporation's articles of incorporation or bylaws may authorize a quorum

24

of a third of the number of directors "in office" or two directors, whichever is greater. *Id.* § 29-406.24(b). Here, the Corporation's bylaws merely require a "simple majority of the Directors then serving." Dkt. 12-1 at 49. It follows that the existing Board could satisfy the quorum requirement, even if it has only two members. That provision of D.C. law, moreover, is consistent with the PBA. The Act provides in clear terms that "[a]ny vacancy in the Board shall not affect its power." 47 U.S.C. § 396(c)(6). The PBA, in other words, expressly authorized the Board to continue to function, notwithstanding "any" vacancy.

For all those reasons, Plaintiffs have also failed to demonstrate irreparable harm.

## CONCLUSION

For the reasons explained above, Plaintiffs' motion for a preliminary injunction, Dkt. 2, is hereby **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: June 8, 2025