# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CORPORATION FOR PUBLIC BROADCASTING, *et al.* | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Case No. 1:25-cv-01305 |
| | ) |
| DONALD J. TRUMP, in his Official Capacity as President of the United States of America, *et al.* | ) |
| | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS THE CORPORATION FOR PUBLIC BROADCASTING, THE BOARD OF DIRECTORS FOR THE CORPORATION FOR PUBLIC BROADCASTING, THOMAS E. ROTHMAN, AND DIANE KAPLAN'S MEMORANDUM IN SUPPORT OF THEIR <u>MOTION FOR SUMMARY JUDGMENT</u>[1]**

---

[1] Laura Ross has voluntarily dismissed her claims in this lawsuit and is no longer a plaintiff. *See* Dkt. No. 34.

**TABLE OF AUTHORITIES** ................................................................................................ ii

**STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE** ........................................................................................................................ 4

The Plain Text Of The PBA States That CPB Is Not A Government Agency .......................... 4

The Legislative History Of The PBA ...................................................................................... 7

The Executive Branch's Treatment Of CPB ........................................................................... 8

President Donald J. Trump Purports To Terminate CPB's Board Members ............................ 9

**LEGAL STANDARD** .................................................................................................... 11

**ARGUMENT** ................................................................................................................ 11

    I.   The President Has No Authority Over CPB ................................................................ 11

       a.   The President Has No Article II Authority Over Private Corporations ..................... 13

          i.   CPB Is A Private Corporation .................................................................... 15

          ii.   CPB Is Not A Government Entity ............................................................. 18

          iii.  Even If CPB Were a Government Entity, It Is Not An Executive Entity .............. 21

       b.   The President Has No Statutory Authority to Remove CPB's Directors Under the DC Nonprofit Corporation Act ................................................................................ 24

          i.   The 1962 DC Nonprofit Corporation Act Gives No Authority to the President to Remove CPB's Directors .................................................................... 26

          ii.   DC Code § 29-406.08(e) Is Inconsistent With the PBA ............................... 27

          iii.  Even if DC Code § 29-406.08(e) Were Consistent With The PBA, It Would Not Allow The President To Unilaterally Remove Directors Without Senate Approval ...................................................................................... 32

    II.   Declaratory Relief is Warranted and Proper ............................................................. 34

**CONCLUSION** ............................................................................................................ 36

## <u>TABLE OF AUTHORITIES</u>

*Accuracy in Media, Inc. v. F.C.C.*,
    521 F.2d 288 (D.C. Cir. 1975) .................................................................................17, 18, 24

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ..................................................................................................27

*Almond Bros. Lumber Co. v. U.S.*,
    34 C.I.T. 370 (2010) .................................................................................................29

*American Chemistry Council v. National Academy of Sciences*,
    2024 WL 1141465 (D.D.C. March 15, 2024) ..........................................................17

*Boatmen's First Nat'l Bank v. Southern Mo. Dist. Council of The Assemblies of God*,
    806 S.W.2d 706 (Mo. Ct. App. 1991) ..............................................................26, 34

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ..................................................................................................23

*C&E Servs., Inc. of Washington v. D.C. Water & Sewer Autho.*,
    310 F.3d 197 (D.C. Cir. 2002) .................................................................................35

*Carroll v. Trump*,
    49 F.4th 759 (2d Cir. 2022) .....................................................................................29

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ..................................................................................................15

*Clinton v. Jones*,
    520 U.S. 681 (1997) ..................................................................................................28

*Collins v. Yellen*,
    594 U.S. 220 (2021) ..................................................................................................22

*Com. ex rel. Reinhardt v. Randall*,
    356 Pa. 302 (1947) ...................................................................................................33

*Community-Service Broadcasting of Mid-America, Inc. v. Fed. Communications Comm'n*,
    593 F.2d 1102 (D.C. Cir. 1978) ..........................................................................17, 24

*Corporation for Public Broadcasting v. FEMA*,
    No. 1:25-cv-00740, Dkt. No. 33-1 (D.D.C. June 24, 2025) ................................7, 18

*Dellinger v. Bessent*,
    2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ...........................................................31

*Dep't of Transp. v. Ass'n of Am. R.Rs.,*
  575 U.S. 43 (2015) ..........................................................................................19, 20

*Edmond v. United States*,
  520 U.S. 651 (1997) ........................................................................................3, 25, 31

*FCC v. League of Women Voters,*
  468 U.S. 364 (1984) ........................................................................................18

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ........................................................................................12, 31

*Glenn v. Thomas Fortune Fay*,
  222 F. Supp. 3d 31 (D.D.C. 2016) ..................................................................35

*Hanes Corp. v. Millard*,
  531 F.2d 585 (D.C. Cir. 1976) ........................................................................35

*Harris v. Bessent*,
  775 F. Supp. 3d 164 (D.D.C. 2025),
  *hearing in banc denied*, No. 25-5037, 2025 WL 1033740 (D.C. Cir. Apr. 7, 2025).........34, 35

*Kennedy v. Braidwood Management, Inc.,*
  606 U.S. ___, 2025 WL 1773628 (U.S. June 27, 2025) ................................. *passim*

*Lebron v. Nat'l R.R. Passenger Corp.*,
  513 U.S. 374, 115 S. Ct. 961 (1995)................................................................19, 20, 21

*Marbury v. Madison*,
  5 U.S. 137 (1803)............................................................................................13

*McCulloch v. Maryland*,
  17 U.S. 316 (1819)..........................................................................................14

*Menard's Heirs v. Massey*,
  49 U.S. 293 (1850)..........................................................................................28

*Morrison v. Olson*, 17 U.S. 316 (1819)<CcULLO
  487 U.S. 654 (1988)........................................................................................25

*Motions Sys. Corp. v. Bush*,
  437 F.3d 1356 (Fed. Cir. 2006)......................................................................29

*Myers v. United States*,
  272 U.S. 52, 47 S. Ct. 21,71 L. Ed. 160 (1926).............................................13, 22, 24

iii

*Nat'l Wildlife Fed. v. U.S.*,
   626 F.2d 917 (D.C. Cir. 1980) ......................................................................29

*National Federation of Independent Businesses v. Sebelius*,
   567 U.S. 519 (2012) ............................................................................14, 28

*National Treasury Employees Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ....................................................13, 17, 28

*Network Project v. Corp. for Pub. Broad.*,
   398 F. Supp. 1332 (D.D.C. 1975),
   *aff'd in relevant part*, 561 F.2d 963 (D.C. Cir. 1977) .............................17

*New York v. Biden*,
   636 F. Supp. 3d 1 (D.D.C. 2022) ..................................................................35

*Nixon v. Fitzgerald*,
   457 U.S. 731, 102 S. Ct. 2690 (1982) .....................................................28, 30

*Operation Rescue Nat. v. U.S.*,
   147 F.3d 68 (1st Cir. 1998) ..........................................................................29

*PHH Corp. v. Consumer Financial Protection Bureau*,
   839 F.3d 1 (D.C. Cir. 2016) *rev'd on other grounds*
   991 F.3d 75 (D.C. Cir. 2018) (*en banc*) ....................................................12

*PHH Corp. v. Consumer Financial Protection Bureau*,
   881 F.3d 75 (D.C. Cir. 2018) ........................................................................12

*President v. Vance*,
   627 F.2d 353 (D.C. Cir. 1980) ......................................................................35

*Pub. Citizen, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   332 F.3d 654 (D.C. Cir. 2003) ......................................................................27

*Schlafly v. Eagle Forum*,
   970 F.3d 924 (8th Cir. 2020) ...................................................................25, 34

*Seila Law LLC v. Consumer Financial Protection Bureau*,
   591 U.S. 197 (2020) .........................................................................12, 22, 31

*Severino v. Biden*,
   71 F.4th 1038 (D.C. Cir. 2023) ..............................................................22, 24

iv

*Trump v. United States*,
    603 U.S. 593 (2024)...........................................................................................11, 14

*U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*,
    813 F.3d 1259 (9th Cir. 2016) ....................................................................................19

*U.S. ex rel. Totten v. Bombardier Corp.*,
    380 F.3d 488 (D.C. Cir. 2004) ...................................................................................19

*United States Ass'n of Reptile Keepers, Inc. v. Jewell*,
    103 F. Supp. 3d 133 (D.D.C. 2015)
    *aff'd sub nom. United States Ass'n of Reptile Keepers, Inc. v. Zinke*,
    852 F.3d 1131 (D.C. Cir. 2017)..................................................................................27

*United States v. Comstock*,
    560 U.S. 126 (2010) (Thomas, J., dissenting) ...........................................................13

*United States v. Hatter*,
    532 U.S. 557, 121 S. Ct. 1782 (2001) ........................................................................30

*United States v. Trucking Management, Inc.*,
    662 F.2d 36, 42-45 (D.C. Cir. 1981)..........................................................................15

*Wiener v. United States*,
    357 U.S. 349 (1958)....................................................................................................22

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..............................................................................................11, 14

## FEDERAL STATUTES

5 U.S.C. § 101........................................................................................................9, 16

5 U.S.C. § 103........................................................................................................9, 16

5 U.S.C. § 105........................................................................................................9, 16

5 U.S.C. § 13101(11) ...................................................................................................23

12 U.S.C. § 1717 ..........................................................................................................21

15 U.S.C. § 714............................................................................................................20

28 U.S.C. § 1346(b)(1) ................................................................................................30

28 U.S.C. § 1361...................................................................................................17, 29

28 U.S.C. § 2201(a) .....................................................................................................34

28 U.S.C. § 2679 ......................................................................................................30

42 U.S.C. § 2296b(a) ...............................................................................................20

42 U.S.C. § 8102 ......................................................................................................20

47 U.S.C. § 396...................................................................................................... *passim*

47 U.S.C. § 398...................................................................................................... *passim*

47 U.S.C. § 399 .......................................................................................................18

49 U.S.C. § 24302(a) ...............................................................................................21

Fed. R. Civ. P. 56.................................................................................................1, 11

President Lyndon B. Johnson, Remarks at the Signing of the Public Broadcasting Act of 1967
(Nov. 7, 1967)..................................................................................................8, 32

Pub. L. No. 87-569, 76 Stat. 265 (Aug. 6, 1962)....................................................26

Pub. L. No. 115 141, 132 Stat. 757 (Mar. 23, 2018) ..............................................27

### STATE STATUTES

D.C. Code § 29-406.03 .......................................................................................... *passim*

### OTHER AUTHORITIES

Webster's New Int'l Dictionary (2d ed. 1943) ........................................................30

H.R.Rep.No.572, 90th Cong., 1st Sess. 15 (1967) ...................................................8

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967)............................................2, 8, 28

U.S. Government Manual
https://www.govinfo.gov/content/pkg/GOVMAN-2025-01-13/pdf/GOVMAN-2025-01-13.pdf ........................................................................................................17

55940744.3

Pursuant to Fed. R. Civ. P. 56, Plaintiffs the Corporation for Public Broadcasting, Thomas Rothman, and Diane Kaplan (collectively, the "Plaintiffs") move for summary judgment on Plaintiffs' Complaint for declaratory judgment (Count I) that President Donald J. Trump's purported termination, on April 28, 2025, of Thomas Rothman, Laura Ross, and Diane Kaplan, from their positions as members of CPB's Board of Directors was unlawful and *ultra vires*, as a matter of law.

Over 58 years ago Congress, in enacting the Public Broadcasting Act of 1967, 47 U.S.C. § 396, (the "PBA"), authorized the creation of the Corporation for Public Broadcasting ("CPB") as an independent, "private corporation … and to afford [it] <u>maximum protection from extraneous interference and control</u>." 47 U.S.C. at § 396(a)(10).   To ensure that CPB was insulated from partisan governmental interference and control and to ensure its autonomy, Congress expressly provided that:

- "[CPB] will not be an agency or establishment of the United States Government. *Id*. at § 396(b).

- "[T]he members of the Board shall not, by reason of such membership, be deemed to be officers or employees of the United States." Id. at § 396(d)(2); and

Congress also put in place broad anti-removal provisions designed to protect the independence of CPB's Board members.  Specifically, Congress forbade "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over … [CPB] or any of its grantees or contractors . . . ." Id. at §398.  The U.S. Supreme Court and the D.C. Circuit Court of Appeals have repeatedly recognized, including as recently as last month, that removal is one of the most powerful forms of control and supervision.  Here, Congress made it

clear that there could not be *any* form of control or supervision of CPB's Board.[2]

Both Congress and the Executive Branch expressly recognized as part of the legislative history that CPB would be ***independent*** and free from governmental control. Thus, the Senate Report accompanying the Act carefully pointed out:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs. It is also recognized that this assistance should ***in no way involve the Government in programming or program judgments***. An ***independent*** entity supported by Federal funds is required to provide programs ***free of political pressures***. The Corporation for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967) (emphasis added).  Similarly, President Johnson, the chief officer of the Executive Branch, in his public remarks in signing the Act on November 7, 1967 expressly emphasized that CPB was to remain free from governmental control and would be independent:

> This Corporation will assist stations and producers who aim for the best in broadcasting good music, in broadcasting exciting plays, and in broadcasting reports on the whole fascinating range of human activity. It will try to prove that what educates can also be exciting. It will get part of its support from our Government. ***But it will be carefully guarded from Government or from party control. It will be free, and it will be independent***-and it will belong to all of our people.

President Lyndon B. Johnson, Remarks at the Signing of the Public Broadcasting Act of 1967 (Nov. 7, 1967) (emphasis added).

For close to 60 years, those statutory protections, purpose, and Legislative history have acted as a bulwark against governmental control and interference by the Executive Branch.  Indeed, in the entirety of CPB's history, no member of the Executive branch has ever served on the Board,

---

[2] A protection further underscored by Congress providing the only basis for removal of a board member is the failure to attend at least half of all Board meetings.  *Id.* at § 396(c)(7).

and neither CPB nor any member of CPB's board has ever reported to, taken direction from, or been subject to the control of the Executive Branch. However, early on the morning of April 28, 2025, Defendant Trent Morse, on behalf of President Donald J. Trump, sent three separate emails to Plaintiffs Thomas Rothman, Laura Ross, and Diane Kaplan, purporting to terminate them from their positions as members of CPB's Board of Directors, doing so in direct violation of the PBA, caselaw, and the Separation of Powers inherent in the U.S. Constitution.

Just as the PBA prohibits the President's unilateral attempt to remove CPB's directors, so too does the D.C. Nonprofit Corporation Act. Indeed, the Defendants' recent efforts to justify the purported removal of CPB's directors by relying on D.C. Code § 29-406.08(e) fails for three fundamental reasons. First, when the PBA was enacted by Congress, D.C. Code § 29-406.08(e) did not exist. Rather, under the 1962 D.C. Nonprofit Corporations Act, in effect when Congress authorized the creation of CPB, there was no statutory authority vesting the President with any removal authority. Since then, Congress has not adopted D.C. Code § 29-406.08(e) as applying to the PBA.

Second, the PBA provides that CPB shall be subject to the D.C. Nonprofit Corporations Act **only to the extent consistent with** the PBA. 47 U.S.C. at § 396(b). Application of D.C. Code § 29-406.08(e) fundamentally conflicts with the PBA's broad anti-removal provisions prohibiting any "department, agency, officer, or employee of the United States" from exercising any "direction, supervision, or control over… the Corporation." 47 U.S.C. § 398(a). Well-established U.S. Supreme Court precedent holds that the power of removal is a core manifestation of the power to direct, control, or supervise. *See Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. __, 2025 WL 1773628, *10 (U.S. June 27, 2025) ("At-will removal is one means of ensuring supervision

3

and direction"); *Edmond v. United States*, 520 U.S. 651, 664 (1997) ("The power to remove officers, we have recognized, is a powerful tool for control").

Third, it is undisputed that the President may not unilaterally place directors onto the Board of CPB. Rather, he must act by and with the consent of the Senate. *See* 47 U.S.C. § 396(c)(1) (directors are "appointed by the President, by and with the advice and consent of the Senate"). As a matter of corporate law and statutory construction, given that the appointment of any director requires the consent of both the President and Senate, any removal under D.C. Code § 29-406.08(e) requires the involvement of both the President and the Senate. *See* D.C. Code § 29-406.08(e) ("a director *who is appointed by persons* other than the members may be removed with or without cause *by those persons*") (emphasis added).

As discussed further below, summary judgment should enter on Plaintiffs' claims for declaratory judgment (Count I) as the President has no legal authority, either statutory or constitutional, over the CPB, and his attempt to terminate its board members is ultra vires.

## STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE DISPUTE

1.     The Corporation for Public Broadcasting ("CPB") is a private, District of Columbia nonprofit corporation, authorized to be created by Congress in the Public Broadcasting Act of 1967 (the "PBA"). *See* 47 U.S.C. § 396; Decl. of E. Slavitt at ¶ 1 (attached as Exhibit 1).

2.     Since its creation, CPB has been the steward of Congressionally appropriated funds for public broadcasting and the largest single source of funding for public radio, television, and related online and mobile services. *See* Decl. of E. Slavitt at ¶ 1.

## The Plain Text Of The PBA States That CPB Is Not A Government Agency

3.     The PBA states that CPB is "not [] an agency or establishment of the United States Government." 47 U.S.C. § 396(b).

4

4.      The PBA states that "[t]he members of the [CPB] Board shall not, by reason of such membership, be deemed to be officers or employees of the United States." *Id*. at § 396(d)(2).

5.      The PBA forbids "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over [CPB] or any of its grantees or contractors…" *Id*. at § 398.

6.      Congress withheld from CPB any form, pure or quasi, of legislative, judicial, or regulatory power. *See* Decl. of E. Slavitt at ¶ 9.

7.      In the course of its business, CPB has no ability to regulate any aspect of public media, resolve disputes among stations, dictate content of public media stations, or render any form of judgment over any other entity or organization. *Id*. at ¶13.

8.      CPB does not, and cannot, infringe on or aid the executive branch's ability to carry out or implement the laws. *Id*.  For example, CPB:

- Has a board that is required to be divided by party, *id*;

- Is not subject to Freedom of Information Act requests, *id*;

- Is not designated as or referred to as a federal entity under any other statute, *id*;

- does not and cannot issue any regulations*, id*;

- Does not and cannot regulate or adjudicate disputes between public radio and television stations and members of the public, *id*;

- Is forward-funded for two years (that is, appropriations made, for example, in 2025 are for its 2027 fiscal year), *id*;

- Receives its funds directly from the Treasury and not through any governmental department or agency, *id*;

- Is not subject to the jurisdiction of any other governmental department or agency with regard to its directly appropriated funds, *id*;

- Is prohibited from making content or dictating content to any station, *id*;

- Is not required to attend frequent oversight hearings in front of Congress, aside from CPB's annual request for appropriations, *id*;

- Does not receive instructions for day-to-day operations from any political branch, *id*; and

- At no time in its 58-year existence has it had a member of any political branch, including the executive, sit on its board. *Id.* at ¶ 4.

9.     The U.S. Government, including all departments and agencies, has no ownership interest in CPB, which operates from private offices leased from a private corporation located in downtown Washington, D.C., and does not share any space with any government agency.  *Id*. at ¶¶ 6,11.

10.     The plain text of the PBA provides the President with the power to appoint directors of CPB with the advice and consent of the Senate.  47 U.S.C. § 396(c).

11.     The plain text of the PBA provides only one way to remove directors: by failing to attend "less than 50 percent of all duly convened meetings of the Board in any calendar year[,]" a board member "shall forfeit membership and the President shall appoint a new member to fill such vacancy not later than 30 days after such vacancy is determined by the Chairman of the Board." 47 U.S.C. § 396(e)(7).

12.     There is no provision in the PBA stating that the Board members serve at the pleasure of the President, only that all of CPB's officers shall serve at the pleasure of the Board. *Id*. at § 396(e)(1).

13.     In CPB's nearly 60-year history, neither CPB nor any member of CPB's Board has ever reported to, taken direction from, or been subject to the control of the Executive branch.  *See* Decl. of E. Slavitt ¶ 10.

14.     In related litigation pending in this District, the Federal Emergency Management Agency, through its Department of Justice attorneys, have acknowledged that CPB is a non-governmental organization. *Corporation for Public Broadcasting v. FEMA*, No. 1:25-cv-00740, Dkt. No. 33-1 at ¶¶ 5-6 (D.D.C. June 24, 2025) ("Since being sworn in on January 25, 2025, the Secretary of Homeland Security ("Secretary") has issued several written and verbal directives regarding payments made by the Department, all of which were designed to ensure that any payments made by the Department are consistent with law and do not promote fraud, waste, or abuse. One such directive is a January 28, 2025 Direction on Grants to Non-governmental Organizations . . . . Pursuant to the Secretary's January 28, 2025 direction, FEMA paused funding for all of its grants programs on February 11, 2025 and began to institute a manual review process under its inherent authority to monitor awards; review its grant records and expenditures; and ensure payments to recipients are used only for allowable, allocable, and reasonable costs under the terms and conditions of the grant award before making payment to the grant recipient. This manual review applied to the NGWS program and required Plaintiff [CPB] to submit additional documentation for FEMA to review prior to FEMA releasing any funds.").

**The Legislative History Of The PBA**

15.     The PBA states that it was enacted as a result of a Congressional finding that "a private corporation should be created to facilitate the development of public telecommunications and to afford maximum protection from extraneous interference and control." 47 U.S.C. § 396(a).

16.     The Senate Report accompanying the PBA stated:

> There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs. It is also recognized that this assistance should in no way involve the Government in programming or program judgments. An independent entity supported by Federal funds is required to provide programs free of political pressures. The Corporation

7

for Public Broadcasting, a nonprofit private corporation, authorized by title II of S. 1160 provides such an entity.

S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967).

17.    The House Report on the PBA stated:

Every witness who discussed the operation of the Corporation agreed that funds for programs should not be provided directly by the Federal Government. It was generally agreed that a nonprofit Corporation, directed by a Board of Directors, none of whom will be Government employees, will provide the most effective insulation from Government control or influence over the expenditure of funds.

H.R.Rep.No.572, 90th Cong., 1st Sess. 15 (1967).

18.    Congress has, for the last forty-five years, consistently supported two-year advance appropriations to CPB.  *See* Decl. of E. Slavitt at ¶ 13.

**The Executive Branch's Treatment Of CPB**

19.    President Johnson, the chief officer of the Executive Branch, in his public remarks in signing the PBA on November 7, 1967, stated:

This Corporation will assist stations and producers who aim for the best in broadcasting good music, in broadcasting exciting plays, and in broadcasting reports on the whole fascinating range of human activity. It will try to prove that what educates can also be exciting. It will get part of its support from our Government. But it will be carefully guarded from Government or from party control. It will be free, and it will be independent-and it will belong to all of our people.

President Lyndon B. Johnson, Remarks at the Signing of the Public Broadcasting Act of 1967 (Nov. 7, 1967).

20.    The National Archives and Records Administration is an executive agency that publishes, and has published, the United States Government Manual for over 80 years in the Federal Register.  *See* https://www.usgovernmentmanual.gov.

55940744.3

21.     According to the United States Government Manual, it is the "official handbook" of the Federal Government and provides information on the agencies of the legislative, judicial, and executive branches.  *See* https://www.usgovernmentmanual.gov.

22.     The Manual also includes information on quasi-official agencies; international organizations in which the United States participates; and boards, commissions, and committees. *See id*.

23.     The United States Government Manual does not mention the CPB anywhere among its listing of governmental and quasi-governmental agencies covering over 2,000 pages.  *See id*.

24.     Other federal statutes defining "executive departments," "government corporation," and "executive agency," do not identify CPB or expressly apply to the CPB.  *See* 5 U.S.C. §101 (setting forth those entities qualifying as executive departments, not including CPB); 5 U.S.C. § 103 (defining "government corporation" as a "corporation owned or controlled by the Government of the United States"); 5 U.S.C. § 105 (defining "executive agency" as "an executive department, a Government corporation").

## President Donald J. Trump Purports To Terminate CPB's Board Members

25.     Early in the morning of April 28, 2025, Trent Morse, on behalf of President Donald J. Trump, sent three separate emails ("the "Correspondence") to Plaintiffs Thomas Rothman, Laura Ross, and Diane Kaplan, purporting to terminate them from their positions as members of CPB's Board of Directors.  *See* Decl. of E. Slavitt at ¶ 19-20.

26.     The Correspondence stated, in full:

On behalf of President Donald J. Trump, I am writing to inform you that your position on the Corporation for Public Broadcasting is terminated effective immediately.

Thank you for your service.

*Id.*

27.     The Correspondence did not identify the authority with which the President was purporting to terminate the Board members.  *Id.* at ¶ 21.

28.     CPB's Board of Directors is a five-person board.  *Id.* at ¶ 24.

29.     The District of Columbia Nonprofit Corporation Act requires a nonprofit corporation organized under the laws of the District of Columbia to have and maintain at least three directors.  D.C. Code § 29-406.03.

30.     The purported termination would deprive CPB of a quorum for any board meeting or resolution.  *See* Decl. of E. Slavitt at ¶ 24.

31.     On April 29, 2025, one day after the President's purported termination of three members of CPB's Board, DOGE officials sent an email to the two remaining CPB Board members.  *Id.* at ¶ 25.

32.     The two Board members who were not the subject of the Correspondence received an email at 3:02 p.m. purportedly from Nate Cavanaugh, a "member of the DOGE team working at the General Services Administration."  *Id.*

33.     In the email, Mr. Cavanaugh stated:

> My name is Nate Cavanaugh – I'm a member of the DOGE team working at the General Services Administration.
>
> Are you available for a meeting tomorrow or on Thursday? I would like to learn more about the Corporation for Public Broadcasting and discuss getting a DOGE team assigned to the organization.
>
> Best,
> Nate

55940744.3

*Id.*

34.   At no time has the General Services Administration ever been involved in the operation, oversight, or control of CPB.  *Id.* at ¶ 26.

## LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is only "'material' if a dispute over it might affect the outcome of a suit under the governing law," meaning that "factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* (citation omitted).

## ARGUMENT

### I.   The President Has No Authority Over CPB

"No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585 (1952)).  The Constitution gives the President no authority over private individuals or corporations.  As a result, the President can only take action against a private corporation, like CPB, if he possesses some statutory authority to do so.  But Congress has given the President no such authority, instead foreclosing all authority over the Corporation other than the power of nominating Directors.  In fact, Congress explicitly restricted the President's authority over the Corporation, stating in no uncertain terms that:  "***Nothing*** contained in this part shall be deemed . . . to authorize any department, agency,

officer, or employee of the United States to exercise any **direction, supervision, or control** over. . . the Corporation . . . ."  47 U.S.C. § 398(a) (emphasis added).  "Nothing means nothing."  *PHH Corp. v. Consumer Financial Protection Bureau*, 839 F.3d 1, 41 (D.C. Cir. 2016) *rev'd on other grounds at* 991 F.3d 75 (D.C. Cir. 2018) (*en banc*).[3]

The Supreme Court has, as recently as last month, reiterated that the power to remove is the power to control:  "The Secretary's authority to remove Task Members at will in turn enables him to **supervise** and **direct** them."  *Kennedy v. Braidwood Management, Inc.*, 606 U.S. ___, 2025 WL 1773628, at *10 (U.S. June 27, 2025) (emphasis added).  The power to remove has been recognized as a key component of Presidential control over executive officials, and played a starring role in multiple recent Supreme Court rulings on executive authority, many of which the President has relied on in briefing in this matter.  *See., e.g., Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 492-93 (2010) ("'[t]he power to remove officers' at will and without cause 'is a powerful tool for control' of an inferior."); *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 204 (2020) ("The President's power to remove—and thus supervise—those who wield executive power on his behalf flows from the text of Article II, was settled by the First Congress, and was confirmed in the landmark decision *Myers v. United States,* 272 U.S. 52, 47 S. Ct. 21 ,71 L. Ed. 160 (1926).").[4]  But Congress expressly forbade any member

---

[3] While the D.C. Circuit, sitting *en banc*, overruled the constitutional law holding of this case, the *en banc* opinion explicitly reinstated the substantive holding relied upon here.  *PHH Corp. v. Consumer Financial Protection Bureau*, 881 F.3d 75, 83 (D.C. Cir. 2018) ("The panel opinion, insofar as it related to the interpretation of RESPA and its application to PHH and Atrium in this case, is accordingly reinstated as the decision of the three-judge panel on those questions.").  The *en banc* decision on the constitutionality of the removal protection was subsequently overruled by the Supreme Court in *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020).

[4] CPB, of course, rejects any notion that it is an executive agency, and addresses that argument in full below.  But these cases are relevant to Congress's express prohibition on government

of the Government, including the President, from exercising any control over CPB—the President

has no statutory authority to remove CPB's Directors.

### a.   *The President Has No Article II Authority Over Private Corporations*

"In our system, the Federal Government's powers are enumerated, and hence limited."

*United States v. Comstock*, 560 U.S. 126, 159 (2010) (Thomas, J., dissenting).  "The government

of the United States has been emphatically termed a government of laws, and not of men.  It will

certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of

a vested legal right."  *National Treasury Employees Union v. Nixon*, 492 F.2d 587, 609 (D.C. Cir.

1974) (citing The Federalist Papers, No. 69).

The highest legal rights in this Country are stated in the Constitution, which is the "supreme

Law of the Land."  U.S. Constitution, Article VI.  The Constitution sets up only three branches of

the federal government, and *limits* those branches to only those powers enumerated within the

Constitution.  *See* U.S. Constitution, Articles I, II, and III.  "[A]nd that these limits may not be

mistaken, or forgotten, the constitution is written.  To what purpose are powers limited, and to

what purpose is that limitation committed to writing, if these limits may, at any time, be passed by

those intended to be restrained?"  *Marbury v. Madison*, 5 U.S. 137, 176 (1803).

"The Constitution's express conferral of some powers makes clear that it does not grant

others.  And the Federal Government 'can exercise only the powers granted to it.'"  *National*

*Federation of Independent Businesses v. Sebelius*, 567 U.S. 519, 534-35 (2012) (quoting

*McCulloch v. Maryland*, 17 U.S. 316, 405, 4. L. Ed. 579 (1819)).   Crucially, Article II of the

Constitution enumerates no authority to the President over private corporations—as a result, the

---

interference with the CPB's daily activities, and preclude any notion that the President has
statutory authority to terminate the CPB's Directors

55940744.3

President has no authority over the CPB. *See id.*, at 535 ("Today, the restrictions on government power foremost in many Americans' minds are likely to be affirmative prohibitions, such as contained in the Bill of Rights. These affirmative prohibitions come into play, however, only where the Government possesses authority to act in the first place. If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not violate any of the express prohibitions in the Bill of Rights or elsewhere in the Constitution.").

"If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so." *Trump*, 603 U.S. at 608 (citing *Youngstown*, 343 U.S., at 655 (Jackson, J., concurring)). Because the President has no authority over CPB, he has no authority to terminate its board members as he has purported to do here. "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585 (finding executive order to seize possession of steel mill invalid because President had no authority under Constitution or Statute to issue it).

The termination of CPB board members is not an exercise of Article II authority because, similar to the lawless seizure of private property in *Youngstown*, it "does not direct that a congressional policy be executed in a manner prescribed by Congress—***it directs that a presidential policy be executed in a manner prescribed by the President***." *Id*. at 588. Indeed, the Correspondence usurps Congress' clearly-stated prerogative with respect to the CPB, particularly with respect to Congressional aims in its formation. 47 U.S.C. § 398(a). As a result, the purported termination also violates the Constitution's Separation of Powers. *See, e.g., United States v. Trucking Management, Inc.*, 662 F.2d 36, 42-45 (D.C. Cir. 1981) (finding Executive Order could not overturn the will of Congress).

Finally, the effect of the President's purported termination is to amend or repeal portions of the PBA as to the authority of the President to remove Board members. But the President can neither amend nor repeal validly enacted laws unilaterally—any amendment or repeal of a validly enacted statute must pass through Congress and be presented to the President. U.S. Constitution, Article I, § 7; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *id*. at 439 ("Although the Constitution expressly authorizes the President to play a role in the process of enacting statutes, it is silent on the subject of unilateral Presidential action that either repeals or amends parts of duly enacted statutes."). Because the President cannot amend or repeal validly enacted statutes unilaterally, the attempt to terminate CPB board members violates the Presentment Clause, and is *ultra vires* for this reason as well.

### i.  CPB Is A Private Corporation

When Congress created CPB, it stated clearly that CPB is not "an agency or establishment of the United States Government." 47 USC 396(b). The Court need go no further than this, as this alone demonstrates that CPB is not an executive agency over which the President may exert plenary Article II powers. But Congress didn't stop there—it also explicitly commanded that the CPB is to be completely free from government control: "Nothing in this part shall be deemed . . . ***to authorize any department, agency, officer, or employee of the United States to exercise any discretion, supervision, or control . . .*** over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation . . . ." 47 USC 398(a) (emphasis added).

Not only does the statute explicitly state that CPB is not a government agency, and that the government cannot exercise any control over CPB, but it also prohibits any political litmus test from applying to its employees: "no political test or qualification shall be used in selecting,

appointing, promoting, or taking other personnel actions with respect to officers, agents,  and employees of the Corporation."  47 USC 396(e)(2).  Moreover, Congress made it clear that "[t]he members of the Board **shall not, by reason of such membership, be deemed to be officers or employees of the United States**."  47 USC 396(d)(2) (emphasis added).  These board members "shall be selected from among citizens of the United States (**not regular full-time employees of the United States**) . . . ."  47 USC 396(b)(emphasis added).  Congress set up the CPB in this manner "to afford [it] maximum protection from extraneous interference and control." *Id*. at § 396 (a)(10).

This is consonant with other federal statutes defining "executive departments," "government corporation," and "executive agency," none of which identify the CPB or apply to the CPB. *See* 5 U.S.C. §101 (setting forth those entities qualifying as executive departments, not including CPB); 5 U.S.C. § 103 (defining "government corporation" as a "corporation owned or controlled by the Government of the United States"); 5 U.S.C. § 105 (defining "executive agency" as "an executive department, a Government corporation, and an independent establishment."). And the U.S. Government Manual, "the official handbook of the Federal Government" that "provides information on the agencies of the legislative, judicial, and executive branches," does not mention CPB even once in its 2,000+ pages. *See* United States Government Manual (2025 ed.).[5]

The D.C. Circuit has explicitly recognized CPB's independence and non-government-entity status in affirming a D.C. District Opinion which found that 28 U.S.C. § 1361 (the Mandamus Act) did not apply to CPB:

> CPB and PBS are not agencies of the United States and the members of the CPB Board of Directors are not Officers of the United States.  [47 USC 396(b)]

---

[5] The U.S. Government Manual is available at https://www.govinfo.gov/content/pkg/GOVMAN-2025-01-13/pdf/GOVMAN-2025-01-13.pdf.

specifically provides that CPB 'will not be an agency or establishment of the United States Government.

*Network Project v. Corp. for Pub. Broad.*, 398 F. Supp. 1332, 1339 (D.D.C. 1975), *aff'd in relevant part*, 561 F.2d 963, 976 (D.C. Cir. 1977).[6] *See also Community-Service Broadcasting of Mid-America, Inc. v. Fed. Communications Comm'n¸* 593 F.2d 1102, 1108-11 (D.C. Cir. 1978) (describing CPB's founding and purpose, and quoting congressional reporting related to its independence being a key component of CPB); *American Chemistry Council v. National Academy of Sciences*, 2024 WL 1141465 (D.D.C. March 15, 2024) (relying on *Network Project*'s ruling, stating "the court concluded that the Corporation for Public Broadcasting was not an "agenc[y] of the United States" and the members of the CPB's board were not "officers of the United States" who could be sued under the mandamus statute.").

Indeed, the D.C. Circuit has found that the Federal Communications Commission, an executive agency, has no jurisdiction over CPB:  "any FCC jurisdiction over the CPB would constitute a radical extension of the FCC's basic jurisdictional grant." *Accuracy in Media, Inc. v. F.C.C.*, 521 F.2d 288, 293 (D.C. Cir. 1975).  As the DC Circuit noted in *Accuracy in Media*, "Congress desired to establish a program funding agency which would be free from governmental influence or control in its operations." *Id*. at 293.

Even the Supreme Court has recognized CPB's independent status.  In *FCC v. League of Women Voters,* 468 U.S. 364 (1984), the Supreme Court relied on the statutory independence of the CPB to invalidate a prior version of 47 U.S.C. § 399.  In doing so, the Supreme Court noted that Congress "mandated that the new Corporation for Public Broadcasting would have a ***private***, bipartisan structure . . . ." *Id*. at 389 (emphasis added).  The Court further recognized:

---

[6] Notably, the Mandamus Act ***does apply*** to the President.  *Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974).

The Act also established a second layer of protections which serve to protect stations from governmental coercion and interference. Thus, in addition to requiring the Corporation to operate so as to 'assure maximum freedom [of local stations] from interference with or control of program content or other activities, **the Act expressly forbids 'any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over the Corporation** or any of its grantees or contractors . . . .'

*Id*. (emphasis added) (citations omitted). As the Court noted, "the legislative history of the Public Broadcasting Act clearly indicates that Congress was concerned with 'assur[ing] complete freedom from any Federal Government influence.'" *Id*. at 394. The Government has even acknowledged CPB's non-governmental status in related litigation pending in this District. *See Corporation for Public Broadcasting v. FEMA,* No. 1:25-cv-00740, Dkt. No. 33-1 at ¶¶ 5-6 (D. D.C. June 24, 2025); Statement of Fact No. 14.

As a result of CPB's independent, non-governmental nature, the President has no inherent authority over it. The only authority the President has with respect to the CPB is to nominate board members, with the advice and consent of the Senate. 47 USC 396(c). Nowhere in the statute is the President empowered with any other authority with respect to the CPB. As a result, the President has no authority to terminate CPB's Board members.

### ii.     CPB Is Not A Government Entity

CPB should not be considered a government entity under *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 115 S. Ct. 961, 974 (1995). *LeBron* determined whether a private entity should be considered a governmental entity with respect to the infringement of constitutional rights of individuals. *See Lebron*, 513 U.S. at 394 ("we conclude that it is an agency or instrumentality of the United States **for the purpose of individual rights guaranteed against the Government by the Constitution** . . . .") (emphasis added). Here, there are no constitutional rights of individuals

55940744.3

even allegedly being infringed by CPB; consequently, whether CPB is a government entity for constitutional purposes is not relevant.

"[J]ust because an entity is considered a federal instrumentality for one purpose does not mean that the same entity is a federal instrumentality for another purpose." *U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259 (9th Cir. 2016) (citations omitted). The D.C. Circuit has recognized this with respect to Amtrak, the "federal entity" at issue in *Lebron*: in *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 492 (D.C. Cir. 2004), the D.C. Circuit found that Amtrak was not a governmental entity for purposes of the False Claims Act, despite *Lebron*'s issuance nearly ten years beforehand. In doing so, then D.C. Circuit Judge Roberts relied on Congress's statement that Amtrak was not the government, noting that Congress's determinations of the matter were "assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control." *Id.* at 492 (quoting *Lebron*, 513 U.S. at 392). Whether CPB is a governmental entity is within Congress's control here, and it has affirmatively stated that CPB is not a government entity.

While Congress cannot avoid constitutional strictures through the use of the private corporate form, that is not the scenario here, either. In *Lebron* and it's later cousin, *Dep't of Transp. v. Ass'n of Am. R.Rs.,* 575 U.S. 43, 53-54 (2015), Amtrak abridged individual citizens' rights through its actions: making substantive speech requirements for advertisements in violation of the First Amendment in *Lebron,* (513 U.S. at 376-78), and issuing regulations that set forth metrics and standards for private enterprises in the railroad industry in *Dep't of Transportation,* purportedly in violation of the separation of powers. 575 U.S. at 45-46. There are no such allegations involved here.

55940744.3

CPB here does not fall within the *Lebron* framework for the same reason that Amtrak did not fall within the *Lebron* framework under the False Claims Act—because Congress has the power to say so. Congress has the power to create CPB and set its limitations, including the limitation that no government agency shall exercise power over it. Were Congress to give CPB the power to issue regulations or take actions that infringed upon the individual rights of citizens, perhaps *Lebron* and its progeny would apply. But no such authority was given to CPB, and no such authority is challenged here. *Lebron* simply does not apply.

But even if the Court were inclined to apply the *Lebron* standards, the test fails on the first element: CPB is not a Congressionally-***created*** corporation. Instead, it was ***authorized*** by Congress, and created by the original board of directors. 47 U.S.C. § 396. The statute is clear: Congress stated that it authorized CPB to *be created*, not that Congress *created* it. Congress has found itself more than capable in other instances of ***creating*** private corporations. *See, e.g.,* 15 U.S.C. § 714 ("there is created a body corporate to be known as Commodity Credit Corporation . . . ."); 42 U.S.C. § 2296b(a) ("***There is established*** in the District of Columbia a private nonmembership nonprofit corporation, which shall be known as the Legal Services Corporation . . . .") (emphasis added); 42 U.S.C. § 8102 ("***There is established*** a Neighborhood Reinvestment Corporation . . . .") (emphasis added); 12 U.S.C. 1717 ("***There is created*** a body corporate to be known as the "Federal National Mortgage Association"") (emphasis added).

Moreover, even the *Lebron* Court itself recognized a difference between the application of Amtrak's powers against individuals and the removal rights of the President: "It is true that the directors of Amtrak, unlike commissioners of independent regulatory agencies, are not, by the explicit terms of the statute, removable by the President for cause, and are not impeachable by Congress. But any reduction in the immediacy of accountability for Amtrak directors vis-á-vis

regulatory commissioners seems to us of minor consequence for present purposes—especially since, by the very terms of the chartering Act, Congress's 'right to repeal, alter, or amend this chapter at any time is expressly reserved.'" *Lebron*, 513 U.S. at 398.  The Supreme Court did not, however, find that the President has a necessary and incident right to remove those Amtrak directors.[7]  Instead, it stated that they "have no doubt, for example, that the statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit, and of the ordinarily presumed power of Government agencies authorized to incur obligations to pledge the credit of the United States." *Lebron*, 513 U.S. at 392 (citations and quotations omitted).  Similarly here, Congress has acted well within its constitutional powers in insulating CPB from political influence.

### iii.    Even If CPB Were a Government Entity, It Is Not An Executive Entity

Even if CPB were considered a government entity under *Lebron*, it would have to be an executive entity for the President to exert any authority over it.  The President's removal powers are limited to executive branch employees and officers—those employees and officers who wield the President's power.  *Seila Law*, 591 U.S. at 213-214 ("These lesser officers must remain accountable to the President, ***whose authority they wield***.'") (citations omitted) (emphasis added).

The Supreme Court has reaffirmed on multiple occasions that the President's removal authority extends only to ***executive offices***. In *Myers v. United States*, 272 U.S. 52 (1926), the Court limited its ruling to executive officers, stating: "the power of appointment to ***executive office*** carries with it, as a necessary incident, the power of removal." *Myers*, 272 U.S. at 126 (emphasis added).  The Supreme Court later specifically noted the limitation of its ruling in *Myers*, stating:

---

[7] The Secretary of Transportation sits on Amtrak's Board of Directors.  49 U.S.C. § 24302(a).  The CPB does not challenge the President's authority to remove cabinet officials at will, nor does it need to in order to make its arguments.  The Defendants' attempts to read the CPB's requested relief overbroadly should similarly be dismissed by the Court.  Opposition at 28-30.

> The actual decision in the *Myers* Case finds support in the theory that [an executive officer] is merely one of the units in the executive department and, hence, inherently subject to the exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is…. [T]he necessary reach of the decision goes far enough to include all purely executive officers. It goes no farther; ***much less does it include an officer who occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President.***

*Humphrey's Ex'r v. United States*, 295 U.S. 602, 627–28 (1935) (emphasis added).  This was not the only occasion on which the Supreme Court recognized the limitation on the Presidential removal power to *executive offices*.

> The assumption was short-lived that the *Myers* case recognized the President's inherent constitutional power to remove officials, no matter what the relation of the executive to the discharge of their duties and no matter what restrictions Congress may have imposed regarding the nature of their tenure.

*Wiener v. United States,* 357 U.S. 349, 352 (1958) (citations omitted).

More recent authority emphasizes that the President's power to remove extends only to executive officials because those officials are wielding his power.  *Collins v. Yellen,* 594 U.S. 220, 252 (2021) ("The removal power helps the President maintain a degree of control ***over the subordinates he needs to carry out his duties as the head of the Executive Branch* . . . .")** (emphasis added); *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023) ("the President generally must be able to control those who execute the laws on ***his*** behalf" and "discharg[e] ***his own*** responsibilities" because "Presidential control … requires the ability to remove ***executive officials.***") (emphasis added).  It naturally follows that the President has no authority over those who do not wield his power, such as CPB.  Indeed, the Separation of Powers prevents the President from infringing upon legislative and judicial prerogatives as much as it prevents Congress and the Judiciary from infringing upon the President's.  *See, e.g., Bowsher v. Synar,* 478 U.S. 714, 721-22 (1986) ("The declared purpose of separating and dividing the powers of government, of course,

was to 'diffus[e] the power better to secure liberty.'  Justice Jackson's words echo the famous

warning of Montesquieu, quoted by James Madison in The Federalist No. 47, that 'there can be no

liberty where the legislative and executive powers are united in the same person . . . .") (citations

omitted).  Because CPB is not an executive agency, nor is it wielding any of the President's

executive power, the President has no authority over it.

To the extent that CPB could be considered a governmental entity, it is not wielding

executive power, but legislative power.  The legislative branch encompasses various entities and

offices beyond Congress.  The Office of the Architect of the Capitol, the United States Botanic

Garden, the Government Accountability Office, the Government Printing Office, the Library of

Congress, the Office of Technology Assessment, the Congressional Budget Office, the United

States Capitol Police, and "any other agency, entity, office, or commission established in the

legislative branch" are part of the legislative branch.  5 U.S.C. § 13101(11).

> [CPB] was established as nonprofit and non-political in nature….  Numerous
> statutory safeguards were created to insure against partisan abuses.  Ultimately,
> Congress may show its disapproval of any activity of the Corporation through the
> appropriation process.  This supervision of CPB through its funding is buttressed
> by an annual reporting requirement. Through these statutory requirements and
> control over the 'purse-strings,' ***Congress reserved for itself the oversight
> responsibility for the Corporation.***

*Accuracy in Media*, 521 F.2d  at 294 (citations omitted) (emphasis added).  CPB, therefore, "is

accountable to Congress and the public."  *Cmty.-Serv. Broad. of Mid-Am., Inc. v. F.C.C.*, 593 F.2d

1102, 1108–09 (D.C. Cir. 1978).

As part of the legislative branch, the President would have no "incidental" removal power

over CPB.  *See Myers*, 272 U.S. at 126; *Severino*, 71 F.4th at 1044.  Further, it would violate the

separation of powers for the President to be able to remove a legislative officer, *i.e.* a CPB Board

member, when "Congress reserved for itself the oversight responsibility for the Corporation."

*Accuracy in Media*, 521 F.2d at 294.  Thus, even if CPB were a governmental entity, the President has no removal power over CPB's Board members because CPB is not an executive agency.

### b.  The President Has No Statutory Authority to Remove CPB's Directors Under the D.C. Nonprofit Corporation Act

In this case, the Government has taken the position that even if the President has no power under the PBA to remove CPB's directors, the President nonetheless has the authority under the D.C. Nonprofit Corporation Act,  D.C. Code § 29-406.08(e), to unilaterally remove CPB's directors.[8]  The government is wrong for three (3) separate reasons.  First, when the PBA was enacted by Congress, D.C. Code § 29-406.08(e) did not exist.  Rather, under the 1962 D.C. Nonprofit Corporations Act, in effect when Congress authorized the creation of CPB, there was no statutory authority vesting the President with any removal authority.  Since then, Congress has not adopted D.C. Code § 29-406.08(e) as applying to the PBA.

Second, the PBA provides that CPB shall be subject to the D.C. Nonprofit Corporations Act only to the extent consistent with the PBA.  47 U.S.C. at § 396(b).  Application of D.C. Code § 29-406.08(e) fundamentally conflicts with the PBA's broad anti-removal provisions prohibiting any "department, agency, officer, or employee of the United States" from exercising any "direction, supervision, or control over… the Corporation." 47 U.S.C. § 398(a).  Well-established U.S. Supreme Court precedent holds that  the power of removal is a core manifestation of the power to direct, control, or supervise.  *See Kennedy*, 606 U.S. __, 2025 WL 1773628 at *10 ("At-will removal is one means of ensuring supervision and direction"); *Edmond v. United States*, 520 U.S. 651, 664 (1997) ("The power to remove officers, we have recognized, is a powerful tool for

_____

[8] D.C. Code § 29-406.08(e) provides that: "Except as otherwise provided in the articles of incorporation or bylaws, a director **who is appointed by persons** other than the members may be removed with or without cause **by those persons**."

control"); *Morrison v. Olson*, 487 U.S. 654, 696 (1988) ("the Act does give the Attorney General several means of supervising or controlling the prosecutorial powers that may be wielded by an independent counsel. Most importantly, the Attorney General retains the power to remove the counsel . . . .").

Third, it is undisputed that the President may not unilaterally place directors onto the Board of CPB. Rather, he must act by and with the consent of the Senate. *See* 47 U.S.C. § 396(c)(1) (directors are "appointed by the President, by and with the advice ***and consent*** of the Senate"). As a matter of corporate law and statutory construction, given that the appointment of any director requires the consent of both the President and Senate, any removal under D.C. Code § 29-406.08(e) requires the involvement of both the President and the Senate. *See* D.C. Code § 29-406.08(e) ("a director *who is appointed by persons* other than the members may be removed with or without cause *by those persons*"); *Schlafly v. Eagle Forum*, 970 F.3d 924, 935 (8th Cir. 2020) ("If a director is elected by a class of voting members entitled to vote, directors or other electors, that director *may be removed only by the same class of members entitled to vote, directors or electors which elected the director*") (emphasis added); *In Wingert vs. Scenic Heights Subdivision Prop. Owners Ass'n, Inc.*, Tex. App., 2008 WL 2778017 (Tex. App. Ct. July 16, 2008) ("In the absence of a provision providing for removal, a director may be removed from office, with or without cause, by the persons entitled to elect, designate, or appoint the director. If the director was elected to office, removal *requires an affirmative vote equal to the vote necessary to elect the director*.") (emphasis added); *Boatmen's First Nat'l Bank v. Southern Mo. Dist. Council of The Assemblies of God*, 806 S.W.2d 706, 714 (Mo. Ct. App. 1991) ("The body which appoints a director may also remove a director").

### i. The 1962 D.C. Nonprofit Corporation Act Gives No Authority to the President to Remove CPB's Directors

When the PBA was enacted by Congress, D.C. Code § 29-406.08(e) did not exist. Rather, under the 1962 D.C. Nonprofit Corporations Act referenced in the PBA and in effect when Congress authorized the creation of CPB, the relevant catch-all removal provision provided:

> A director may be removed from office pursuant to any procedure therefor provided in the articles of incorporation or the bylaws, and if none be provided may be removed at a meeting called expressly for that purpose, with or without cause, by such vote as would suffice for his election.

Public Law 87-569 §19(d). Applying this provision to the issue of removing CPB directors, it would require the vote of the Senate to remove the directors that were appointed through the Presidential nomination and Senate confirmation process. As a result, there is nothing in the 1962 D.C. Nonprofit Corporation Act which gave the President the unilateral power to remove any director from CPB.

The 1962 D.C. Nonprofit Corporations Act remained largely unchanged for close to 50 years. In 2011, the D.C. Council enacted a revised D.C. nonprofit corporation code which overhauled the 1962 act and included D.C. Code § 29-406.08(e).[9] However, Congress has not amended the PBA to adopt D.C. Code § 29-406.08(e)'s removal provisions. Indeed, between 2011, when D.C. adopted the new Nonprofit Corporations Act, and today, the PBA was only amended once in 2018 that was embedded as part of an omnibus appropriations bill. That amendment authorized CPB to use funds for interconnection system upgrades and repealed certain annual reporting requirements. Importantly, it did *not* address incorporation, governance, or director removal provisions. *See* Consolidated Appropriations Act of 2018, Public Law No. 115

---

[9] D.C. Law 18-378, which includes the D.C. Nonprofit Corporation Act of 2011, was introduced as Bill No. 18-500 and referred to the Committee on Public Services and Consumer Affairs, whereafter the Mayor signed it on February 27, 2011.

55940744.3

141, 132 Stat. 757 (Mar. 23, 2018).

As a result, controlling U.S. Supreme Court precedent reflects that Congress did not affirmatively adopt the new D.C. Nonprofit Corporation Act's removal provision merely by amending unrelated sections of the PBA. *See, e.g., Alexander v. Sandoval,* 532 U.S. 275 (2001) (rejecting notion that Congressional inaction or isolated amendments signal approval of a particular statutory interpretation; "when, as here, Congress has not comprehensively revised a statutory scheme but has made only isolated amendments, we have spoken more bluntly: 'It is 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the Court's [subsequent] statutory interpretation.'"); *Pub. Citizen, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003) ("Congress has neither re-enacted the entire PRO statute nor amended § 1320c–3(a)(14) at all. Rather, it has simply enacted a series of isolated amendments to other provisions."); *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 152 (D.D.C. 2015), *aff'd sub nom. United States Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir. 2017) ("the ratification canon is of 'little assistance' where Congress has not re-enacted the entire statute at issue or significantly amended the relevant provision . . . . Here, Congress did not re-enact the entire Lacey Act and did not amend the relevant language in any of the three subsequent enactments upon which Defendants rely").

## ii.  DC Code § 29-406.08(e) Is Inconsistent With the PBA

In authorizing the creation of CPB, Congress made it clear that CPB was only subject to the DC Nonprofit Corporation Act "to the extent consistent" with the PBA.  *See* 47 U.S.C. § 396(b).  Even assuming *arguendo* that D.C. Code § 29-406.08(e)'s 2011 removal provision could be read into the PBA despite Congress' failure to ratify or adopt that provision into the PBA, it

27

would still not be operable because it is fundamentally inconsistent with the PBA's broad anti-removal provisions which were designed to preclude the type of unilateral action taken by President Trump.

First,  Congress made it clear that CPB is an *independent* nonprofit corporation and "not…an agency or establishment of the United States Government." 47 U.S.C. § 396(b); S.Rep.No.222, 90th Cong., 1st Sess. 4, 11 (1967) ("An independent entity supported by Federal funds is required to provide programs free of political pressures").

Second, Congress expressly prohibited "any department, agency, *officer*, or employee of the United States [from] exercis[ing] any direction, supervision, or control …over [CPB]…" *Id.* at § 398.  As a threshold matter, there is no dispute that, as a matter of law and based on President Trump's own admissions, the President is an "officer" and "employee" of the United States. Indeed, controlling caselaw from the U.S. Supreme Court and the D.C. Circuit, as well as other federal courts, has recognized the President as being an officer, and, indeed, an employee, for statutory purposes.  *See, e.g.,  Clinton v. Jones*, 520 U.S. 681, 699 n. 29 (1997) ("We noted in *Fitzgerald*: Article II [of the Constitution]…establishes the President as the chief constitutional officer"); *Menard's Heirs v. Massey*, 49 U.S. 293, 309 (1850) (referring to "the President or some other officer"); *Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 592 n.4, 602, 618  (D.C. Cir. 1974) (ruling that President is an executive officer who is subject to mandamus proceedings under 28 U.S.C. § 1361, which encompass actions to "compel an officer or employee of the United States…to perform a duty"); *Nat'l Wildlife Fed. v. U.S.*, 626 F.2d 917, 923 (D.C. Cir. 1980) ("[m]andamus is not precluded because the federal official at issue is the President of the United States" where statute encompassed "an officer or employee of the United States").  *See also Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022) (holding that President Trump was an officer or

employee under the Westfall Act; "[T]the President of the United States fits comfortably within the statutory description's plain language"); *Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1375 (Fed. Cir. 2006) (concurrence) ("There is, however, massive historical support—in the Constitution itself, in two centuries of Supreme Court jurisprudence, in significant opinions of the lower courts, in federal statutes, and in myriad other sources—for the proposition that the President is an 'officer' of his country"); *Operation Rescue Nat. v. U.S.*, 147 F.3d 68, 71 (1st Cir. 1998) (stating in dictum that the FTCA covers "all officers, up to the president"); *Almond Bros. Lumber Co. v. U.S.*, 34 C.I.T. 370, 383 (2010) (Both the President and the [United States Trade Representative] are officers of the United States" because "status as an officer of the United States stems from the Constitution itself, for the President is the essential constitutional officer under Article II of the Constitution.").

Moreover, President Trump *himself* has represented to federal courts that he is plainly both an "officer" and "employee" of the United States. Specifically, in *Carroll v. Trump*, discussed above, President Trump filed briefs with both with the U.S. District Court for the Southern District of New York and the U.S. Court of Appeals for the Second Circuit in which he expressly represented and acknowledged that he was indeed both an employee and an officer of the United States under the plain language of the Westfall Act. In the District Court, President Trump asserted:

> *The broad and sweeping language of the FTCA covers the President, who is fairly characterized as both an "officer" and "employee" of the government*. The Supreme Court has recognized that Article II, Section 1 of the Constitution "establishes the President as the chief constitutional officer of the Executive Branch," and indeed plaintiff acknowledges as much. *Nixon v. Fitzgerald*, 457 U.S. 731, 750, 102 S. Ct. 2690, 2701 (1982); see also Opp'n at 14 (describing "President as the sole officer under 'executive'"); U.S. Const. art. II, § 1, cl. 1, 8 (discussing President's "Office"). Likewise, contemporaneous definitions of the term "employee" encompass "one who works for wages or salary in the service of an employer," *which would likewise apply to the President, who receives a salary for*

> ***services rendered to the United States***. See Employee Webster's New Int'l Dictionary (2d ed. 1943); U.S. Const. art. II, § 1, cl. 7 ("The President shall, at stated Times, receive for his Services, a Compensation . . . .); *United States v. Hatter*, 532 U.S. 557, 563, 121 S. Ct. 1782, 1788 (2001) (President falls in "class of current federal employees").

*See* Case 1:20-cv-07311-LAK, Document 21, Filed 10/19/20 at p.8 (emphasis added).

Similarly, in his appellate brief filed with the Second Circuit, President Trump continued

to assert that he was "plainly" an employee of the government:

> The District Court's erroneous holding below that the Westfall Act does not apply to the President is contrary not only to the established understanding evidenced by those and other cases, *but it is contrary to the plain language of the Westfall Act, which by its terms applies to "any employee of the Government,"* 28 U.S.C. §§ 1346(b)(1), 2679(b). ***Presidents plainly are employees of the Government***, and Congress plainly intended Presidents to be covered by the Westfall Act -- notwithstanding the District Court's strenuous but strained and unsuccessful effort to show otherwise here …. Under Article II, section 1, the President is the "President of the United States of America," holds an "Office" -- ***which could only be an Office of the Government*** -- and "receive[s] for his [or her] services, a Compensation" from the Government. U.S. Const. art. II, § 1. And, not surprisingly given these facts, both Congress and the Supreme Court have referred to the President as an employee of the Government.

*See* Docket No. 20-03978 (2d Cir. Nov 25, 2020), BL-25, at pp. 5-6, 13 (emphasis added).

Not only is President Trump "plainly" an officer and employee under 47 U.S.C. § 398, as

discussed above, the U.S. Supreme Court and the D.C. Circuit Court of Appeals have repeatedly

recognized, including as recently as last month, that removal is one of the most powerful forms of

control and supervision.  *See*, *e.g.*, *Kennedy*, 606 U.S. __, 2025 WL 1773628 at *10 ("At-will

removal is one means of ensuring supervision and direction");  *Seila Law*, 591 U.S. at 204 ("The

President's power to remove—**and thus supervise**—those who wield executive power on his

behalf follows from the text of Article II, was settled by the First Congress") (emphasis added);

*Free Enter. Fund*, 561 U.S. at 510 ("In particular, we noted that the **power to remove** officers at

will and without cause '**is a powerful tool for control**'"); *Edmond v. United States*, 520 U.S. 651,

664 (1997) ("The power to remove officers…is a powerful tool for control"); *Dellinger v. Bessent*, 2025 WL 559669, at \*16 (D.C. Cir. Feb. 15, 2025) ("The President must be able to remove—and thus maintain a degree of control over—subordinates through whom he exercises his executive power."). As Justice Kavanaugh explained in *Kennedy:*

> This Court has said that **the authority to remove an officer at will is a powerful tool for control**. The reason is straightforward: Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey. An officer's presumed desire to avoid removal generally creates a here-and-now subservience. **The prerogative of at-will removal of a subordinate, then, often carries with it the power to supervise and direct that subordinate**. . . . In short, through the **power to remove** and replace Task Force members at will, the Secretary **can exert significant control** over the Task Force

2025 WL 1773628 at \*9-10 (emphasis added).

Applying D.C. Code § 29-406.08(e) as the government argues, therefore, would give the President, an officer and employee of the United States, the exact power to direct, supervise, and control CPB's Board members that the PBA expressly prohibits. *See* 47 U.S.C. § 398; *Kennedy*, 606 U.S. __, 2025 WL 1773628 at \*10; *Seila Law*, 591 U.S. at 204; *Free Enter. Fund*, 561 U.S. at 510; *Edmond*, 520 U.S. at 664; *Dellinger*, 2025 WL 559669 at \*16. Consequently, D.C. Code § 29-406.08(e) is inconsistent with the PBA and does not apply. *See* 47 U.S.C. at § 396(b). The PBA underscored that broad anti-removal provision by providing the only basis for removal under the PBA is failure to attend at least half of all Board meetings. *Id.* at § 396(c)(7). Congress, therefore, chose to include ***only*** this statutory basis of removal. The canon of construction "*expressio unius est exclusio alterius*"—mention of one thing implies exclusion of the other—is particularly compelling given the statutory provisions of the PBA and the legislative history and purpose reflecting a desire to create an "independent entity" free from "political pressures" and free from "Government control." *See* President Johnson's Remarks Upon Signing the Public

31

Broadcasting Act of 1967 ("This Corporation .... *will be carefully guarded from Government or from party control. It will be free, and it will be independent*-and it will belong to all of our people.").

### iii.    Even if DC Code § 29-406.08(e) Were Consistent With The PBA, It Would Not Allow The President To Unilaterally Remove Directors Without Senate Approval

Even if D.C. Code § 29-406.08(e)'s 2011 removal provision were consistent with the PBA's broad anti-removal provisions and clear statutory purpose of preventing governmental control over CPB, that provision would still not allow the President to unilaterally remove CPB board directors.  This is because it is undisputed that the President may not unilaterally place directors onto the Board of CPB.  Rather, he must act by and with the consent of the Senate to place directors on CPB's Board, s*ee* 47 U.S.C. § 396(c)(1), and, as a result, the same process must be followed under D.C. Code § 29-406.08(e) for their removal.

Indeed, D.C. Code § 29-406.08(e)'s provision that "a director who is appointed by persons other than the members may be removed with or without cause *by those persons*," reflects a recognition in corporate and municipal law that those who **collectively** appoint must **collectively** remove.  For example, *Kreppein v. Downs* concerned the suspension of a supervisor of probation. 72 N.Y.S.2d 150, 151 (App. Div. 1947).  Under the applicable law—§ 938 of the Code of Criminal Procedure—the power to appoint probation officers was vested in two judges of the county court. *Id*. at 152.  However, the probation officer was suspended after he was found guilty of insubordination after a hearing initiated solely by one of the two judges on the county court.  The second judge not only disagreed with the charges and findings but also directed the probation officer to continue working.  *Id*.  On appeal, the court ruled that because the appointment process was vested in two county judges, "consequently the act of removal requires the concurrence of

both county judges." As a result, the court held that the removal was void and of no effect because the first judge did not obtain the approval of the second judge before taking action against the supervisor. *Id*.

As further illustration, *Com. ex rel. Kelley v. Sheridan* involved the attempted removal of two members of the Board of Revision of Taxes by the county treasurer, acting alone. 331 Pa. 415, 419 (1938). Under the governing statutes, however, appointments to the Board were made not by a single official but by a combination of appointing authorities—the county treasurer and the county controller—**each selecting different members**. *Id*. at 418. The court noted that to "[give] the Constitution its full effect, the power of removal must be the same power, namely, *the joinder of all of the elements or parts of the appointive power*." *Id*. at 419. Accordingly, the court concluded "[t]o remove these members from the Board requires the joint action of this appointive power. Without the action of all of these factors, any attempted removal by one of them is abortive." *Id*. at 420.[10]

More broadly, corporate law recognizes the well-established principle that the authority to remove must be exercised collectively by those who shared in the power to appoint. *See, e.g, Schlafly v. Eagle Forum*, 970 F.3d 924, 935 (8th Cir. 2020) ("If a director is elected by a class of voting members entitled to vote, directors or other electors, that director *may be removed only by the same class of members entitled to vote, directors or electors which elected the director*") (emphasis added); *In Wingert vs. Scenic Heights Subdivision Prop. Owners Ass'n, Inc.*, Tex. App., 2008 WL 2778017 (Tex. App. Ct. July 16, 2008) ("In the absence of a provision providing for

---

[10] Nine years later, the Pennsylvania Supreme Court disapproved, <u>in part</u>, its prior ruling in *Sheridan* that dealt with appointments effectuated by a single person or entity but in conjunction with a <u>different</u> appointment as part of the same process (e.g. entity A appoints individual #1 and entity B appoints individual #2 as part of the same process) requiring joint entity participation of the removal process. *Com. ex rel. Reinhardt v. Randall*, 356 Pa. 302 (1947).

removal, a director may be removed from office, with or without cause, by the persons entitled to elect, designate, or appoint the director. If the director was elected to office, removal *requires an affirmative vote equal to the vote necessary to elect the director*.") (emphasis added); *Boatmen's First Nat'l Bank v. Southern Mo. Dist. Council of The Assemblies of God*, 806 S.W.2d 706, 714 (Mo. Ct. App. 1991) ("The body which appoints a director may also remove a director.").

As a result, even assuming that D.C. Code § 29-406.08(e) was not directly inconsistent with the protections afforded CPB board members under the PBA, given that the appointment process of CPB's board members involved the agreement of both the President and Senate, as a matter of corporate law, any removal would necessarily have to involve both the President and Senate, which, of course, was not done.  Thus, President Trump's purported removal of CPB's directors was unlawful.

## II.    **Declaratory Relief is Warranted and Proper**

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  "It provides neither jurisdiction nor a cause of action, but rather a form of relief when the case is already properly before the Court."  *Harris v. Bessent*, 775 F. Supp. 3d 164, 178 (D.D.C. 2025) ("*Harris II*"), *hearing in banc denied*, No. 25-5037, 2025 WL 1033740 (D.C. Cir. Apr. 7, 2025) (citing *C&E Servs., Inc. of Washington v. D.C. Water & Sewer Autho.*, 310 F.3d 197, 201 (D.C. Cir. 2002)).  "[A] declaratory judgment always rests within the sound discretion of the court."  *President v. Vance*, 627 F.2d 353, 365 n.76 (D.C. Cir. 1980).

"There are no dispositive factors a district court should consider in determining whether it should entertain an action brought under the Declaratory Judgment Act."  *New York v. Biden*, 636

F. Supp. 3d 1, 31 (D.D.C. 2022).  "[F]actors [that] may be helpful to the Court's consideration of 'the propriety of granting a declaratory judgment,'" include: "whether the judgment will serve a useful purpose in clarifying the legal relations at issue"; "whether it would finally settle the controversy between the parties"; "whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding"; and "the public importance of the question to be decided." *Harris II*, 775 F. Supp. 3d at 179 (quoting *Hanes Corp. v. Millard*, 531 F.2d 585, 592 n.4 (D.C. Cir. 1976) and *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016).

Here, there is no dispute that Plaintiffs have pleaded an actual case or controversy before this Court.  Granting declaratory relief would:  clarify the legal relationship between the Executive branch and CPB's Board members, specifically as to the scope of authority of the Executive; finally settle the controversy of whether the President can remove a member of CPB's Board of Directors; and terminate and afford relief from the uncertainty, insecurity, and controversy arising from the attempted terminations of the Board members' positions and CPB's corresponding ability to function. *See Harris II*, 775 F. Supp. 3d at 179.  Last, the dispute between the parties presents an issue of grave public importance concerning the authority of the President over a private non-profit corporation. *See id.*  Declaratory relief, therefore, is warranted in this matter.

As discussed at length above, the president does not have the authority under Article II of the Constitution to terminate the positions of board members of CPB, a private corporation, even if the President appointed them.  Further, the president does not have the authority under the PBA to terminate the positions of board members of CPB because the PBA provides only appointment power, not removal power, and specifically restricts officers from directing, supervising, or controlling CPB.  The president also lacks authority under the D.C. Nonprofit Corporation Act to

terminate the positions of board members of CPB because the provision upon which the government relies does not apply, is inconsistent with the PBA, or does not allow for the unilateral action, without the Senate, engaged in here. Plaintiffs, therefore, are entitled to a declaratory judgment that Defendants' attempted terminations of CPB's board members were not legal and had no legal effect.

## **CONCLUSION**

CPB is a private corporation, and as a private corporation, the President has no authority over it. Because the President has no authority over CPB, his attempt to terminate CPB's Board Members is *ultra vires* and without effect. CPB requests the Court declare the President's attempts to terminate CPB's board members as ineffective due to his lack of authority, and declare the actions legally null and void.

Dated:  July 25, 2025

By: */s/ Jason W. McElroy*
Jason W. McElroy (D.C. Bar No. 502733)
Peter C. Nanov (D.C. Bar No. 230021)
SAUL EWING LLP
1919 Pennsylvania Avenue NW, Suite 550
Washington, D.C. 20006
Tel: (202) 295-6605
Email:        jason.mcelroy@saul.com
              peter.nanov@saul.com

Jeffrey S. Robbins (*Admitted Pro Hac Vice*)
Joseph D. Lipchitz (*Admitted Pro Hac Vice*)
SAUL EWING LLP
131 Dartmouth St., Suite 501
Boston, MA 02116
Tel: (617) 912-0941
Email:        jeffrey.robbins@saul.com
              joseph.lipchitz@saul.com

***Counsel for Plaintiffs***

36

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I caused one copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** on all parties and counsel of record via the Court's CM/ECF system as follows:

Jeremy Samuel Bloch Newman
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Email: jeremy.s.newman@usdoj.gov


*/s/ Jason W. McElroy*
Jason W. McElroy

*Counsel for Plaintiffs*