**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

───────────────────────────────────

|  |  |  |
|---|---|---|
| THE CORPORATION FOR | ) | |
| PUBLIC BROADCASTING, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-1305 (RDM) |
| | ) | |
| DONALD J. TRUMP, in his Official | ) | |
| Capacity as President of the | ) | |
| United States of America, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

──────────────────────────────── )

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND................................................................................................................2

I.    Statutory Background ..............................................................................................2

II.    Factual Background.................................................................................................6

III.   Procedural Background ..........................................................................................7

LEGAL STANDARD .......................................................................................................9

ARGUMENT ....................................................................................................................9

I.    The President Lawfully Removed the Former Members from the CPB's Board.............9

       A.    Absent a Valid Statutory Restriction on Removal, Presidential Appointees Are Removable by the President at Will.........................................................10

       B.    The CPB Is Governmental for Constitutional Purposes, Such as the President's Removal Authority.........................................................................15

       C.    The D.C. Nonprofit Corporation Act Independently Authorized the President's Removal of the Former Members.................................................25

II.    Each Claim in the Complaint Fails for an Independently Sufficient Reason..................31

CONCLUSION.................................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Accuracy in Media, Inc. v. FCC,*
  521 F.2d 288 (D.C. Cir. 1975) ................................................................................ 23, 24

*Alexander v. FBI,*
  691 F. Supp. 2d 182 (D.D.C. 2010) ............................................................................. 32

*Ali v. Rumsfeld,*
  649 F.3d 762 (D.C. Cir. 2011) ..................................................................................... 31

*Barnhart v. Sigmon Coal Co.,*
  534 U.S. 438 (2002) ...................................................................................................... 14

*Bellinger v. Bowser,*
  288 F. Supp. 3d 71 (D.D.C. 2017) ............................................................................... 31

*Bhd. of Ry. & Steamship Clerks v. Ass'n for Benefit of Non-Contract Emps.,*
  380 U.S. 650 (1965) ...................................................................................................... 33

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ...................................................................................................... 21

*Cherry Cotton Mills, Inc. v. United States,*
  327 U.S. 536 (1946) ...................................................................................................... 21

*Collins v. Yellen,*
  594 U.S. 220 (2021) ...................................................................................................... 14

*Dalton v. Specter,*
  511 U.S. 462 (1994) ...................................................................................................... 34

* *Dep't of Transp. v. Ass'n of Am. R.Rs.,*
  575 U.S. 43 (2015) ................................................................................................. *passim*

*FCC v. League of Women Voters,*
  468 U.S. 364 (1984) ...................................................................................................... 23

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ................................................................................................ 14, 32

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ...................................................................................................... 14

*Glob. Health Council v. Trump,*
  No. 25-5097, --- F.4th ---, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ........................ 34

*Husain v. Power,*
  630 F. Supp. 3d 188 (D.D.C. 2022) ............................................................................... 9

*In re Hennen*,
   38 U.S. 230 (1839) ................................................................................ 10, 15

*Inland Waterways Corp. v. Young*,
   309 U.S. 517 (1940) ...................................................................................... 21

*INS v. Chadha*,
   462 U.S. 919 (1983) ...................................................................................... 31

*Jam v. Int'l Fin. Corp.*,
   586 U.S. 199 (2019) ...................................................................................... 27

\* *Kennedy v. Braidwood Mgmt., Inc.*,
   145 S. Ct. 2427 (2025) .............................................................................. 10, 13

*LeBlanc v. U.S. Priv. & Civil Liberties Oversight Bd.*,
   No. 25-5197, 2025 WL 1840591 (D.C. Cir. July 1, 2025) ......................... 10, 11

\* *Lebron v. Nat'l R.R. Passenger Corp.*,
   513 U.S. 374 (1995) ................................................................................ *passim*

\* *Myers v. United States*,
   272 U.S. 52 (1926) .............................................................................. 1, 10, 30

*Nat'l Treas. Emps. Union v. Vought*,
   No. 25-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ............................ 33

*Network Project v. Corp. for Public Broad.*,
   398 F. Supp. 1332 (D.D.C. 1975)
   *aff'd in part, rev'd in part and remanded*, 561 F.2d 963 (D.C. Cir. 1977) ........................ 21

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025) ...................................................................................... 33

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ....................................................................... 33

*Parsons v. United States*,
   167 U.S. 324 (1897) ...................................................................................... 10

*Pennsylvania v. Bd. of Dirs. of City Trs. of Phila.*,
   353 U.S. 230 (1957) (per curiam) .................................................................. 21

*Reconstruction Fin. Corp. v. J.G. Menihan Corp.*,
   312 U.S. 81 (1941) ........................................................................................ 21

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) ........................................................................................ 2

\* *Severino v. Biden*,
   71 F.4th 1038 (D.C. Cir. 2023) ....................................................... 1, 10, 11, 14

*Shurtleff v. United States*,
  189 U.S. 311 (1903) ............................................................ 10, 13

*Soucie v. David*,
  448 F.2d 1067 (D.C. Cir. 1971) ............................................ 32

*United States v. ex rel. Totten v. Bombardier Corp.*,
  380 F.3d 488 (D.C. Cir. 2004) ............................................. 17

*United States v. Ho*,
  984 F.3d 191 (2d Cir. 2020) ................................................ 28

*United States v. Mouat*,
  124 U.S. 303 (1888) ........................................................... 14

**Statutes**

5 U.S.C. § 101 ...................................................................... 21

5 U.S.C. § 103 ...................................................................... 21

5 U.S.C. § 105 ...................................................................... 21

5 U.S.C. § 415 ............................................................... 5, 19, 22

5 U.S.C. § 702 ...................................................................... 31

5 U.S.C. § 706 ...................................................................... 31

15 U.S.C. § 41 ...................................................................... 12

28 U.S.C. § 2201 .................................................................. 31

28 U.S.C. § 2202 .................................................................. 31

31 U.S.C. § 902 .................................................................... 21

47 U.S.C. § 390 ...................................................................... 3

* 47 U.S.C. § 396 ........................................................... *passim*

47 U.S.C. § 398 ............................................................. 5, 12, 19

Consolidated Appropriations Act, 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2022) ...................... 5, 20

D.C. Code § 29-401.01 ........................................................ 29

D.C. Code § 29-406.01 ........................................................ 29

D.C. Code § 29-406.03 ................................................................................ 29

\* D.C. Code § 29-406.08 ........................................................................... *passim*

D.C. Code § 29-406.12 ................................................................................ 29

D.C. Code § 29-406.24 ................................................................................ 29

D.C. Code, tit. 29, ch. 4 .............................................................................. 7

District of Columbia Nonprofit Corporations Act,
    Pub. L. No. 87-569, 76 Stat. 265 (1962) ............................................ 27, 28

Public Broadcasting Act of 1967,
    Pub. L. No. 90-129, 81 Stat. 365 (1967) .......................................... *passim*

Rail Passenger Service Act of 1970,
    Pub. L. No. 91-518, 84 Stat. 1327 (1970) .......................................... 16, 18

Rescissions Act of 2025,
    Pub. L. No. 119-28, 139 Stat. 467 (2025) ........................................... 5, 20

**Rules**

Fed. R. Civ. P. 56 ....................................................................................... 9

**Other Authorities**

2 Bancroft,
    History of the Constitution of the United States, 192 ............................ 30

By-Laws of the Corporation for Public Broadcasting, As amended September 13, 2021,
    https://cpb.org/sites/default/files/CPB%20By-
    Laws%20as%20amended%20September%2013%2C%202021.pdf ................. 4, 25, 26, 29

By-Laws of the Corporation for Public Broadcasting, As amended May 15, 2025,
    (May, 15, 2025).......................................................................... 26

Congressionally Mandated Reports,
    https://www.govinfo.gov/app/collection/cmr .................................... 24

*Const. Separation of Powers Between the President & Cong.*,
    20 Op. O.L.C. 124 (1996) ............................................................. 17

Corporation for Public Broadcasting, Office of the Inspector General,
    https://cpboig.oversight.gov/what-we-do/overview (last visited Aug. 26, 2025)............. 6, 19

Gov't Accountability Office, Government Corporations: Profiles of Existing Government
Corporations (1996),
    https://www.gao.gov/assets/ggd-96-14.pdf ....................................... 22

Grant-Making Agencies,
https://www.grants.gov/learn-grants/grant-making-agencies...............................................  24

*Holdover & Removal of Members of Amtrak's Reform Bd.*,
27 Op. O.L.C. 163 (2003) ........................................................................................  17, 25

House Committee on Energy & Commerce,
https://energycommerce.house.gov/events/oversight-and-investigations-subcommittee-
hearing-examining-accusations-of-ideological-bias-at-npr-a-taxpayer-funded-news-entity
(May 8, 2024)...........................................................................................................  6, 19, 20

Joseph Story,
2 *Commentaries on the Constitution* § 791 .......................................................  14

Press Release, Committee on Oversight and Government Reform, Hearing Wrap Up: DOGE
Subcommittee Holds NPR and PBS Executives Accountable for Leftist Propaganda Funded by
Taxpayer Dollars, Committee on Oversight and Government Reform (Mar. 26, 2025),
https://oversight.house.gov/release/hearing-wrap-up-doge-subcommittee-holds-npr-and-pbs-
executives-accountable-for-leftist-propaganda-funded-by-taxpayer-dollars/.......................  20

*Status of Nat'l Veterans Bus. Dev. Corp.*,
28 Op. O.L.C. 62 (2004) ..........................................................................................  21

U.S. Government Manual, About Us,
available at: https://usgovernmentmanual.gov/About .......................................  22

## INTRODUCTION

As the President conferred with statutory authority to appoint members of the Board of the Corporation for Public Broadcasting ("CPB"), President Donald J. Trump has the lawful authority to remove them. In the Public Broadcasting Act ("PBA"), Congress empowered the President to appoint each member of the CPB's Board, with Senate confirmation. 47 U.S.C. § 396(c)(1). That appointment power carries with it the incident power to remove Board members at will. *See Myers v. United States*, 272 U.S. 52, 126 (1926). Plaintiffs argue that the CPB's enabling statute does not contain a provision expressly stating that the President may remove Board members, and therefore the President lacks *any* authority to remove Board members. That is backwards. "Because of the background presumption that the President may remove anyone he appoints, Congress must make it clear in a statute if it wishes to restrict the President's removal power," not the other way around. *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023). Far from restricting the President's removal power, the PBA provides that the CPB is generally governed by the D.C. Nonprofit Corporation Act, which itself creates a default rule that those who appoint board members have the authority to remove them. *See* 47 U.S.C. § 396(b); D.C. Code § 29-406.08(e).

Plaintiffs get no further in arguing that the President lacks any authority over the CPB because Congress structured it as a corporation and provided that it is not a government agency. In determining whether a government-created corporation is governmental for constitutional purposes, courts look not to Congressional disclaimers of agency status, but rather to a functional test based on the federal government's authority and influence over the corporation. *See Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 50-55 (2015); *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392-99 (1995). The CPB easily qualifies as governmental under this test because "the Government create[d] [the CPB] by special law, for the furtherance of governmental

objectives, and retains for itself permanent authority to appoint . . . the directors of [the CPB]." *Lebron*, 513 U.S. at 399. That Congress has dictated many aspects of the CPB's operations, that the CPB must regularly report to Congress or the Executive Branch, that it depends on federal appropriations for its own operations, and that its principal function is to disburse Congressional appropriations to other organizations in a manner prescribed in detail by statute, further show that "its significant ties to the Government" make it "a governmental entity for purposes of the Constitution's separation of powers provisions." *Ass'n of Am. R.Rs.*, 575 U.S. at 53-54. The President's role in selecting Board members ties his reputation and faithful execution of statutory duties to their performance and service on the board. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) (removal authority is necessary for the President to "be held fully accountable for discharging his own responsibilities") (citation omitted). The President must therefore be able to supervise Board members and remove them if necessary.

In any event, even if Plaintiffs were correct that the CPB should be viewed as a wholly private entity regulated only by District of Columbia corporate law, the result would be the same. That is because the D.C. Nonprofit Corporation Act enacts a default rule that "a director who is appointed by persons other than the members may be removed with or without cause by those persons." D.C. Code § 29-406.08(e). Any way you slice it, under executive removal precedents or under D.C. corporate law, the President's power to remove CPB Board members at will is incident to his power to appoint them.

## BACKGROUND

### I.    Statutory Background

The CPB is a corporation created by Congress that advances governmental purposes subject to statutory restrictions by deploying appropriated taxpayer dollars. CPB is overseen by a Board consisting solely of Senate-confirmed Presidential appointees.

2

Congress created the CPB in the Public Broadcasting Act of 1967 (the "PBA").  Pub. L. No. 90-129, 81 Stat. 365 (1967), *codified at* 47 U.S.C. § 390, *et seq.*  Congress determined that the CPB would advance various governmental purposes, including serving the "public interest" by "encourag[ing] the growth and development of public radio and television broadcasting" and "nonbroadcast telecommunications technologies for the delivery of public telecommunications services."  47 U.S.C. § 396(a)(1), (2).[1]  The CPB advances these purposes primarily by using appropriated taxpayer funds, drawn from an established Public Broadcasting Fund administered by the Secretary of the Treasury, to issue grants supporting public broadcasting, in a manner prescribed in detail by statute.  *See id.* § 396(k).

The CPB is governed by a "Board of Directors," which, when fully staffed, "consist[s] of 9 members appointed by the President, by and with the advice and consent of the Senate."  *Id.* § 396(c)(1).  The PBA provides that "[t]he term of office of each member of the Board appointed by the President shall be 6 years."  *Id.* § 396(c)(5).  The PBA contains no explicit provision protecting Board members from removal, such as a for-cause removal restriction.  The only provision explicitly discussing how Board members could lose their seats during their term refers to forfeiture, not removal; it states that Board members who fail to attend 50 percent of Board meetings in a calendar year "shall forfeit membership and the President shall appoint a new member to fill such vacancy not later than 30 days after such vacancy is determined by the Chairman of the Board."  *Id.* § 396(c)(7).  The PBA also states that the CPB is subject to D.C. Nonprofit Corporation Act to the extent that statute is consistent with § 396 of the PBA.  *See id.*

---

[1] *See also*, *e.g.*, *id.* § 396(a)(4) ("the encouragement and support of public telecommunications . . . are . . . of appropriate and important concern to the Federal Government"); *id.* § 396(a)(9) ("it is in the public interest for the Federal Government to ensure that all citizens of the United States have access to public telecommunications services through all appropriate available telecommunications distribution technologies").

§ 396(b).  The District of Columbia Nonprofit Corporation Act, in turn, creates a default rule that the power to remove board members at will is incident to the power of appointment:  "Except as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons."  D.C. Code § 29-406.08(e).  On April 28, 2025, when the President exercised his removal authority, the CPB's articles of incorporation and bylaws contained no provision purporting to restrict the President's authority to remove Board members.  *See* By-Laws of the Corporation for Public Broadcasting, As amended September 13, 2021 ("2021 Bylaws"), §§ 2.01-2.02 (Sept. 13, 2021); Defs.' Statement of Material Facts ("Defs.' SOMF") ¶¶ 1-2.

The PBA provides that "[t]he members of the Board shall not, by reason of such membership, be deemed to be officers or employees of the United States."  *Id.* § 396(d)(2).  It also provides that the CPB "will not be an agency or establishment of the United States Government." *Id.* § 396(b).  Notwithstanding the statutory disclaimer of CPB's government agency status, the PBA and other statutes provide many levers of government control and influence over the CPB:

- As noted above, all of the CPB's Board members are appointed by the President and confirmed by the Senate.  *Id.* § 396(c)(1).

- Congress set forth specific qualifications for Board members, including that no more than 5 members will be of the same political party, that Board members must be "eminent in" relevant fields, and that the Board contain members who represent licensees and permittees of public television stations and public radio stations.  *Id.* § 396(c)(1)-(3).

- Congress restricted the compensation of CPB's officers and employees based on a federal employee pay scale.  *Id.* § 396(e)(1).

- Congress authorized the CPB to take various actions "[i]n order to achieve the objectives and to carry out the purposes of" the PBA.  *Id.* § 396(g); *see also id.* § 396(a) (listing those objectives and purposes).  The CPB funds "public telecommunications . . . programs," assists "in the development . . . of interconnection systems" and "public telecommunication entities."  *Id.* § 396(g)(1).  And the CPB is empowered to make grants, hire staff, make payments, and to "take such other actions" necessary to support its congressional purposes. *Id.* § 396(g)(2).  Congress also "prohibited" the CPB from owning or operating broadcast stations or producing its own programming.  *Id.* § 396(g)(3).

4

- Through the appropriations process, Congress and the President decide whether or how much funding the CPB will receive. The CPB is primarily funded through annual Congressional appropriations. *Id.* § 396(k)(1). For example, for fiscal year 2025 (which extends through September 30, 2025), Congress appropriated $535 million. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 407, 136 Stat. 4459, 4901 (2022). Congress recently enacted legislation proposed by the President that rescinded the CPB's appropriations for fiscal year 2026 and fiscal year 2027. *See* Rescissions Act of 2025, Pub. L. No. 119-28, § 2(20), 139 Stat. 467, 469-70 (2025).

- Congress sharply restricted how the CPB can use its funds, requiring it to use appropriated funds "solely for its grants, contracts, and administrative costs." 47 U.S.C. § 396(k)(2). Congress further required the CPB to establish an annual budget, and Congress set forth specific percentage requirements or limits for certain uses of funds. *Id.* § 396(k)(3).

- Only a small percentage of the funds appropriated to CPB go to funding the CPB itself; the vast majority are disbursed in accordance with a highly reticulated statutory scheme to various local and national public-radio and public-broadcasting entities. *Id.* The CPB is, in short, a statutorily-created body that exists to administer the disbursement of appropriations in accordance with a statutory scheme.

- Congress imposed various requirements on recipients of grants from the CPB, including that they hold open meetings, that public broadcast station grant recipients establish a community advisory board, and that employees of PBS and NPR cannot "be compensated in excess of reasonable compensation" while those organizations receive grants. *Id.* § 396(k)(4), (8), (9).

- The CPB must be audited by the Government Accountability Office ("GAO") in accordance with regulations promulgated by the Comptroller General, and the Comptroller General must report on such audits to Congress. *Id.* § 396(l).

- The PBA provides that nothing in the statute "shall be deemed . . . *except to the extent authorized in subsection (b)*, to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation, or over the curriculum, program of instruction, or personnel of any educational institution, school system, or public telecommunications entity." *Id.* § 398(a) (emphasis added).[2] That subsection requires the CPB to incorporate into its grant agreements equal employment opportunity (EEO) regulations promulgated by the Secretary of Health and Human Services and empowers the Secretary to review claims of EEO violations and make final determinations on such claims. *Id.* § 398(b)(2), (3). That subsection also requires the CPB to provide an annual report to the Secretary of Health and Human Services. *Id.* § 398(b)(4).

- The CPB is a "designated Federal entity" under the Inspector General Act, 5 U.S.C. § 415(a)(1)(A), which means it has an Inspector General who conducts investigations and

---

[2] Plaintiffs cite this provision frequently, yet they omit the caveat referring to subsection (b).

audits of the CPB's operations and issues reports to Congress, the CPB Board and Management, and the public, *see* Corporation for Public Broadcasting, Office of the Inspector General https://cpboig.oversight.gov/what-we-do/overview (last visited Aug. 26, 2025) (the CPB's Office of the Inspector General "conduct[s] independent audits, evaluations, and investigations" and "report[s] to Congress and the public about our activities").

- Congress holds oversight hearings regarding the CPB. *See*, *e.g.*, Oversight and Investigations Subcommittee Hearing: "Examining Accusations of Ideological Bias at NPR, a Taxpayer Funded News Entity," House Committee on Energy & Commerce https://energycommerce.house.gov/events/oversight-and-investigations-subcommittee-hearing-examining-accusations-of-ideological-bias-at-npr-a-taxpayer-funded-news-entity (May 8, 2024, 10:00 AM); *see also* Slavitt Decl. ¶ 9, ECF No. 2-2 (the CPB submits "annual request for appropriations" to Congress).

## II.    Factual Background

Before April 28, 2025, the CPB had five members sitting on its Board: Plaintiff Diane Kaplan, former Plaintiff Thomas E. Rothman, former Plaintiff Laura G. Ross, Ruby Calvert, and Liz Sembler.  The remaining four spots on its board were vacant.  Defs.' SOMF ¶ 3.

On April 28, 2025, President Trump removed three members of the CPB's Board of Directors: Ms. Kaplan, Ms. Ross, and Mr. Rothman (the "former members").  Defs.' SOMF ¶ 4. The President communicated this removal through emails from Trent Morse, the Deputy Director of Presidential Personnel for the Executive Office of the President, informing the former members "[o]n behalf of President Donald J. Trump" that their "position on the Corporation for Public Broadcasting is terminated effective immediately."  *Id.*; Decl. of Evan Slavitt ¶ 23, ECF No. 35-2 ("Slavitt SJ Decl.").

From the time President Trump removed the former members through July 2025, the three former members continued to purport to act as Board members and were recognized as such by the CPB.  Defs.' SOMF ¶¶ 5-14.  They participated in Board meetings, voted on matters coming before the Board, and presented themselves to the public as Board members, including on the CPB's website.  *Id.* ¶¶ 5-9, 11-12, 14.  On July 15, 2025, the United States filed a quo warranto

Complaint against Ms. Ross, Mr. Rothman, and Ms. Kaplan, seeking to oust them from their usurped offices as Board members.  *See* Compl., *United States v. Kaplan*, ECF No. 1, Case No. 1:25-cv-2261 (D.D.C.).  Shortly after the government filed that Complaint, Ms. Ross and Mr. Rothman both ceased purporting to serve as a Board member.  On July 22, Ms. Ross sent a letter to the CPB's Chief Executive Officer acknowledging that she no longer served as a Board member.  *Id.* ¶ 10.  On July 24, she voluntarily dismissed her claims.  ECF No. 34.  On July 31, Mr. Rothman sent a letter to the CPB's Chief Executive Officer acknowledging that he no longer served as a Board member.  Defs.' SOMF ¶ 13.  On August 1, 2025, he voluntarily dismissed his claims.  ECF No. 36.  Plaintiff Kaplan continues to purport to serve as a Board member, and the CPB still lists her as a Board member on its website.  Defs.' SOMF ¶¶ 11-12, 15.

## III.    Procedural Background

On April 29, 2025, the three former members, the CPB, and the Board of Directors of the CPB filed the Complaint in this action.  *See* Compl., ECF No. 1.  Defendants are President Trump, the White House Presidential Personnel Office and its Director Sergio Gor and Deputy Director Trent Morse, and the United States Office of Management and Budget ("OMB") and its Director Russell Vought.  *Id.* ¶¶ 6-11.

The Complaint contains four counts.  Count I seeks a declaratory judgment that the former members "lawfully remain members of the CPB's Board of Directors."  *Id.* ¶ 45.  Count II asserts that by terminating the former Board members, Deputy Director Morse exceeded statutory authority in violation of the Administrative Procedure Act ("APA").  *Id.* ¶¶ 55-56.  Count III, labeled Violation of Separation of Powers/Ultra Vires Presidential Action, asserts that the removal of the former members "usurp[ed] congressional legislative authority" and exceeded the President's authority under Article II of the Constitution.  *Id.* ¶¶ 61-62.  Count IV claims that the former members' removal "constitutes a partial, unilateral repeal or amendment of the Act by the

President," and accordingly "violates the Presentment, Appropriations, and Take care Clauses of the U.S. Constitution." *Id.* ¶¶ 70-71.

The same day they filed the Complaint, Plaintiffs moved for a temporary restraining order. *See* Mot. For a TRO, ECF No. 2. In the motion, Plaintiffs sought an order that would, among other things, enjoin all Defendants, including the President, from "taking any steps to implement or give effect to any purported removal of any board member of the [CPB]." Proposed Order at 1, ECF No. 2-3. At a hearing on that motion, the parties agreed to convert the motion into a Motion for Preliminary Injunction. *See* Transcript of May 14, 2025 Hearing 2:15-22.

On June 8, 2025, the Court issued a Memorandum Opinion and Order ("PI Order"), ECF No. 32, denying Plaintiffs' Motion for Preliminary Injunction. Among other things, the Court held that Plaintiffs "have failed to demonstrate a likelihood of success on the merits" of their claim that the President lacked authority to remove the former members. *Id.* at 21. The Court explained that under the Public Broadcasting Act and D.C. Nonprofit Corporation Act, "the President (as the appointing person) was authorized to remove the three directors at the time he acted," and that "the Court [was] unpersuaded" by Plaintiffs' contrary arguments. *Id.* at 15.

On June 27, 2025, the parties filed a joint motion asking the Court to set a briefing schedule for cross-motions for summary judgment, ECF No. 33, which the Court granted, Minute Order (June 29, 2025). Pursuant to that schedule, Plaintiffs filed their Motion for Summary Judgment on July 25, 2025. *See* Pls. The Corp. for Pub. Broad., The Bd. of Dirs. for the Corp. for Pub. Broad., Thomas E. Rothman & Diane Kaplan's Mot. for Summ. J. ("Pls.' SJ Mot."), ECF No. 35; Pls. The Corp. for Pub. Broad., The Bd. of Dirs. for the Corp. for Pub. Broad., Thomas E. Rothman & Diane Kaplan's Mem. in Supp. of their Mot. for Summ. J. ("Pls.' SJ Mem."), ECF No. 35-1.

**LEGAL STANDARD**

"Summary judgment is warranted if a party can 'show[] that there is no genuine dispute as to any material fact and [that the party] is entitled to judgment as a matter of law.'" *Husain v. Power*, 630 F. Supp. 3d 188, 194 (D.D.C. 2022) (quoting Fed. R. Civ. P. 56(a)). "A fact is 'material' if it could affect the outcome of the litigation under governing law, and a dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted).

**ARGUMENT**

I.    **The President Lawfully Removed the Former Members from the CPB's Board**

The President lawfully exercised his authority to remove Board members of the CPB at will.  As a longstanding rule of constitutional law and statutory interpretation, the President's removal authority is incident to his power to appoint.  Therefore, statutes granting the President the power to appoint are construed as granting him the power to remove at will, absent a clear manifestation of Congressional intent to restrict the President's removal authority.  That does not exist here.  Plaintiffs have suggested that these principles do not apply because the CPB is wholly nongovernmental, but that is incorrect.  Under the functional test articulated by the Supreme Court, for purposes of evaluating the President's removal authority and issues under the separation of powers, the CPB is governmental because it was created by Congress to advance governmental purposes, and it is governed by a Board whose members are all appointed by the President.  In any event, even if the CPB were viewed as a wholly private entity governed by the D.C. Nonprofit Corporation Act, the result would be the same.  This is because D.C. corporate law applies the same default rule as executive removal precedents:  the power to remove a board member at will is incident to the power to appoint.  The CPB's Bylaws in effect at the time the President removed the former members did not alter this fundamental rule.

A.    **Absent a Valid Statutory Restriction on Removal, Presidential Appointees Are Removable by the President at Will**

At its base, "the power of removal [is] incident to the power of appointment." *In re Hennen*, 38 U.S. 230, 259 (1839) (holding that district court could remove court clerk because it appointed the clerk). This is doubly true for appointments by the President, as "it was very early adopted, as the practical construction of the Constitution, that [the removal] power was vested in the President alone." *Id.* at 259 (explaining resolution of the removal debate of 1789 in Congress). So courts have long recognized "the background presumption that the President may remove anyone he appoints." *Severino*, 71 F.4th at 1044; *see also Myers*, 272 U.S. at 126 ("In the absence of any specific provision to the contrary, the power of appointment to executive office carries with it, as a necessary incident, the power of removal."); *Parsons v. United States*, 167 U.S. 324, 338-39 (1897) (holding that the President had authority to remove Presidentially-appointed United States Attorneys at will, notwithstanding the fact that the statute provided for a term of years).

Thus, "to 'take away' the power of at-will removal from an appointing officer, Congress must use 'very clear and explicit language.' . . . '[M]ere inference or implication' does not suffice." *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2448 (2025) (quoting *Shurtleff v. United States*, 189 U.S. 311, 315 (1903)); *accord Severino*, 71 F.4th at 1044 ("Congress must make it clear in a statute if it wishes to restrict the President's removal power" over a Presidential appointee). "When Congress wants to depart from the default of at-will removability and instead furnish for-cause protection, it knows how to do so" by enacting for-cause removal provisions, as Congress has done "[i]n many statutes." *Braidwood*, 145 S. Ct. at 2448. Consistent with *Braidwood*, the D.C. Circuit has recently stayed two district court rulings purporting to reinstate presidential appointees removed by the President where the statute contained no express restriction on removal, but the district court had recognized implied removal restrictions. *See LeBlanc v. U.S.*

10

*Priv. & Civil Liberties Oversight Bd.*, No. 25-5197, 2025 WL 1840591 (D.C. Cir. July 1, 2025); Order, *Harper v. Bessent*, No. 25-5268 (D.C. Cir. Aug. 21, 2025) (per curiam). Here, the PBA contains no for-cause removal restriction or any other restriction on the President's removal authority. Absent a valid, express restriction on removal, the President has discretion to remove those he appoints.

The fact that the Act provides a fixed term of years for Board members, *see* 47 U.S.C. § 396(c)(5) ("[t]he term of office of each member of the Board appointed by the President shall be 6 years"), does not imply a restriction on removal. "When used in federal appointment statutes, the word 'term' has a long-settled meaning of limiting a person's tenure in office, not investing the person with a guaranteed minimum period of service. A 'term,' in other words, is a ceiling, not a floor, on the length of service." *Severino*, 71 F.4th at 1045. Thus, "the longstanding meaning of a fixed-term provision laid out in *Parsons* and *Myers*" is that "[a] defined term of office, standing alone, does not curtail the President's removal power during the office-holder's service." *Id.* at 1047.

Plaintiffs have pointed to the fact that a provision of the PBA calls for Board members to "forfeit membership" if they miss more than 50 percent of Board meetings. 47 U.S.C § 396(c)(7). Plaintiffs argue that "Congress . . . chose to include *only* this statutory basis of removal," and urge the Court to apply "[t]he canon of construction '*expressio unius est exclusion alterius*'" to conclude that "the only basis for removal under the PBA is failure to attend at least half of all Board meetings." Pls.' SJ Mem. 31.

As the Court has explained, this "argument barely gets off the ground." PI Order 18. Nothing in § 396(c)(7) precludes or restricts removal of a Board member by other means. As a general matter, the "[e]*xpressio unius*" or "negative-implication canon," under which the

expression of one thing in a statute implies the exclusion of others, "must be applied with great caution, since its application depends so much on context. . . . The doctrine properly applies only when the *unius* . . . can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012). Automatic forfeiture for failing to perform one's duties in no way limits discretionary removal by the appointer (here, the President). Indeed, it would be absurd to believe that Congress intended that a Board member could not be removed for any reason other than failure to attend Board meetings. If that were the case, then "the PBA would implicitly create an immunity from removal, even when, for example, a director '[h]as been convicted of a felony.'" PI Order 18 (quoting D.C. Code § 29-406.08(c)(2)). That goes far beyond typical for-cause removal restrictions. *See*, *e.g.*, 15 U.S.C. § 41 (FTC members can be removed for "inefficiency, neglect of duty, or malfeasance in office"). Thus, the Court should not "endorse [Plaintiffs'] extraordinary reading" that § 396(c)(7) provides the exclusive means of removing board members. PI Order 18. Furthermore, as the Court has pointed out, this provision "says nothing about 'removal'—and, instead, talks about 'forfeiture'—and is simply designed to ensure that the directors attend Board meetings." *Id.* at 19 (quoting 47 U.S.C. § 396(c)(7)). It cannot reasonably be read to restrict the President's authority to remove Board members.

Plaintiffs also wrongly characterize § 398(a) of the PBA as an anti-removal provision. That provision reads, in part: "Nothing contained in this part shall be deemed . . . except to the extent authorized in subsection (b), to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation." 47 U.S.C. § 398(b). Plaintiffs argue that "[n]othing means nothing," and this

provision therefore "foreclos[es] all authority over the [CPB] other than the [President's] power of nominating Directors."  Pls.' SJ Mem. 11-12.

This argument fails for multiple reasons.  *First*, § 398(a) does not mention removal of Board members.  Plaintiffs cite *Braidwood* for the proposition that the authority to remove officials enables supervising and directing them.  Pls.' SJ Mem. 12 (citing *Braidwood*, 145 S. Ct. at 2444). But *Braidwood* cuts against Plaintiffs' position.  As the Supreme Court explained, "to 'take away' the power of at-will removal from an appointing officer, Congress must use 'very clear and explicit language.' . . . '[M]ere inference or implication' does not suffice."  *Braidwood*, 145 S. Ct. at 2448 (quoting *Shurtleff*, 189 U.S. at 315).  Plaintiffs' argument that the Court should draw a restriction on presidential removal from a provision that restricts the influence of Executive Branch agencies over the CPB amounts to mere inference or implication.

*Second*, as this Court already concluded, in light of the President's appointment power, § 398(a) cannot be read to foreclose the President from controlling who serves on the CPB's Board. As the Court reasoned, "Congress did provide the President with appointment authority, which necessarily admits of some influence through the selection of directors, and it did not include any express removal provision—whether for-cause or otherwise."  PI Order 15.  The Supreme Court has likewise recognized that the authority to appoint board members leads to "the practical reality of federal control."  *Ass'n of Am. R.Rs.*, 575 U.S. at 55.  Accordingly, whatever it may signify about the authority of federal agencies to control the actions of the CPB, § 398 cannot be read to preclude the President from influencing the makeup of the CPB's Board.

*Third*, § 398(a) does not mention the President.  Plaintiffs argue that the President is encompassed within the words "officer" or "employee" in § 398(a), citing a variety of authorities colloquially referring to the President as an officer or employee or holding that the President is an

officer or employee in a particular statutory context. *See* Pls.' SJ Mem. 28-29. True enough, but there is also authority to the contrary.[3] In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Supreme Court held that "[o]ut of respect for the separation of powers and the unique constitutional position of the President," it "would require an express statement by Congress before assuming it intended" to restrict the President's authority in the APA, even though the APA provided that it applied broadly to "each authority of the Government of the United States," *id.* at 800-01, language that could be read as applying to the President. Similarly, the general language in § 398(a) does not expressly apply to the President and should not be read as restricting the President's authority. Other provisions of the PBA specifically mention the President, *see* 47 U.S.C. § 396(c)(1), (c)(2), (c)(3), (c)(5), (c)(7), (l)(2)(B), which bolsters the inference that Congress deliberately omitted the President from § 398(a). *See Collins v. Yellen*, 594 U.S. 220, 248 (2021) ("when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)).

"Because of the background presumption that the President may remove anyone he appoints, Congress must make it clear in a statute if it wishes to restrict the President's removal power." *Severino*, 71 F.4th at 1044. The PBA's lack of restrictions on Presidential removal confirms the President's removal authority.

---

[3] *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497-98 (2010) ("The people do not vote for the 'Officers of the United States.' Art. II, § 2, cl. 2. They instead look to the President . . . ."); *United States v. Mouat*, 124 U.S. 303, 307 (1888) ("Unless a person in the service of the government, therefore, holds his place by virtue of an appointment by the president, or of one of the courts of justice or heads of departments authorized by law to make such an appointment, he is not, strictly speaking, an officer of the United States."); Joseph Story, 2 *Commentaries on the Constitution* § 791 ("[T]he enumeration of the president and vice president, as impeachable officers, was indispensable. . . . [T]he [impeachment] clause . . . does not even affect to consider them officers of the United States.").

### B.    The CPB Is Governmental for Constitutional Purposes, Such as the President's Removal Authority

Plaintiffs suggest that precedents regarding the President's removal authority have no application to the CPB because the CPB should be viewed as a wholly nongovernmental, purely private corporation, or alternatively should be viewed as part of the Legislative Branch. *See* Pls.' SJ Mem. 13-24. To a large extent, this issue is beside the point. The principle of statutory interpretation that a statute granting appointment power includes the incident power of removal (absent a valid removal restriction) is not confined to presidential appointments of executive officers. *See*, *e.g.*, *Hennen*, 38 U.S. at 259 (holding that district court could remove court clerk because it appointed the clerk). Moreover, as explained below, the D.C. Nonprofit Corporation Act affirms this same rule that removal authority is incident to appointment authority, even for purely private nonprofit corporations. *See infra*, pp. 25-26. Because the PBA grants the President the authority to appoint Board members and contains no clear removal restriction, 47 U.S.C. § 396(c)(1), it empowers the President to remove Board members, regardless of whether the CPB is considered part of the government or where in the government it sits.

In any event, Plaintiffs are incorrect. In considering whether a government-created corporation is part of the government for purposes of separation of powers, courts apply a functional test that does not depend on whether Congress formally structured the entity as a corporation rather than a government agency. Under that test, the CPB is governmental because it is created by the government to serve governmental purposes, and its Board is appointed wholly by the government.

The framework for evaluating whether a government-created corporation should be considered part of the government is set forth in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), and its progeny. In *Lebron*, the Supreme Court held that the National

Railroad Passenger Corporation (commonly known as Amtrak) was "an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution," even though the federal statute creating Amtrak structured it as a corporation. *Id.* at 394. Amtrak, much like the CPB, is a corporation created by a federal statute that "declares that [Amtrak] 'will not be an agency or establishment of the United States Government.'" *Id.* at 391 (quoting Rail Passenger Service Act of 1970, Pub. L. No. 91-518, 84 Stat. 1327, 1330 (1970)). Plaintiffs in *Lebron* argued that *Amtrak*'s "charter's disclaimer of agency status prevents it from being considered a Government entity in the present case," *id.* at 392, but the Supreme Court rejected this argument, explaining that "[t]his reliance on the statute is misplaced." *Id.* The Court reasoned that it does not consider a Congressional determination within the enabling statute as the final word of an entity's status as governmental or nongovernmental, particularly in areas where the agency affects the "constitutional rights of citizens." *Id.* The Supreme Court instead applied a functional test to conclude that Amtrak was part of the government for constitutional purposes, holding "that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 399.

Plaintiffs' arguments here mirror the arguments rejected by the Supreme Court in *Lebron*. Plaintiffs rely on a provision of the PBA similar to Amtrak's disclaimer of agency status, which states that the CPB is not "an agency or establishment of the United States Government." 47 U.S.C. § 396(b). According to Plaintiffs, "[t]he Court need go no further than this" provision to conclude that the CPB is nongovernmental. Pls.' SJ Mem. 15. To the contrary, *Lebron*'s functional test applies.

16

Plaintiffs attempt to distinguish *Lebron* because it was a First Amendment case, *see* Pls.' SJ Mem. 18-19, but the Supreme Court later applied the *Lebron* analysis to hold that Amtrak is "a governmental entity for purposes of the Constitution's separation of powers provisions." *Ass'n of Am. R.Rs.*, 575 U.S. at 53-54. In that case, the Supreme Court favorably cited an opinion of the Department of Justice's Office of Legal Counsel ("OLC"), which relied on *Lebron* to conclude that "[t]he President may remove a member of the Amtrak Reform Board without cause." *Holdover & Removal of Members of Amtrak's Reform Bd.*, 27 Op. O.L.C. 163, 163 (2003); *see Ass'n of Am. R.Rs.*, 575 U.S. at 51 (citing this OLC opinion). OLC reasoned that *Lebron* applied to the removal question because there is "no principled basis for distinguishing between the status of a federal entity vis-a-vis constitutional obligations relating to individual rights and vis-a-vis the structural obligations that the Constitution imposes on federal entities." 27 Op. O.L.C. at 166 (quoting *The Const. Separation of Powers Between the President & Cong.*, 20 Op. O.L.C. 124, 148 n.70 (1996)). OLC therefore deemed applicable to Amtrak the "fundamental element of executive-branch structure . . . that presidential appointees are subject to removal by the President." *Id.* Under *Association of American Railroads* and the OLC's opinion endorsed in that case, the *Lebron* analysis applies not just to the First Amendment but also to separation of powers questions such as the President's removal authority.[4]

---

[4] Plaintiffs cite *United States v. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 492 (D.C. Cir. 2004), which held that Amtrak was not a governmental entity for purposes of the False Claims Act. *See* Pls.' SJ Mem. 19. *Totten* is consistent with the Supreme Court's reasoning that statutory disclaimers of government status are "assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control—for example, whether it is subject to statutes that impose obligations or confer powers upon Government entities," *Lebron*, 513 U.S. at 392, but do not control "Amtrak's status as a federal actor or instrumentality under the Constitution," *Ass'n of Am. R.Rs.*, 575 U.S. at 55. Like *Association of American Railroads*, this case involves a question regarding "the Constitution's separation of powers provisions," *id.* at 54, the President's removal authority.

Under this test, the CPB clearly qualifies as part of the government. *First*, the CPB was "create[d] . . . by special law," the PBA. *Lebron*, 513 U.S. at 399; *see* 47 U.S.C. § 396(b) ("There is authorized to be established a nonprofit corporation, to be known as the 'Corporation for Public Broadcasting.'"). Plaintiffs have argued that the CPB was not created by statute in the relevant sense because the PBA authorized the creation of the CPB, but the CPB was formally incorporated through subsequent actions. *See* Pls.' SJ Mem. 20-21. However, the CPB was created by statute in exactly the same manner as Amtrak, the corporation that the Supreme Court characterized in *Lebron* as "create[d] . . . by special law." 513 U.S. at 399. The Rail Passenger Services Act of 1970 stated that "[t]here is authorized to be created a national Railroad Passenger Corporation," and then authorized the President to appoint incorporators who would also serve as the initial board of directors and "shall take whatever actions are necessary to establish the Corporation." Pub. L. No. 91-518, §§ 301, 302, 84 Stat. 1330. Similarly, the Public Broadcasting Act states that "[t]here is authorized to be established a nonprofit corporation, to be known as the 'Corporation for Public Broadcasting,'" 47 U.S.C. § 396(b), then provides that the initial Board members appointed by the President "shall serve as incorporators and shall take whatever actions are necessary to establish the Corporation under the District of Columbia Nonprofit Corporation Act," *id.* § 396(c)(4).

*Second*, Congress created the CPB "for the furtherance of governmental objectives." *Lebron*, 513 U.S. at 599. The PBA lists those objectives, *see* 47 U.S.C. § 396(a), and prescribes specific mechanisms for the CPB to advance those objectives, *see, e.g.*, *id.* § 396(g), (k). Plaintiffs acknowledge that the CPB serves governmental objectives in the first paragraph of their Complaint, alleging that "CPB is the steward of the federal government's investment in public broadcasting." Compl. ¶ 1.

*Third*, the federal government "retains for itself permanent authority to appoint a majority of the directors of" the CPB. *Lebron*, 513 U.S. at 599. All Board members of the CPB, not just a majority, are appointed by the President with the advice and consent of the Senate. 47 U.S.C. § 396(c)(1). Indeed, the Supreme Court in *Lebron* identified the CPB as an entity that is structured similarly to Amtrak and suggested that its analysis would likewise apply to the CPB. *See Lebron*, 513 U.S. at 391.

In *American Association of Railroads*, the Supreme Court pointed to other characteristics of Amtrak that further confirmed the conclusion that Amtrak was a public entity for purposes of the separation of powers analysis. Almost all of these characteristics apply equally if not more so to the CPB.

- "Under further statutory provisions, Amtrak's Board members must possess certain qualifications." *Ass'n of Am. R.Rs.*, 575 U.S. at 51. Likewise, CPB Board members must be of partisan balance, have eminence in certain fields, and represent interests of licensees of public broadcasters. *See* 47 U.S.C. § 396(c)(1)-(3).

- "Amtrak must submit numerous . . . reports" to the federal government. *Ass'n of Am. R.Rs.*, 575 U.S. at 52. Similarly, CPB must submit annual reports to the Secretary of Health and Human Services regarding EEO issues, 47 U.S.C. § 398(b)(4), the GAO audits the CPB and the Comptroller General submits reports of those audits to Congress, 47 U.S.C. § 396(l)(2)(B), CPB submits annual appropriation requests to Congress, Decl. of Evan Slavitt ¶ 9, ECF No. 2-2 ("Slavitt PI Decl."), "CPB is under an obligation under the Continuing Resolution to make certain reports to the Office of Management and Budget," *id.* ¶ 27, and the Inspector General of CPB "report[s] to Congress" about its audits and investigations of CPB. Corporation for Public Broadcasting, Office of the Inspector General, https://cpboig.oversight.gov/what-we-do/overview (last visited Aug. 26, 2025).

- "Amtrak must maintain an inspector general, much like governmental agencies such as the Federal Communications Commission and the Securities and Exchange Commission." *Ass'n of Am. R.Rs.*, 575 U.S. at 52. CPB is also a "designated Federal entity" with an inspector general. 5 U.S.C. § 415(a)(1)(A).

- "Congress conducts frequent oversight hearings into" Amtrak. *Ass'n of Am. R.Rs.*, 575 U.S. at 52. Congress has likewise recently conducted oversight hearings into the CPB and how it deploys its funds. *See, e.g.*, Oversight and Investigations Subcommittee Hearing: "Examining Accusations of Ideological Bias at NPR, a Taxpayer Funded News Entity," House Committee on Energy & Commerce (May

19

8, 2024, 10:00 AM), https://energycommerce.house.gov/events/oversight-and-investigations-hearing-examining-accusations-of-ideological-bias-at-npr-a-taxpayer-funded-news-entity; Press Release, Committee on Oversight and Government Reform, Hearing Wrap Up: DOGE Subcommittee Holds NPR and PBS Executives Accountable for Leftist Propaganda Funded by Taxpayer Dollars, Committee on Oversight and Government Reform (Mar. 26, 2025), https://oversight.house.gov/release/hearing-wrap-up-doge-subcommittee-holds-npr-and-pbs-executives-accountable-for-leftist-propaganda-funded-by-taxpayer-dollars/.

- "Amtrak is required to pursue numerous . . . goals defined by statute." *Ass'n of Am. R.Rs.*, 575 U.S. at 53. The PBA sets forth clear congressional purposes for CPB and limits its use of appropriated funds. *See* 47 U.S.C. § 396(a) (setting forth Congressional purposes for CPB); *id.* § 396(g) (authorizing the CPB to take actions and prohibiting the CPB from taking other actions to further Congressional purposes); *id.* § 396(k)(2)-(3) (directing and limiting CPB's uses of appropriated funds).

- "Amtrak is also dependent on federal financial support." *Ass'n of Am. R.Rs.*, 575 U.S. at 53. CPB is dependent on federal financial support, *see id.* § 396(k)(1), and Congress and the President decide each year whether to appropriate funds to the CPB. In 2022, Congress appropriated $535 million to the CPB for the current fiscal year, *see* Pub. L. No. 117-328, § 407, 136 Stat. 4901, but Congress recently enacted legislation rescinded the CPB's appropriations for the next two fiscal years, *see* Rescissions Act of 2025, Pub. L. No. 119-28, § 2(20), 139 Stat. 469-70.

Furthermore, in carrying out its various "public interest" missions, the CPB "acts as a governmental agency in performing its functions," *Lebron*, 513 U.S. at 394-96 (citation omitted), in that it has sweeping grant- and contract-making power. *See* 47 U.S.C. § 396(g)(2)(A), (B). That is, it is "authorized to . . . obtain grants from and make contracts with individuals and with private, State, and Federal agencies, organizations, and institutions," and can also "contract with or make grants to public telecommunications entities, national regional, and other systems of public telecommunications entities, and independent producers and production entities for the production of acquisition of public telecommunications services to be made available for use by public telecommunications entities." *Id.* Ample authority exists for treating other government-created entities as governmental where they serve governmental purposes, such as these, and are controlled

by governmental appointees.[5]  "That Government-created and -controlled corporations are (for many purposes at last) part of the Government itself has a strong basis, not merely in past practice and understanding, but in reason itself.  It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form."  *Lebron*, 513 U.S. at 397.  There is no basis to treat the CPB differently.

Plaintiffs' remaining contrary arguments are unpersuasive.  Plaintiffs argue that some statutes do not define the CPB as an executive department, government corporation, or executive agency, Pls.' SJ Mem. 16 (citing 5 U.S.C. §§ 101, 103, 105).  Plaintiffs also cite a case relying on the agency disclaimer to support the conclusion that the PBA did not create a private right of action by viewers of public broadcasting to sue the CPB for violating the Act.  *Id.* at 16-17 (citing *Network Project v. Corp. for Public Broadcasting*, 398 F. Supp. 1332 (D.D.C. 1975), *aff'd in part, rev'd in part and remanded*, 561 F.2d 963 (D.C. Cir. 1977)).  But while the agency disclaimer may be

---

[5] *See Biden v. Nebraska*, 600 U.S. 477, 490-92 (2023) (finding that a state nonprofit corporation was "part of" the state, for purposes of determining the state's standing to sue, where the corporation was "created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State"); *Pennsylvania v. Bd. of Dirs. of City Trs. of Phila.*, 353 U.S. 230, 231 (1957) (per curiam) (holding that Girard College, which had been built and maintained pursuant to a privately erected trust, was nevertheless a governmental actor for constitutional purposes because it was operated and controlled by a board of state appointees, which was itself a state agency); *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539 (1946) (concluding Reconstruction Finance Corporation ("RFC") was "an agency selected by Government to accomplish purely Governmental purposes"); *Reconstruction Fin. Corp. v. J.G. Menihan Corp.*, 312 U.S. 81, 83 (1941) (finding RFC—despite its organic statute not stating it to be a Governmental instrumentality, to be "a corporate agency of the government" because "it acts as a governmental agency in performing its functions."); *Inland Waterways Corp. v. Young*, 309 U.S. 517 (1940) (finding that Inland Waterways Corporation, though not specifically designated in its charter as an instrumentality of the U.S., was an agency of the U.S.); Status of Nat'l Veterans Bus. Dev. Corp., 28 Op. O.L.C. 62, 78 (2004) (determining that the National Veterans Business Development Corporation was a government corporation under 5 U.S.C. § 103 and an agency under 31 U.S.C. § 902 where the "President appoints the entire Board of Directors," "high-level federal officials serve on the Board," the United States "regulates NVBDC's fiscal operations," and the entity "receives federal appropriations").

relevant to that discrete issue of statutory interpretation, it is "not dispositive of [CPB]'s status as a governmental entity for purposes of separation of powers analysis under the Constitution." *Ass'n of Am. R.Rs.*, 575 U.S. at 51. Moreover, statutes do not uniformly exclude the CPB from lists of federal entities. It is listed as a "designated Federal entity" under the Inspector General Act, 5 U.S.C. § 415(a)(1)(A), which means that it "must maintain an inspector general, much like governmental agencies such as the Federal Communications Commission and the Securities and Exchange Commission," *Ass'n of Am. R.Rs.*, 575 U.S. at 52, a fact specifically relied on by the Supreme Court in classifying Amtrak as governmental for separation-of-powers purposes, *id.*

For the same reasons, the fact that CPB is not listed in the United States Government Manual, Pls.' SJ Mem. 16, does not affect the analysis. The U.S. Government Manual does not purport to be a legal document or a definitive expression of the Executive's view on the law. Rather, it is a handbook that provides salient information as to the identities of officials, summaries of agency missions, histories of agencies, and contact information for government components. U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About. As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" *Id.* Presumably, its omission simply reflects that the CPB did not submit any information for inclusion in the U.S. Government Manual. Notably, the GAO included the CPB in a report about "government corporations" even though the CPB had "reported" to GAO "that [it] w[as] not" a government corporation, because it is "frequently considered to be [a government corporation] by others and w[as] previously identified in several major [government corporation] studies done over the last 15 years." Gov't Accountability Office, Government Corporations: Profiles of Existing Government Corporations at 2 n.4, 160 (1996), https://www.gao.gov/assets/ggd-96-14.pdf. In any event, the CPB's

exclusion from the Manual does not change the fact that it is a corporation created "by special law, for the furtherance of governmental objectives," and the government "retains for itself permanent authority to appoint . . . the directors of that corporation." *Lebron*, 513 U.S. at 399.

Plaintiffs cite Supreme Court and D.C. Circuit precedents, but those cases actually support the conclusion that the CPB is governmental for constitutional purposes. For example, in *FCC v. League of Women Voters*, 468 U.S. 364 (1984), the Supreme Court held that a law restricting public broadcasting stations that received CPB grants from engaging in editorializing violated the First Amendment. *Id.* at 366, 402. Plaintiffs point to language in the Court's opinion noting the objective of "assur[ing] the maximum freedom *[of local stations]* from interference with or control of program content," *id.* at 389 (emphasis added) (second alteration in original), and "that Congress was concerned with assur[ing] complete freedom from any Federal Government influence," *id.* at 394. But the Supreme Court referred to freedom of government influence *over public broadcast stations*, explaining that "[c]onsistently with this concern, Congress refused to create any federally owned stations and it expressly forbid the CPB to own or operate any television or radio stations." *Id.* at 394 (citing 47 U.S.C. § 396(g)(3)). That is, because the CPB itself is subject to significant federal government influence through the Act, forbidding CPB from owning broadcasting stations is a way to insulate those stations from federal influence. Therefore, the Supreme Court's analysis underscores that the CPB is governmental.

Plaintiffs also cite a D.C. Circuit case relying on § 398(a) to conclude that the FCC does not have general jurisdiction to regulate the CPB's compliance with the Act. *Accuracy in Media, Inc. v. FCC*, 521 F.2d 288, 292-93 (D.C. Cir. 1975). If anything, the fact that the CPB is not regulated by the FCC in a way that a private media company would be, so that the CPB can better pursue governmental objectives, suggests that the CPB is governmental, not a purely private entity.

And the D.C. Circuit acknowledged that despite the lack of general FCC jurisdiction, the federal government exercised substantial influence of the CPB, noting that the Act imposes many "statutory requirements" on CPB's operations and that "the appropriation process" provides a way for the government to influence CPB's activities." *Id.* at 294. These are among the factors relied on by the Supreme Court to conclude that Amtrak was governmental in the separation of powers analysis. *Ass'n of Am. R.Rs.*, 575 U.S. at 53 ("Amtrak is required to pursue numerous, additional goals defined by statute" and "is also dependent on federal financial support").

Finally, Plaintiffs argue that if the CPB is a part of the government, it is part of the Legislative Branch, not the Executive Branch. *See* Pls.' SJ Mem. 23. But nothing about the CPB is legislative. It plays no role in legislation or in providing support services to the legislative branch. In characterizing the CPB as legislative, Plaintiffs cite a case noting that Congress can exercise "oversight" over the CPB based on its control over appropriations and the fact that CPB must submit an annual report to Congress. Pls.' SJ Mem. 23 (citing *Accuracy in Media*, 521 F.2d at 294). But most executive agencies depend on annual appropriations for funding, and many also have regular requirements to report to Congress. *See generally* Congressionally Mandated Reports, https://www.govinfo.gov/app/collection/cmr (collecting recent congressionally mandated reports, organized by agency). The CPB's basic functions are to implement a statute, the PBA, and carry into effect Congress's general purposes through specific decisions and actions. *See* 47 U.S.C. § 396(a). Those tasks are fundamentally executive. CPB has done so in large part by deciding where to allocate funds through grants. This too is an executive function. *See generally* Grant-Making Agencies, https://www.grants.gov/learn-grants/grant-making-agencies (listing grant-making agencies throughout the Executive Branch).

Because the CPB is governmental for purposes of the separation of powers, the "fundamental element of executive-branch structure . . . that presidential appointees are subject to removal by the President," applies to the CPB.  27 Op. O.L.C. at 166.

### C.  The D.C. Nonprofit Corporation Act Independently Authorized the President's Removal of the Former Members

**1.**  Even if the CPB were viewed as a purely private nonprofit corporation, application of the D.C. Nonprofit Corporation Act would produce the same result: the President had the right to remove the former members.  That act sets the same default rule for Board members as the governing executive removal precedents, that the power to remove is incident to the power to appoint.  Specifically, the D.C. statute provides that "[e]xcept as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons."  D.C. Code § 29-406.08(e).  Under that default rule, because the CPB's Board members are "appointed by" the President, they "may be removed with or without cause by" the President.  *Id.*  This Court correctly (albeit preliminarily) concluded that this provision likely authorized the President's removal of the former members.  *See* PI Order 15 ("assuming that D.C. corporate law is controlling, the President (as the appointing person) was authorized to remove the three directors at the time he acted"). There is no reason to come to a different conclusion now.

Crucially, no provision of the CPB's Bylaws or Articles of Incorporation in effect as of the President's removal of the former on April 28, 2025, displaced the default rule that he, as the appointing authority, was authorized to remove them at will.[6]  The CPB's Articles of Incorporation

---

[6] The Articles of Incorporation in effect as of April 28, 2025, are contained in Exhibit A to the Supplemental Declaration of Evan Slavitt ("Suppl. Slavitt Decl."), ECF No. 12-1.  *See* Defs.' SOMF ¶ 1; Suppl. Slavitt Decl. ¶ 3; *id.* Ex. A, at 17-43.  The Bylaws of the CPB that were current as of April 28, 2025 were adopted as amended on September 13, 2021 (the "2021 Bylaws"), and also contained in that exhibit.  *See* Defs.' SOMF ¶ 2; Suppl. Slavitt Decl. Ex. A, at 45-58.  They

make no mention whatsoever of removal of Board members. *See generally* Suppl. Slavitt Decl., Ex. A, at 17-43. The 2021 Bylaws, in effect on April 28, 2025, also contain no restriction on removal of Board members. They provide that "[t]he method of appointment of Directors and their terms of office shall be as set forth in the Public Broadcasting Act of 1967 and any amendments thereto," but say nothing specifically about removal of Board members. 2021 Bylaws § 2.02. One of the Board's roles is to appoint several "Officers" to manage the Corporation. *Id.* § 4.01. In contrast to the Board, the Bylaws' provision for "[O]fficers appointed" includes a "Removal" subsection that states that "[a]ny officer appointed by the Board may be removed by the Board, and any officer appointed by the President [of CPB] and Chief Executive Officer under expressed delegated authority from the Board may be removed by the [CPB] President, whenever, in the judgment of the Board or the [CPB] President, the best interests of the Corporation will be served thereby." *Id.* § 4.04. Thus, the CPB knew how to include specific removal provisions in their Bylaws but chose not to modify the default rule for Board members. And even in setting the removal rules for Officers, the Bylaws adopt the default that the appointer may remove the appointee.

    **2.** Plaintiffs offer three arguments for why § 29-406.08(e) did not authorize the President to remove the former members,[7] but none is persuasive.

---

are also displayed on CPB's website. *See* By-Laws of the Corp. for Pub. Broad., As amended Sep. 13, 2021, https://cpb.org/sites/default/files/CPB%20By-Laws%20as%20amended%20September%2013%2C%202021.pdf.

[7] On May 15, 2025, the CPB Board purportedly amended the bylaws to restrict the President's authority to remove Board members. *See* CPB, Board of Directors, Meetings, May 15, 2025, https://perma.cc/7FUW-7YPL (purporting to adopt resolution amending the bylaws); By-Laws of the Corporation for Public Broadcasting, As amended May 15, 2025, § 2.11 (purported amended bylaws stating "[n]o Director may be removed from the Board by any person or authority, including the President of the United States, without a two-thirds vote of the other Directors confirming such removal"). Plaintiffs do not rely on this purported amendment in their summary judgment briefing, and for good reason. The former members were removed on April 28, 2025,

    **a.** *First*, Plaintiffs argue that § 29-406.08(e) does not apply to the CPB because it "did not exist" when Congress enacted the PBA, and the CPB is instead governed by the 1962 District of Columbia Nonprofit Corporations Act, Pub. L. No. 87-569, 76 Stat. 265 (1962). Pls.' SJ Mem. 26-27. This argument fails because the CPB is governed by the D.C. Nonprofit Corporation Act as it currently exists, not as it was enacted in 1962. "According to the 'reference' canon, when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209 (2019). To adopt another statute "as it existed when the referring statute was enacted," the referring statute must "refer[] to another statute by specific title or section number." *Id.* The PBA states that the CPB "shall be subject . . . to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act." 47 U.S.C. § 396(b). But it does not refer to a specific title or section number or contain any other textual indication that it intended to apply to the CPB a version of D.C. corporate law that was frozen in time. The District of Columbia Nonprofit Corporation Act, both at the time of the enactment of the PBA and currently, is a sprawling statute that sets forth the general body of statutory law governing D.C. nonprofit corporations. *See generally* Pub. L. No. 87-569, 76 Stat. 265 (1962); D.C. Code, tit. 29, ch. 4. The PBA adopts this general body of law as it is updated over time, including any subsequent amendments.

---

seventeen days before the purported adoption of the amendment to the bylaws. Therefore, even if that amendment were duly adopted and lawful, "the President (as the appointing person) was authorized to remove the three directors at the time he acted." PI Order 15. Moreover, the amendment was purportedly adopted by the Board that included the former members, who had already been removed from the Board and were then usurping their positions. *See* CPB, Board of Directors, Meetings, May 15, 2025, https://perma.cc/7FUW-7YPL (stating that resolution to amend bylaws was adopted by "[f]our in favor, one absent"). That flaw renders the purported amendment null and void. In any event, because the purported May 2025 amendment could not have had any effect on the validity of the President's earlier removal of the former members, the Court need not determine whether that purported amendment would have any effect on the President's authority to remove Board members in the future.

A recent Second Circuit decision, *United States v. Ho*, 984 F.3d 191 (2d Cir. 2020), is instructive. That case concerned a statute that made felony violations of "the Foreign Corrupt Practices Act" a violation of the federal money laundering statute. *Id.* at 202. The Second Circuit held that this referred to the FCPA as it currently exists, not as it existed when that provision of the money laundering statute was enacted in 1992: "In light of the money laundering statute's unambiguous incorporation by reference of the FCPA in its entirety, we reject Ho's suggestion that Congress was obliged to specify that its reference to the FCPA expressly included subsequent amendments to the statute." *Id.* at 203 (cleaned up). So too here, the PBA's general reference to the D.C. Nonprofit Corporation Act includes subsequent amendments to that statute. It is true, as Plaintiffs point out, that Congress has not affirmatively amended the PBA since 2011 to specifically adopt D.C. Code § 29-406.08(e). But the Second Circuit rightly "reject[ed] [the] suggestion that because Congress *could have* amended" a statute referencing another statute to "specifically include later . . . amendments [to the referenced statute], its failure to do so reflects an intent to exclude those subsequent amendments." *Ho*, 984 F.3d at 203.

Furthermore, it would be absurd to read the PBA as applying the archaic 1962 version of the D.C. Nonprofit Corporations Act to the CPB. That statute conferred general regulatory authority over nonprofit corporations on "the Commissioners of the District of Columbia," Pub. L. No. 87-569, § 2(i), 76 Stat. 267; *see also id.* § 93, 76 Stat. 301-02 (describing the duties and functions of the Commissioners under the statute), meaning the presidentially-appointed Commissioners who governed the District before the era of home rule. But Plaintiffs could not seriously contend that the CPB, alone among D.C. corporations, is regulated by the District's pre-home rule government that has not existed for more than a half century. Indeed, Plaintiffs elsewhere acknowledge that current D.C. nonprofit corporate law, as embodied by the D.C.

28

Nonprofit Corporation Act of 2011, applies to the CPB.  Plaintiffs have repeatedly cited and relied on various provisions of the modernized D.C. Nonprofit Corporation Act of 2011.  *See*, *e.g.*, Pls.' SJ Mem. 10 (citing D.C. Code § 29-406.03); Pls.' Reply in Supp. Of Mot. for TRO, ECF No. 12, at 16 (citing D.C. Code § 29-406.24); *id.* at 17 (citing D.C. Code § 29-401.01); *id.* (citing D.C. Code § 29-406.01); *id.* (citing D.C. Code § 29-406.03).  And the CPB's Bylaws contain an entire Article devoted to the Designated Body, a mechanism adopted in the D.C. Nonprofit Corporation Act of 2011 for handling a scenario in which less than three directors are serving, that did not exist in the 1962 version.  *See* 2021 Bylaws Art. V; D.C. Code § 29-406.12.

**b.**  *Second*, Plaintiffs argue that to the extent D.C. Code § 29-406.08(e) authorizes removal of Board members of the CPB, it is not "consistent with" the PBA, 47 U.S.C. § 396(b)(1), and therefore does not govern.  *See* Pls.' SJ Mem. 27-32.  The Court already correctly rejected this argument, concluding that it was "unpersuaded" that D.C. law was "inconsistent with the PBA" in "permit[ing] the President unilaterally to remove the three directors."  PI Order 15.  As explained above, the PBA does not restrict the President from removing Board members.  To the contrary, by empowering the President to appoint Board members without any clear restriction on removal, the PBA confers on the President the incident power of removal.  *See supra*, pp. 10-14.

**c.**  *Third*, Plaintiffs argue that because Senate confirmation is required for the President's appointment of Board members, § 29-406.08(e) also requires the Senate to confirm the removal of Board members.  Pls.' SJ Mem. 32-34.  The Court already correctly rejected this argument as well. PI Order 19-20.  The statute provides: "Except as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons."  D.C. Code § 29-406.08(e).  This statute establishes a default rule that the person or persons whom a director "is appointed by"

"may . . . remove[]" that director "with or without cause." *Id.* Here, CPB Board members are appointed by the President alone, albeit with the advice and consent of the Senate. *See* 47 U.S.C. § 396(c)(1) (CPB Board members are "appointed by the President, by and with the advice and consent of the Senate"). Therefore, the President, as the appointing authority, has authority to remove at will.

Plaintiffs argue that the President and Senate "*collectively* appoint" Board members and therefore must "*collectively* remove" them. Pls.' SJ Mem. 32. But as the Court explained, this argument "misunderstands the difference in meaning between 'appoint' and 'advise and consent.'" PI Order 19. "[I]t is, in fact, the President who makes the appointment," "not . . . the President and the Senate . . . ." *Id.* at 19-20. The Court's view is consistent with the Supreme Court's decision in *Myers*, in which Chief Justice Taft explained that the Senate's advise and consent authority does not "make the Senate part of the removing power." 272 U.S. at 119. Chief Justice Taft gave "great weight" to the views of Oliver Ellsworth, a Senator in the First Congress and later a Chief Justice, who explained: "The advice of the Senate does not make the appointment. The President appoints." *Id.* at 122 (quoting 2 Bancroft, History of the Constitution of the United States, 192). As Chief Justice Taft concluded: "The power of removal is incident to the power of appointment, not to the power of advising and consenting to appointment." *Id.*

Plaintiffs cite several state corporate law cases in support of their position that the Senate must confirm the President's removal of CPB Board members, Pls.' SJ Mem. 32-34, "but none of the cases that they cite are even remotely analogous." PI Order 20. Those cases involve appointments jointly by multiple individuals or a body of individuals, or election by a class of individuals, not appointment by a single person with the concurrence of another person or body. *See id.* at 20 n.3 (explaining why the cases cited by Plaintiffs are inapposite).

Plaintiffs' view that the D.C. Nonprofit Corporation Act requires Senate confirmation of presidential removals of CPB Board members is not only wrong as a matter of statutory interpretation, but would also raise severe constitutional doubt under *INS v. Chadha*, 462 U.S. 919 (1983). In *Chadha*, the Supreme Court held that statutes authorizing one-house legislative vetoes were unconstitutional and held that generally, Congress can only act through the Constitution's procedures of bicameralism and presentment. *See id.* at 955-56. This Court should not construe D.C. corporate law in a way that would create such severe constitutional doubt.

## II.     Each Claim in the Complaint Fails for an Independently Sufficient Reason

As explained above, all of Plaintiffs' claims fail because their core contention that the President lacked authority to remove the former members is incorrect. *See supra*, Part I. Each of the four causes of action asserted in the Complaint fails for an independently sufficient reason.

**1.** Plaintiffs first bring a claim under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, seeking a declaration that the President's removal of the former members was unlawful. *See* Compl. ¶¶ 44-47. "But it is well settled that the Declaratory Judgment Act does not provide a private right of action; it only authorizes a form of relief." *Bellinger v. Bowser*, 288 F. Supp. 3d 71, 79 (D.D.C. 2017). Therefore, where plaintiffs "have not alleged a cognizable cause of action," they "have no basis upon which to seek declaratory relief." *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011). As explained below, Plaintiffs' other purported causes of action are not cognizable.

**2.** Plaintiffs next bring a claim under the APA, 5 U.S.C. § 706(2), contending that the President's removal of the former members was not in accordance with law and in excess of statutory authority. This claim fails because Plaintiffs do not challenge any "agency action" under the APA. 5 U.S.C. § 702.

The former members were removed by the President, but it is well established that the President is not an agency under the APA. *Franklin*, 505 U.S. at 800-01. Plaintiffs try to circumvent this limitation by asserting that the former members were removed by Mr. Morse, Deputy Director of the Presidential Personnel Office of the Executive Office of the President. Compl. ¶ 55. Yet as Plaintiffs concede, the former members were removed "by the President." *Id.* ¶ 70. The fact that Mr. Morse sent emails notifying Plaintiffs of the President's action to remove them does not convert the President's removal into an action of the Presidential Personnel Office, any more than every agency regulation is an action of the National Archives and Records Administration ("NARA") because NARA prints them in the Federal Register.

In any event, the Presidential Personnel Office is also not an agency under the APA. "[A] component of the Executive Office [of the President] whose sole function [i]s to 'advise and assist the President' would not be an agency under . . . the Administrative Procedures Act." *Alexander v. FBI*, 691 F. Supp. 2d 182, 189 (D.D.C. 2010) (quoting *Soucie v. David*, 448 F.2d 1067, 1075 (D.C. Cir. 1971)), *aff'd* 456 F. App'x 1 (D.C. Cir. 2011). The Presidential Personnel Office is not an agency because it advises and assists the President in personnel functions but does not exercise "substantial independent authority" from the President. *Soucie*, 448 F.2d at 1073.

Nor do Plaintiffs make out an APA claim against the Office of Management and Budget (OMB) and Director Vought. Plaintiffs have never alleged or provided evidence that OMB played any role in removing the former members. The Complaint contains no allegations of any actions by OMB or Director Vought, mentioning them only to list them as parties. *See* Compl. ¶¶ 8-9. And Plaintiffs do not mention OMB or Director Vought once in either their summary judgment brief or their supporting declaration. *See generally* Pls.' SJ Mem.; Slavitt SJ Decl.

**3.**    Plaintiffs next bring a nonstatutory ultra vires cause of action, asserting that the President exceeded his authority by removing the former members. Compl. ¶¶ 57-63. Such claims are highly disfavored, however, "[b]ecause ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes . . . ." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025).  As a result, an ultra vires claim "applies only when an agency has taken action entirely 'in excess of its delegated powers,'" and "'contrary to a *specific prohibition*' in a statute." *Id.* (emphasis in original) (quoting *Bhd. of Ry. & Steamship Clerks v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 660 (1965)).  Thus, the Supreme Court recognized that an ultra vires claim "'is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds.'" *Id.* at 681-82 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)); *see also Nat'l Treas. Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *18 (D.C. Cir. Aug. 15, 2025) ("*ultra vires* claims[] are 'extremely limited' in scope").

Plaintiffs' claim falls well short of the end zone.  There is no "*specific prohibition*" against the removal of a CPB Board member in the PBA.  *Nuclear Regul. Comm'n*, 605 U.S. at 681 (citation omitted). As explained, there is no express removal restriction anywhere in the statute. *See supra*, pp. 10-14.  This is why Plaintiffs ask the Court to infer an implicit removal restriction from various features of the PBA.  Such arguments are insufficient to meet the high bar set for an ultra vires claim in violation of a statute that does not otherwise provide a cause of action.  *Nuclear Regul. Comm'n*, 605 U.S. at 681-82.

**4.** Finally, Plaintiffs bring a claim labeled as Violation of the Presentment, Appropriations, and Take Care Clauses.  Compl. Count IV.  In this claim, Plaintiffs contend that because the President's removal of the former members was purportedly beyond his authority under the PBA, it "constitute[d] a partial, unilateral repeal or amendment of the [PBA] by the President, an action

which he has no authority to take without Congress effecting the repeal through legislation." *Id.* ¶ 70. But Plaintiffs point to no evidence that the President has repealed or amended the PBA, other than that he has taken a discrete action that Plaintiffs contend is in excess of his authority under the PBA. This is transparently an attempt to couch a claim of a statutory violation as a constitutional claim. But the Supreme Court and D.C. Circuit have rejected the "reasoning that 'whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine,' and therefore 'judicial review must be available to determine whether the President has statutory authority for whatever action he takes.'" *Glob. Health Council v. Trump*, No. 25-5097, --- F.4th ---, 2025 WL 2480618, at *6 (D.C. Cir. Aug. 28, 2025) (quoting *Dalton v. Specter*, 511 U.S. 462, 471 (1994)). A plaintiff may not "transform a statutory claim into a constitutional one to avoid limits on judicial review." *Id.* at *8. Where, as here, a "constitutional claim is predicated on underlying statutory violations," *id.*, plaintiffs may not bring a freestanding constitutional claim.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and enter judgment in favor of Defendants.

Dated:  August 29, 2025

Respectfully Submitted,


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 532-3114
Fax: (202) 616-8470
Email: jeremy.s.newman@usdoj.gov

*Attorneys for Defendants*